Bruce Berline
BERLINE & ASSOCIATES, LLC
Second Floor, Macaranas Building
PO Box 5682 CHRB
Saipan, MP 96950
Tel.: (670) 233-3663
Fax: (670) 233-5262
Email: bruce@saipanlaw.com

Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

TIANMING WANG, DONG HAN,          )
YONGJUN MENG, LIANGCAI SUN,       )
YOULI WANG, QINGCHUN XU,          )
and XIYANG DU                     )
                                  )  **Case No. CV-18-00030**
          Plaintiffs,             )
                                  )
          v.                      )  **FIRST AMENDED COMPLAINT**
                                  )
GOLD MANTIS CONSTRUCTION          )
DECORATION (CNMI), LLC,           )
MCC INTERNATIONAL SAIPAN LTD.     )
CO., and IMPERIAL PACIFIC         )
INTERNATIONAL (CNMI), LLC,        )
                                  )
          Defendants.             )

**INTRODUCTION**

1.   Plaintiffs are seven men from China who incurred significant debts to pay large recruitment fees based on promises of high-paying construction jobs in Saipan. Instead, Plaintiffs were forced by their employers to work long hours for below minimum wage under extremely dangerous and inhumane conditions on the Imperial Pacific casino construction site.

1

2. Imperial Pacific, the subsidiary of a Hong Kong-based company, hired multiple Chinese construction firms to build its casino and resort in Saipan, including the state-owned conglomerate MCC and the publicly-traded company Gold Mantis. Plaintiffs were employed by the Saipan-based subsidiaries of these companies.

3. Plaintiffs paid fees sometimes exceeding U.S. $8,000 to recruiters in China for their jobs in Saipan. Many of them had to borrow money from loan sharks at high interest rates, using their land or homes as collateral, in order to pay these fees. Upon arriving in Saipan, managers at MCC and Gold Mantis then extracted additional fees from Plaintiffs before permitting them to work. Although Plaintiffs had been promised that they could work in Saipan for multiple years or even obtain green cards, they later learned that they lacked legal authorization to work in Saipan.

4. Plaintiffs were required to work over 12 hours per day without any rest day, and sometimes were forced to work a 24-hour shift. Even though Plaintiffs' pay rate was already below the legal minimum wage, their employers systematically withheld a portion of their earned wages and often failed to pay them anything for weeks at a time. Plaintiffs were crammed into dormitories, some of which had no showers or air-conditioning. Their supervisors yelled and cursed at them, and forced them to pay fines if they did not work hard enough or arrived late. The Imperial Pacific construction site was also extremely dangerous. The injury incidence rate exceeded the national average as untrained and inexperienced workers were pushed to work around-the-clock while basic safety precautions were ignored.

5. Despite the dehumanizing conditions of their employment, Plaintiffs were coerced into continuing to work for their employers. Plaintiffs faced immense pressure to repay the large (and growing) debts incurred in China, and were told by their employers that if they left

2

their job, nobody else would hire them. One Gold Mantis supervisor, who had already physically beaten another employee, threatened to kill Plaintiffs if they disobeyed him. MCC and Gold Mantis managers also repeatedly told them that because they were in Saipan illegally, it would be useless to complain to the authorities.

6.    Imperial Pacific knew about or, at a minimum, recklessly disregarded its contractors' exploitative and illegal practices. Imperial Pacific was repeatedly told about the use of unauthorized workers on its construction site. Unpaid Gold Mantis and other construction workers protested publicly in the streets. However, rushing to complete the project, rather than remedy the situation, Imperial Pacific and its contractors sought to conceal their illegal scheme from government authorities, medical providers, and any other party that might hold them accountable. Imperial Pacific and its contractors denied entry to an investigator from the Occupational Safety and Health Administration ("OSHA") who came to inspect safety conditions on the worksite. The unauthorized Chinese workers were also told to hide when government inspectors did come to the worksite or dormitories. In the meantime, Imperial Pacific earned billions of U.S. dollars in revenue from its casino operations.

7.    Each Plaintiff suffered a physical injury while working for Gold Mantis on the Imperial Pacific project, including a badly burnt leg, scalded hand, and partially severed finger. Workers' compensation insurance was never purchased for Plaintiffs. After they were injured, Gold Mantis refused to take the workers to the hospital and threatened Plaintiffs that they risked being deported if they sought medical attention on their own. When Plaintiffs later complained to Gold Mantis' lawyer in Saipan about their injuries, he promised that they would be compensated once they returned to China. However, despite having returned to China, no Plaintiff has received a penny in compensation for his injury.

When Plaintiffs' attorney raised this with Gold Mantis, the company denied that the workers were its employees and refused to take any responsibility.

8. Plaintiffs bring this action to seek compensation for the abuse, mistreatment, and injuries suffered while working on the Imperial Pacific project in Saipan. Specifically, Plaintiffs allege claims against all defendants – Imperial Pacific, MCC, and Gold Mantis – for (i) forced labor under the federal Trafficking Victims Protection Reauthorization Act, (ii) forced labor under the CNMI Anti-Trafficking Act, (iii) negligence resulting in their workplace injuries, and (iv) failing to secure compensation for their workplace injuries under CNMI law.

## JURISDICTION & VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because it involves civil actions arising under the laws of the United States.

10. This Court has supplemental jurisdiction over Plaintiffs' causes of action based on the laws of the Commonwealth of the Northern Mariana Islands ("CNMI") pursuant to 28 U.S.C. § 1367(a), because they arise from the same nucleus of facts as supports the federal claims.

11. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1), because Defendants reside in the CNMI, and pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the causes of action occurred in the CNMI.

## PARTIES

12. Plaintiff Tianming Wang (Mr. Tianming Wang) is a resident and citizen of the People's Republic of China.

13. Plaintiff Dong Han (Mr. Han) is a resident and citizen of the People's Republic of China.

4

14. Plaintiff Yongjun Meng (Mr. Meng) is a resident and citizen of the People's Republic of China.

15. Plaintiff Liangcai Sun (Mr. Sun) is a resident and citizen of the People's Republic of China.

16. Plaintiff Youli Wang (Mr. Youli Wang) is a resident and citizen of the People's Republic of China.

17. Plaintiff Qingchun Xu (Mr. Xu) is a resident and citizen of the People's Republic of China.

18. Plaintiff Xiyang Du (Mr. Du) is a resident and citizen of the People's Republic of China.

19. Plaintiffs do not speak, understand, write, or read English.

20. Mr. Tianming Wang, Mr. Han, Mr. Meng, Mr. Sun, Mr. Youli Wang, Mr. Xu, and Mr. Du are referred to collectively as "Plaintiffs".

21. Defendant Gold Mantis Construction Decoration (CNMI), LLC ("Gold Mantis") is, and was at all time relevant hereto, a limited liability company created and existing under CNMI law with its principal office located in Saipan, CNMI.

22. Upon information and belief, Gold Mantis is a wholly owned subsidiary of an entity in China ("Gold Mantis China") named either Gold Mantis (International) Construction Decoration Limited, Gold Mantis (China) Construction Decoration Limited, or Suzhou Gold Mantis Construction Decoration Co., Ltd.

23. Upon information and belief, Gold Mantis China is a public company traded on the Shenzhen Stock Exchange.

24. Upon information and belief, towards the end of 2015, Gold Mantis China invested U.S. $30 million into a subsidiary entity in Saipan.

