Bruce Berline
BERLINE & ASSOCIATES, LLC
Second Floor, Macaranas Building
PO Box 5682 CHRB
Saipan, MP 96950
Tel.: (670) 233-3663
Fax: (670) 233-5262
Email: bruce@saipanlaw.com

Aaron Halegua
AARON HALEGUA, PLLC
154 Grand Street
New York, New York 10013
Tel.: (646) 854-9061
Email: ah@aaronhalegua.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

TIANMING WANG, *et. al*,

    Plaintiffs,

    v.

GOLD MANTIS CONSTRUCTION DECORATION (CNMI), LLC, *et. al*,

    Defendants.

Case No. 18-cv-0030

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS, MOTION TO STRIKE, MOTION FOR A MORE DEFINITE STATEMENT, AND MOTION TO STAY**

Hearing Date: June 6, 2019
Hearing Time: 1:30 P.M.
Judge: Hon. Ramona V. Manglona

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ........................................................................ 1

II.  STATEMENT OF FACTS ............................................................................. 2

III. PROCEDURAL HISTORY ........................................................................... 5

IV.  MOTIONS TO DISMISS UNDER RULE 12(b)(6) ...................................... 5

  A.  STANDARD OF REVIEW ...................................................................... 5
  B.  PLAINTIFFS STATE CLAIMS UNDER THE TVPRA AND
      CNMI ANTI-TRAFFICKING ACT ....................................................... 6
    1.  Plaintiffs state a claim that they were subjected to "forced labor" under the TVPRA ......... 7
    2.  Plaintiffs state at least one claim under the TVPRA against each of the Defendants ......... 13
  C.  PLAINTIFFS STATE CLAIMS FOR NEGLIGENCE AND UNDER 4 CMC § 9304 ......... 17
    1.  Plaintiffs state a claim for negligence against each of the Defendants .............................. 17
    2.  MCC and Gold Mantis' argument that Plaintiffs' 4 CMC § 9304 claim should be
        dismissed lacks merit ....................................................................................................... 23
    3.  Imperial Pacific's argument that Plaintiffs' negligence and 4 CMC § 9304 claims should
        be dismissed because it allegedly purchased a workers' compensation policy fails. ......... 24
        a.  Under Rule 12(b)(6), Imperial Pacific's motion to dismiss based on its
            workers' compensation policy should be denied because it failed to
            "secure" compensation.................................................................................25
        b.  Even under Rule 56, Imperial Pacific's motion must be either denied
            or stayed because material issues of fact remain and Plaintiffs have not been
            afforded an opportunity to conduct discovery.....................................................26
        c.  Imperial Pacific's motion should be denied because it did not notify
            Plaintiffs of their right to seek compensation....................................................30

V.   MOTION TO STRIKE ................................................................................ 31

VI.  MOTION FOR MORE DEFINITE STATEMENT ...................................... 32

VII. MOTION TO STAY .................................................................................... 36

VIII. CONCLUSION .......................................................................................... 38

i

# TABLE OF AUTHORITIES

**Federal and State Cases**

*Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674 (S.D. Tex. 2009) .......................................... 6, 16

*Amin v. Mercedes-Benz USA, LLC*, 349 F. Supp. 3d 1338 (N.D. Ga. 2018) ................................ 33, 35

*Anderson v. Martz*, 2019 WL 1958600 (S.D. Ind. May 2, 2019) ...................................................... 29

*Ara v. Khan*, 2007 WL 1726456 (E.D.N.Y. June 14, 2007) ................................................................. 36

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................................... 6, 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................................... 5, 6

*Brown Services, Inc. v. Fairbrother*, 776 S.W.2d 772 (Tex. App. Corpus Christi 1989) ................. 25

*Craighead v. Austal USA, LLC*, 2017 WL 6559917 (S.D. Ala. Dec. 21, 2017) .......................... 33, 35

*Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552 (4th Cir. 2015) ....................... 29

*David v. Signal Int'l., LLC*, 37 F. Supp. 3d 822 (E.D. La. 2014) .................................................. 9, 12

*Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308 (1980) ........................................................ 22

*Doagett v. United States*, 875 F.2d 684 (9th Cir. 1989) .................................................................. 22

*Espinosa v. Bluemercury, Inc.*, 2017 WL 1079553 (N.D. Cal. Mar. 22, 2017) ............................... 33

*Fantasy, Inc. v. Fogerty*, 984 F.2d 1524 (9th Cir. 1993) ................................................................. 31

*Ferguson v. Hosp. Corp. Int'l*, 769 F.2d 268 (5th Cir. 1985) .......................................................... 25

*Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214 (4th Cir. 2002) .................................. 30

*Headley v. Church of Scientology Intern.*, 687 F.3d 1173 (9th Cir. 2012) ....................................... 11

*In re Metropolitan Securities Litigation*, 532 F. Supp. 2d 1260 (E.D. Wash. 2007) ......................... 35

*Israel Antonio-Morales v. Bimbo's Best Produce, Inc.*,
2009 WL 1591172 (E.D. La. Apr. 20, 2009) .................................................................................. 36

*IV Sols., Inc. v. CIGNA Healthcare of California Inc.*, 2016 WL 6902457 (C.D. Cal. 2016) .......... 31

*Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107 (D.D.C. 2012) ............................................................. 9

ii

*Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*,
    2011 WL 5188424 (W.D. Ark. Oct. 31, 2011) ............................................................... 37

*Kyle K. v. Chapman*, 208 F.3d 940 (11th Cir. 2000) .............................................................. 33

*Lagayan v. Odeh*, 199 F. Supp. 3d 21 (D.D.C. 2016).................................................... 10, 11

*Lepp v. Yuba Cty.*, 2019 WL 1129108 (E.D. Cal. 2019) ........................................................ 31

*Lesnik v. Eisenmann SE*, 2018 WL 4700342 (N.D. Cal. Oct. 1, 2018) .......................... 12, 16

*Martin v. Scott Paper Co.*, 511 A.2d 1048 (Me. 1986) ......................................................... 25

*Martinez v. Calimlim*, 651 F. Supp. 2d 852 (E.D. Wis. 2009)............................................... 37

*Mouloki v. Epee*, 262 F. Supp. 3d 684 (N.D. Ill. 2017) ................................................... 13, 17

*Nesbitt v. Bemer*, 2018 WL 5619716 (D. Conn. Oct. 30, 2018)...................................... 36, 37

*Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134 (C.D. Cal. 2011) ................... 9

*Physicians Care All., LLC v. All Day Beauty, LLC*, 2019 WL 176782 (D. Ariz. Jan. 11, 2019)....... 33

*Plaintiff A v. Schair*, 2012 WL 12864367 (N.D. Ga. Nov. 28, 2012)..................................... 36

*Pride v. Correa*, 719 F.3d 1130 (9th Cir. 2013) ...................................................................... 6

*Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017) ................................................... 13, 14, 17

*Scott v. Mortg. Elec. Registration Sys., Inc.*, 605 F. App'x 598 (9th Cir. 2015) ................. 6, 35

*Sec. & Exch. Comm'n v. Bardman*, 216 F. Supp. 3d 1041 (N.D. Cal. 2016) ....................... 34

*Shukla v. Sharma*, 2012 WL 481796 (E.D.N.Y. Feb. 14, 2012) ............................. 8, 10, 11

*Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708 (7th Cir. 2018) ............................................. 29

*Skinner v. Switzer*, 562 U.S. 521 (2011)......................................................................... 6, 21

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ....................................................................... 6

*Sulastri v. Halsey*, 2014 WL 4904527 (E.D.N.Y. Sept. 30, 2014) ...................................... 9

*Terrell v. Cent. Washington Asphalt, Inc.*, 2015 WL 4419375 (D. Nev. July 20, 2015).................. 18

*U.S. v. Bradley*, 390 F.3d 145 (1st Cir. 2004)........................................................ 8, 9, 10, 11

*U.S. v. Calimlim*, 538 F.3d 706 (7th Cir. 2008) ........................................................... passim

iii

*U.S. v. Dann*, 652 F.3d 1160 (9th Cir. 2011) .................................................................... 7, 10

*U.S. v. Farrell*, 563 F.3d 364 (8th Cir. 2009) ................................................................... 9, 10

*U.S. v. Kozminski*, 487 U.S. 931 (1988) ................................................................................ 8

*U.S. v. Rivera*, 2012 WL 2339318 (E.D.N.Y. June 19, 2012) ............................................ 11

*Updateme Inc. v. Axel Springer SE*, 2018 WL 1184797 (N.D. Cal. Mar. 7, 2018) ..................... 34, 35

*Wagner v. First Horizon Pharmaceutical Corp*, 464 F.3d 1273 (11th Cir. 2006) ........................... 35

*Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015) ................................. 33

*Weilian Lu, by & through Xiaojie Ge v. Star Marianas Air, Inc.*,
2015 WL 632390 (D. N. Mar. I. Feb. 12, 2015) ................................................. 17, 18, 21

**CNMI Cases**

*Bernal v. Tenorio Enterprises*, No. 93-cv-890 (N. Mar. I. Super. Ct. May 25, 1994) ...................... 25

*Commonwealth Ports Authority v. Leo A. Daly Company, et al.*,
No. 13-cv-0085 (N. Mar. I Super. Ct. June 20, 2014) ............................................... 21

*Grizzard v. Mogambo, Inc., et al.*, No. 95-cv-657 (N. Mar. I. Super. Ct. July 26, 1999).................. 22

*Muna v. Pacific Development, Inc.*, No. 96-cv-1115 (N. Mar. I. Super. Ct. Aug. 10, 1998) ....... 25, 30

*Owens v. Commonwealth Health Center*, 2012 WL 2501082 (N. Mar. I. June 7, 2012).................. 21

**Federal Statutes**

18 U.S.C.
    § 1589 ................................................................................................. passim
    § 1590 ........................................................................................... 13, 14, 17
    § 1592 .................................................................................................... 10
    § 1595 ................................................................................................. passim

**CNMI Statutes**

4 CMC
    § 9304 .................................................................................................. 23, 24
    § 9305 .................................................................................................. 24, 28
    § 9339 .................................................................................................. 24, 28
    § 9343 ....................................................................................................... 24

iv

6 CMC
§ 1502 ................................................................................................................ 17
§ 1503 ................................................................................................................ 17
§ 1507 ................................................................................................................ 17

**Other Authorities**

Restatement (Third) of Torts: Apportionment Liab. (Am. Law. Inst. 2000)
§ 15 .................................................................................................................. 21
§ 17 .................................................................................................................. 21

Restatement (Third) of Torts: Phys. & Emot. Harm (Am. Law Inst. 2010)
§ 3 .................................................................................................................... 17
§ 6 .................................................................................................................... 18
§ 7 .................................................................................................................... 18
§ 26 ........................................................................................................... 18, 21
§ 27 .................................................................................................................. 22
§ 55 .................................................................................................................. 20

## I.   PRELIMINARY STATEMENT

Plaintiffs are seven men from China who incurred significant debts to pay large recruitment fees based on promises of high-paying construction jobs in Saipan.[1] Instead, Plaintiffs were forced to work long hours for below minimum wage under extremely dangerous and inhumane conditions on the Imperial Pacific casino construction site – and each one sustained physical injuries in the process. Plaintiffs brought four claims against each of the three Defendants for (i) forced labor and other claims under the federal Trafficking Victims Protection Reauthorization Act ("TVPRA"), (ii) forced labor and other claims under the CNMI Anti-Trafficking Act, (iii) negligence resulting in their injuries, and (iv) failing to secure compensation for their injuries under CNMI law.