25. Upon information and belief, Gold Mantis entered into a contract with Imperial Pacific on December 24, 2015, and again on December 24, 2016, to build a casino resort in Saipan.

26. Defendant MCC International Saipan Ltd. Co. ("MCC") is, and was at all time relevant hereto, a limited liability company created and existing under CNMI law with its principal office located in Saipan, CNMI.

27. Upon information and belief, MCC is a subsidiary of two entities in China based in Beijing: MCC International Incorporation Ltd., which is a 95 percent member of MCC, and MCC International Trading Co., Ltd., which is a 5 percent member of MCC. Upon information and belief, MCC International Incorporation Ltd. is a subsidiary of Metallurgical Corporation of China, Ltd., a Chinese state-owned enterprise.

28. Upon information and belief, in 2015, MCC International Incorporation Ltd. entered into a contract for RMB 610 million (approximately U.S. $90 million) to build the first phase of the Imperial Pacific casino resort complex.

29. Defendant Imperial Pacific International (CNMI), LLC ("Imperial Pacific") is, and was at all time relevant hereto, a limited liability company created and existing under CNMI law with its principal office located in Saipan, CNMI.

30. Upon information and belief, Imperial Pacific is a wholly owned subsidiary of an entity named Imperial Pacific International Holdings Limited, which was incorporated in Bermuda, has a principal place of business in Hong Kong, and is traded on the Hong Kong Stock Exchange.

31. The 2017 annual report of Imperial Pacific International Holdings Limited lists no fewer than ten subsidiaries incorporated in the CNMI for the purposes of owning or leasing a property interest there.

32. Gold Mantis, MCC, and Imperial Pacific are referred to collectively as "Defendants".

**FACTS**

**Defendants recruit unauthorized and inexperienced workers
in their rush to finish construction of the casino**

33. The CNMI is a commonwealth of the United States consisting of fourteen islands in the northwestern Pacific Ocean, one of which is Saipan.

34. Saipan is a small island with a population of roughly 50,000 people.

35. Saipan is thousands of miles away from mainland China.

36. Imperial Pacific was granted an exclusive license to build casino resorts in Saipan. The first of these was to be built on a site in Garapan on the island of Saipan (the "Casino Project").

37. Upon information and belief, Imperial Pacific was the developer of the Casino Project, and possessed and controlled the land on which it was being constructed.

38. Imperial Pacific hired multiple Chinese construction companies to work on the Casino Project, including Gold Mantis, MCC, Beilida New Materials System Engineering Co. Ltd. ("Beilida"), and Sino Great Wall International Engineering Co. LLC ("Sino Great Wall").

39. Defendants operated with great urgency to complete the Casino Project.

40. Imperial Pacific was contractually obligated to open the casino in March 2017, and there was a possibility that if the casino was not completed on time, the local government might revoke Imperial Pacific's exclusive license.

41. Imperial Pacific initially planned to open the casino in January, 2017.

42. Imperial Pacific projected it would need about 2,000 workers for the Casino Project.

43. In January, 2016, the CNMI Department of Labor said there were only about 1,000 construction workers in the CNMI, which meant that there was an "obvious" labor shortage and that the price of local workers was rising.

44. In fiscal year 2016, all of the 12,999 available CW-1 permits were granted by May, 2016.

7

45. Upon information and belief, Defendants arranged for workers from China to enter Saipan as "tourists" but then work on the Casino Project.

46. In January, 2016, in response to reports of unauthorized workers on the Casino Project, the CNMI Casino Commission instructed Imperial Pacific to revisit its agreements with its contractors and demand that their employees are all legally authorized to work.

47. In its annual report for 2016, Imperial Pacific reported having "over 2,000 construction workers" on the Casino Project who were "working around-the-clock to ensure timely completion" of the casino.

48. In or around April, 2016, in response to numerous violations at the construction site, the CNMI Bureau of Environmental and Coastal Quality revoked permission for workers on the Imperial Pacific site to work extended hours. The very next day Imperial Pacific allegedly had workers laboring late into the night and on Sunday. The Bureau stated that Imperial Pacific committed "flagrant violations" of the working hours stipulation in its permit and in a letter from the Bureau suspending work hours on the project site.

49. In January, 2017, Imperial Pacific was still "rushing to finish" the Casino Project, and had rescheduled the casino opening to "sometime in February."

50. In or around February, 2017, Victor Hocog, the CNMI Lieutenant Governor, told Imperial Pacific that federal authorities were investigating the presence of unauthorized workers on the Casino Project.

51. In March, 2017, because significant progress had been made on the Casino Project, the CNMI Casino Commission granted Imperial Pacific an extension to finish construction.

**Plaintiffs' recruitment to and employment in Saipan**

52. Plaintiffs and many of the other Chinese construction workers on the Casino Project paid large recruitment fees for jobs in Saipan based on the promise of good conditions, high wages, legal work status, and immigration benefits. Some Plaintiffs were specifically promised jobs working on the Casino Project.

53. Plaintiffs borrowed money, often at high interest rates, to pay these recruitment fees. In some instances, Plaintiffs used their home as collateral to borrow this money.

54. Plaintiffs and their coworkers later discovered that they were not legally authorized to work in Saipan.

55. Defendants' managers referred to employees lacking work visas as "*heigong*", which literally means "black worker" in Chinese and implies that the person lacks legal status.

56. Upon information and belief, individuals and/or entities working for, with, or on behalf of Defendants were involved in recruiting workers from China who they knew lacked work visas and were paying recruitment fees for their jobs. These individuals and/or entities often received a financial benefit from the workers' payment of those recruitment fees.

57. Plaintiffs Mr. Han, Mr. Sun, and Mr. Tianming Wang (collectively, "MCC/GM Plaintiffs") worked for MCC in Saipan prior to working for Gold Mantis.

58. A recruitment agency in China promised Mr. Han that if he paid RMB 55,000 (over U.S. $8,000) then it would arrange for him to work for MCC in Saipan for a minimum of three years at a high monthly salary, with room and board provided.

59. Based on this promise, Mr. Han borrowed RMB 55,000, which needed to be repaid with interest and was collateralized by his home.

60. A recruiter in China charged Mr. Sun RMB 55,000 for a job that would allow him to

9

eventually obtain a green card.

61. In order to pay these fees, Mr. Sun borrowed RMB 55,000 at a high interest rate and used his land as collateral for the loan.

62. In exchange for a substantial recruitment fee, Plaintiff Meng was promised a job with Gold Mantis in Saipan for which he would receive a salary paid monthly and which did not require a visa.

*Employment by MCC*

63. Upon arriving in Saipan, MCC/GM Plaintiffs were required to pay an additional fee of U.S. $2,000 for the job at MCC.

64. While employed by MCC, MCC/GM Plaintiffs regularly worked 12 or more hours per day with no days off to rest.

65. MCC/GM Plaintiffs were not free to refuse overtime work assigned by MCC.

66. MCC was never current in its payment of wages to MCC/GM Plaintiffs, but always owed them money for work previously performed. MCC/GM Plaintiffs believed that if they left their job at MCC, they would not receive these owed wages.

67. MCC systematically paid workers less than the minimum wage required under applicable laws, and less than what MCC/GM Plaintiffs were promised in China.