Defendants filed a series of motions in response, which are more significant in number than in substance. Defendants' motions to dismiss for failure to state a claim under Rule 12(b)(6) are unavailing. Plaintiffs have more than adequately stated a plausible claim for relief under the TVPRA for forced labor and trafficking against each Defendant. Defendants' arguments rely on precedents that Congress has explicitly overturned through legislative amendments or arguments that simply overlook (or ignore) robust factual allegations in the FAC. Similarly, Plaintiffs have stated a claim for negligence, as each Defendant had a duty to ensure a safe work environment, but rather than fix the dangers brought to their attention, Defendants allowed them to persist and concealed them from government detection. Imperial Pacific claims that it cannot be sued for negligence because it had a workers' compensation insurance policy in place; however, the declaration and exhibit submitted by Imperial Pacific cannot establish as a matter of law that this policy was ever intended to cover or actually did cover the hundreds (or maybe thousands) of unauthorized Chinese workers ("*heigong*")

---

[1] The defined terms in the First Amended Complaint (Doc. No. 6; "FAC") are also used throughout this Memorandum of Law. Unless specified otherwise, all monetary amounts are stated in U.S. dollars and any "Rule" refers to the Federal Rules of Civil Procedure.

1

doing construction work on the project. Moreover, such a motion is premature because Plaintiffs have not yet been able to conduct discovery.

Defendants' other motions are similarly lacking in merit. Defendants move for an order requiring Plaintiffs to resubmit their "shotgun" pleading because each cause of action realleges the facts that proceed it, even though the FAC's subheadings make abundantly clear which allegations apply to which causes of action. Imperial Pacific moves to strike as "immaterial" an entire factual section of the FAC that contains allegations detailing the safety concerns that triggered an OSHA investigation, Defendants' refusal to allow an OSHA inspector onto the site, and the "serious" violations identified by OSHA. However, these facts are central to Plaintiffs' claims that Defendants sought to conceal Plaintiffs from federal authorities and compelled them to work under conditions known to be dangerous. Imperial Pacific also moves to stay the proceedings based *entirely* on speculation that there is an ongoing criminal trafficking investigation of Imperial Pacific, but without providing an indictment, subpoena, government communication, or any other such evidence.

Therefore, the Court should deny Defendants' multiple motions so that a case management plan can be developed and discovery can commence.

## II.    STATEMENT OF FACTS

Plaintiffs are seven men from China who speak no English. (FAC ¶¶12-19). Upon promises of high wages and good conditions, they paid recruiters large fees, sometimes exceeding $8,000, for jobs in Saipan. (FAC ¶¶3, 52). Plaintiffs borrowed money at high interest rates to pay these fees, sometimes using their homes or land as collateral. (FAC ¶¶53, 58-61). If unable to repay this debt, Plaintiffs feared a range of consequences, including loan sharks physically harming them or their relatives, loss of their homes and financial hardship for their families, and "loss of face" or shame. (FAC ¶¶315).

Imperial Pacific, the subsidiary of a Hong Kong-based company, is the developer of the casino resort project in Garapan and hired multiple Chinese firms to do the construction. (FAC ¶¶2, 29-30,

37-38). MCC and Gold Mantis are the CNMI subsidiaries of large Chinese construction companies. (FAC ¶¶21-23, 26-27). Imperial Pacific hired MCC's parent in China to be the "general contractor" and executed a $90 million contract. (FAC ¶¶28, 129). Gold Mantis' Chinese parent was retained to work on the casino project, and then transferred $30 million to the entity in Saipan. (FAC ¶¶2, 24).

Three Plaintiffs worked for MCC and then later worked for Gold Mantis ("MCC/GM Plaintiffs"); the remaining four only worked for Gold Mantis. (FAC ¶57). MCC and Gold Mantis were aware of Plaintiffs' debts, but each still charged them an additional fee after they arrived in Saipan in order to start working. (FAC ¶¶56, 63, 80, 101). Both companies mandated long hours and compulsory overtime; paid far below the minimum wage, made deductions from wages, and withheld weeks or months of salary; threatened deportation for disobedience; told workers it was useless to complain; told workers that nobody else would hire them if they quit; instructed workers not to associate with people outside work; and told them to hide from government authorities. (FAC ¶¶6, 64-76, 83-121, 145, 202). Because they were *heigong*, managers told Plaintiffs that the companies were not responsible if they get injured. (FAC ¶¶72, 93). Plaintiffs were crammed into dormitories, some of which had no showers or air-conditioning. (FAC ¶¶4, 77-79, 194). MCC also confiscated its employees' passports. (FAC ¶76). A Gold Mantis manager screamed and cursed at Plaintiffs, physically attacked employees, and even threatened to kill Plaintiffs if they disobeyed him or left their jobs. (FAC ¶¶103, 109-114). Plaintiffs believed they had no choice but to continue working for MCC and Gold Mantis, otherwise they would face physical harm, financial harm, or deportation (FAC ¶¶66, 98-99, 114, 314-316), and some even worked while injured (FAC ¶¶161-163, 270).

On December 6, 2016, an OSHA inspector went to the casino site and explained to representatives of MCC, Gold Mantis, and Imperial Pacific (and eventually put in a public court-filed affidavit ("OSHA Affidavit")) the above-average injury incidence rate on the construction site, that injuries were not being reported to OSHA, that injured workers were being shipped back to China over

doctors' objections, and concerns about existing dangers on the site. (FAC ¶¶135-142). Defendants nonetheless denied the inspector entry onto the site and forced OSHA to seek a warrant in court. (FAC ¶138). When OSHA finally inspected, Defendants made sure all *heigong* were not present on the site. (FAC ¶145). OSHA cited MCC and Gold Mantis for numerous "serious" violations, including failing to provide the proper personal protective equipment, inadequate safety precautions, and not recording injuries or reporting them to authorities. (FAC ¶¶146-149).

Even after the OSHA inspection, Defendants did not address these dangers, and Plaintiffs were still not provided safety training or adequate protective equipment. (FAC ¶151-156). As a result, in 2017, all seven Plaintiffs suffered injuries while working, including a badly burnt leg, scalded hand, and partially severed finger. (FAC ¶7).

Defendants never purchased workers' compensation insurance for Plaintiffs and, accordingly, Plaintiffs were never notified of their right to file for workers' compensation by any Defendant. (FAC ¶¶157-158). Plaintiffs' injuries were never reported to government authorities and, accordingly, Plaintiffs never received copies of any such reports as required by law. (FAC ¶159). Defendants never took Plaintiffs to a hospital or to see a doctor; furthermore, they threatened Plaintiffs that they risked being deported if they sought medical attention on their own. (FAC ¶¶7, 160). No Defendant has provided Plaintiffs any compensation for their injuries. (FAC ¶¶297-307). In late 2017, when Plaintiffs' counsel sent a letter to Gold Mantis detailing their injuries, Gold Mantis responded that Plaintiffs were not employed by Gold Mantis. (FAC ¶305).

In February, 2017, Imperial Pacific praised MCC for its professional performance and management ability, and stated that it hoped to cooperate further with MCC in the future. (FAC ¶209). The next month, having made sufficient progress on the casino resort project, Imperial Pacific was permitted to retain its casino license, from which it generated billions of U.S. dollars between 2016

and 2018. (FAC ¶¶51, 215-216). In May, 2017, Gold Mantis expressed that it wished to do additional work on the casino project. (FAC ¶126).

## III.   PROCEDURAL HISTORY

Plaintiffs filed the initial Complaint on December 17, 2018 against Gold Mantis. (Doc. No. 1). Gold Mantis filed a motion to dismiss (Doc. No. 3), but it was made obsolete when Plaintiffs filed the FAC on March 15, 2019, which brought four causes of action against each of the three Defendants. (Doc. No. 6). The parties stipulated to give Defendants additional time to respond to the FAC. (Doc. No. 9).

On April 30, 2019, Defendants filed a series of motions and supporting memorandum of law. Imperial Pacific filed a brief supporting its motion to dismiss or alternatively strike (Doc. No. 12, "IPI"), which included the Declaration of Magdalena P. Attao (Doc. No. 12-1, "Attao Decl.") and an exhibit containing documents and emails relating to Imperial Pacific's workers' compensation policy (Doc. No. 12-2, "IPI Policy"). Imperial Pacific also filed a brief with its motion to stay these proceedings (Doc. No. 14, "IPI Stay"), including the Declaration of Phillip James Tydingco (Doc. No. 14-1) that attached numerous local newspaper articles (Doc. Nos. 14-2 to 14-15; "Ex. A-N"). MCC filed a motion to dismiss pursuant to Rule 12(b)(6) and for a more definite statement pursuant to Rule 12(e). (Doc. No. 15, "MCC"). Gold Mantis filed a motion to join MCC's motions. (Doc. No. 16, "Gold Mantis"). Imperial Pacific then also filed a motion to join MCC's motions. (Doc. No. 17).

## IV.   MOTIONS TO DISMISS UNDER RULE 12(b)(6)

### A.  STANDARD OF REVIEW

A complaint need only contain enough facts to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In deciding a motion under Rule 12(b)(6), a court must accept plaintiffs' factual allegations as true and draw all reasonable inferences in plaintiffs' favor.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013). "Under *Iqbal*, all that is required at this pleading stage is that the claims made by Plaintiffs are plausible, not that they show probability of success." *Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 684 (S.D. Tex. 2009) (denying defendants' Rule 12(b)(6) motion to dismiss federal trafficking claims). *See also Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011) ("The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable. The factual allegations of the complaint need only 'plausibly suggest an entitlement to relief.'") (*quoting Iqbal*, 556 U.S. at 681); *id.* at 1217 (the pleading standard "'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence'" to support the allegations) (*quoting Twombly,* 550 U.S. at 556).[2]

Plaintiffs are also not required to commit to a specific legal theory at this stage. "[T]he Supreme Court has made clear that, 'under the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory' to survive a motion to dismiss." *Scott v. Mortg. Elec. Registration Sys., Inc.*, 605 F. App'x 598, 599 (9th Cir. 2015) (*quoting Skinner v. Switzer*, 562 U.S. 521, 530 (2011)). "We have likewise held that a plaintiff does not need to plead specific legal theories in the complaint, as long as the opposing party receives notice as to what is at issue in the lawsuit" and "sufficient factual averments show that the claimant may be entitled to some relief." *Id.* (internal citations omitted).