68. MCC deducted a portion of Mr. Han's wages and paid it to his labor broker in Saipan.

69. MCC/GM Plaintiffs were forced to purchase their own personal protective equipment, such as work boots and gloves.

70. MCC managers told MCC/GM Plaintiffs that if they did not work hard, or if they complained, they would be sent back to China.

71. MCC managers told MCC/GM Plaintiffs that it would be useless for them to complain to

anyone because they were *heigong*.

72. MCC managers told MCC/GM Plaintiffs that the company would not be responsible if they got injured because they were in Saipan illegally.

73. MCC managers told MCC/GM Plaintiffs not to be out in public or associate with people other than their co-workers.

74. MCC managers told MCC/GM Plaintiffs that if they quit, nobody else would hire them.

75. MCC/GM Plaintiffs believed that if they quit their job at MCC, because they were unauthorized to work in Saipan, they would not be able to find other work.

76. MCC managers held MCC/GM Plaintiffs' passports while they worked for the company.

77. In the dormitory where Mr. Tianming Wang and Mr. Sun lived, twelve men were housed in each room.

78. Mr. Han lived in a dormitory with no air conditioning or showers when he worked for MCC.

79. While working for MCC, Mr. Han needed to walk outside for over 10 minutes in order to shower, and sometimes needed to wait for nearly an hour to use the shower.

*Employment by Gold Mantis*

80. Gold Mantis manager, Xianghu Kong ("Supervisor Kong"), charged Plaintiffs an additional U.S. $1,000 fee for their job, to be either paid upfront or deducted from their wages.

81. Gold Mantis required Plaintiffs to wear construction boots and "Gold Mantis" shirts and hardhats.

82. Gold Mantis deducted money from Plaintiffs' wages for their boots and work clothing.

83. Gold Mantis set Plaintiffs' work schedule and assigned their work duties.

84. Plaintiffs and their coworkers regularly worked 12 or more hours per day.

85. Plaintiffs were required to work shifts of approximately 24 hours on occasion.

11

86. Plaintiffs were not free to refuse overtime work assigned by Gold Mantis.

87. Gold Mantis set Plaintiffs' rate of pay and decided whether, when, and how to pay them.

88. Gold Mantis arranged Plaintiffs' housing, meals, and transportation to and from the worksite. Plaintiffs lived in the same dormitory, traveled to and from the worksite on the same buses, had their meals prepared in the same kitchen, and worked alongside Gold Mantis' CW-1 employees.

89. Gold Mantis executives and managers performed a safety inspection of one of the dormitories in which some Plaintiffs and other Gold Mantis employees lived.

90. Gold Mantis maintained records concerning Plaintiffs' work, including the number of days worked by each Plaintiff. Gold Mantis supervisor Changwei Shang kept track of Plaintiff Youli Wang's attendance.

91. Gold Mantis had and exercised the power to hire, fire, and discipline Plaintiffs.

92. During the night shift, when Plaintiff Youli Wang stopped to rest, Gold Mantis manager Zhengwei Zhang criticized him and told him to work harder.

93. A Gold Mantis manager in charge of safety on the site, Mr. Wangxiong Liu, was regularly present at the Casino Project. He frequently told Plaintiffs to pay attention to safety, and told Plaintiffs during staff meetings that the company would not be responsible for workers on tourist visas who got injured on the job.

94. Gold Mantis systematically paid workers less than the minimum wage required under applicable laws and less than they had been promised by their recruiters in China.

95. Supervisor Kong routinely paid Plaintiffs for one less hour of overtime each day than they had actually worked.

96. Gold Mantis consistently failed to pay Plaintiffs' wages in a timely manner. Plaintiffs were

12

always owed wages at any given time.

97. Mr. Meng was never paid any wages in the entire time he was employed by Gold Mantis.

98. Plaintiffs believed that if they quit their job at Gold Mantis, then they would not receive the wages that they had already earned but not yet been paid.

99. Plaintiffs knew of one worker who left his job at Gold Mantis and never received over U.S. $1,000 in wages that he had earned.

100. When providing breakfast to its employees, Gold Mantis often permitted the employees with valid CW-1 work visas to eat first and then Plaintiffs and other *heigong* needed to share whatever food was left over.

101. Upon information and belief, Supervisor Kong and other Gold Mantis managers were aware that Plaintiffs incurred large debts to come work in Saipan. Plaintiff Youli Wang had conversations with Zhengwei Zhang, a Gold Mantis manager, about this fact.

102. During meetings, Supervisor Kong told Plaintiffs and their coworkers that they must work hard in order to repay their debts.

103. Supervisor Kong often screamed and cursed at Plaintiffs.

104. In several cases, Supervisor Kong summarily fired workers in anger over a single incident, such as when an employee took a rest during work.

105. During meetings with Plaintiffs and their coworkers, Supervisor Kong announced fines that he imposed on workers for not working hard enough. The fines were sometimes U.S. $50 for a single incident.

106. When Plaintiff Xu was late for work one day, Supervisor Kong fined him U.S. $20.

107. If an employee took off one day to rest without permission (which was rarely, if ever, granted), Supervisor Kong would deduct pay from his wages.

13

108. When Plaintiff Xu said that he was unable to work the overtime shift and needed to rest, Supervisor Kong fined him U.S. $50.

109. Supervisor Kong intimidated Plaintiffs by threatening to physically harm any employee who challenged him or was not entirely obedient to him.

110. Supervisor Kong told Plaintiffs that if they get injured, or even if they die, nobody would care because they were *heigong*.

111. Supervisor Kong told a group of employees, including some Plaintiffs, that if they did something to hurt his personal interest, he would kill them.

112. Supervisor Kong told Plaintiffs that it is not unusual for a Chinese person to be killed in Saipan and that nobody would notice if a few Chinese people "disappeared."

113. Upon information and belief, Supervisor Kong physically assaulted a Gold Mantis employee who then needed to be hospitalized. Despite their awareness of this incident, Gold Mantis managers did not terminate Supervisor Kong.

114. Plaintiffs feared that if they left their job at Gold Mantis, or otherwise hurt Supervisor Kong's interest, he might physically injure or kill them.

115. Gold Mantis systematically discouraged its employees from contacting government, medical, or other authorities outside of the company, including by threatening them that they were in Saipan illegally and could be arrested or deported at any time.

116. Gold Mantis managers instructed Plaintiffs not to go to public places or interact with others because they could be detained and deported.

117. Gold Mantis managers told Plaintiffs to hide at the beach one day because government authorities were coming to inspect their dormitory.

118. Numerous Gold Mantis managers, including Supervisor Kong, manager Zhengwei Zhang,

and supervisor Chengwei Shang, instructed Plaintiffs to hide if government authorities ever came to the worksite to avoid being arrested and deported to China.

119. During meetings, Supervisor Kong suggested that it was useless for Plaintiffs to complain about their situation to government authorities because they would just be arrested and deported to China.

120. Gold Mantis managers told Plaintiffs that if they quit their job, no other employers in Saipan would hire them.

121. Plaintiffs believed that if they quit their job at Gold Mantis, because they were unauthorized to work in Saipan, they would not be able to find other work.

122. Plaintiffs did not complain about or object to Supervisor Kong's abusive treatment because they feared that he would punish, fire, or physically harm them.

123. Upon information and belief, in or around March, 2017, after the FBI began investigating Casino Project contractors, Gold Mantis managers and supervisors returned to China while Plaintiffs and their coworkers were left unpaid in decrepit housing without food and water.