## B. PLAINTIFFS STATE CLAIMS UNDER THE TVPRA AND CNMI ANTI-TRAFFICKING ACT

Each Defendant makes a motion pursuant to Rule 12(b)(6) to dismiss Plaintiffs' claims pursuant to the TVPRA and, arguing that the two statutes are "substantially similar" (Gold Mantis

---

[2] In its brief arguing for the dismissal of Plaintiffs' forced labor claims, MCC also references Rule 8(a)(2)'s requirement that the pleader show it "is entitled to relief" and cites to *Twombly*. (MCC at 5). This argument is essentially duplicative of its Rule 12(b)(6) argument and therefore should be denied for the same reasons.

at 3), to dismiss the claims under the CNMI Anti-Trafficking statute. Many of the arguments for dismissal are based upon Defendants' misunderstanding of the provisions of the TVPRA or mischaracterization of the allegations in the FAC. Very few of these arguments are supported with reference to any legal authority; and, if they are, that authority is of limited relevance or has been superseded by a legislative amendment. Nonetheless, Plaintiffs address Defendants' contentions below.

### 1. Plaintiffs state a claim that they were subjected to "forced labor" under the TVPRA.

The FAC adequately states a claim for relief under the TVPRA because it alleges that each Defendant either actively participated in or knowingly benefitted from a venture that involved forced labor. Under 18 U.S.C. § 1589, a defendant subjects a victim to forced labor when it "knowingly provides or obtains the labor services of a person…by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a)(4). The term "serious harm" is defined in the statute to include "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm" that would "compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). Congress added the above definition in 2000 to "define harm broadly" and capture the "increasingly subtle" means used by modern-day traffickers. *U.S. v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011). In addition to parties who provide or obtain such labor services, the statute also makes liable any party that "knowingly benefits" from the forced labor scheme, where "knowledge" includes "reckless disregard" that the labor was obtained through forced labor. 18 U.S.C. § 1589(b).

It should be noted at the outset that Defendants' suggestion that either physical harm or legal coercion is a necessary element of a forced labor claim is simply wrong. (MCC at 4). MCC cites

*U.S. v. Kozminski*, 487 U.S. 931 (1988) in support of this argument. (*Id.*). But Plaintiffs here bring their case under 18 U.S.C. § 1589 – a statute that was not only enacted in 2000 after *Kozminski* was decided, but which Congress passed "expressly to counter" the limitations under *Kozminski* of what constituted coercion. *U.S. v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004). As recited above, forced labor under the TVPRA may be committed "by means of *any scheme, plan, or pattern*" intended to cause a person to believe that "serious harm" would result if the person did not perform such labor. 18 U.S.C. § 1589(a)(4) (emphasis added). *See Bradley*, 390 F.3d at 150 (new language reflects Congress' intent to encompass forms of coercion "such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence").

Plaintiffs' particular "background" and "circumstances," including their "special vulnerabilities," are key to the forced labor analysis. 18 U.S.C. § 1589(c)(2); *see Bradley*, 390 F.3d at 153 (considering "immigrant status" and "lack of local ties"); *Shukla v. Sharma*, 2012 WL 481796, at *4 (E.D.N.Y. Feb. 14, 2012) (considering that plaintiff was an "immigrant without his passport, that he had no money, and that that he did not speak English"). Accordingly, Defendants' actions must be evaluated through the lens of Plaintiffs' vulnerabilities: in this case, Plaintiffs are poor migrants from China who, at the time of their exploitation, did not speak English, lacked any knowledge of the U.S. legal system, and had incurred large debts and posted significant collateral back in China for the opportunity to work in Saipan. (FAC ¶¶12-19, 52-53).

The FAC establishes that Defendants forced Plaintiffs to work by exploiting their fear of "serious harm" if they did not repay their debts, including: physical harm against them and their families by loan sharks; financial harm from the growing interest on their debts and loss of their homes or other collateral; and reputational harm from the embarrassment, shame, and "loss of face" amongst their family and community. (FAC ¶¶52-53, 55-56, 101-102, 188, 315). These fall squarely within the

types of "serious harm" that courts have routinely found to satisfy the TVPRA. *See, e.g., David v. Signal Int'l., LLC*, 37 F. Supp. 3d 822, 832 (E.D. La. 2014) (inability to repay debts constitutes serious harm sufficient to survive motion to dismiss); *Sulastri v. Halsey*, 2014 WL 4904527, at *2 (E.D.N.Y. Sept. 30, 2014) (evidence that plaintiff continued working in order to repay debt is sufficient to create an issue of material fact); *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011) (allegation that plaintiffs had to keep working to repay debts states a claim); *U.S. v. Calimlim*, 538 F.3d 706, 710-11 (7th Cir. 2008) (inability to support family in home country constitutes "serious harm"). *See also U.S. v. Farrell*, 563 F.3d 364, 375 (8th Cir. 2009) ("It would have been extremely difficult, if not impossible, for the workers to meet their debt obligations on salaries in the Philippines.")

Defendants further engaged in a series of practices that were not simply indicative of "bad employer-employee relationships" (IPI at 7), but designed to make Plaintiffs fear that if they did not continue working, then they would have no way of repaying their debts, and would thus suffer serious harm. For instance, MCC and Gold Mantis took additional fees from workers before permitting them to start working, thus forcing them deeper into debt. (FAC ¶¶63, 80, 313). *See Nunag-Tanedo*, 790 F. Supp. 2d at 1138 (previously undisclosed fees required to start work). Defendants systematically withheld wage payments, such that Plaintiffs would be forfeiting these earnings if they left their job (FAC ¶¶66, 96-99, 313), and if Defendants paid any wages, it was less than Plaintiffs had been promised and below the minimum wage (FAC ¶¶52-62, 67-69, 94-95). *See Farrell*, 563 F.3d at 368 (forced labor where paid less than promised and debt increases); *Bradley*, 390 F.3d at 149 (paid less than promised); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 111 (D.D.C. 2012) (promises of decent pay).

The dehumanizing treatment of Plaintiffs – including the inadequate housing, excessive work hours and compulsory overtime, extremely dangerous work conditions, and denial of medical care –

is further evidence of forced labor. (FAC ¶¶4, 48, 64-65, 77-78, 84-86, 88, 115, 160, 333). *See Farrell*, 563 F.3d at 373 ("employment and living conditions" support coercion finding); *Shukla*, 2012 WL 481796, at *3 (payment below what promised, excessive hours, and housing in "cramped, dirty" space support forced labor finding).

Similarly, MCC confiscated the passports of the MCC/GM Plaintiffs (FAC ¶76), which impeded them from leaving their job without MCC's consent. *See Lagayan v. Odeh*, 199 F. Supp. 3d 21, 28 (D.D.C. 2016) (confiscating passport evidence of "scheme" to make victim believe serious harm or physical restraint would result if stopped working). MCC's contention that "Plaintiffs do not allege that MCC refused to release their passports" is irrelevant. (MCC at 5). The statute does not require Plaintiffs to make such a request; it merely requires that MCC "confiscates" or "possesses" the documents. 18 U.S.C. § 1592(a); *Dann*, 652 F.3d at 1173.[3]

Defendants also made direct threats that serious harm would result if Plaintiffs did not continue to work. MCC and Gold Mantis threatened Plaintiffs that if they did not work hard, they would be sent back to China; that if they left this job, nobody else would hire them; and that complaining to the government would be futile. (FAC ¶¶5, 70, 74, 75, 115, 121, 313). Gold Mantis also fined disobedient workers and even threatened to physically abuse or kill them. (FAC ¶¶5, 103-114, 122). Defendants took additional steps to ensure this scheme continued, including dissuading Plaintiffs from complaining to the government, discouraging them from talking to people outside of work, obstructing government inspectors from entering the worksite, and hiding them from government authorities. (FAC ¶¶5, 71, 73, 115-118, 313). *See Bradley*, 390 F.3d at 155 (effort to minimize outside contact and

---

[3] In addition to being evidence of a forced labor scheme under 18 U.S.C. §1589, confiscation of a victim's passport with the intent to, or in the course of, subjecting that person to forced labor constitutes an additional TVPRA violation. 18 U.S.C. §§ 1592, 1595.

isolate from medical care indicative of forced labor). It can be inferred that these acts contributed to Plaintiffs' fear that if they stopped working, they would suffer harm.

Individually, and certainly taken together, these allegations certainly suffice to state a claim that Plaintiffs were subject to forced labor under § 1589. Defendants' arguments to the contrary are unavailing.

Defendants' contention that informing Plaintiffs that nobody else in Saipan would hire them was a "permissible warning of adverse but legitimate consequences" (MCC at 5) ignores the impact of the statement on Plaintiffs. Immigration consequences such as arrest and deportation constitute a "serious harm" and Defendants' warnings were intended and understood by Plaintiffs as threats of such harm. *See U.S. v. Rivera*, 2012 WL 2339318, at *6 (E.D.N.Y. June 19, 2012) (victims continued working out of fear of deportation), *aff'd*, 799 F.3d 180 (2d Cir. 2015); *Shukla*, 2012 WL481796, at *4 (returning to country lawfully and being forcibly deported are "clearly distinguishable"). Regardless, at best, Defendants have raised a factual question as to the nature of the "warning," *see Calimlim*, 538 F.3d at 713 (for jury to decide whether understood as threat or advice), but these statements should be interpreted as threats in deciding this motion because all inferences are drawn in Plaintiffs' favor, *Iqbal*, 556 U.S. at 678.[4]

Defendants' argument that the conduct alleged in the FAC "do[es] not amount to the type of 'serious harm' or 'threats of serious harm' protected by the TVPA" (MCC at 5) is plainly wrong. *See*, *e.g.*, *Lagayan*, 199 F. Supp. 3d at 28 (D.D.C. 2016) (denying motion to dismiss because domestic worker's allegations of excessive work hours, warnings not to talk with family members or others,

---

[4] The cases cited by Defendants on this issue do not help their argument. In *Headley*, the court found the fact that two ministers might "potentially [lose] contact with family, friends, or each other" if they stopped working at the church would not constitute "serious harm." *Headley v. Church of Scientology Intern.*, 687 F.3d 1173, 1180 (9th Cir. 2012). That consequence is far less severe than being arrested and deported by law enforcement. *Bradley* is not particularly instructive on this point because it primarily considers whether a jury should be instructed to distinguish improper threats from permissible warnings, but has no holding as to where that line is. *Bradley*, 390 F.3d at 151.