124. After some Gold Mantis supervisors fled Saipan, Mr. Wei Yuan, a Gold Mantis manager, came to the workers' dormitory to discuss the wages still owed to them.

125. After numerous protests, through settlements with the U.S. Department of Labor announced in May, 2017, MCC, Gold Mantis, and other Imperial Pacific contractors agreed to pay millions of dollars to Plaintiffs and other workers as compensation for violations of the federal wage and hour laws.

126. In or around May, 2017, Gold Mantis expressed to the CNMI Casino Commission that it wished to do additional work on the Casino Project.

15

**Defendants utterly disregarded the safety of the workers**

127. Defendants showed a reckless disregard for safety conditions on the worksite and the safety or well-being of the Chinese construction workers, including Plaintiffs.

128. Upon information and belief, OSHA conducted trainings for Defendants to ensure their awareness of and compliance with federal workplace health and safety laws, including that all injuries must be reported.

129. Upon information and belief, MCC was the general contractor on the Casino Project and shared responsibility for ensuring safety on the entire worksite, such as through taking measures relating to working conditions, worker training, and using protective equipment.

130. Upon information and belief, Gold Mantis shared responsibility on the Casino Project for ensuring safety of its portion of the worksite and its workers, such as through taking measures relating to working conditions, worker training, and using protective equipment.

131. Defendants knew of the unsafe conditions on the Casino Project, but did not take actions within their authority to appropriately address the situation and ensure workers' safety.

132. Upon information and belief, Defendants knew that in February, 2016 an MCC worker on the Casino Project had his leg crushed after an improperly secured pipe fell from a crane.

133. Upon information and belief, Defendants knew that generators weren't properly grounded, workers were missing basic personal protective equipment such as safety glasses and appropriate footwear, and welders lacked the necessary training to handle torches.

134. On December 4, 2016, MCC reported to OSHA that a worker on the Casino Project died of a heart attack.

135. On December 6, 2016, a Compliance Safety and Health Officer ("CSHO") from OSHA went to the Casino Project to investigate claims of a large number of workers being seriously injured and a reported worker death due to a heart attack.

136. When the CSHO approached the Casino Project, he was able to observe workers exposed to fall hazards because they were climbing between levels of scaffolding without continuous fall protection.

137. The CSHO explained the reason for the inspection to a group of Defendants' representatives, including safety consultants, representatives from Imperial Pacific and Gold Mantis, and Chuck McDonald, legal counsel for Imperial Pacific.

138. Defendants did not permit the CSHO to enter the Casino Project site on December 6, 2016.

139. According to Assistant U.S. Attorney James J. Benedetto, the inspection was prompted by an online complaint by a doctor working at the Commonwealth Health Center's emergency room reporting serious injuries at the project on a daily basis.

140. As part of an application seeking a warrant for OSHA to inspect the Casino Project, the CSHO filed an affidavit, dated December 15, 2016 ("OSHA Affidavit"), which included a spreadsheet showing approximately 80 serious injuries from the worksite logged at the hospital in Saipan ("CHCC") from January 1 to December 6, 2016. The breakdown of injuries included: hit by moving/falling item (43); fall from height of one to twenty meters (9); injured by power tool (12); cut by metal/wood (7); pain after lifting (2); stepped on nail (3); infected wound (1); stepped in hole (1); twisted ankle (1); electrocution (1).

141. The OSHA Affidavit stated that the injury incidence rate on the Casino Project "greatly exceeds" the national average.

142. The OSHA Affidavit stated that after a worker on the Casino Project fell and broke his back, the treating physician recommended that the worker be admitted and not transported, but the injured person's employer refused to admit him and promptly transported him back to China instead.

143. Upon information and belief, Defendants did not grant the CSHO access to the Casino Project to perform an investigation prior to December 15, 2016.

144. Upon information and belief, OSHA conducted an inspection of the Casino Project from December 16-22, 2016.

145. Upon information and belief, Defendants coordinated so that no undocumented workers were present at the Casino Project when OSHA performed its investigation.

146. During this inspection, OSHA found no less than twenty "serious violations" by Gold Mantis, MCC, and Beilida, and issued fines totaling over U.S. $191,000.

147. OSHA issued four citations against Gold Mantis for "serious" violations of federal workplace safety rules based on observations made on December 16, 2016. The violations included (1) failure to provide required eye and face protection for employees using a metal cut-off saw; (2) failure to properly store large steel beams, which were stacked in way that could easily fall and strike workers; (3) failure to protect workers from strike-by hazards by permitting the use of a frayed rope to lift large steel beams; and (4) failure to take proper steps to prevent injuries caused by a drill press to its operator and nearby workers.

148. OSHA issued numerous citations against MCC for violations of federal workplace safety rules, including: the presence of holes that were not covered and that people could fall through; multiple fall hazards, such as unsecured and unsafe scaffolding; and failing to use compliant reporting forms.

149. One of the OSHA citations against MCC identifies seven workers who were injured in just a three-week period but for whom MCC made no record of their injury and did not report the case to OSHA. These injuries included a cut finger from operating a saw that resulted in amputation and several workers struck by heavy metal objects.

150. OSHA issued numerous citations against Beilida for violations of federal workplace safety rules, including: failure to properly store compressed gas cylinders; operating torch equipment with broken oxygen gauge needles; multiple fall hazards; permitting workers to walk under a crane with a cart of compressed gas cylinders; and failing to use compliant reporting forms.

151. After the OSHA inspection, Defendants failed to adequately address the dangerous, illegal conditions on the worksite.

152. On March 14, 2017, a fire broke out at the Casino Project because welding sparks fell onto construction material debris that had been allowed to pile up.

153. On March 22, 2017, a Casino Project worker died after falling 24 feet from the scaffolding to the ground. Upon information and belief, this worker was transported to the hospital by a private car instead of an ambulance, his work uniform had been removed by the time he arrived there, and the individuals who accompanied him lied that he was not employed at the Casino Project.

154. The March 22, 2017 fatality resulted in OSHA issuing five citations against Beilida for "serious" safety violations – including improper planking, missing toe boards, missing X bracing, and improper stair treads – and a proposed fine of U.S. $48,890.

19

155. On September 25, 2017, a Casino Project worker received an electric shock while using an electric saw, injuring his arm and burning his hand. A video of the aftermath shows him writhing on the ground, screaming.

156. Defendants did not provide Plaintiffs with adequate training or the proper protective equipment to perform their jobs safely.

157. Defendants did not purchase workers' compensation insurance on behalf of Plaintiffs.

158. Defendants neither posted required notices regarding workers' compensation in or about the workplace, nor made any other effort to inform workers of their right to compensation for injuries sustained at work.

159. Defendants did not file the legally required reports with government authorities upon discovering that Plaintiffs sustained injuries at work, and thus did not provide Plaintiffs with copies of any such reports as required by law.

160. Defendants threatened Plaintiffs by stating that if they sought out medical care on their own, they could face deportation or other troubles with the immigration authorities.

161. Defendants refused to pay wages to workers who needed to rest due to an injury or illness.

162. Even when Mr. Du had blisters on his feet from wearing the work boots for many continuous hours and days, and it hurt him to walk, he still went to work due to his fear that Gold Mantis would dock his wages or terminate him.

163. Upon information and belief, MCC and Gold Mantis fired employees who, due to an injury or illness, did not work a shift or report to work.