required supervision outside of home, and failure to pay wages "are more than sufficient to give rise to a plausible inference that Defendants" violated § 1589); *Lesnik v. Eisenmann SE*, 2018 WL 4700342, at *13 (N.D. Cal. Oct. 1, 2018) ("immigration threats, …financial threats, threats of litigation, and threats to withhold medical care…are sufficient to state a claim under § 1589). Accordingly, the threats of physical violence, deportation, and forfeited wages if Plaintiffs' left their jobs, combined with the multiple forms of harm that Plaintiffs would face if unable to repay their debts, are more than sufficient to state a claim for forced labor.[5]

Similarly, Imperial Pacific's argument that Plaintiffs "were not isolated but instead worked publicly in the proximity of many co-workers, and were not repeatedly threatened by IPI or any other defendant" is factually inaccurate and misstates the legal standard. (IPI at 7). Defendants *did* threaten Plaintiffs with arrest, deportation, and physical harm (FAC ¶¶5, 55, 109-115, 160) and Plaintiffs *did not* work publicly: Defendants refused an OSHA inspector entry onto the worksite, hid Plaintiffs from government inspectors, and told them not to speak with outsiders (FAC ¶¶6, 115, 117-118, 137-138, 202, 313). Whether Plaintiffs entered the U.S. legally is also not determinative.[6] *See Calimlim*, 538 F.3d at 708 (lied to consular officer to obtain entry visa); *David*, 37 F. Supp. 3d at 824-25 (entered

---

[5] Imperial Pacific argues that the physical injuries suffered by Plaintiffs were not inflicted upon them by Defendants in furtherance of the forced labor or trafficking scheme. (IPI at 6-7). Plaintiffs do not rely on the injuries as the "serious harm" that would result if they stopped working for Defendants. However, the fact that Plaintiffs continued working despite these dangers is further evidence of Defendants' coercion. Instead, the injuries are part of the damages suffered as a result of Defendants' forced labor and trafficking wrongdoing.

[6] MCC states in its motion that because Plaintiffs would need to go through Customs and Border Protection to enter Saipan, they must have known they were not authorized to work. (MCC at 2). This factual allegation is unsupported and its legal relevance is unclear. Nonetheless, Plaintiffs do not deny learning at some point that they lacked legal authorization to work in the CNMI. (FAC ¶54). In fact, their precarious immigration status made them more vulnerable to Defendants' threats and coercive tactics, which Defendants readily exploited. (FAC ¶55).

12

U.S. legally on H-2B visas). Once again, at best, Defendants have raised an issue of fact to be resolved later in this litigation.

### 2. Plaintiffs state at least one claim under the TVPRA against each of the Defendants.

Each Defendant objects in some manner that the allegations as to its own particular conduct are insufficient. These poorly-crafted arguments all fail. The FAC adequately pleads claims against each Defendant under the TVPRA.[7] MCC and Gold Mantis are both liable under 18 U.S.C. § 1589(a) because they obtained the labor of Plaintiffs, who worked over 12 hours per day on their behalf (FAC ¶¶64, 84-85), and engaged in the threats, non-payment, and other coercive conduct comprising the forced labor scheme detailed above.[8]

MCC and Gold Mantis are also liable for trafficking under 18 U.S.C. § 1590 because they, in violating the forced labor provisions, amongst other acts, "harbored" Plaintiffs by providing them housing and food, and concealing their existence from government authorities, for purposes of obtaining their labor. *Mouloki v. Epee*, 262 F. Supp. 3d 684, 698 (N.D. Ill. 2017) (provision of lodging in order to obtain victim's labor constitutes harboring); *Ricchio v. McLean*, 853 F.3d 553, 556 (1st

---

[7] *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017) (finding one plausible claim under TVPRA is sufficient to deny motion to dismiss, even if other plausible claims exist).

[8] In its brief, MCC confusingly argues that "Plaintiffs do not allege what services they performed under threat that benefited MCC." (MCC at 5). All of Plaintiffs' work on the casino project was for the benefit of Defendants. MCC also states that "Plaintiffs fail to allege" that they were included in an April 17, 2017 settlement agreement concerning back wages, recruitment fees, and repatriation costs or "to what extent" these damages remain. (MCC at 2). Plaintiffs have pleaded multiple types of damages, such as medical costs and emotional distress (FAC ¶¶322, 328, 334), which are unaffected by any settlement. Further, Plaintiffs are not in possession of the settlement agreement (and MCC has not provided it) and therefore cannot comment on its impact, but MCC is free to plead in its answer that monies already paid should offset any recovery through this litigation.

13

Cir. 2017) (stated claim for harboring under § 1590 against motel owner who knowingly rented room to perpetrator engaged in forced labor).

To be clear, those Plaintiffs who only worked for Gold Mantis also state a plausible claim against MCC because the company participated in or, at a minimum, "knowingly benefited" from Gold Mantis' forced labor scheme. 18 U.S.C. §§ 1589(b) (imposing penalties on anyone who "knowingly benefits, financially or by receiving anything of value" from participation in forced labor venture, "knowing or in reckless disregard" of the fact that the venture obtained labor services through such means), 1595 (allowing suit against whoever "knowingly benefits" from participation in a venture which that person "knew or should have known" engaged in forced labor). The FAC allegations permit the easy inference that MCC knew about or "recklessly disregarded" the fact that Gold Mantis workers were subject to forced labor practices: MCC and Gold Mantis employees were on the same construction site, lived in the same dorms, and shared the same buses; some of MCC's own former *heigong*, known to be in debt and underpaid, went to work for Gold Mantis; MCC permitted Gold Mantis workers to labor under dangerous conditions on the construction site over which it had significant control; in January, 2017, Gold Mantis workers protested publicly that they were not being paid; and a Gold Mantis representative was part of the group that decided to deny OSHA access to the worksite. (FAC ¶¶52-61, 63-79, 88, 137-143, 206).

Furthermore, MCC clearly "benefited" from this scheme: after MCC received $90 million to be the "general contractor" on the project (FAC ¶¶28, 129), through Gold Mantis and other contractors quickly completing the work by using cheap, obedient workers, Imperial Pacific expressed its satisfaction with MCC's management of the project and discussed the possibility of future collaborations together (FAC ¶209). MCC's efforts to conceal all of the contractors' *heigong* from OSHA (FAC ¶¶137-138, 145) also suggest that they were knowingly benefitting from the scheme. *Calimlim*, 538 F.3d at 714 (effort to hide worker evidences that profiting from her labor).

14

Gold Mantis argues that Plaintiffs' TVPRA claims should be dismissed because there could be "a different theory of liability" depending on the precise relationship between Gold Mantis and Supervisor Kong, but cites no legal authority in support of this contention and provides no explanation as to why the claims should be dismissed. (Gold Mantis at 2-3). Regardless of Gold Mantis' precise relationship with Supervisor Kong (about which Gold Mantis possesses the relevant evidence), the company still did "obtain" Plaintiffs' labor through a forced labor scheme (§ 1589(a)). Moreover, not only Supervisor Kong engaged in these coercive acts; the company and its other managers also issued threats and instructions to Plaintiffs to hide from authorities (FAC ¶¶93, 115-118), told Plaintiffs to work harder (FAC ¶92), and arranged Plaintiffs' housing, meals, and transportation (FAC ¶¶83, 88-90, 100). Further, whatever Supervisor Kong's role, Gold Mantis still harbored Plaintiffs under § 1590 by providing housing (FAC ¶88) and seeking to conceal Plaintiffs from authorities (FAC ¶¶115-118, 137-138). Additionally, the FAC alleges facts to state a claim against Gold Mantis under § 1589(b). The pleadings establish that Gold Mantis knew or recklessly disregarded the coercive tactics being used. (*See* FAC ¶88 (Gold Mantis housed, transported, and fed Plaintiffs with its other workers), 101 (knew Plaintiffs were indebted), 113 (knew Supervisor Kong hit a worker but took no action)). Gold Mantis also "benefitted" from quickly and cheaply performing its $30 million contract (FAC ¶24) through obedient workers who labored long hours (sometimes 24 per day) for far below minimum wage. Indeed, Gold Mantis expressed a desire to continue working on the casino project (FAC ¶126), evidencing that it benefitted from the first phase.

The FAC also easily states a claim that Imperial Pacific knowingly benefitted from the forced labor scheme perpetrated by MCC and Gold Mantis. 18 U.S.C. §§ 1589(b), 1595. FAC allegations permit a reasonable inference that Imperial Pacific knew about or, at a minimum, recklessly disregarded Plaintiffs' situation: Imperial Pacific was repeatedly told about the use of unauthorized workers on the construction site; it knew the contents of the OSHA Affidavit, including the high rate

of injuries, that injuries were not being reported to OSHA, and that injured workers were being sent back to China over doctors' objections; workers from Gold Mantis and another subcontractor each protested publicly that they had not been paid; it helped keep an OSHA inspector off the worksite to prevent discovery of the presence of *heigong*; it provided housing for workers; it arranged the buses for workers, which transported them to hide in the dorms when inspectors came to the worksite; it had staff on the worksite and staff inspecting the dorms; the CNMI government told Imperial Pacific that workers were laboring in excess of the provisions of a working hours stipulation; and it orchestrated the transfer of workers between contractors. (FAC ¶¶6, 31, 46, 48, 50, 164-216). In a comparable case, the court in *Lesnik* found "knowledge" where Tesla allegedly knew its contractor's employees worked outside the terms of their visas, knew they worked long hours, observed them being transported in vans to company accommodations, knew of job hazards on site, and gave some work instructions to the contractor. *Lesnik*, 2018 WL 4700342, at *14 ("Tesla knew or should have known of [contractor]'s mistreatment of the workers who spent every day at Tesla's facility"). *See Adhikari*, 697 F. Supp. 2d at 684 (publicized complaints by subcontractor's workers establishes knowledge).

The FAC pleads facts sufficient to infer that Imperial Pacific "benefitted" from the forced labor scheme. Enough progress on the project was made for Imperial Pacific to keep its license and earn billions of U.S. dollars through its gambling operations. (FAC ¶¶214-216). Imperial Pacific also praised MCC's performance on the project, implying MCC had adequately fulfilled its obligations and the relationship was beneficial to Imperial Pacific. (FAC ¶209). Similarly, Gold Mantis' desire to continue working on the casino project permits an inference that the parties benefited from the first phase. (FAC ¶126). *See Lesnik*, 2018 WL 4700342, at *14 (finding Tesla "benefitted" under § 1589 because the contractor's actions were committed to fulfill a contract signed with Tesla). Imperial Pacific's continued failure to act upon information that contractors were employing *heigong* on the worksite and its efforts to conceal these workers from OSHA (FAC ¶¶137-138, 145) further

demonstrate that it was benefitting from the scheme. *Calimlim*, 538 F.3d at 714 (concealment is evidence of benefit).