**Imperial Pacific's role**

164.  Defendants, including Imperial Pacific, knew or should have known that unauthorized workers were being used to construct the Casino Project.

165.  Defendants, including Imperial Pacific, knew or should have known that no workers' compensation insurance was purchased for the unauthorized construction workers.

166.  Defendants, including Imperial Pacific, knew that many of the Casino Project workers were inexperienced in construction work and lacked adequate safety or other training. One of the reasons Imperial Pacific cited for the project being behind schedule was a "lack of readily available skilled laborers."

167.  Imperial Pacific knew that there was a particular risk of injury to Plaintiffs and others working for MCC, Gold Mantis, or its other contractors.

168.  Upon information and belief, Imperial Pacific was deeply involved with selecting and supervising contractors on the Casino Project.

169.  Upon information and belief, Imperial Pacific made agreements with contractors based on the necessary wages, hours, and manpower to perform the work.

170. Imperial Pacific coordinated with its contractors about the size of the foreign workforce each would need in Saipan.

171. Imperial Pacific's general counsel, Charles H. McDonald II, served as the authorized representative for Gold Mantis and MCC in their applications for an exemption from a CNMI law capping the number of foreign workers that an employer may hire.

172. Upon information and belief, these applications included information about the nature of the construction, total cost of the project, duration of the project, number of foreign national workers to be employed on the project, and the workers' job classifications.

21

173. Upon information and belief, Imperial Pacific was aware of the number of workers employed by each contractor, the status of each contractor's progress, and exercised its authority to direct what tasks would be performed by each of its contractors' employees.

174. Upon information and belief, despite hiring Sino Great Wall to work on the interior and exterior of the Casino Project, Imperial Pacific later ordered Sino Great Wall to provide its workers to another contractor, MCC, to assist with the foundation of the project.

175. Upon information and belief, Imperial Pacific provided and shared office space with the contractors for the Casino Project.

176. Upon information and belief, Imperial Pacific established corporate entities that then employed construction managers and workers for the Casino Project.

177. Upon information and belief, Jamie Fejeran, a director of Imperial Pacific, was also the Vice President of Marianas Enterprises Limited, which obtained visas for and employed numerous managers and laborers working for Beilida.

178. Upon information and belief, the entities MCC and Gold Mantis were created solely to carry out the Imperial Pacific project.

179. Upon information and belief, Imperial Pacific knew that MCC and Gold Mantis had little or no prior experience doing construction work in the United States.

180. Upon information and belief, Imperial Pacific retained and exercised significant control over safety conditions for all workers involved in the Casino Project.

181. Upon information and belief, as reported in its annual filings, Imperial Pacific strictly required its contractors to comply with all laws and regulations, had a zero-tolerance policy for contractors that violate the law, and worked to ensure that its contractors maintained a work environment free of health and safety hazards.

182. Upon information and belief, Imperial Pacific had the power to terminate contracts with its contractors that failed to comply with legal requirements.

183. Upon information and belief, Imperial Pacific had the authority to shut down the Casino Project site in response to the unsafe work conditions.

184. Upon information and belief, Imperial Pacific monitored the number of fatalities and workplace injuries amongst workers employed by its contractors.

185. Upon information and belief, Imperial Pacific carried out daily health and safety inspections to eliminate any potential hazards at the Casino Project and required that a complete incident or accident report be prepared for any job-related or on-duty injury.

186. Upon information and belief, Imperial Pacific monitored, evaluated, and reported on the risk of forced labor in its operations each year.

187. Upon information and belief, Imperial Pacific was aware of Saipan's history of forced labor, including the payment of large recruitment fees by Chinese migrant workers, and that this practice still continues.

188. Upon information and belief, Imperial Pacific was aware of the prevalence of foreign migrant workers in the construction industry incurring debt in order to pay recruitment fees for job opportunities abroad.

189. Upon information and belief, Imperial Pacific arranged the guards at the Casino Project to check that workers wore protective equipment, such as work boots and helmets.

190. Upon information and belief, Imperial Pacific ignored at least three written pleas from a safety expert to stop work on the Casino Project.

191. Upon information and belief, Imperial Pacific forced a safety expert to compress a three-hour safety briefing into one hour.

192. Upon information and belief, Imperial Pacific never reported to its shareholders or in its public disclosures the true number of injuries and illegal safety violations occurring on the Casino Project.

193. Upon information and belief, Imperial Pacific arranged or provided the housing for hundreds of unauthorized construction workers, including Plaintiffs.

194. In some dormitories, workers employed by MCC, Gold Mantis, and other Imperial Pacific contractors were all housed together.

195. Upon information and belief, some of the housing arranged by Imperial Pacific lacked a certificate of occupancy and had dangerous, unsanitary conditions for some of the time that the construction workers lived there.

196. Upon information and belief, Imperial Pacific sent its own staff to inspect, maintain, and clean the housing it arranged or provided to the Casino Project workers as well as set rules for the residents, such as prohibiting them from smoking inside.

197. Upon information and belief, Imperial Pacific was aware of its contractors' policies concerning hours of work and harsh punishments and fines for minor work infractions.

198. The contractors hung posters inside the worker dormitories that stated the work schedule for the Casino Project construction workers, the harsh punishments for even minor work infractions, and examples of discipline actually imposed, such as when a group of workers was fined U.S. $1,000 because they arrived late to work.

199. Upon information and belief, employees for multiple Imperial Pacific contractors worked together to prepare food in the kitchen and deliver the food to workers of various contractors on the construction site.

200. Upon information and belief, when non-Chinese workers later lived in the same dormitories in which the Chinese workers lived, fewer workers were housed in each room.

201. Upon information and belief, Imperial Pacific owned and/or arranged the buses that transported the unauthorized construction workers, including Plaintiffs, between the dormitories and Casino Project each day.

202. Upon information and belief, Imperial Pacific owned and/or arranged the buses that transported the unauthorized construction workers from the Casino Project worksite to the dormitory in the middle of their shift in order to hide from government investigators.

203. Upon information and belief, Imperial Pacific paid "red envelope" bonuses to the Chinese construction workers during the Chinese New Year.

204. Imperial Pacific halted construction on the Casino Project to throw a Chinese New Year party and dinner for the construction workers.

205. In December, 2016, dozens of workers employed by Sino Great Wall held a public protest in Garapan because they had not been paid for several months. This protest was reported in the local newspapers.

206. Upon information and belief, employees of Gold Mantis staged a protest in January, 2017 because their employer had not paid their wages.

207. Upon information and belief, despite reports that Chinese contractors failed to legally compensate workers, Imperial Pacific took no meaningful steps to ensure its contractors legally compensated their construction workers.

208. Upon information and belief, on February 10, 2017, Jamie Fejeran, a director for Imperial Pacific, attended a meeting with the U.S. Department of Labor and Yulong Xue concerning

25

alleged wage and hour violations by Gold Mantis, including failure to pay minimum wage and requiring the payment of fees.

209. In February, 2017, Imperial Pacific President Xu Jianmin praised MCC for its professional performance and management ability, and stated that he hoped to cooperate further with MCC in the future.

210. Upon information and belief, on March 13, 2017, the U.S. Department of Labor held a meeting with Imperial Pacific, MCC, Gold Mantis, Beilida, and Marianas Enterprises Limited concerning findings of violations of federal wage and hour laws by these entities. Jamie Fejeran represented Gold Mantis at that meeting.