Imperial Pacific is also liable for trafficking under 18 U.S.C. § 1590 because it "harbored" and/or "transported" Plaintiffs in furtherance of the forced labor scheme by providing dormitories for the workers (FAC ¶¶31, 193) and operating the buses transporting them (FAC ¶¶201-202). *Mouloki*, 262 F. Supp. 3d at 698; *Ricchio*, 853 F.3d at 556.

For the reasons set forth above, Plaintiffs have also stated claims against each Defendant under the substantially similar CNMI Anti-Trafficking Act.[9]

## C.  PLAINTIFFS STATE CLAIMS FOR NEGLIGENCE AND UNDER 4 CMC § 9304

### 1.  Plaintiffs state a claim for negligence against each of the Defendants.

"A person acts negligently if the person does not exercise reasonable care under all the circumstances. Primary factors to consider in ascertaining whether the person's conduct lacks reasonable care are the foreseeable likelihood that the person's conduct will result in harm, the foreseeable severity of any harm that may ensue, and the burden of precautions to eliminate or reduce the risk of harm." Restatement (Third) of Torts: Phys. & Emot. Harm § 3 (Am. Law Inst. 2010) (hereinafter, "Restatement (Third) of Torts"); *Weilian Lu, by & through Xiaojie Ge v. Star Marianas Air, Inc.*, 2015 WL 632390, at *2 (D. N. Mar. I. Feb. 12, 2015) ("Commonwealth negligence claims are governed by the restatements of the American Law Institute"). "An actor whose negligence is a factual cause of physical harm is subject to liability for any such harm within the scope of liability."

---

[9] Like the TVPRA, the CNMI law permits victims to bring a civil action (6 CMC § 1507) against any person who: "recklessly, knowingly, or intentionally subjects, or attempts to subject, another person to forced labor" (6 CMC § 1502); "[k]nowingly recruits, transports, entices, harbors, provides, or obtains by any means, another person…knowing that the person will be subject to [forced labor]" (6 CMC § 1503(a)); or "[b]enefits financially or receives anything of value, from knowing participation in a venture" which has engaged in the above acts (6 CMC § 1503(b)).

Restatement (Third) of Torts § 6. "Conduct is a factual cause of harm when the harm would not have occurred absent the conduct." *Id.* § 26. "Generally, an actor has a duty to exercise reasonable care when his conduct creates a risk of physical harm." *Weilian Lu*, 2015 WL 632390, at *2 (*citing* Restatement (Third) of Torts § 7).[10]

    The FAC pleads a plausible claim that each Defendant acted negligently by failing to exercise reasonable care, which caused harm to Plaintiffs. Defendants each owed a duty to Plaintiffs to maintain a safe work environment because they had knowledge of the dangerous conditions and high injury rate, which made future injuries foreseeable, and each one exercised sufficient control such that it had the power to mitigate those dangers. (FAC ¶¶129, 130, 166-168, 179-185, 189, 330, 331). Yet, even after the December, 2016 visit by OSHA made clear that injuries were common and current safety precautions were inadequate, no Defendant exercised reasonable care by using its authority and control to improve safety procedures or conditions on the site. (FAC ¶¶135-142, 151). Instead, each Defendant failed to provide adequate training, failed to provide adequate protective equipment, failed to provide adequate manpower, and failed to remedy unsafe conditions. (FAC ¶¶131, 156, 159, 332). Further, Defendants also were in a great rush to finish the project, and either pushed or permitted Plaintiffs to work long shifts, sometimes up to 24 hours, with no days off, which foreseeably increased the risk of injury. (FAC ¶¶6, 39, 47-49, 84-86). The FAC sets forth how these acts and omissions by Defendants, such as a lack of training, equipment, and manpower, were a cause of Plaintiffs' injuries. (FAC ¶¶232-233, 241, 251, 276, 285, 296, 334). *See Terrell v. Cent. Washington Asphalt, Inc.*, 2015 WL 4419375, at *4 (D. Nev. July 20, 2015) ("Breach and causation generally are fact questions for the jury").

---

[10] In cases involving physical harm, negligence is sometimes described as consisting of the following elements: duty; failure to exercise reasonable care; factual cause; physical harm; and harm within the scope of liability (historically, "proximate cause"). The aforementioned standard is intended to incorporate these elements. *See* Restatement (Third) of Torts § 6 comment b.

At the risk of being repetitive, in light of Defendants' objections, a prima facie case for each Defendant is articulated below. Imperial Pacific had a duty arising not only from the fact that it commissioned the construction of the casino resort, but also maintained significant control over safety conditions, including through regular inspections. (FAC ¶¶37, 180, 185). It also had and exercised the authority to set and enforce rules for how its contractors operated as well as to shut down the site. (FAC ¶¶181-183). Particularly upon learning from OSHA of the high rates of injuries on the site and legal violations by its contractors, it was easily foreseeable that more workers would be injured. Therefore, fulfilling a duty of reasonable care required taking measures to mitigate these harms. However, Imperial Pacific breached this duty: it neither shut down the site nor ensured better safety measures. Imperial Pacific further breached its duty by failing to ensure the provision of adequate training, adequate protective equipment, or adequate manpower, or otherwise remedying unsafe conditions. (FAC ¶¶ 131, 151, 156, 159, 241, 276, 332). Quite to the contrary, Imperial Pacific ignored multiple written pleas from a safety expert to stop work, forced a safety expert to shorten safety briefings, and impeded OSHA's access to the worksite. (FAC ¶¶138, 190-191). These acts and omissions by Imperial Pacific were a cause of Plaintiffs' injuries. (FAC ¶¶ 232-233, 241, 251, 276, 285, 296, 334).

MCC's duty arises from its role as the general contractor with shared responsibility for ensuring safety on the entire worksite, such as safety issues concerning working conditions, worker training, and the use of protective equipment. (FAC ¶129). It received OSHA trainings and thus understood how violations of federal regulations lead to injuries. (FAC ¶128). Particularly after the filing of the OSHA Affidavit (FAC ¶¶140-142), MCC knew that the current safety precautions resulted in high rates of injuries and thus future harm was foreseeable if nothing changed. MCC breached its duty by not exercising reasonable care in this scenario. Instead, it denied the OSHA inspector access to the site and committed multiple "serious" violations of federal regulations, including not reporting

injuries. (FAC ¶¶138, 148-149). MCC made no changes to the operations on the construction site, failing to take steps to ensure that workers received adequate training and protective equipment, that there was sufficient manpower to perform tasks, and to remove unsafe conditions. (FAC ¶¶131, 151, 156, 159, 241, 276, 332). These acts and omissions by MCC were a cause of Plaintiffs' injuries. (FAC ¶¶232-233, 241, 251, 276, 285, 296, 334).

Gold Mantis had a duty to exercise reasonable care in ensuring a safe work environment. Given the dangers inherent in construction work, and evidence of the high injury rate on the Imperial Pacific site, it was foreseeable that a failure to take adequate safety measures would result in injury. Gold Mantis breached its duty and failed to act reasonably: including by refusing OSHA access to the worksite; not reporting injuries; committing "serious" violations of federal regulations; and not making changes even after the OSHA investigation, but instead continuing to push Plaintiffs to work long hours with little rest, failing to provide adequate training, failing to provide the proper protective equipment, failing to provide sufficient manpower, and failing to remove safety hazards on the worksite. (FAC ¶¶84-86, 131, 138, 147, 151, 156, 159, 241, 276, 306, 332). These acts and omissions by Gold Mantis were a cause of Plaintiffs' injuries. (FAC ¶¶232-233, 241, 251, 276, 285, 296, 334).

Defendants also acted negligently not only in hiring unqualified contractors, but also in failing to remove them after they proved unable to ensure safety on the worksite. *See* Restatement (Third) of Torts § 55 (general duty of care applies to actor hiring contractor). Imperial Pacific hired contractors despite knowing they had little or no experience operating in the United States. (FAC ¶179). It required them to comply with all laws and had a zero-tolerance policy for violations (FAC ¶181), but then, even after learning from OSHA of the high injury rate and regular violations of federal regulations, Imperial Pacific failed to exercise reasonable care when it permitted MCC and Gold Mantis to continue operating on the site (FAC ¶151) – even praising them (FAC ¶209). Similarly, MCC acted negligently by allowing other contractors to continue operating on the site despite knowing of the high injury rate,

dangerous conditions, and violations of federal workplace standards.[11] *But see Skinner*, 562 U.S. at 530 (a precise legal theory need not be plead in the complaint to survive a motion to dismiss).

Defendants make a variety of misguided arguments to dismiss Plaintiffs' claims for negligence. Defendants have offered no legal authority in support of these arguments, except as concerns the exclusive remedy under the workers' compensation law (discussed below). The only case concerning negligence that is cited, *Owens*, is procedurally and factually inapposite to the present case. *Owens v. Commonwealth Health Center*, 2012 WL 2501082 (N. Mar. I. June 7, 2012) (opinion concerning whether the plaintiff, having successfully sued the hospital for misdiagnosing his injury, was entitled to future economic damages based on the evidence at trial).

Gold Mantis argues that the FAC is inadequate because Plaintiffs stated that "Defendants" were responsible for Plaintiffs' injuries, instead of saying "Gold Mantis" is responsible. (Gold Mantis at 4).[12] However, the term "Defendants" is clearly defined in the FAC to mean "Imperial Pacific, MCC, and Gold Mantis" (FAC ¶32) – a fact that Gold Mantis acknowledges in its brief (Gold Mantis at 4, n.2). Moreover, it is well-established that multiple parties can be negligent for the same injury. *See* Restatement (Third) of Torts § 26 comment c (recognizing there can be multiple factual causes); *Weilian Lu*, 2015 WL 632390 at *2 (one party's duty to exercise reasonable care "does not displace" that of another party); *Commonwealth Ports Authority v. Leo A. Daly Company, et al.*, No. 13-cv-0085, at *13 (N. Mar. I Super. Ct. June 20, 2014) (recognizing that the CNMI has two statutes explicitly addressing issues involving joint tortfeasors). *See also* Restatement (Third) of Torts: Apportionment Liab. §§ 15 (Am. Law. Inst. 2000) (persons acting in concert), 17 (joint liability). Since

---

[11] There are additional grounds for the negligence claims against the Defendants. For instance, it was foreseeable that not providing medical attention or medical care to Plaintiffs after their injuries would cause additional suffering and emotional distress, but Defendants failed to do this. (FAC ¶¶333-334).