211. Upon information and belief, Imperial Pacific, after being informed about U.S. Department of Labor findings that its contractors' employees paid large recruitment fees and that its contractors violated federal wage and hour laws, did not terminate its contracts with those contractors or otherwise punish those contractors.

212. In or around September, 2017, Imperial Pacific compensated dozens of Casino Project workers for the minimum wage violations they suffered while employed by its contractors.

213. Upon information and belief, in the summer of 2018, Chinese workers on the Casino Project still were not being paid overtime in compliance with applicable laws.

214. Defendants, including Imperial Pacific, benefitted from being able to quickly obtain a large number of foreign construction workers that could be compelled to work long hours for illegally low wages with little or no rest.

215. Imperial Pacific made sufficient progress on the Casino Project before Plaintiffs stopped working so as to avoid revocation of its casino license or payment of significant liquidated damages.

216. Imperial Pacific's gambling operations generated billions of U.S. dollars in gross revenue from 2016 to 2018.

**Injuries suffered by Plaintiffs**

*Tianming Wang*

217. In or around early 2017, Mr. Tianming Wang began his employment with MCC working on the Casino Project.

218. On or about February 20, 2017, Mr. Tianming Wang began his employment with Gold Mantis working on the Casino Project.

219. In the evening of March 17, 2017, Mr. Tianming Wang was at the Casino Project using a tool to cut a metal barrel. He was performing this task because his Gold Mantis supervisor had instructed him to do so.

220. The sparks produced by his cutting work ignited a substance, causing a large flame to shoot out from the barrel, engulfing Mr. Tianming Wang's lower left leg. The fire incinerated his pant leg and burned his lower left leg. (See Exhibit A.)

221. Mr. Tianming Wang was in excruciating pain and in need of immediate medical assistance.

222. Gold Mantis supervisors and agents, including Supervisor Kong, were on site at the time of Mr. Tianming Wang's injury and were aware of the accident.

223. After learning of Mr. Tianming Wang's injuries, Gold Mantis refused to take him to the emergency room, call for emergency medical assistance, or arrange any other form of medical attention.

224. Other than provide two rolls of gauze on the date of his injury, Gold Mantis never provided Mr. Tianming Wang with any medical assistance or treatment during his employment.

225. Gold Mantis officials told Mr. Tianming Wang that, because he was working in Saipan

illegally, he could be arrested if he went to the hospital.

226. After his injury, Gold Mantis told Mr. Tianming Wang to go back to the dormitory, where he was left to tend to his injuries himself. He paid the taxi fare to be transported back to the dormitory himself.

227. Mr. Tianming Wang was unable to work after his injury.

228. Mr. Tianming Wang spent hundreds of dollars of his own money to purchase medication to address his injury and pain.

229. Mr. Tianming Wang still suffers from pain in his lower left leg, which has not fully healed.

230. Mr. Tianming Wang's burns have resulted in severe scarring and permanent disfigurement.

231. Mr. Tianming Wang's inability to use his left leg for many months has resulted in a weakening of his left leg, muscular imbalances, and a limp that could be permanent.

232. Upon information and belief, at the Casino Project, Defendants did not take appropriate precautions for the sort of work that Mr. Tianming Wang was required to perform. Objects containing highly flammable substances were left haphazardly about the site and not clearly marked as such.

233. Upon information and belief, Gold Mantis did not provide Mr. Tianming Wang with the necessary training or safety equipment to perform this cutting work.

*Dong Han*

234. In or around the summer of 2016, Mr. Han began his employment with MCC working on the Casino Project.

235. In February, 2017, Mr. Han began his employment with Gold Mantis working on the Casino Project.

236. In or around the middle of March, 2017, Mr. Han and other workers were stacking heavy

28

metal pipes when the stack of pipes shifted. The pipes crushed the pinky finger on Mr. Han's right hand causing bleeding, severe pain, swelling, and bruising. (See Exhibit B.)

237. Gold Mantis supervisors and agents were on site at the time of Mr. Han's injury.

238. After learning of Mr. Han's injuries, Gold Mantis refused to take him to the emergency room, call for emergency medical assistance, or arrange any other form of medical attention.

239. The first time Mr. Han saw a doctor was after his employment with Gold Mantis ended and government authorities had intervened.

240. As a result of his injuries, Mr. Han has experienced severe pain, has endured a long and painful recovery and rehabilitation process, and continues to suffer from weakened and diminished use of his right hand. As of the filing of this pleading, Mr. Han is unable to perform construction work.

241. At the worksite, Defendants did not take appropriate precautions for the sort of work that Mr. Han was required to perform, such as moving and stacking steel pipes.

*Yongjun Meng*

242. On or about February 14, 2017, Mr. Meng began his employment with Gold Mantis working on the Casino Project.

243. After hiring Mr. Meng as a construction worker, Gold Mantis transferred him to kitchen duty around late February, 2017. No training was provided for this new position.

244. In or around March, 2017, Mr. Meng and two other kitchen workers were loading a large, heavy vat of hot soup onto a vehicle for transport to the construction site. As the workers were lifting the vat into the vehicle, the soup spilled onto Mr. Meng, causing incredible pain and severe burns to his left hand and left leg. (See Exhibit C.)

245. Gold Mantis managers observed Mr. Meng's injury and someone called Supervisor Kong,

29

who drove to the site of the accident and then told Mr. Meng to go to the dormitory and rest.

246. As his injury was getting worse, with liquid discharging from the wound, Mr. Meng asked to be taken to the hospital. Supervisor Kong refused, and instructed him not to go on his own because he would be arrested and deported back to China.

247. Supervisor Kong did not come to check on Mr. Meng's condition for several weeks.

248. Mr. Meng had to buy medicine himself from the local supermarket and spent several hundred dollars.

249. When Mr. Meng saw Supervisor Kong at his dormitory, he asked him for some spending money. Supervisor Kong refused.

250. Mr. Meng was unable to work for several months after his injury due to the pain. He still suffers from diminished use of his left hand and a scar remains on his skin.

251. Gold Mantis did not take appropriate safety precautions for the work that Mr. Meng was required to perform. Gold Mantis did not provide adequate equipment or manpower to transport the large vats of scalding hot soup. Mr. Meng was not provided with gloves or other protective equipment for dealing with the hot items. The container of boiling hot soup was not appropriately secured to avoid spilling.

*Liangcai Sun*

252. Mr. Sun began working for Gold Mantis on or around January 16, 2017.

253. On or around January 26, 2017, while working in what is now the lobby area of the Imperial Pacific casino, Mr. Sun and another employee were transporting large, heavy boxes. Mr. Sun was attempting to lift and move the box with another worker when it became unsteady. The box fell onto Mr. Sun's left hand, smashing his index finger.

254. Mr. Sun was in incredible pain; his finger was bleeding and his hand swelled. The injury

caused a partial amputation of the finger.

255. After the injury, a Gold Mantis manager was called over to see Mr. Sun. Upon determining that he was an unauthorized worker, he took no action other than to say that someone should notify Supervisor Kong.

256. When Supervisor Kong came to see Mr. Sun, he told him that he could not go to the hospital because he was a *heigong*.

257. During the remainder of his employment, Gold Mantis neither took Mr. Sun to a hospital nor to see any medical professional.