[12] Specifically, Gold Mantis argues that the FAC pleadings concerning Plaintiffs Dong Han and Youli Wang allege that "Defendants" failed to provide adequate training or equipment. (Gold Mantis at 4).

Gold Mantis is included in the FAC allegations that "Defendants" failed to provide adequate training or the proper equipment (FAC ¶¶241, 276), and because Gold Mantis breached its duty in multiple other ways as described above (FAC ¶¶332-333), this argument fails.

Gold Mantis also argues that the FAC pleadings concerning the injury of "Liang cai" (sic) – presumably Plaintiff Liangcai Sun ("Mr. Sun") – contain "no allegations of negligence" because it is not explicitly stated that Gold Mantis failed to provide him adequate training or equipment. (Gold Mantis at 4). This argument also lacks merit. Plaintiffs specifically allege that "Defendants did not provide Plaintiffs with adequate training or the proper protective equipment to perform their jobs safely" (FAC ¶156), which includes Gold Mantis (FAC ¶32) and Mr. Sun (FAC ¶20). Furthermore, the FAC alleges multiple other ways in which Defendants, including Gold Mantis, breached their duty to keep Plaintiffs safe, including failing to provide the appropriate equipment to complete the assigned tasks. (FAC ¶332(c)). The failure to provide appropriate machinery to lift heavy boxes was a cause of Mr. Sun's injury. (FAC ¶253).

MCC argues that it is "impossible" for Plaintiffs to establish that MCC caused their injuries because MCC was not their employer at the time of the injuries. (MCC at 6 ("Plaintiffs do not allege a causal link between their losses and MCC")). MCC's extremely bold legal proposition that *only* an employer can cause injury to an individual is simply untrue. *See*, *e.g.*, Restatement (Third) of Torts § 27 (multiple sufficient causes). In an instructive New York case, where the subcontractor's employee was injured by a car that veered onto a construction site, the court held that a jury could still find that the failure by the general contractor (who was not plaintiff's employer) to erect proper barriers around the site was a proximate cause of the injuries. *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308 (1980). This "determination of whether a particular negligent act is the proximate cause of a resulting injury is a question of fact for the jury." *Grizzard v. Mogambo, Inc., et al.*, No. 95-cv-657 (N. Mar. I. Super. Ct. July 26, 1999) (*citing Doagett v. United States*, 875 F.2d 684, 692 (9th Cir. 1989)). As

discussed above, regardless of whether MCC was Plaintiffs' employer, the detailed pleadings in the FAC state a plausible claim that MCC had a duty to ensure a safe work environment, breached the duty in numerous ways, and this was a cause of Plaintiffs' injuries.

### 2.   MCC and Gold Mantis' argument that Plaintiffs' 4 CMC § 9304 claim should be dismissed lacks merit.

MCC and Gold Mantis argue that Plaintiffs' fourth cause of action pursuant to 4 CMC § 9304 should be dismissed because the allegations are conclusory or because it fails to name the "subcontractor" as a party. (MCC at 7; Gold Mantis at 5). This provision concerns the liability of a contractor to a worker where the subcontractor fails to secure compensation. 4 CMC § 9304(c). This provision is designed for situations such as this where multiple defendants point fingers at each other and seek to obfuscate their actual relationship to injured workers. Nonetheless, the FAC pleads that Plaintiffs were injured and that no entity secured compensation for them (FAC ¶¶298, 307), and that Plaintiffs' employer was a subcontractor of Gold Mantis, MCC, and/or Imperial Pacific (FAC ¶339). Together with the other allegations of the FAC, these state a plausible claim for relief under this section. (FAC ¶¶37-38 (Imperial Pacific was the developer and signed contracts with MCC and Gold Mantis); 129 (MCC was general contractor); 305 (Gold Mantis denies that Plaintiffs were its employees)). Plaintiffs are permitted to advance alternate legal theories at the motion to dismiss stage, particularly where Defendants are in control of the relevant evidence defining their precise relationship to each other and the workers. Indeed, Defendants acknowledge the appropriateness of advancing alternative theories (Gold Mantis at 5) and cite no authority to the contrary. There is no requirement that the subcontractor be included as a defendant, and Defendants cite no authority otherwise. Accordingly, the motion to dismiss this cause of action should be denied so that discovery on these issues may commence.

### 3. Imperial Pacific's argument that Plaintiffs' negligence and 4 CMC § 9304 claims should be dismissed because it allegedly purchased a workers' compensation policy fails.

Imperial Pacific argues that Plaintiffs' negligence claims against it are barred because it maintained a workers' compensation insurance policy and Plaintiffs did not file a timely workers' compensation claim. (IPI at 2-4 (*citing* 4 CMC § 9305)). This argument fails. As a matter of law, to avail itself of the workers' compensation exclusivity provision, a company in the CNMI must both purchase a policy that covers the specific plaintiff's injuries and, if it did, notify the plaintiff of his/her right to obtain relief through the workers' compensation system.

The exclusivity provision of the Workers' Compensation Act (the "Act") provides:

> "Where the conditions of compensation exist, the right to recover such compensation, pursuant to the provisions of this chapter, is the exclusive remedy for injury or death of an employee against the employer or against any other employee of the employer acting within the scope of such other employee's employment; provided that, if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death resulted from the injury, may elect to claim compensation under this chapter, or to maintain an action at law or for damages on account of such injury or death." 4 CMC § 9305.

The Act also puts numerous obligations on employers, including that "[e]very employer who has secured compensation under the provisions of [the Act to] keep posted in a conspicuous place in or about each of its places of business, typewritten or printed notices" stating this fact. 4 CMC § 9343(a). Employers must also file a report with the workers' compensation administrator within ten days of learning about a worker's injury. 4 CMC § 9339.

If an entity does not "secure" compensation, however, then the exclusivity provision of the Act does not apply. The court in *Bernal*, a case cited by Imperial Pacific, held that while an employer's failure to make timely and full payments of benefits does not constitute a failure to "secure" compensation permitting a tort action, a failure to carry workers' compensation coverage would be

such a failure. *Bernal v. Tenorio Enterprises*, No. 93-cv-890, at *4 (N. Mar. I. Super. Ct. May 25, 1994) (noting "[t]he California courts have taken this position").

The other case cited by Imperial Pacific, *Muna*, holds that an employee cannot avail itself of the exclusivity provision of the Act where it has not fulfilled its legal obligation to notify a worker of his/her right to collect workers' compensation. *Muna v. Pacific Development, Inc.*, No. 96-cv-1115, at *4 (N. Mar. I. Super. Ct. Aug. 10, 1998) ("without any form of notice, it would be improper to apply the exclusivity provision of the Act") (*citing Brown Services, Inc. v. Fairbrother*, 776 S.W.2d 772 (Tex. App. Corpus Christi 1989)). *See also Martin v. Scott Paper Co.*, 511 A.2d 1048, 1052 (Me. 1986) ("To allow an employer who has not complied with the notice provisions [of the statute] … to continue under the [statute] to claim immunity from civil suit would be inconsistent with the notice requirements"); *Ferguson v. Hosp. Corp. Int'l*, 769 F.2d 268, 273 (5th Cir. 1985) (holding employer's "failure to comply with any of the notice provisions bars it from … assert[ing] that [the worker's] remedies are limited to the exclusive remedy of workers' compensation").

a. <u>Under Rule 12(b)(6), Imperial Pacific's motion to dismiss based on its workers' compensation policy should be denied because it failed to "secure" compensation.</u>

Imperial Pacific's argument fails because the FAC pleads that Imperial Pacific had no workers' compensation insurance policy that covered Plaintiffs. (FAC ¶157). Because these allegations are to be accepted as true on a motion to dismiss, Imperial Pacific's argument should be rejected and its motion denied. Imperial Pacific's opposition to the third and fourth causes of action is based entirely on the Declaration submitted by its own employee (Attao Decl. ¶¶5-6) and parts of a disjointed exhibit of e-mails, parts of a workers' compensation policy, and alleged amendments thereto. It is not appropriate to submit such materials as part of a pre-discovery Rule 12(b)(6) motion to dismiss and the Court is not required to consider it. *See* Fed. R. Civ. P. 12(d) (noting discretion of Court on a Rule 12(b)(6) motion to exclude matters presented that are outside the pleadings). As Imperial Pacific has

neither cited any authority to support the propriety of introducing these new facts at this stage, nor requested that this motion be treated as a motion for summary judgment, the Court should simply evaluate the sufficiency of the FAC and deny Imperial Pacific's claim.

                b.   <u>Even under Rule 56, Imperial Pacific's motion must be either denied or stayed because material issues of fact remain and Plaintiffs have not been afforded an opportunity to conduct discovery.</u>

If the Court converts Imperial Pacific's motion to one for summary judgment and considers its evidence, the motion should still be denied because it falls far short of demonstrating the absence of a genuine dispute as to whether the policy covered Plaintiffs' injuries. Fed. R. Civ. P. 56(c)(1)(B). If not dismissed for that reason, the motion for summary judgment should be denied or stayed to provide Plaintiffs an opportunity to conduct discovery concerning the scope of the IPI Policy. Fed. R. Civ. P. 56(d)(2). *See also* Fed. R. Civ. P. 12(d) (If a Rule 12(b)(6) motion is converted to a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.")

In support of its argument, Imperial Pacific's memorandum of law only references a single paragraph of the IPI Policy, which it claims "clearly and expressly provides that it covers claims of employees of construction subcontractors." (IPI at 3). In reality, that is far from clear. The paragraph in question is part of a boilerplate policy drafted 25 years prior to when Imperial Pacific purchased its insurance coverage:

> "If the Employer is a contractor the subject of whose contract includes operations covered by this Policy and he (sic) shall sub-contract all or any part of such contract to one or more sub-contractors, the remuneration of all the direct employees of all such sub-contractors shall be included in the return of remuneration under the provisions of this Policy upon which premium is computed. Such remuneration so reported shall be considered the remuneration of employees of this Employer and shall in all instances be governed by the same terms, conditions, requirements and obligations of the Policy as the remuneration of the direct Employees of this Employer." (IPI Policy at 9).

26

The above paragraph does not establish, let alone conclusively establish, that its policy covers Plaintiffs. First, the provision appears to be inapplicable. This boilerplate paragraph only applies to situations in which the "Employer" [Imperial Pacific] is a "contractor" operating "subject" to a contract that "includes operations covered by this Policy" that is then further subcontracted. However, in terms of the construction of the casino, Imperial Pacific is the developer (FAC ¶37), not a "contractor," and Imperial Pacific offered no "contract" or other evidence to establish otherwise. Second, Imperial Pacific provides no evidence of the identity of its "subcontractors," let alone that Plaintiffs were the "direct employees" of any of these subcontractors. In fact, Gold Mantis explicitly stated in a letter to Plaintiffs' counsel that Plaintiffs were *not* employed by Gold Mantis. (FAC ¶305).