258. The next day, due to the unbearable pain, Mr. Sun went on his own to a medical clinic. The doctor wanted to perform an x-ray on his hand, but Mr. Sun was unable to afford this procedure. Mr. Sun paid hundreds of dollars of his own money for the consultation alone.

259. Mr. Sun needed to borrow money from his co-workers in order to pay for his consultation at the clinic and to afford the medicine to relieve his pain.

260. The incident resulted in the total loss of Mr. Sun's fingernail.

261. After his employment with Gold Mantis ended and he was taken to see a doctor at the hospital in Saipan, the doctor told him that he needed to consult a surgeon concerning the possible need to amputate the tip of his injured finger.

262. Upon his return to China, medical providers there told Mr. Sun that he requires surgery.

263. As of the filing of this pleading, Mr. Sun has not yet had surgery performed on his finger because he is unable to afford the cost.

264. As of the filing of this pleading, Mr. Sun deals with alternating pain and numbness in his finger, which could permanently affect the usage of his hand and his ability to work.

*Youli Wang*

265. Mr. Youli Wang began working for Gold Mantis in or around November, 2016.

266. On or about January 20, 2017, while Mr. Youli Wang was loading steel beams onto a piece of plywood (to then be raised with a forklift), he and other Gold Mantis employees sat on top of the load to balance it. As the load was lifted, the plywood snapped, sending the load of steel and the workers falling to the ground. The falling steel beams smashed his left hand and fractured his left ring finger.

267. Mr. Youli Wang was immediately in extreme pain. His finger began swelling and bleeding profusely. His fingernail was nearly completely separated from his finger.

268. Gold Mantis supervisors and agents were on site at the time of Mr. Youli Wang's injury, including Chenwei Shang and Xiangfu Kong. After about a half-hour, Zhengwei Zhang, the Gold Mantis manager in charge of the warehouse, came to see Mr. Youli Wang's injury.

269. Zhengwei Zhang decided that Mr. Youli Wang should not see a doctor at the hospital because he feared his unauthorized employment status would be discovered, and instead took him to the manager's dormitory and poured a cheap brand of Chinese drinking alcohol (*baijiu*) on the wound.

270. Mr. Youli Wang was told that if he did not return to work, he would not be paid. So, despite the injury not having healed and his extreme pain, he returned to work just days after the injury. Once back at work, Supervisor Kong reaffirmed that he would not be paid if he did not work.

271. Supervisor Kong told Mr. Youli Wang that he would compensate him RMB 500 for his injury, but never did.

272.  Nearly one week after the injury, Mr. Youli Wang's fingernail had completely separated from his finger.

273.  Mr. Youli Wang paid for his own medicine to treat the wound and relieve his pain.

274.  When he saw a doctor at the hospital in Saipan, after his employment with Gold Mantis had ended, the physician confirmed that his finger was fractured and that the fingernail was now growing into his hand. The physician stated that he needed surgery, but Mr. Youli Wang did not have sufficient funds to pay for the procedure.

275.  Mr. Youli Wang's finger has not healed completely and he still suffers from diminished use of his left hand. A doctor in China stated that he must undergo surgery, but Mr. Youli Wang does not have sufficient funds for the procedure.

276.  Defendants failed to provide appropriate equipment or manpower for the safe movement of this material. The demand that workers perform their work quickly, even at the expense of safety, was also a cause of the accident.

*Qingchun Xu*

277. Mr. Xu began working for Gold Mantis on or around February 14, 2017.

278. In or around March, 2017, Mr. Xu was working at the Casino Project moving very heavy pieces of stone.

279. Mr. Xu and another worker were using ropes to lift a piece of stone up the stairs. The stone was too heavy and fell onto Xu's left lower leg, inverting his ankle.

280. Mr. Xu was in a tremendous amount of pain and could not walk on his left ankle.

281. Several workers witnessed what happened to Mr. Xu. Supervisor Kong soon arrived at the scene of the injury.

282. Gold Mantis refused to take Mr. Xu to the hospital or to see a doctor.

283. Mr. Xu went to a store to purchase some pain medication. He paid the costs himself, which totaled several hundred dollars. He had to borrow more money from others in order to pay for the medicine.

284. Mr. Xu still suffers from diminished use of his left foot.

285. Gold Mantis did not provide the appropriate equipment or manpower for the safe movement of this material.

*Xiyang Du*

286. Mr. Du began working for Gold Mantis on or around December 3, 2016.

287. In or around mid-December, 2016, while working overtime after dinner, Mr. Du was at the Casino Worksite moving heavy pieces of plaster. A large piece of plaster fell over and crushed the middle finger on his right hand. The finger swelled immediately and was bleeding. Mr. Du was in tremendous pain and could not use his right hand.

288. Gold Mantis personnel were on the site when Mr. Du was injured and aware of his injury. Supervisor Kong told Mr. Du to wrap his finger with a bandage. Mr. Du was neither permitted to leave work to seek treatment nor return home to rest.

289. Gold Mantis did not take Mr. Du to the emergency room, call for emergency medical assistance, or arrange any other form of medical attention.

290. Mr. Du was never provided with any medical assistance by or through Gold Mantis during the remainder of his employment.

291. Mr. Du was unable to take any time off from work to recover from his injury because Gold Mantis refused to pay wages if he rested and he also feared being fired.

292. Mr. Du only went to the hospital to see a doctor after Supervisor Kong had fled Saipan and local government authorities had intervened in the matter.

293. The hospital doctor in Saipan told Mr. Du that he required surgery. Upon information and belief, Gold Mantis refused to pay for this procedure.

294. Mr. Du still suffers pain in his finger and diminished use of his hand, making him unable to perform manual labor.

295. Mr. Du has not had the surgery performed on his finger because he cannot afford it.

296. Gold Mantis did not provide the appropriate equipment or manpower for the safe movement of the heavy pieces of plaster.

**Defendants' failure to secure compensation**

297. Upon information and belief, Defendants have known since 2017 that Plaintiffs suffered injuries while working on the Casino Project.

298. Defendants, including Gold Mantis, never compensated Plaintiffs for their injuries.

299. Defendants, including Gold Mantis, never reimbursed Plaintiffs for any money they spent on medicine or medical treatment.

300. Defendants did not provide Plaintiffs with any pay or other money during the time that they were unable to work due to injury. Any compensation that they received for that period of time was only paid much later as part of a settlement between Gold Mantis and the U.S. Department of Labor.

301. Upon information and belief, Defendants did not follow the procedures required by law to record and report the workplace injuries suffered by Plaintiffs.

302. When Plaintiffs asked Gold Mantis' lawyers about compensation for their work-related injuries as they were preparing to depart Saipan for China, they were told that a company representative would meet them at the airport in China to discuss the matter.

303. Plaintiffs have not been contacted by anyone from Gold Mantis since returning to China.

304. Since their injuries, Plaintiffs have suffered acute anxiety, despair, and emotional distress as a result of the pain from their physical injuries, the fear of being arrested or deported, their mistreatment by Defendants, concern over their growing debts, and not being able to afford appropriate medical care.

305. In late 2017, Plaintiffs' counsel sent letters to Gold Mantis detailing the injuries they suffered while employed by Gold Mantis. Gold Mantis responded by denying that Plaintiffs were employed by Gold Mantis.

306. Upon information and belief, Gold Mantis never filed any injury report concerning Plaintiffs' injuries or took any steps towards securing compensation for Plaintiffs.