Third, there is no evidence suggesting, let alone conclusively establishing, that the "operations covered by this Policy" include the actual construction of the casino resort. Indeed, the enumerated job positions for the purpose of calculating the premiums owed under the IPI Policy strongly suggest otherwise, as they are positions involved in operating a casino or supervisor/managerial-level jobs. (IPI Policy at 3, 5, 17). The "amended endorsement" to which Imperial Pacific directs the Court via a post-it note in the exhibit (by an unidentified author) does not establish otherwise. (IPI Policy at 17). Neither the Attao Declaration nor Imperial Pacific's brief explain the relevance of the amended endorsement or how it conclusively establishes that Plaintiffs' injuries are covered by this policy. The documents appear to suggest that the policy was amended to add a category of employees in the position of "Construction/Building Surveyor/Sr. Architect." The word "construction" in this context does not mean that Imperial Pacific was now expanding its policy to incorporate all construction work on the casino resort and the over 2,000 workers performing it. Indeed, this would be an extremely unusual way to make such a dramatic change to a policy. Instead, the word "construction" is used as the title of the position of "construction surveyor." This is why it makes sense to be grouped together

with "engineers," "project managers," "senior project managers," "building surveyors," and "senior architects." (IPI Policy at 17).

The most significant evidence that this policy does not cover Plaintiffs, and was never intended to cover Plaintiffs, is what Imperial Pacific does *not* say and does *not* provide. First, after the amendment to the proposal, there is no evidence that Imperial Pacific then included the nearly 2,000 construction workers for the purpose of calculating its insurance premium, or that the premium amount even changed. Second, it does not provide any evidence of communications, either with its policy carrier or its subcontractors, that Imperial Pacific decided to purchase workers' compensation insurance on behalf of thousands of construction workers.

Third, the Attao Declaration makes only the vague statement that Imperial Pacific "carried [insurance] for its employees" (Attao Decl. ¶10), but makes no explicit claim that Plaintiffs are covered by the insurance policy. The Declaration also does not state that Gold Mantis was Imperial Pacific's subcontractor or that Plaintiffs were the "direct employees" of Gold Mantis.

Fourth, paragraph 5 of the "Conditions" of the policy requires that "when an injury occurs written notice shall be given by or on behalf of [Imperial Pacific] to the [insurance carrier] … as soon as practicable" including the "time, place and circumstances of the injury, the names and addresses of the injured and of available witnesses." (IPI Policy at 13). Imperial Pacific has provided no evidence that it provided such notice for Plaintiffs' injuries. Fifth, Imperial Pacific has similarly provided no evidence that it filed a report with the workers' compensation administrator within ten days of learning about Plaintiffs' injuries, as required by 4 CMC § 9339.

The above points illustrate that Imperial Pacific has not met its burden of demonstrating the absence of a genuine dispute as to whether it had a workers' compensation insurance policy that covered Plaintiffs' injuries and it thus "secured" compensation on their behalf pursuant to 4 CMC § 9305. *See* Fed. R. Civ. P. 56(c)(1)(B) advisory committee's comment to 2010 amendment (in

28

opposing a summary judgment motion, "a party need not always point to specific record materials. One party, without citing any other materials, may respond or reply that materials cited to dispute or support a fact do not establish the absence or presence of a genuine dispute."); *Anderson v. Martz*, 2019 WL 1958600, at *1 (S.D. Ind. May 2, 2019) ("A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.") Based on the evidence presented, particularly when viewed in the "light most favorable" to Plaintiffs and drawing all reasonable inferences in their favor, Imperial Pacific has not established as a matter of law that it procured insurance that covered Plaintiffs. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).

If the Court does not find that Imperial Pacific's motion can be dismissed at this stage, Plaintiffs should then be afforded an opportunity to conduct discovery as to whether the policy was intended to or actually did cover Plaintiffs' injuries. *Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015) ("As a general matter, of course, summary judgment is to be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition") (citations omitted). In discovery, there is good reason to believe that Plaintiffs would obtain admissible evidence showing that Gold Mantis took the position that Plaintiffs were not its own employees. (*See* Declaration of Aaron Halegua, dated May 14, 2019 ("Halegua Decl."), ¶2, Ex. A (media story reporting that Gold Mantis told the newspaper that Plaintiffs and other unauthorized workers in Saipan were working for an employment agency, not directly for Gold Mantis)). This evidence would be relevant to determining whether Plaintiffs were in fact covered by the IPI Policy. If permitted to conduct discovery, Plaintiffs would also request all evidence concerning the following: whether Imperial Pacific was a "contractor" with a "contract" to construct the casino for which it then found subcontractors; whether Imperial Pacific hired MCC or Gold Mantis as "subcontractors"; whether Plaintiffs were "direct employees" of any of Imperial Pacific's contractors;

29

whether Imperial Pacific paid insurance premiums for the thousands of construction workers after amending its policy; whether Imperial Pacific ever notified unauthorized Chinese construction workers of their right to workers' compensation benefits; whether Imperial Pacific reported the injuries of Plaintiffs or other construction workers to its insurance carrier as required under the policy; whether Imperial Pacific reported Plaintiffs' injuries to the workers' compensation authorities as required by law; and whether any unauthorized Chinese construction workers ever collected benefits under the IPI Policy. (Halegua Decl. ¶3). If Imperial Pacific's motion is treated as one for summary judgment, such information would be essential to Plaintiffs' opposition. However, these items are in Defendants' control and inaccessible to Plaintiffs. (Halegua Decl. ¶4). *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 246–47 (4th Cir. 2002) ("sufficient time for discovery is considered especially important when the relevant facts are exclusively in the control of the opposing party") (internal quotations and citations omitted). Therefore, Defendants' motion should be denied at this time or, in the alternative, stayed until the close of discovery.

> c. <u>Imperial Pacific's motion should be denied because it did not notify Plaintiffs of their right to seek compensation</u>.

Even assuming that Imperial Pacific could establish that it did "secure" workers' compensation insurance that covered Plaintiffs, its motion should nonetheless be denied because the FAC alleges that it never posted the notice required by the Act or otherwise notified Plaintiffs of their right to file a claim for workers' compensation. (FAC ¶158). Imperial Pacific has provided no evidence to the contrary. Accordingly, "it would be improper to apply the exclusivity provision" to bar Plaintiffs' claims against Imperial Pacific. *Muna*, No. 96-cv-1115, at *4. Therefore, Imperial Pacific's motion to dismiss must be denied.

## V.      MOTION TO STRIKE

Imperial Pacific moves to strike certain allegations of the FAC (¶¶127-155) concerning Defendants' disregard for the safety of Plaintiffs and other workers under Fed. R. Civ. P. 12(f). (IPI at 9). This motion is entirely without merit. Rule 12(f) permits the court to strike "any redundant, immaterial, impertinent, or scandalous matter" from a pleading. Fed. R. Civ. P. 12(f). Imperial Pacific's brief sets forth the definitions of "immaterial," "impertinent," and "scandalous," but only provides the conclusory statement that Plaintiffs "do not connect … those allegations and their specific claims" and that the allegations are "meant solely to inflame passion or prejudice against" Imperial Pacific. (IPI at 9). No further explanation is provided. While Imperial Pacific cites several cases in this section, it makes no effort to analogize them to the instant matter, likely because they are all irrelevant.[13]

Imperial Pacific either fails to understand or simply chooses to ignore the relevance of the allegations it seeks to strike. The FAC section entitled "Defendants utterly disregarded the safety of the workers" (FAC ¶¶127-155) contains allegations concerning: Defendants' awareness of OSHA's legal requirements; Defendants' knowledge of the unsafe conditions on the worksite; actual injuries suffered on the site by other workers; how Defendants refused an OSHA inspector access to the worksite even after he presented evidence that a large number of injuries occurred on the site and were never reported as required by law; the role Imperial Pacific played in denying entry to the inspector;

---

[13] *See IV Sols., Inc. v. CIGNA Healthcare of California Inc.*, 2016 WL 6902457, at *5 (C.D. Cal. 2016) (striking "prior misconduct" that predated and thus "lacked relevance" to the conduct in question at the lawsuit); *Lepp v. Yuba Cty.*, 2019 WL 1129108, at *4-5 (E.D. Cal. 2019) (striking a supplemental complaint because it was filed without leave of court, which was required for a supplemental pleading in that instance); *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994) (affirming district court decision to strike "stale and barred charges that had already been extensively litigated and would have been burdensome for Fantasy to answer" and "no legal theories regarding the relevance" of the alleged acts were offered).

the large number of "serious" OSHA violations detected on the site; the death of a worker on the site even after the OSHA inspection took place; and Defendants' failure to provide adequate training or equipment to Plaintiffs, purchase workers' compensation on their behalf, notify Plaintiffs of their right to claim workers' compensation, or report Plaintiffs' injuries upon discovering them.

These allegations are directly relevant to Plaintiffs' claims. For example, in terms of the forced labor claims, the refusal by Imperial Pacific, MCC, and Gold Mantis to allow the OSHA inspector onto the premises (FAC ¶¶137-138) permits the inference that Defendants knew of the illegal employment of *heigong* on the project and actively sought to conceal this from federal authorities. As for the negligence claims, these allegations show that Defendants knew that the worksite was dangerous, but repeatedly failed to fulfill their duty to make it safe. Instead, Defendants continued allowing Plaintiffs to work without proper training, protective equipment, or adequate machinery. Furthermore, as these facts demonstrate Defendants' reckless indifference towards the safety of their workers, the allegations are relevant to Plaintiffs' claims for punitive damages. (FAC ¶ 341(3)). This is likely the true reason that Imperial Pacific would like to see these claims stricken.

## VI.  MOTION FOR MORE DEFINITE STATEMENT

Defendants move, pursuant to Rule 12(e), to demand that Plaintiffs amend their pleadings. This rule provides that "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). In support of this motion, Defendants argue that Plaintiffs' pleading is in "shotgun form" because the first paragraph of each cause of action re-alleges all the preceding allegations. (MCC at 7-8). Gold Mantis and MCC also object to the use of the term "Defendants" regarding certain claims (Gold Mantis at 2; MCC at 9), and Gold Mantis claims that Plaintiffs are required to offer more specificity as to the particular alleged relationship between itself and Supervisor Kong (Gold Mantis at 2, 5-6). These contentions all lack merit.