307. Upon information and belief, neither Imperial Pacific nor MCC took any steps towards securing Plaintiffs compensation for their injuries.

**FIRST CAUSE OF ACTION**
**FORCED LABOR**
Trafficking Victims Protection Reauthorization Act
(18 U.S.C. §§ 1589, 1590, 1592, 1595)

308. Plaintiffs repeat, re-allege, and incorporate herein by reference, each and every allegation contained in the preceding paragraphs.

309. Defendants knowingly provided or obtained the labor services of Plaintiffs by means of force, threats of force, physical restraint, or threats of physical restraint.

310. Defendants knowingly provided or obtained the labor services of Plaintiffs by means of serious harm or threats of serious harm.

311. Defendants knowingly provided or obtained the labor services of Plaintiffs by means of abuse or threatened abuse of law or legal process.

312. Defendants knowingly provided or obtained the labor services of Plaintiffs by means of a scheme, plan, or pattern intended to cause Plaintiffs to believe that, if they did not perform such labor, they or another person would suffer serious harm or physical restraint.

313. Defendants compelled Plaintiffs to provide and continue providing their labor services by, amongst other means, forcing them to incur debts that needed to be repaid, withholding wage payments, making threats about deportation, threatening and imposing substantial fines, threatening physical violence, discouraging communication with individuals outside the workplace, dissuading complaints to government authorities, obstructing government inspectors, and hiding unauthorized workers from government authorities.

314. Defendants created a culture of fear that made Plaintiffs believe that they had no choice but to continue working for Defendants.

315. Plaintiffs believed that if they stopped working for Defendants, they would be unable to earn sufficient money to repay their debts and the accumulating interest, causing various forms of serious harm including: harassment or physical violence towards them or their relatives perpetrated by those who loaned them money; loss of their family homes or other collateral and the corresponding hardship; and severe embarrassment, shame, or "loss of face" amongst their relatives, friends, and community.

316. Plaintiffs believed that if they stopped working for Defendants, they would be physically harmed and/or arrested and deported.

317. Defendants knowingly benefited, financially and in other ways, from participating in a venture that engaged in providing or obtaining Plaintiffs' labor through the means described above, either knowingly or in reckless disregard of the fact that the venture was engaged in the providing or obtaining of labor or services through such means.

37

318. Defendants knowingly concealed, removed, confiscated, or possessed Plaintiffs' passports in the course of and/or with the intent to violate the provisions on forced labor and human trafficking, or in order to prevent or restrict or attempt to prevent or restrict, without lawful authority, Plaintiffs' liberty to move or travel, in order to maintain the labor or services of Plaintiffs, who are victims of a severe form of trafficking in persons.

319. Defendants knowingly recruited, harbored, transported, provided, or obtained the labor or services of Plaintiffs through the means described above.

320. Defendants obstructed, attempted to obstruct, or interfered with enforcement of the laws protecting Plaintiffs from forced labor and trafficking.

321. These acts caused Plaintiffs damages, including but not limited to financial losses, physical injuries and related costs, and emotional distress.

322. Accordingly, Plaintiffs are entitled to damages, including but not limited to their recruitment fees and medical costs, as well as for emotional distress, punitive damages, and reasonable attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**FORCED LABOR**
CNMI Anti-Trafficking Act
(6 CNMI §§ 1502, 1503, 1507)

323. Plaintiffs repeat, re-allege, and incorporate herein by reference, each and every allegation contained in the preceding paragraphs.

324. Defendants recklessly, knowingly, or intentionally subjected, or attempted to subject, Plaintiffs to forced labor or services without due process of law.

325. Defendants knowingly recruited, transported, enticed, harbored, provided, or obtained the labor or services of Plaintiffs knowing or with the intent that the person will be subjected to forced labor or services without due process of law.

38

326. Defendants benefited financially or received something of value from their knowing participation in a venture that engaged in the aforementioned acts.

327. These acts caused Plaintiffs damages, including but not limited to financial losses, physical injuries and related costs, and emotional distress.

328. Accordingly, Plaintiffs are entitled to damages, including but not limited to their recruitment fees and medical costs, as well as for emotional distress, punitive damages, and reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### NEGLIGENCE

329. Plaintiffs repeat, re-allege, and incorporate herein by reference, each and every allegation contained in the preceding paragraphs.

330. Defendants had a duty to Plaintiffs, either as its employees and/or as workers on a construction site that it owned and/or controlled, including but not limited to: ensuring a safe worksite, working environment, and working conditions; ensuring the use of safe work practices; and providing appropriate safety equipment and safety training.

331. Defendants had a duty to Plaintiffs because they knew or should have known that there was a particular risk of injury to Plaintiffs and others working on the Casino Project.

332. Defendants breached their duty to Plaintiffs by, amongst other things:

    a.   Failing to provide a safe worksite and safe working conditions;

    b.   Failing to comply with government regulations concerning workplace safety;

    c.   Failing to provide appropriate equipment to complete the assigned tasks;

    d.   Failing to provide appropriate safety training;

    e.   Failing to provide appropriate protective equipment to workers;

    f.   Failing to purchase or arrange workers' compensation insurance;

39

g.   Failing to report workers' injuries;

h.   Obstructing government authorities from inspecting safety conditions; and

i.   Failing to respond appropriately to injuries.

333. Defendants further breached their duty to Plaintiffs by failing to obtain appropriate medical care after their injuries and actively discouraging Plaintiffs from obtaining appropriate care.

334. Defendants' actions and/or omissions were the direct and proximate cause of the injuries and damages suffered by Plaintiffs, including but not limited to physical injuries, pain and suffering, medical costs, loss of wages, and future medical or other treatments.

335. Plaintiffs are entitled to an award of punitive damages because Defendants' conduct constitutes gross negligence, and/or a reckless and/or malicious and/or willful, wanton disregard of Plaintiffs' rights, well-being, or safety.

**FOURTH CAUSE OF ACTION**
**LIABILITY FOR EMPLOYEES OF SUBCONTRACTOR**
(4 C.M.C. § 9304)

336.  Plaintiffs repeat, re-allege, and incorporate herein by reference, each and every allegation contained in the preceding paragraphs.

337.  Pursuant to Section 9304(c) of the Commonwealth Code, where a subcontractor in the construction industry does not secure payment of the compensation owed to its injured employee, the contractor shall be liable for and shall secure payment of such compensation.

338.  Plaintiffs were employees of a subcontractor engaged in the construction industry that failed to secure compensation for their injuries.

339.  Plaintiffs were employees of a subcontractor that was contracted by Gold Mantis, MCC, and/or Imperial Pacific.

340. Gold Mantis, MCC, and/or Imperial Pacific is liable for securing compensation owed to Plaintiffs as a result of their injuries.

## PRAYER FOR RELIEF

341. WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

   (1) Declaratory judgment;

   (2) General and special damages in an amount to be proven at trial;

   (3) Punitive damages in an amount to be proven at trial;

   (4) Attorneys' fees;

   (5) Costs of this suit; and

   (6) Such other and further relief as the court may deem just and proper.

## DEMAND FOR JURY TRIAL

342. Plaintiffs hereby demand a trial by jury.

Dated this 15th day of March, 2019.

_____
/s/

Bruce Berline
Attorney for Plaintiffs

41

# Exhibit A



# Exhibit B



# Exhibit C