The mere fact that the causes of action in a complaint reallege all the preceding paragraphs does not automatically render it an impermissible "shotgun pleading" warranting a Rule 12(e) motion; the inquiry is whether the complaint "adequately put defendants on notice of the allegations against them…." *Physicians Care All., LLC v. All Day Beauty, LLC*, 2019 WL 176782, at *2 (D. Ariz. Jan. 11, 2019) (denying motion to dismiss because a complaint is only a shotgun pleading if it makes "no attempt to lay out which conduct constitutes the violation alleged"). *See also Espinosa v. Bluemercury, Inc.*, 2017 WL 1079553, at *5 (N.D. Cal. Mar. 22, 2017) ("a complaint does not employ impermissible shotgun pleading just because it re-alleges by reference all of the factual paragraphs preceding the claims for relief"); *Craighead v. Austal USA, LLC*, 2017 WL 6559917, at *2, n.3 (S.D. Ala. Dec. 21, 2017) ("the defining defect in shotgun pleadings is not incorporation by reference *per se*, but is instead the net effect that it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief") (citations omitted); *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1326 (11th Cir. 2015) (finding pleadings were "informative enough to permit a court to readily determine if they state a claim upon which relief can be granted" and reversing dismissal by district court).

Similarly, the use of the term "Defendants" in some allegations to refer to each of the three Defendants is not a *per se* grounds for a Fed. R. Civ. P. 12(e) motion, and may even be a more efficient means of pleading. *See Amin v. Mercedes-Benz USA, LLC*, 349 F. Supp. 3d 1338, 1353 (N.D. Ga. 2018) ("[t]he fact that defendants are accused collectively does not render the complaint deficient where it can fairly [be] read to aver that all defendants are responsible for the alleged conduct") (*citing Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000)); *Craighead*, 2017 WL 6559917, at *2 (denying objection that use of term "Defendants," rather than specifying what each has done, will render defendants "unable to decipher with reasonable specificity which acts or omissions are alleged against it") (internal quotations and citations omitted).

In the present case, neither the use of the word "Defendants" nor the fact that paragraphs are re-alleged in the causes of action, renders the Court or Defendants unable to decipher what facts support what claims. To the contrary, as discussed above, the acts and omissions engaged in by each of the three Defendants is set forth quite painstakingly in the FAC. The term "Defendants" is clearly defined to refer to all three entities (FAC ¶32) and is used deliberately only in those instances where the allegation is applicable to all three Defendants. *See Updateme Inc. v. Axel Springer SE*, 2018 WL 1184797, at *5 (N.D. Cal. Mar. 7, 2018) (finding objection to the complaint has "no merit" because plaintiff has alleged sufficient detail as to each defendant and "plaintiff has stated it believes these specific allegations show defendants – acting in concert – harmed plaintiff").

It is also sufficiently clear what facts in the FAC support each of the causes of action, particularly given the nature of the claims and the fact that no discovery has occurred. *Updateme Inc.*, 2018 WL 1184797, at *5. The factual allegations of the FAC are grouped under numerous subheadings that indicate the relevance of those paragraphs and to which Defendant they are applicable. *E.g.*, FAC "Employment by MCC" (¶¶63-79), "Employment by Gold Mantis" (¶¶80-126), "Imperial Pacific's role" (¶¶164-216); *see also Sec. & Exch. Comm'n v. Bardman*, 216 F. Supp. 3d 1041, 1051-52 (N.D. Cal. 2016) (denying motion based on alleged shotgun pleading where "Plaintiff's complaint has laid out a course of conduct … with multiple sub-headings that assist in tying the allegations to the various counts below").

Defendants' more specific complaints are also without merit. MCC objects to the FAC pleading negligence claims against all Defendants despite the fact that only three Plaintiffs worked for MCC, and none of them worked for MCC at the time of their injury. (MCC at 9). Any confusion stems from MCC's misunderstanding of the law rather than a fault in the pleadings. As explained above, an employment relationship is not a prerequisite to be liable for a negligence claim, and that is not the basis for Plaintiffs' claims against MCC. Instead, it is based on MCC's role as a general contractor

that exercised control over a worksite that it knew to have dangerous conditions, which it could have corrected but instead chose to conceal.

Gold Mantis' observation that the FAC alternatively alleges that Plaintiffs were employees of Gold Mantis or employees of its subcontractor does not warrant any judicial action at this time. Under each scenario, Plaintiffs have still pleaded plausible causes of action against Gold Mantis. Moreover, it is perfectly acceptable for Plaintiffs to advance multiple legal theories of liability at the pleadings stage, *Scott*, 605 F. App'x at 599, and particularly in a case like this, where discovery has not yet commenced and Defendants are in control of all the relevant contracts, communications, payments, and other evidence explaining the precise relationship amongst them or with the various people working on their behalf. *See Amin*, 349 F. Supp. 3d at 1352 ("find[ing] it improbable that Plaintiffs' agency allegations could have been pleaded with further specificity at this stage without the benefit of discovery since the factual information setting forth [defendants'] corporate structure and … relationship … likely lies within the sole province of [the company] itself").

In short, the FAC adequately sets forth "which factual allegations support which claims," and provides Defendants with "fair notice of the claims being lodged against it. That is all Rule 8(a)(2) requires." *Amin*, 349 F. Supp. 3d at 1353. *See Craighead*, 2017 WL 6559917, at *2 (same); *Updateme Inc.*, 2018 WL 1184797, at *5 (same). Furthermore, the cases cited by Defendants are inapposite because they concern the adequacy of fraud claims pleaded under the heightened, more demanding Rule 9(b) standard.[14]

---

[14] *See In re Metropolitan Securities Litigation*, 532 F. Supp. 2d 1260, 1279 (E.D. Wash. 2007) ("In this case, the [complaint] fails to satisfy the particularity requirements of Rule 9(b) because … it is difficult and laborious to determine which portions of the Registration Statements are allegedly false and which false statements are attributed to any particular defendant"); *Wagner v. First Horizon Pharmaceutical Corp*, 464 F.3d 1273, 1279-1280 (11th Cir. 2006) (finding a "lack of connection between the substantive count and the factual predicates" such that the court "cannot perform [its] gatekeeping function with regard to the averments of fraud").

## VII.    MOTION TO STAY

Imperial Pacific's motion to stay this litigation pursuant to 18 U.S.C. § 1595(b) must be denied because it has not provided any evidence of a criminal trafficking investigation. The TVPRA does provide for a stay of civil litigation during the pendency of a criminal action, including either an investigation or prosecution, arising out of the same occurrence in which the claimant is a victim. 18 U.S.C. § 1595(b). In support of its claim, Imperial Pacific argues that although "[n]o criminal action has been filed against IPI[,]... it is public knowledge that the federal government has engaged in criminal prosecutions based on contractors and subcontractors working on IPI's construction project using unlawful labor." (IPI Stay at 2-3). Imperial Pacific also supplied numerous local media reports about these criminal prosecutions. (*Id.* at Ex. A-N).

Imperial Pacific provides only speculation, but no evidence, that it is being investigated for violations of the TVPRA. In all the cases granting a stay that Imperial Pacific cites, either the U.S. Department of Justice requested the stay or there was significantly more evidence of a criminal investigation into trafficking crimes than exists here. *See*, *e.g.*, *Israel Antonio-Morales v. Bimbo's Best Produce, Inc.*, 2009 WL 1591172, at *1 (E.D. La. Apr. 20, 2009) (Department of Justice filed unopposed motion to stay civil proceedings); *Ara v. Khan*, 2007 WL 1726456, at *1 (E.D.N.Y. June 14, 2007) (United States filed letter-motion requesting stay notifying court that a criminal investigation into defendant's conduct had commenced); *Plaintiff A v. Schair*, 2012 WL 12864367, at *2 (N.D. Ga. Nov. 28, 2012) (parties agreed criminal investigation had commenced after evidence of a subpoena provided); *Nesbitt v. Bemer*, 2018 WL 5619716, at *5 (D. Conn. Oct. 30, 2018) (granting motion for stay where civil complaint alleges same type of conduct as set forth in criminal indictment already filed against the defendant, and plaintiff acknowledges civil and criminal cases arise from same facts).

For those cases in which there is limited or no evidence of a current criminal investigation into a defendant's liability under the TVPRA, however, courts will not grant a stay. *See Nesbitt*, 2018 WL

36

5619716, at *2 (denying initial motion for a stay where, even though a criminal action had commenced, defendant failed to provide documentation to support factual assertion that civil and criminal cases "arose out of the same facts and were thus parallel proceedings"). *See also Martinez v. Calimlim*, 651 F. Supp. 2d 852, 864 (E.D. Wis. 2009) (refusing to grant motion for stay where defendants had already been re-sentenced in their criminal case).

In the case most instructive for the present matter, *Kolbek*, the defendant moved for a stay of civil proceedings based on far more compelling facts than exist here, including: there previously had been a criminal investigation, the U.S. Attorney's Office made a statement to the local press that the investigation was "not over," and the government objected to producing documents in response to a Freedom of Information Act request. *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, 2011 WL 5188424, at *2 (W.D. Ark. Oct. 31, 2011). Nonetheless, the court denied the motion, finding it would be "illogical, and contrary to the purpose of the [TVPRA]" to impose a stay based on the motion of a civil defendant "who can *only surmise* as to whether a criminal investigation may be ongoing." *Id.* (emphasis added). Otherwise, "victims bringing actions under the TVPRA could often be denied justice, having their trial delayed indefinitely by a civil defendant who merely theorizes that an investigation might possibly be ongoing." *Id.*

Imperial Pacific has produced no evidence that federal authorities are presently, or ever were previously, investigating it for criminal liability under the TVPRA – or for any other crime. There is no indictment or subpoena, or even a sworn representation by a company representative establishing an actual investigation. Instead, Imperial Pacific is asking for a stay based on pure speculation. However, even its speculation is unpersuasive. The criminal prosecutions of Imperial Pacific's contractors charged them with employment and harboring of unauthorized workers – not violations of the TVPRA. Imperial Pacific provides no evidence (or even explanation) as to why federal authorities would now be investigating it for TVPRA violations.

Even if an investigation had been commenced, issuing a stay requires the Court to find that the subject matter arises "out of the same occurrence" as the civil case. 18 U.S.C. § 1595(b). This would require speculation upon speculation. Accordingly, Imperial Pacific's motion to stay this litigation pursuant to 18 U.S.C. § 1595(b) should be denied at this time.

## VIII.   CONCLUSION

For the reasons set forth above, Defendants' multiple motions should be denied and discovery commenced.

Respectfully submitted,

/s/
_____
Aaron Halegua (*admitted pro hac vice*)
AARON HALEGUA, PLLC
154 Grand Street
New York, New York 10013
Tel.:   (646) 854-9061
Email:  ah@aaronhalegua.com

Bruce Berline
BERLINE & ASSOCIATES, LLC
Second Floor, Macaranas Building
PO Box 5682 CHRB
Saipan, MP 96950
Tel.:   (670) 233-3663
Fax:    (670) 233-5262
Email:  bruce@saipanlaw.com

Attorneys for Plaintiffs