Bruce Berline
BERLINE & ASSOCIATES, LLC
Second Floor, Macaranas Building
PO Box 5682 CHRB
Saipan, MP 96950
Tel: (670) 233-3663
Fax: (670) 233-5262
Email: bruce@saipanlaw.com

Aaron Halegua
AARON HALEGUA, PLLC
154 Grand Street
New York, New York 10013
Tel: (646) 854-9061
Email: ah@aaronhalegua.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

TIANMING WANG, *et. al*,

               Plaintiffs,

      v.

GOLD MANTIS CONSTRUCTION
DECORATION (CNMI), LLC, *et. al*,

               Defendants.

Case No. 18-cv-0030

**MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFFS'
PETITION FOR DAMAGES**

Hearing Date: August 7, 2020
Hearing Time:
Judge: Hon. Ramona V. Manglona

## **TABLE OF CONTENTS**

I.     **PRELIMINARY STATEMENT**……………………………..……………1

II.    **STATEMENT OF FACTS**…………………………………..……………3

III.   **PROCEDURAL HISTORY**……………………..……………..…………5

IV.   **ARGUMENT**……………………………………………..……………6

    **A. PLAINTIFFS ARE ENTITLED TO DAMAGES**
       **FOR ALL CAUSES OF ACTION**………………………………………6

    **B. PLAINTIFFS CAN ESTABLISH DAMAGES TO**
       **A REASONABLE CERTAINTY WITHOUT AN**
       **EVIDENTIARY HEARING INVOLVING LIVE TESTIMONY**………………..…………7

    **C. PLAINTIFFS ARE ENTITLED TO COMPENSATORY**
       **DAMAGES, PUNITIVE DAMAGES,**
       **AND ATTORNEYS' FEES AND COSTS UNDER THE TVPRA**……………….....……9

      1.  Emotional distress damages for each day subjugated to forced labor……………..……….10

      2.  Damages resulting from the physical injuries suffered by Plaintiffs. …………………13

      3.  Punitive damages for IPI's reprehensible and egregious conduct……………..……….27

      4.  Plaintiffs are entitled to an award of attorneys' fees and costs………….……………29

V.    **CONCLUSION**………………………………….…………………30

i

## <u>TABLE OF AUTHORITIES</u>

*Abafita v. Aldukhan*, No.16-cv-06072, 2019 WL 6735148 (S.D.N.Y. Apr. 4, 2019 .................. 12, 27

*Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504 (2d Cir. 1991) ................................................8

*AGCO Finance, LLC v. Littrell*, No. 16-cv-4105, 2017 WL 7369877 (D. Minn. 2017) ....................8

*Aguilar v. Imperial Nurseries*, No. 07-cv-0193, 2008 WL 2572250 (D. Conn. May 28, 2008) .. 29, 30

*Alabado v. French Concepts, Inc.*, No. 15-cv-2830,

    2016 WL 5929247 (C.D. Cal. May 2, 2016) ........................................................... passim

*Arreguin v. Sanchez*, 398 F. Supp. 3d 1314 (S.D. Ga. 2019) ................................................28

*Asanok v. Million Express Manpower, Inc.*, No. 07-cv-0048 (E.D.N.C. Oct. 26, 2009) ..................30

*Belvis v. Colamussi*, No. 16-cv-544, 2018 WL 1532437 (E.D.N.Y. Mar. 29, 2018)..........................8

*Bisom v. Commonwealth of N. Mariana Islands*, 2002 WL 32983568 (N. Mar. I. Sept. 13, 2002)...21

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996).....................................................................27

*Bseirani v. Mahshie*, 107 F.3d 2 (2d Cir. 1997)..........................................................................24

*Canal v. Dann*, No. 09-cv-03366, 2010 WL 3491136 (N.D. Cal. Sept. 2, 2010).........................8, 27

*Carazani v. Zegarra*, 972 F. Supp. 2d 1 (D.D.C. 2013).............................................................8, 30

*Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338 (9th Cir. 1987). .........................................21

*David v. Signal*, No. 08-cv-1220 (E.D. La. February 8, 2015)................................................29, 30

*Ditullio v. Boehm*, 662 F.3d 1091 (9th Cir. 2011)...................................................................1, 27

*Doe v. Howard*, No. 11-cv-1105, 2012 WL 3834867, at *3–4 (E.D. Va. Sept. 4, 2012) ........... 12, 24

*Does v. Rodriguez*, No. 06-cv-0805 (D. Colo. Apr. 15, 2009) ......................................................30

*E.E.O.C. v. Global Horizons, Inc.*, No. 11-cv-00257,

    2014 WL 7338725 (D. Haw. Dec. 19, 2014)........................................................8, 10

*Fernandes v. Hayes*, No. 11-cv-00137 (W.D. Tex. April 27, 2012)................................................29

*Francisco v. Susano*, 525 Fed.Appx. 828 (10th Cir. 2013) ....................................................14, 29

*Gentile v. Cty. of Suffolk*, 926 F.2d 142 (2d Cir. 1991)...................................................................24

*Gurung v. Malhotra*, 851 F. Supp. 2d 583 (S.D.N.Y. 2012) ..............................................................8

*In re Air Crash at Lexington, Kentucky Aug. 27, 2006*, No. 5:06-cv-316,

2009 WL 3151101 (E.D. Ky. July 2, 2009)....................................................................22

*Indalecio v. Mobil Oil Marianas, Inc.*, No. 2017-SCC-0035-CIV,

2020 WL 118605 (N. Mar. I. Jan. 10, 2020)........................................................ 14, 23, 26

*Jackson v. City of Cookeville*, 31 F.3d 1354 (6th Cir. 1994)........................................................22

*Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261 (E.D. Pa. 2014)......................................8

*Johnson v. Hale*, 13 F.3d 1351 (9th Cir. 1994)....................................................................... 10

*Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983)..............................................21, 22

*Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445 (E.D. Va. 2015)................................................. 10, 28

*Lasheen v. Embassy of The Arab Republic of Egypt*, 625 Fed. Appx. 338 (9th Cir. 2015).................7

*Lewis v. United States*, No. 15-cv-8354, 2017 WL 2311874 (C.D. Cal. May 24, 2017).................25

*Licea v. Curacao Drydock Co., Inc.*, 584 F. Supp. 2d 1355 (S.D. Fla. Oct. 31, 2008)............... 26, 29

*Lipenga v. Kambalame*, 219 F. Supp. 3d 517 (D. Md. 2016)..............................................8, 30

*Magnifico v. Villanueva*, No. 10-cv-80771, 2012 WL 5395026 (S.D. Fla. Nov. 2, 2012) ............ 8, 30

*Magnifico v. Villanueva*, No. 10-cv-80771, ECF Nos. 127, 133 (S.D. Fla. November 1, 2012) . 12, 29

*Mazengo v. Mzengi*, No. 07-cv-756, 2007 WL 8026882 (D.D.C. Dec. 20, 2007)............................10

*McCabe v. Mais*, No. 05-cv-73, 2010 WL 3938383 (N.D. Iowa Oct. 5, 2010)..............................22

*Moore v. The Sally J.*, 27 F. Supp. 2d 1255 (W.D. Wash. 1998).......................................................19

*O'Connor v. Powell*, No. 99-cv-6582, 2000 WL 1230459 (N.D. Ill. Aug. 23, 2000) ........................8

*Philip Morris USA, Inc. v. Castworld Prod., Inc.*, 219 F.R.D. 494 (C.D. Cal. 2003).........................7

*Pickern v. Marino's Pizza & Italian Restaurant*, No. 01-cv-1096,

2003 U.S. Dist. LEXIS 26951 (E.D. Cal. Feb. 24, 2003)..................................................7

*Porter v. Tupaz*, No. 82-0180A, 1984 WL 48854 (D. Guam App. Div. June 12, 1984) ................... 24

*Price v. Kan Pacific, Ltd.*, No. 08-0046E (N.M.I. Super. Ct. Apr. 23, 2013) ................................... 25

*Rana v. Islam*, No. 14-cv-1993, 2016 WL 2758290 (S.D.N.Y. May 12, 2016) .............................. 12

*Ross v. Jenkins*, 325 F. Supp. 3d 1141 (D. Kan. 2018) ....................................................... 29

*Russo v. Corey Steel Co.*, 125 N.E.3d 1036 (Ill. App. 1st Dist., 3rd Div. 2018) ............................. 26

*Same Day Garage Door Servs. v. Y.N.G. 24/7 Locksmith LLC*, No. 19-cv-04782,

  2020 WL 1659913 (D. Ariz. Apr. 3, 2020) ........................................................................ 7

*Scott v. United States*, 884 F.2d 1280 (9th Cir. 1989) ....................................................... 24

*Shukla v. Sharma*, No. 07–cv–2972, 2012 WL 481796 (E.D.N.Y. Feb. 14, 2012) .............. 12, 24, 25

*Stratton v. Dep't for the Aging for City of New York*, 132 F.3d 869 (2d Cir. 1997) ........................ 22

*Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239 (11th Cir. 2015) ................................... 6

*Taylor Made Golf Co. v. Carsten Sports, Ltd.*, 175 F.R.D. 658 (S.D. Cal. 1997) .............................. 8

*Taylor v. City of Baldwin, Mo.*, 859 F.2d 1330 (8th Cir. 1988) ........................................... 8

*Ukau v. Wang*, No. 11-cv-00030, 2014 WL 2894232 (D. Guam June 26, 2014 ....................... 24, 26

*Warren v. Cty. Comm'n of Lawrence Cty., Ala.*, 826 F. Supp. 2d 1299 (N.D. Ala. 2011) ............... 22

*Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072 (C.D. Cal. 2012) ................................ 7

iv

Plaintiffs, through their attorneys, hereby submit this memorandum of law in support of their petition for damages as part of the default judgment to be entered against Defendant Imperial Pacific International (CNMI), LLC's ("IPI"). (ECF No. 157). In support of their petition, Plaintiffs submit declarations from each of the Plaintiffs—Tianming Wang ("T. Wang Decl."), Dong Han ("Han Decl."), Liangcai Sun ("Sun Decl."), Yongjun Meng ("Meng Decl."), Qingchun Xu ("Xu Decl."), Youli Wang ("Y. Wang Decl."), and Xiyang Du ("Du Decl.")—as well as the Declaration of Aaron Halegua ("Halegua Decl."), Declaration of Florence Burke ("Burke Decl."), and Declaration of Neil Steinkamp ("Steinkamp Decl."). All declarations are dated July 1, 2020. For the reasons set forth below, the seven Plaintiffs seek a total of $3.86 million in compensatory damages, twice that amount in punitive damages, as well as an award of attorneys' fees and costs.[1]

## I.  **PRELIMINARY STATEMENT**

Forced labor is a "contemporary manifestation of slavery," *Ditullio v. Boehm,* 662 F.3d 1091, 1098 (9th Cir. 2011), which the Northern Marianas Commonwealth Legislature has rightly found takes a "devastating" toll on its victims, Public Law No. 14-88 § 1. These words ring too true for Plaintiffs. They were defrauded into paying enormous fees for work in Saipan, indebting themselves to family, friends, or loan sharks, only to spend each day in fear of being beaten, fired, fined, or deported. They were treated like "machines," not humans, working 13-hour days for less than minimum wage without a day off in up to five months. It was the most dangerous worksite that Plaintiffs had ever seen—tired workers performing evening shifts high-up on the casino scaffolding with no safety nets. (T. Wang Decl. ¶11, Han Decl., Ex. C). One coworker fell to his death.

Once back in their hot, filthy, overcrowded dorms, Plaintiffs tried to sleep as rats crawled across their bodies. Plaintiffs were humiliated by bosses who called them *heigong* ("illegal workers")

---

[1] Plaintiffs used the rate of RMB 7.09 (¥ 7.09) to 1 USD for all conversions from Chinese currency into U.S. dollars. This was the exchange rate reported by Google on June 19, 2020.

and ridiculed for being "stupid" because they paid a recruitment fee for their job. Their employers were indifferent to their suffering: no medical attention was offered for Plaintiffs' scalded hands, burnt legs, or bloody ankles. One manager poured a cheap Chinese liquor on Plaintiff Youli Wang's wound. Plaintiff Sun had to rely on his cell phone's translation app to try buying medicine for his severed finger at the local pharmacy. Plaintiff Wang paid his own taxi fare to get back to the dorm after his leg was incinerated. In the words of Florence Burke, a leading expert on forced labor, this behavior was "quite extreme even for human traffickers." (Burke Decl. ¶24).

The impact of this conduct by IPI and its contractors on Plaintiffs' lives has been ruinous. Most Plaintiffs remain in debt years after returning from Saipan. One lives with his sister, away from his son and mother, because he fears the loan sharks in his hometown. Tianming Wang has been totally unable to work in the three years since his leg was engulfed by flames. Every day he endures the shame and embarrassment of wanting to support his parents, but instead watching his 51-year old father endure backbreaking work to support him and his daughter. Dong Han reluctantly accepts money from his elderly father's pension. Plaintiffs have been told for years that they need surgery on their fractured or severed fingers, but lack the few thousand dollars for the procedure. They still have nightmares from their abuse in Saipan and fear being retaliated against for filing this lawsuit.

IPI not only condoned this inhumane treatment, but actively participated in and benefitted from the forced labor scheme. When OSHA discovered that 80 workers were seriously injured in a single year, IPI still denied the inspector access to the site. IPI provided the decrepit dorm that lacked a certificate of occupancy. It took no action upon seeing unpaid workers protest or being told that workers on tourist visas were building its casino. Instead, IPI praised MCC for doing a great job while it earned billions of U.S. dollars in revenue.

Plaintiffs would prefer that they never worked on IPI's casino and endured so much suffering. Unfortunately, there only chance at reclaiming justice is through this lawsuit. Despite the immense

suffering experienced by Plaintiffs, their request for compensation is eminently reasonable, even foregoing certain categories of damages. As IPI now pleads poverty, Plaintiffs fear the further indignity of being unable to collect on a judgment. Accordingly, Plaintiffs hope this matter may be resolved as expeditiously as possible.

## II.   STATEMENT OF FACTS

Plaintiffs are seven men from China who speak no English.[2]  (FAC ¶¶12–19). Upon promises of high wages and good conditions, they paid recruiters large fees, sometimes exceeding $8,000, for jobs in Saipan. (FAC ¶¶3, 52). They borrowed money at high interest rates, sometimes using their homes or land as collateral. (FAC ¶¶53, 58–61). If unable to repay this debt, Plaintiffs feared a range of consequences, including loan sharks physically harming them or their relatives, loss of their homes and financial hardship for their families, and "loss of face" or shame. (FAC ¶¶315).

Three Plaintiffs worked for MCC and then later worked for Gold Mantis; the remaining four only worked for Gold Mantis. (FAC ¶57). MCC and Gold Mantis were aware of Plaintiffs' debts, but each still charged them an additional fee after they arrived in Saipan in order to start working. (FAC ¶¶56, 63, 80, 101). Both companies mandated long hours and compulsory overtime; paid far below the minimum wage, made deductions from wages, and withheld weeks or months of salary; threatened deportation for disobedience; told workers it was useless to complain; told workers that nobody else would hire them if they quit; instructed workers not to associate with people outside work; and told them to hide from government authorities. (FAC ¶¶6, 64–76, 83–121, 145, 202). Because they were *heigong*, managers told Plaintiffs that the companies were not responsible if they get injured. (FAC ¶¶72, 93). Plaintiffs were crammed into dormitories, some of which had no showers or air-conditioning. (FAC ¶¶4, 77–79, 194). MCC held its employees' passports. (FAC ¶76). A Gold Mantis manager screamed and cursed at Plaintiffs, physically attacked employees, and even threatened to kill

---

[2]  Abbreviations used herein have the same meaning as in the FAC (ECF No. 6).

Plaintiffs if they disobeyed him or left their jobs. (FAC ¶¶103, 109–114). Plaintiffs believed they had no choice but to continue working for MCC and Gold Mantis, otherwise they would face physical harm, financial harm, or deportation (FAC ¶¶66, 98–99, 114, 314–316), and some even continued working while injured (FAC ¶¶161–163, 270).

On December 6, 2016, an OSHA inspector went to the casino site and explained to representatives of MCC, Gold Mantis, and IPI the high injury incidence rate on the construction site, that injuries were not being reported to OSHA, that injured workers were being shipped back to China over doctors' objections, and concerns about existing dangers. (FAC ¶¶135–142). IPI nonetheless denied the inspector entry onto the site and forced OSHA to seek a warrant in court. (FAC ¶138). When OSHA finally inspected, Defendants made sure all *heigong* were not present. (FAC ¶145). OSHA cited MCC and Gold Mantis for numerous "serious" violations, including failing to provide the proper personal protective equipment, inadequate safety precautions, and not recording injuries or reporting them to authorities. (FAC ¶¶146–149).

Even after the OSHA inspection, IPI and its contractors did not address these dangers. (FAC ¶¶151–156). As a result, all seven Plaintiffs suffered injuries while working on the casino site, including a scorched leg, scalded hand, partially severed finger, smashed fingers, and an inverted ankle. (FAC ¶¶7, 217–296). Plaintiffs' injuries were never reported to government authorities. (FAC ¶159). Defendants never took Plaintiffs to a hospital or to see a doctor; furthermore, they threatened Plaintiffs that they risked being deported if they sought medical attention on their own. (FAC ¶¶7, 160). Plaintiffs have received zero compensation for their injuries. (FAC ¶¶297–307).

IPI was involved in operating the forced labor scheme and concealing it from the government. Government officials told IPI about the use of unauthorized workers on the construction site (FAC ¶¶6, 46, 50); IPI denied OSHA access to the worksite (FAC ¶¶48, 50, 135–154); workers from Gold Mantis and another subcontractor each protested publicly about not being paid, but IPI took no action

4

(FAC ¶¶205, 206); IPI provided the workers with housing that lacked certificates of occupancy (FAC ¶195); and IPI provided the buses that transported workers to hide in the dorms when inspectors came to the worksite (FAC ¶202).

In February, 2017, after several protests by unpaid workers and OSHA's findings of serious violations, IPI praised MCC for its professional performance and management ability, and stated that it hoped to cooperate further with MCC in the future. (FAC ¶209). The next month, having made sufficient progress on the casino resort project, IPI was permitted to retain its casino license, from which it generated billions of U.S. dollars between 2016 and 2018. (FAC ¶¶6, 51, 215–216).[3]

The forced labor scheme only came to an end after a tourist worker fell to his death on the construction site in March 2017, prompting an FBI investigation and raid of IPI's contractors. Gold Mantis managers fled Saipan, leaving Plaintiffs unpaid in decrepit housing without food and water. (FAC ¶123). Only then were Plaintiffs finally taken to the hospital in Saipan. (FAC ¶¶261, 274, 292–293). As the U.S. Department of Labor ("USDOL") negotiated with Gold Mantis about Plaintiffs' unpaid wages, Plaintiffs asked the company's Chinese-speaking lawyer about compensation for their injuries. (FAC ¶302). The lawyer stated that a company representative would meet them at the airport back in China to discuss the matter. (*Id.*). Nobody was at the airport, and nobody ever contacted Plaintiffs about their injuries. (FAC ¶303).

## III. PROCEDURAL HISTORY

Plaintiffs recognize the Court's familiarity with the procedural history of this case. Most recently, after IPI persisted in brazenly violating a series of Court orders, the Court issued an Order to Show Cause why a default judgment should not be entered for its repeated failures to comply with

---

[3] *See also* "Imperial Pacific 2016 VIP turnover totals US$34.2 billion," *Asia Gaming Brief*, Jan. 3, 2017, available at: https://agbrief.com/headline/imperial-pacific-2016-vip-turnover-totals-us32-4-billion/; "Imperial Pacific International Earns $1 Billion," *The iGaming Post*, Sept. 27, 2017, available at: https://gaming-awards.com/NEWS/imperial-pacific-international-earns-1-billion/.

discovery orders. (ECF No. 149). IPI filed its submission on June 10, 2020 (ECF No. 153), Plaintiffs responded on June 11, 2020 (ECF No. 154), and at a hearing on June 12, 2020, the Court entered a default against IPI, set aside its Answer, and set a briefing schedule and hearing date to assess damages for the default judgement. (ECF No. 157). After a stipulation was entered modifying that schedule, a new hearing date was set for August 7, 2020 was set. (ECF Nos. 168, 169).

## IV.   <u>ARGUMENT</u>

### A.  **PLAINTIFFS ARE ENTITLED TO DAMAGES FOR ALL CAUSES OF ACTION.**

As a preliminary matter, entering a default judgment is only proper where the complaint states a claim on which the plaintiffs may recover. *Alabado v. French Concepts, Inc.*, No. 15-cv-2830, 2016 WL 5929247, at \*4 (C.D. Cal. May 2, 2016). Plaintiffs seek entry of a default judgment as to each of their four claims. Earlier in this litigation, the sufficiency of Plaintiffs' pleadings was already determined by this Court: IPI made a Rule 12(b)(6) motion to dismiss each of Plaintiffs' causes of action (ECF No. 12); Plaintiffs opposed the motion by citing the specific allegations that support each claim (ECF No. 25); and the Court denied IPI's motion (ECF No. 30). *See Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Conceptually, then, a motion for default judgment is like a reverse motion to dismiss").

Pursuant to their TVPRA claim, Plaintiffs seek compensatory damages for the emotional distress from being subjugated to forced labor, past and future lost income resulting from their physical injuries, and pain and suffering (emotional distress) arising from their physical injuries. Plaintiffs also seek punitive damages and an award of attorneys' fees and costs. Plaintiffs are similarly entitled to damages for their CNMI trafficking, negligence, and 4 C.M.C. § 9304 claims. However, any such damages would be duplicative of what Plaintiffs are seeking under the TVPRA and therefore this memorandum of law does not separately analyze those claims.

6

## B. PLAINTIFFS CAN ESTABLISH DAMAGES TO A REASONABLE CERTAINTY WITHOUT AN EVIDENTIARY HEARING INVOLVING LIVE TESTIMONY.

In the context of a default judgment, Plaintiffs have the burden of establishing damages with "reasonable certainty." *Same Day Garage Door Servs. v. Y.N.G. 24/7 Locksmith LLC*, No. 19-cv-04782, 2020 WL 1659913, at *3 (D. Ariz. Apr. 3, 2020) (internal quotations omitted). However, "Plaintiff's burden in 'proving up' damages is relatively lenient…. [P]laintiff need prove only that the compensation sought relates to the damages that naturally flow from the injuries pled." *Philip Morris USA, Inc. v. Castworld Prod., Inc.*, 219 F.R.D. 494, 498 (C.D. Cal. 2003). A "reasonable basis" for the computation must exist, but "[d]amages are not rendered uncertain because they cannot be calculated with absolute exactness." *Same Day Garage Door Servs.*, 2020 WL 1659913, at *3. "Courts have also accepted less precise estimates of damages where a defendant frustrates the discovery of a precise amount by defaulting in the action." *Id.*

There is no requirement that the Court conduct a hearing on the issue of damages. *See* Fed. R. Civ. P. 55(b)(2)(B) (the Court "*may* conduct hearings" to determine the amount of damages) (emphasis added). Where the amount claimed is a liquidated sum or capable of calculation, a hearing is often deemed unnecessary. *Lasheen v. Embassy of The Arab Republic of Egypt*, 625 Fed. Appx. 338, 341 (9th Cir. 2015). However, even in cases where damages are not a liquidated sum, courts may forego a hearing if the damages are ascertainable based on the declarations or other information submitted by the parties. *Id.*; *Pickern v. Marino's Pizza & Italian Restaurant*, No. 01-cv-1096, 2003 U.S. Dist. LEXIS 26951, at *3–4 (E.D. Cal. Feb. 24, 2003).

If a hearing on damages is to be conducted, however, "a 'hearing' under [Rule 55] need not include live testimony, but may instead rely on declarations submitted by the parties, so long as notice of the amount requested is provided to the defaulting party." *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1079 (C.D. Cal. 2012); *Same Day Garage Door Servs.*, 2020 WL 1659913, at *3 (determining damages based on the complaint and an affidavit); *Taylor Made Golf Co. v. Carsten*

*Sports, Ltd.*, 175 F.R.D. 658, 663 (S.D. Cal. 1997) (same).[4]  Moreover, a defendant that seeks to delay the proceedings, or a concern that assets will dissipate, may be relevant to deciding the appropriate form of any hearing. *See O'Connor v. Powell*, No. 99-cv-6582, 2000 WL 1230459, at *5 (N.D. Ill. Aug. 23, 2000) (precluding defendant from introducing evidence disputing damages and giving plaintiff option of proceeding by affidavit or live testimony); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 507–08 (2d Cir. 1991) (full evidentiary hearing not required to award punitive damages).

In fact, several district courts in the Ninth Circuit have awarded damages for trafficking claims, including emotional distress damages, based on declarations submitted by the plaintiffs. *See, e.g.*, *Alabado*, 2016 WL 5929247, at *12-13; *Canal v. Dann*, No. 09-cv-03366, 2010 WL 3491136, at *3–4 (N.D. Cal. Sept. 2, 2010). District courts in other Circuits have done the same. *See Belvis v. Colamussi*, No. 16-cv-544, 2018 WL 1532437, at *1 (E.D.N.Y. Mar. 29, 2018).[5]

In the present case, as illustrated below, Plaintiffs' detailed declarations, photographs, certified medical records, and other supporting evidence adequately establish the necessary facts to determine damages in this matter, and provide the Court with a sufficient basis to enter a default judgment without the need for live witness testimony. In addition, an evidentiary hearing with live witnesses

---

[4] Other Circuits also recognize that declarations may be sufficient for determining damages for a default judgment. *See Taylor v. City of Baldwin, Mo.*, 859 F.2d 1330, 1333 (8th Cir. 1988) ("the district court need not hold an evidentiary hearing on the issue of damages"); *AGCO Finance, LLC v. Littrell*, No. 16-cv-4105, 2017 WL 7369877, at *3–4 (D. Minn. 2017) (court decided damages based on affidavit); *Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 271, n.8 (E.D. Pa. 2014) ("Rule 55(b)(2)'s language regarding hearings is permissive. If the court can determine the amount of damages based on affidavits or other evidentiary materials, the court is under no requirement to conduct an evidentiary hearing with testimony").

[5]  *See also Lipenga v. Kambalame*, 219 F. Supp. 3d 517, 531 (D. Md. 2016); *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 24 (D.D.C. 2013); *Gurung v. Malhotra*, 851 F. Supp. 2d 583, 595 (S.D.N.Y. 2012); *Magnifico v. Villanueva*, No. 10-cv-80771, 2012 WL 5395026, at *1 (S.D. Fla. Nov. 2, 2012). *See also E.E.O.C. v. Global Horizons, Inc.*, No. 11-cv-00257, 2014 WL 7338725, at *27 (D. Haw. Dec. 19, 2014) (Title VII case) (collecting cases).

would create a significant burden for Plaintiffs, who are all living in China and working low-wage jobs, if they are able to work at all. Moreover, the COVID–19 pandemic creates numerous practical obstacles to Plaintiffs testifying, including a severely limited number of flights out of China, new visa restrictions, the lack of inbound flights to Saipan, and mandatory quarantine periods. Even remote video testimony would require considerable logistical coordination between Plaintiffs, a Mandarin interpreter, and counsel across different time zones.

**C. PLAINTIFFS ARE ENTITLED TO COMPENSATORY DAMAGES, PUNITIVE DAMAGES, AND ATTORNEYS' FEES AND COSTS UNDER THE TVPRA.**

Victims of TVPRA offenses "may recover damages and reasonable attorneys' fees." 18 U.S.C. § 1595. The intent of the TVPRA is that victims be fully compensated. *See Alabado*, 2016 WL 5929247, at *13. The statute's mandatory restitution provision requires that courts order offenders to pay the "full amount of the victim's losses." 18 U.S.C. § 1593(b)(1); *see In Re Sealed Case*, 702 F.3d 59, 66–67 (D.C. Cir. 2012). This term is defined as "any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim," and includes medical services, physical and occupational therapy and rehabilitation, necessary transportation, lost income, reasonable attorneys' fees, and "any other relevant losses incurred by the victim." 18 U.S.C. § 2259(c)(2). Thus, Plaintiffs seek damages for (1) emotional distress from being subjugated to forced labor, (2) lost income because of the physical injuries sustained while subjected to forced labor, (3) pain and suffering (emotional distress) related to those physical injuries, (4) punitive damages, and (5) attorneys' fees and costs. In an effort to streamline this petition for damages, and demonstrate the reasonableness of their requests, Plaintiffs do not seek reimbursement for recruitment fees, travel costs to Saipan, or medical expenses.[6]

---

[6] The U.S. Department of Labor settlements with MCC and Gold Mantis designated a portion of the payment made to each worker as reimbursement for recruitment fees. Although not every Plaintiff was wholly compensated by that amount, and it is not a foregone conclusion that IPI should be able to

9

1. **Emotional distress damages for each day subjugated to forced labor.**

   Plaintiffs may recover emotional distress damages that are the "proximate result" of a TVPRA offense. *Alabado*, 2016 WL 5929247, at *13 (*quoting* 18 U.S.C. § 2259(b)(3)). In the Ninth Circuit, objective evidence is not required to prove such damages; testimony alone or appropriate inferences from circumstances are sufficient. *Global Horizons*, 2014 WL 7338725, at *27 (citing *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994)). In determining such damages, courts look to "all relevant circumstances ..., including sex, age, condition in life and any other fact indicating susceptibility of the injured person to [the] type of harm." *Mazengo v. Mzengi*, No. 07-cv-756, 2007 WL 8026882, at *7 (D.D.C. Dec. 20, 2007) (internal quotations omitted). For TVPRA cases, courts generally grant a daily rate of damages for the period of time that the plaintiff was subjected to forced labor. *See Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 458 (E.D. Va. 2015) (noting emotional distress awards for forced labor victims ranging from $410 to $780 per day).

   The significant emotional distress experienced by Plaintiffs can be inferred from the facts establishing the forced labor offenses by IPI recited above. Plaintiffs incurred significant debt, even using their homes or land as collateral. (FAC ¶¶53, 59, 61). They regularly worked over 12-hours per day and were not permitted to rest (*id.* ¶¶4, 64); on some occasions they were ordered to work 24-hour shifts. (*Id.* ¶85). Plaintiffs were always paid far below the minimum wage; never paid on time; and sometimes not paid at all. (FAC ¶¶1, 4, 67, 94). Managers repeatedly threatened workers that they could be arrested and deported to China, particularly if they complained or quit. (*Id.* ¶¶7, 70, 115–119, 160, 313). Employers instructed Plaintiffs to hide from government authorities. (*Id.* ¶¶6, 117–118, 202). Managers imposed large fines on Plaintiffs and their coworkers who violated the rules or took a

---

benefit from those settlements, Plaintiffs do not seek the difference here. Second, Plaintiffs are not seeking damages for the money spent on medicine and doctor's visits over the past three years since their injury. However, Plaintiffs do not waive their right to seek these categories of damages from MCC and/or Gold Mantis later in this litigation.

rest. (*Id.* ¶¶4, 105, 108, 198, 313). Plaintiffs were crammed into decrepit, overcrowded dormitories (*id.* ¶¶4, 77–79, 88) where rats crawled over them (Sun Decl. ¶25; Meng Decl. ¶18). Managers verbally abused Plaintiffs, called them *heigong*, and even threatened to kill Plaintiffs if they were disobedient; one manager even physically hit a worker. (*Id.* ¶¶5, 111–113). Employers confiscated workers' passports. (*Id.* ¶¶76, 318). Plaintiffs constantly feared injury as coworkers around them constantly got hurt. (*Id.* ¶¶135, 140, 149, 153).

The profound psychological impact of the aforementioned conditions on Plaintiffs is easily deduced; however, Plaintiffs also provide direct evidence of emotional distress in their declarations. For instance, Plaintiffs describe living in fear each day of being screamed at or hit by their managers, or being fired and deported back to China. (T. Wang Decl. ¶41; Han Decl. ¶42; Sun Decl. ¶45; Meng Decl. ¶¶15–16, 36; Xu Decl. ¶¶11, 30; Y. Wang Decl. ¶¶15, 38; Du Decl. ¶¶12, 14). Plaintiffs experienced great stress, anxiety, and fear because they could not repay loan sharks in China, causing the lenders to harass their family members and threaten to take their property. (T. Wang Decl. ¶¶42, 45–46; Han Decl. ¶¶41, 44, 46; Sun Decl. ¶¶43–44, 46; Meng Decl. ¶¶10, 38; Xu Decl. ¶¶23, 32; Y. Wang Decl. ¶¶27, 39). Plaintiffs felt like they were no longer human: employers treated them like "machines," extracting as much labor from them as possible at the lowest possible price, and did not even care if they got injured. (Han Decl. ¶42; Sun Decl. ¶45; Meng Decl. ¶¶36–37). Plaintiffs describe feelings of anger, depression, helplessness, shame, and embarrassment. (T. Wang Decl. ¶¶41, 43, 46; Han Decl. ¶¶42–43; Sun Decl. ¶¶43, 45, 47; Meng Decl. ¶¶36, 38–39; Xu Decl. ¶¶29–31, 33; Y. Wang Decl. ¶¶27, 31, 37, 41, 43; Du Decl. ¶¶29, 32). Plaintiffs were humiliated by managers who called them "stupid" for paying money to work in Saipan. (Han Decl. ¶43). This emotional harm also had physical manifestations: Plaintiffs had trouble sleeping and lost their appetite (T. Wang Decl. ¶45; Han Decl. ¶46; Y. Wang Decl. ¶39; Sun Decl. ¶46) and many had nightmares that persisted even long after returning to China (Sun Decl. ¶47; Y. Wang Decl. ¶¶31, 39; Xu Decl. ¶31; Meng Decl. ¶36).

The declaration of Florence Burke, an expert on the psychological impacts of human trafficking, further explains that it is typical for forced labor victims to experience these "intense feelings of shame and significant self-esteem issues," an "undermin[ing of] their sense of self-worth and competence," feelings of being "dehumanized," guilt towards the family members that they hoped to support, and "immense pressure and anxiety" from their outstanding debts. (Burke Decl. ¶21). Moreover, forced labor victims regularly suffer from a variety of stress-related symptoms, such as the sleep disturbance, loss of appetite, anxiety, and loss of hope that Plaintiffs described. (*Id.* ¶22).

Based on similar TVPRA cases, Plaintiffs request an emotional distress award of $425 for each day that they were subject to forced labor. *See Shukla v. Sharma*, No. 07–cv–2972, 2012 WL 481796, *14 (E.D.N.Y. Feb. 14, 2012) (awards in similar cases should be used to determine reasonable award). *See Magnifico v. Villanueva*, No. 10-cv-80771, ECF Nos. 127, 133 (S.D. Fla. November 1, 2012) (awarding $750 per day defendant forced victims to work longs hours for meager wages in hotels and country clubs, threatened them with deportation, placed them in overcrowded houses, confiscated their immigration documents confiscated, and verbally abused them); *Doe v. Howard*, No. 11-cv-1105, 2012 WL 3834867, at *3–4 (E.D. Va. Sept. 4, 2012) (awarding $500 per day to a victim forced to work over 80 hours per week and confined in defendants' home for three months); *Abafita v. Aldukhan*, No.16-cv-06072, 2019 WL 6735148, at *5–6 (S.D.N.Y. Apr. 4, 2019) (awarding $450 per day where defendants "required [plaintiff] to work gruelingly long hours under inhumane conditions for little to no pay," withheld her passport, denied medical services, and threatened punishment for disobedience); *Rana v. Islam*, No. 14-cv-1993, 2016 WL 2758290, at *1 (S.D.N.Y. May 12, 2016) (awarding $450 per day to victims brought to U.S. on false promise of high wages, forced to work seven days per week from 6:30am to 11:00pm, had passports withheld, had pay withheld, and were threatened with arrest); *Alabado*, 2016 WL 5929247, at *8 (awarding $400 per day to a group of 11 Filipino guest workers who were forced to work long hours every day for minimal wages, slept on the

floor of a small laundry room, were instructed to lie to government investigators, and whose employers imposed a debt on them).

Plaintiffs only seek emotional distress damages for the days that they actually worked for Defendants, not for all of their time in Saipan. Thus, no damages are sought for the time after Plaintiffs were fired by Xianghu Kong (Mr. Du and Youli Wang), after they were injured and unable to work (Tianming Wang and Mr. Meng), or after the FBI raids caused Gold Mantis managers to abandon Plaintiffs. Similarly, no damages are sought for the few days between the time when Tianming Wang, Mr. Han, and Mr. Sun were terminated by MCC and they began working for Gold Mantis. Each Plaintiff's start and end dates are found in their declarations (T. Wang Decl. ¶¶10, 17–18, 25; Han Decl. ¶¶9, 20–21, 30; Sun Decl. ¶¶10, 20–21, 33; Meng Decl. ¶¶11, 19; Xu Decl. ¶¶9, 19; Y. Wang Decl. ¶¶10, 24; Du Decl. ¶¶9, 20), which are consistent with the dates used by USDOL to calculate Plaintiffs' backpay in its settlements with MCC and Gold Mantis. (Halegua Decl., Exs. A, B).

| Plaintiff | MCC Start | MCC End | GM Start | GM End | Total Days | Daily Rate | Total |
|---|---|---|---|---|---|---|---|
| T. Wang | 9/10/2016 | 2/18/2017 | 2/20/2017 | 3/17/2017 | 186 | $425 | $79,050 |
| H. Dong | 9/1/2016 | 2/7/2017 | 2/10/2017 | 4/2/2017 | 210 | $425 | $89,250 |
| L. Sun | 11/2/2016 | 1/12/2017 | 1/16/2017 | 4/2/2017 | 147 | $425 | $62,475 |
| Y. Meng | n/a | n/a | 2/14/17 | 3/9/2017 | 23 | $425 | $9,775 |
| Q. Xu | n/a | n/a | 2/14/17 | 4/2/2017 | 47 | $425 | $19,975 |
| Y. Wang | n/a | n/a | 11/20/2016 | 3/21/2017 | 121 | $425 | $51,425 |
| X. Du | n/a | n/a | 12/3/2016 | 1/20/2017 | 48 | $425 | $20,400 |

2. **Damages resulting from the physical injuries suffered by Plaintiffs.**

Each of the Plaintiffs suffered a physical injury while working on the IPI project. (*See* FAC ¶¶217–296). As explained above, forced labor victims may recover damages "proximately caused" by the TVPRA offense. *Alabado*, 2016 WL 5929247, at *13 (internal quotations omitted). Plaintiffs pleaded, and it is accepted as proven, that Defendants' TVPRA offenses "caused" the physical injuries

13

suffered by Plaintiffs. (FAC ¶321).[7]   Accordingly, Plaintiffs are seeking three types of damages related

to their injuries: (1) lost income; (2) future lost income; and (3) pain and suffering (emotional distress)

related to the injury itself as well as its ongoing impact on Plaintiffs' lives. *See* 18 U.S.C. § 2259(c)(2)

(restitution includes "lost income, […] other relevant losses"); *Francisco v. Susano*, 525 Fed. Appx.

828, 835 (10th Cir. 2013) (noting traditional tort remedies apply to TVPRA claims); *Canal*, 2010 WL

3491136, at *4 (TVPRA victim entitled to traditional tort remedies and damages "attributable to the

tortious conduct [plaintiff] endured"). *See also Indalecio v. Mobil Oil Marianas, Inc.*, No. 2017-SCC-

0035-CIV, 2020 WL 118605, at *3 (N. Mar. I. Jan. 10, 2020) (affirming award of lost income to

injured worker suing employer).

### a. *Description of Plaintiffs' injuries*.

The detailed basis for an award of economic and non-economic damages related to Plaintiffs'

physical injuries is set forth in their declarations and the photographs, medical records, and other

exhibits attached thereto.[8]   Therefore, each Plaintiffs' injury and its consequences are only briefly

summarized in this section.

*Tianming Wang*. While Tianming Wang was cutting a barrel on the construction site, the sparks

ignited something causing a flame to shoot out. (T. Wang Decl. ¶25). The fire incinerated his pant leg

and engulfed his lower left leg, burning his skin, causing him excruciating pain. (*Id.*, Ex. C). He was

denied any medical care, and even paid for the taxi back to the dormitory himself. (*Id.* ¶¶26–27).

---

[7]  This causal link between the forced labor scheme and Plaintiffs' injuries is further supported by
these facts and others: Defendants failed to provide adequate training, failed to provide adequate
protective equipment, failed to provide adequate manpower, and failed to remedy unsafe conditions
(FAC ¶¶131, 156, 159, 332); Defendants obstructed OSHA's access to the worksite (FAC ¶¶138, 143);
and Defendants pushed Plaintiffs to work long shifts, sometimes up to 24 hours, with no days off,
which lead to accidents (FAC ¶¶6, 39, 47-49, 84-86).

[8]  Plaintiffs have obtained a certification for the medical records from the Commonwealth Healthcare
Corporation for all seven Plaintiffs. (Halegua Decl., Ex. C).

Tianming Wang was practically confined to his bed for over 20 days; coworkers needed to bring him food and buy medicine for him; and Gold Mantis said that he would not be paid while he was not working. (*Id.* ¶¶28–29). He paid US $800 of his own money for medication, but did not see a doctor until after Gold Mantis' managers fled Saipan. (*Id.* ¶¶29–30, Ex. D). Now back in China, he still experiences alternating pain and numbness in his leg; he remains unable to walk or stand for longer than 15 minutes; and numerous doctors said he likely has nerve damage. (*Id.* ¶¶33–34, 38–40). He has been unable to work: he has little education and thus cannot do an office job, but his leg injury has rendered him unable to perform manual labor. (*Id.* ¶35). He has been unable to repay the debt he incurred to travel to Saipan and receives threats from the lender. (*Id.* ¶42). His 51-year old father had to leave home and get a construction job to provide for the family, leaving Tianming Wang ashamed and unable to face his parents. (*Id.* ¶¶37, 43–44). He recognizes that the stress has caused him to develop a short temper and he sometimes fights with relatives or friends. (*Id.* ¶46). His leg has permanent scars from the burns and no doctor can say whether or not his leg will ever recover. (*Id.* ¶¶38, 40, Exs. C, E). He has not seen much progress in the last three years; he has a limp that he fears will be permanent; and he has stopped buying the pain medicine that allowed him to walk a bit each day because he does not want to create a greater financial burden on his parents. (*Id.* ¶¶33, 39).

*Dong Han*. Mr. Han's finger exuded blood and swelled after being crushed by a stack of metal pipes, and blood poured out a second time when he was forced to return to work the next day. (Han Decl. ¶¶26, 28, Ex. E). Only then was he allowed to rest, but only for a single day. (*Id.* ¶28). Three years after returning to China, his finger has not improved; it still has little strength and hurts whenever touched. (*Id.* ¶35). A doctor in China said that Mr. Han must avoid heavy work and rest the finger. (*Id.* ¶33). Whereas he previously could make over RMB 10,000 per month as a skilled construction worker, he now works as a cleaner earning just RMB 2,000 per month; he does not expect his finger to get better. (*Id.* ¶¶36–38). Mr. Han is still unable to repay the debt he incurred to go to Saipan; his

15

77-year-old father needs to use his pension just to help Mr. Han pay the interest on his debt; and he fears losing the apartment he posted as collateral. (*Id.* ¶44). He cannot afford his son's tuition payments, let alone to socialize with his own friends. (*Id.* ¶45). He feels embarrassed, ashamed, and depressed, and has trouble sleeping. (*Id.* ¶46).

*Liangcai Sun*. A large, heavy box was dropped on Mr. Sun's hand, smashing his index finger and causing incredible pain, bleeding, and swelling; the injury caused a partial amputation of the finger. (Sun Decl. ¶26, Ex. A). Denied medical care by Gold Mantis, he paid to go to a clinic himself and went alone to the pharmacy, where he was forced to rely on the translation software on his phone to buy the correct medicine. (*Id.* ¶¶27–29, 32). He had to borrow more money to pay these costs, which totaled US $2,000. (*Id.* ¶29). He only took off three days, for which he was not paid. (*Id.* ¶30). Three years later, his finger still hurts if touched and is often numb. (*Id.* ¶42). Doctors in Saipan and China recommended surgery to smooth out the bone, but Mr. Sun cannot afford the cost. (*Id.* ¶¶34–35, 38, 40). He is still in debt, and the loan shark harasses him and his wife, causing him extreme stress and nightmares. (*Id.* ¶47). Despite the pain, roughly one year after returning to China, he began working as a long-haul truck driver, earning about RMB 7,000 per month. (*Id.* ¶41). He still fears that Gold Mantis or IPI will retaliate against him for bringing this lawsuit. (*Id.* ¶47).

*Yongjun Meng*. While loading a large, heavy vat of soup onto a vehicle for transport to the construction site, Mr. Meng sustained severe burns and experienced incredible pain when the scalding-hot liquid spilled onto his hand and leg. (Meng Decl. ¶18, Ex. B). Gold Mantis refused to take him to the hospital, and nobody checked on him for weeks. (*Id.* ¶19). He was unable to work for the rest of his time in Saipan. (*Id.* ¶23). The Saipan casino project was the most dangerous worksite he had ever seen, and his treatment by Gold Mantis was the worst that he had ever experienced. (*Id.* ¶37). Once back in China, Mr. Meng did not have enough money to repay his debts and his son's tuition, forcing him to borrow more money once again. (*Id.* ¶¶29, 39). He also continued to experience great pain in

16

his hand, which left him unable to work. (*Id.* ¶30). After resting for six months, however, he could not afford to stay home; but he could only perform "light" construction work because of his hand pain, which paid about half of what he used to earn. (*Id.* ¶¶32–33). As his hand slowly healed, he was able to return to doing "heavy" work in 2020. (*Id.* ¶35). His stress and anxiety persist because he cannot satisfy his family's expenses, and he lives in constant fear of retaliation by Gold Mantis or the casino, causing him nightmares. (*Id.* ¶¶36, 39).

*Qingchun Xu.* Mr. Xu and his coworkers were using ropes to lift heavy pieces of stone, when one fell onto his lower left leg, inverting his ankle. (Xu Decl. ¶16). This caused Mr. Xu tremendous pain, and there was blood all over his ankle and foot; he could barely walk on his left foot. (*Id.* ¶17, Ex. A). Gold Mantis refused to take him to the hospital or provide medical care, so Mr. Xu went himself to a nearby store to buy medicine for the pain and ointment for the ligaments in his ankle; he spent hundreds of dollars, which he had to borrow from others. (*Id.* ¶18). He was only taken to the hospital after Gold Mantis' managers fled Saipan. (*Id.* ¶20, Exs. B, C). Mr. Xu returned to China unable to repay his debts; the loan shark would scream and curse at him, and threaten to sue him; Mr. Xu feared losing his house or being put on a government blacklist. (*Id.* ¶23). He saw several doctors, who prescribed him medicine, but the pain persists; he is unable to heavy work; after resting several months for his ankle to heal, Mr. Xu was still only able to do "light" construction work that pays a fraction of what he would otherwise earn. (*Id.* ¶¶24–27, Ex. D). Supervisor Kong's threat to kill disobedient workers still causes Mr. Xu nightmares and he fears for his family's safety. (*Id.* ¶¶30–31). He hides from the loan sharks who lent him money, and did not even return home during Chinese New Year for fear of encountering them. (*Id.* ¶32). His poor financial state at 50 years old makes him feel inadequate, embarrassed, and depressed. (*Id.* ¶33).

*Youli Wang.* While loading steel beams onto a piece of plywood (to then be loaded with a forklift) in the Gold Mantis warehouse, the plywood snapped, causing the beams to fall to the floor,

smashing Youli Wang's left hand and fracturing his left ring finger. (Y. Wang Decl. ¶18, Exs. C, D).

He was instantly in extreme pain; the finger began swelling and bleeding profusely; his fingernail was

almost separated from his finger. (*Id.*). His manager refused to take him to the hospital; instead he

poured a cheap bottle of Chinese liquor (*baijiu*) onto Youli Wang's wound. (*Id.* ¶19). He had to return

to work with a fractured finger just days later, because otherwise he would not get paid. (*Id.* ¶20).

Soon thereafter, he lost his fingernail completely. (*Id.* ¶22). He worked like that for two months, until

he was effectively terminated for asking Kong about his unpaid salary. (*Id.* ¶20). When Youli Wang

finally saw a doctor at the Saipan hospital, he was told that he needed surgery, but he lacked any

money to pay for it. (*Id.* ¶25, Ex. B). He was still in debt when he arrived back in China; the loan shark

would wait all day in his house for him to return, causing great stress for him and his elderly mother.

(*Id.* ¶27). His finger still hurts and sometimes goes numb; he can only avoid pain by not touching

anything; doctors said he needs surgery to remove the bone fragments, but he lacks the money; he

must avoid any heavy lifting. (*Id.* ¶¶28–29). After resting his hand a few months, Youli Wang did light

work for a renovation company, but only earned RMB 3,500–4,000 per month. (*Id.* ¶30). In 2019, he

had a heart attack that left him hospitalized for 22 days, which Youli Wang attributes to the stress

caused by his debt and his inability to earn money; his sisters had to pay the RMB 60,000 medical bill

for him. (*Id.* ¶31, Ex. E). Given his inability to do regular construction work and his heart condition,

Youli Wang decided to open a small snack shop, but it earns him very little money despite his putting

in long hours. (*Id.* ¶32). His debt has strained his own family relations and those of the sister from

whom he borrowed money; he fears needing to sell his home, which would leave his elderly mother

homeless; he can barely sleep and has nightmares about five times per week. (*Id.* ¶¶37, 39). He opened

his shop in another city because he fears the lenders in his hometown, which means he rarely sees his

mother or son. (*Id.* ¶40).

*Xiyang Du*. While working overtime one evening moving heavy pieces of plaster, one piece fell over and crushed the middle finger on Mr. Du's hand. The finger swelled immediately and was bleeding, leaving him in tremendous pain and unable to use his hand. (Du Decl. ¶15). Gold Mantis forbid him from going to the hospital. (*Id.* ¶16). He had to work through the pain, otherwise he would not get paid. (*Id.* ¶18). Mr. Du never told his parents about the injury; he only told them good things. (*Id.* ¶19). When he finally went to the hospital, after Gold Mantis' managers had fled Saipan, he was told that he needed surgery because the nail had not grown back normally—but he had no money. (*Id.* ¶22). His nail still hurt after he returned to China, so he visited a local hospital; when the medicine did not help, he went to a traditional Chinese medicine clinic, but that also failed to fix the problem. (*Id.* ¶¶23–24). Three years later, his finger still hurts whenever it touches something and aches when it rains. (*Id.* ¶28, Ex. C). His hand injury greatly limited the work he could perform, but then in 2018, he was involved in a debilitating car accident that left him totally unable to work. (*Id.* ¶26). His old parents need to provide for him and his children, which causes him great shame and embarrassment. (*Id.* ¶31).

### b. *Calculation of lost income*.

The injuries suffered by Plaintiffs either made them completely unable to work or impaired their ability to work. Plaintiffs are entitled to recover their "but for" earnings—that is, the amount that they would earn but for the injury minus what they actually earn with the injury. The requested damages represent very conservative estimates of their lost earnings. After returning to China, having received no medical attention in Saipan, all seven Plaintiffs experienced some amount of lost income for at least their first year back home. *See Moore v. The Sally J.*, 27 F. Supp. 2d 1255, 1260 (W.D. Wash. 1998) (awarding 14 months of lost wages to commercial freighter cook who suffered hand and wrist injuries from cleaning vessel's stove). The following subsection addresses Plaintiffs' lost earnings from the time of their arrival back in China to the end of 2019. Four of the Plaintiffs still

19

continue to experience lost income as a result of their injury and thus are entitled to an award of future lost income, which is addressed in the subsequent subsection.

Plaintiffs generally based the "but for" earnings calculations on the national average salary for a construction worker in China. The National Bureau of Statistics of China ("NBS") provides data on the "Average Wage of Employed Persons in Urban Private Units by Sector," which includes an entry specifically for the "Construction" occupation ("National Average Salary") each year. (Steinkamp Decl. ¶¶18–19). This is actually a very conservative estimate of Plaintiffs' potential earnings, however, because some Plaintiffs had more skill than average workers, some Plaintiffs worked in provinces with higher-than-average wages, and several Plaintiffs report earning wages higher than these statistical averages prior to traveling to Saipan. (*See, e.g.*, T. Wang Decl. ¶¶4, 35–36; Y. Wang Decl. ¶¶5, 29–30, 32–35; Han Decl. ¶¶5, 35–39; Meng Decl. ¶¶3, 32–36).

### c. *Lost income for 2017–2019*.

For the five Plaintiffs who had done construction work prior to their time in Saipan, their lost income for 2017–2019 was calculated by subtracting their actual income from the National Average Salary for each of those years. If a Plaintiff earned more than the National Average Salary then no lost income is sought for that year. In the case of Mr. Sun, he never worked in construction prior to or after his time in Saipan. Therefore, his starting wage at the first job that he found upon reentering the workforce (as a long-haul truck driver) was used for his "but for" wage. For Mr. Du, since he worked as a courier prior to being trafficked to Saipan, a conservative estimate of those earlier wages is used as his "but for" income in 2017 and 2018, when he was involved in a car accident. The Halegua Declaration further describes the calculation conducted for each Plaintiff (Halegua Decl. ¶¶7 –15) and presents the results in a table (*id.*, Ex. E).

### d. *Future lost income.*

Four of the Plaintiffs—Tianming Wang, Dong Han, Qingchun Xu, and Youli Wang—still earn less than even the National Average Salary as a result of their injury. As described above, there is no reason to believe that their injury will significantly improve and thus their earning potential increase. Plaintiffs retained an expert, Neil Steinkamp, who is the Managing Director at Stout Risius Ross, LCC and has over 20 years of financial consulting experience, to calculate Plaintiffs' future lost income for the remainder of their working life.[9]  In doing these calculations, Plaintiffs were very conservative in their assumptions. For instance, no lost income was calculated for 2020 as the year is almost half-way over. (Steinkamp Decl. ¶25). When the calculation starts in 2021, the National Average Salary for 2019 of ￥54,167 per year (US $7,660) is used as the but for income—thus, zero wage growth is assumed for 2020 and 2021. (*Id.*) Moreover, lost income was only calculated until each Plaintiff turns 60, which is the official retirement age in China, even though most Chinese live and work much longer (*id.* ¶24) and Plaintiffs also expect to work beyond age 60 (*see* Han Decl. ¶38; Xu Decl. ¶27).

In calculating a plaintiff's lost income, the Supreme Court has stressed that regardless of methodology, such damages invariably "must be a rough approximation" that "can never be predicted with complete confidence," given that they ask the factfinder to look far into the future. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 546 (1983). If one were to determine damages based on the worker's current wage multiplied by the years of work lost, the court noted that factors like raises, promotions, and inflation would counsel for an upward adjustment of that figure; however, the possibility of earning interest on any lump sum award paid today suggests discounting any such figure to present value. *See generally id.*; (Steinkamp ¶12). Yet, because it would "be a costly and ultimately

---

[9]  Plaintiffs do note, however, that expert testimony is not necessarily required for the calculation of front pay, particularly where plaintiffs are not claiming future raises or salary increases. *See, e.g.*, *Bisom v. Commonwealth of N. Mariana Islands*, 2002 WL 32983568, at *4 (N. Mar. I. Sept. 13, 2002) (*citing Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338 (9th Cir. 1987)).

unproductive waste of … resources to make [economic] forecasts the centerpiece of litigation," and because "[t]he average accident trial should not be converted into a graduate seminar on economic forecasting," the court concluded that trial courts should be "discouraged" from pursing such a complex approach. *Id.* at 548.

One alternative described by the court that has the "virtue of simplicity" but is based on "sound economic[s]" is the "total offset rule." *Id.* at 547, 549–50. That method is based on research suggesting that, "in the long run," productivity gains and other factors that lead to rising wages "match (or even slightly exceed)" the 'real interest rate' that economists use to discount a future stream of income to present value. *Id.* at 549. Accordingly, the plaintiff's lost income in the current year can simply be multiplied by the number of years that he is expected to work, without considering inflation, wage growth, or discount rates. The *Jones* court did note, however, that the total offset rule, if anything, may actually undercompensate some plaintiffs. *Id.* at 550 n.31.

Numerous federal courts have subsequently cited *Jones* in adopting the "total offset rule" or declining to exclude experts using that method. *See Jackson v. City of Cookeville*, 31 F.3d 1354, 1361 (6th Cir. 1994) ("A reasonable approximation of this figure can be obtained by simply multiplying his present salary by eleven and neither including future pay raises nor applying a discount rate."); *McCabe v. Mais*, No. 05-cv-73, 2010 WL 3938383, at *8 (N.D. Iowa Oct. 5, 2010) (inflation over next 28.7 years offsets reduction for present value); *Warren v. Cty. Comm'n of Lawrence Cty., Ala.*, 826 F. Supp. 2d 1299, 1318 (N.D. Ala. 2011) ("[O]ther courts have persuasively applied this method and this Court finds it to be a reasonable method of calculation that is appropriate to this case.")[10]

---

[10] *See also In re Air Crash at Lexington, Kentucky Aug. 27, 2006*, No. 5:06-cv-316, 2009 WL 3151101, at *2 (E.D. Ky. July 2, 2009) (adopting rule because it "is based on sound logic; it eliminates the bias experts can inject through the use of various discount and inflation rates; and it will save substantial time and reduce the likelihood of jury confusion in this upcoming trial," and excluding "evidence of present value, inflation [and] discount rates"); *Stratton v. Dep't for the Aging for City of New York*, 132 F.3d 869, 882 (2d Cir. 1997) ("The district court did not factor future salary increases into its front pay award; hence, it was not required to discount to present value.").

Plaintiffs' expert, based on the conservative assumptions identified above, calculated the projected lost income for the four Plaintiffs. In Scenario 1, Mr. Steinkamp applied the "total offset" approach, meaning that wages were held constant at the National Average Salary for 2019, but no discount for the present value of money was applied. (Steinkamp Decl. ¶¶14, 18–27, Exs. B–E). Mr. Steinkamp also ran two more scenarios with differing assumptions about inflation and discounting, the results of which are presented in Exhibits B–E of his declaration.[11]  Mr. Steinkamp concluded that Scenario 1 provides the "most reasonable" of the projections because, given the considerable time horizon for these calculations (at least 10 years for each Plaintiff), it is reasonable to expect that there will be some amount of wage growth and/or inflation, but that this will be "roughly equivalent" to an appropriate discount for the present value of money, thus "offsetting the impact of either." (*Id.* ¶30). In light of this analysis, Plaintiffs believe that the calculation of Plaintiffs' future lost income pursuant to the "total offset" method is appropriate for this case and request that such amounts be awarded.[12] (*See* Steinkamp Decl., Exs. B–E). Moreover, Plaintiffs' methodology is consistent to the approach to lost earnings used by other courts in similar situations.[13]

---

[11]  In Scenario 2, the most conservative, wages were still held constant but a discount for the present value of money was applied using the current interest rate of a 20-year U.S. Treasury Note (1.25%), which is commonly accepted as a "risk-free" rate. (*Id.* ¶28). The third approach, Scenario 3, assumes that the Plaintiff's wage will grow at China's average rate of inflation (2.2%) but then applies the same deduction as in Scenario 2. (*Id.* ¶29).

[12]  In fact, this method may very well undercompensate Plaintiffs because the average rate of inflation in China over the past twenty years (2.2%) is higher than the interest rate on U.S. Treasury Notes that is generally used as a discount rate. (*Id.* ¶30). For instance, the total award for the four Plaintiffs under Scenario 3 ($463,172), which accounts for both inflation and the present value of money, is significantly higher than under Scenario 1 ($359,502). (*Id.*, Exs. B–E).

[13]  For instance, in *Indalecio*, it was uncertain at the time of trial whether or not the injured security guard would ever work again. *Indalecio*, 2020 WL 118605, at *2. Nonetheless, the court affirmed a jury award of $220,000 for future lost income based on the assumptions that the plaintiff: would not work again for the next 18 years; would have earned a minimum wage salary for the remainder of his

### e.  *Pain and suffering (emotional distress) for Plaintiffs' injuries*.

Plaintiffs may recover emotional distress damages suffered as a proximate cause of TVPRA violations. *Alabado*, 2016 WL 5929247, at *13. In addition to the aforementioned emotional distress award for each day that Plaintiffs were subjected to the forced labor scheme, a separate award of pain and suffering stemming from Plaintiffs' physical injuries is proper. In an analogous situation, the *Doe* court awarded the plaintiff emotional distress damages of $500 per day due to her forced labor as a domestic worker, but also a "discrete" emotional distress award of $1.25 million for the rape and sexual abuse perpetrated by her employer. *Doe*, 2012 WL 3834867, at *2–3. *See also Shukla*, 2012 WL 481796, at *12–13 (jury award compensating plaintiff for distinct harms arising from TVPRA violations is proper); *Scott v. United States*, 884 F.2d 1280, 1283 (9th Cir. 1989) (damage awards for pain and suffering and for physical impairment arising from same act of malpractice not duplicative); *Ukau*, 2014 WL 2894232, at *8 ("As for non-economic damages, awarding damages for physical impairment and loss of enjoyment of life are not duplicative.")

Plaintiffs' pain and suffering from the intense burns, smashed fingers, and other physical injuries is sufficiently discrete from the emotional distress from the daily fear, anxiety, and shame they experienced. Accordingly, a separate emotional distress award for those harms is necessary to make Plaintiffs whole for all injuries suffered. *See Bseirani v. Mahshie*, 107 F.3d 2, at *2 (2d Cir. 1997) (rejecting allegation of duplicative damages where plaintiff alleged multiple injuries) (*citing Gentile v. Cty. of Suffolk*, 926 F.2d 142, 153–54 (2d Cir. 1991)).

Courts recognize that "[t]he award of damages for pain and suffering is by its nature a subjective determination." *Porter v. Tupaz*, No. 82-0180A, 1984 WL 48854, at *5 (D. Guam App. Div. June 12, 1984), *aff'd*, 760 F.2d 276 (9th Cir. 1985). Thus, the only requirement is that the award

---

career but for the injury; and would have worked until age 67. *Id.* at *2–3. *See also Ukau v. Wang*, No. 11-cv-00030, 2014 WL 2894232, at *5 (D. Guam June 26, 2014) (bench trial awarding $797,390.22 in lost income to injured construction worker who had legs amputated based on assumption that he may not work again and that he otherwise would have worked into his 60s).

"be reasonable, based on the evidence and factfinder's common sense, and caused by the tort." *Lewis v. United States*, No. 15-cv-8354, 2017 WL 2311874, at *11 (C.D. Cal. May 24, 2017) ("there is no fixed standard to calculate the amount a plaintiff is entitled to recover for pain and suffering").

Nonetheless, one method for determining a reasonable award is to examine damages in similar cases. *Shukla*, 2012 WL 481796, at *14. A good baseline for this inquiry is a 2013 CNMI case in which then-Superior Court Judge Inos found a $300,000 award of non-economic damages to be reasonable for a plaintiff who had a "slightly torn rotator cuff" after slipping and falling in a parking lot. *Price v. Kan Pacific, Ltd.*, No. 08-0046E, at *4, *17 (N.M.I. Super. Ct. Apr. 23, 2013) (Halegua Decl., Ex. D). Although the plaintiff had only a small facture (that a first x-ray did not even detect) and two doctors stated that surgery was unnecessary, the court noted that the plaintiff "experienced severe pain for a number of years," showed little improvement in that time, was likely to suffer for the foreseeable future, and would incur future expenses related to the injury. *Id.* at *3–4, *17.

The injuries suffered by Plaintiffs, and the resulting pain and suffering, are more severe than what the plaintiff in *Price* experienced, and thus higher damages are warranted. Therefore, Plaintiffs request an emotional distress award of $700,000 for Tianming Wang and $400,000 for each of the other Plaintiffs. As discussed above, Tianming Wang endured severe burns to his leg that still leave him unable to walk or stand for longer than 15 minutes, let alone work. Mr. Han's smashed finger still hurts when touched three years later, reducing him to simple cleaning work; Mr. Youli Wang's finger was fractured but he cannot afford the surgery and thus continues to suffer; Mr. Sun had a piece of his finger severed, is still in pain, and needs surgery to smoothen the bone, but he is unable to afford the procedure; and Mr. Du's crushed middle finger still causes him pain after trying numerous medical treatments. Mr. Meng suffered deep burns to his hand and leg, rendering him incapable of working for several months and leaving him scars. Mr. Xu's bloody, inverted ankle left him unable to walk and the persisting pain three-years later prevents him from pursuing more profitable work. In addition,

Plaintiffs' declarations describe how their injuries have impacted their work, emotional state, familial relationships, and friendships. (T. Wang Decl. ¶¶33, 37, 43–44, 46; Han Decl. ¶¶45–46; Sun Decl. ¶47; Meng Decl. ¶¶36, 39; Xu Decl. ¶¶23, 32–33; Y. Wang Decl. ¶¶27, 37, 39–40; Du Decl. ¶31).

The requested amounts are modest compared to damages awarded in other tort cases in the CNMI, Guam, and elsewhere. *See, e.g., Indalecio*, 2020 WL 118605, at *1, *3 (jury awarded $600,000 to security guard who fell through a drainage ditch, which caused a laceration to his lower left leg and who was later discovered to have a degenerative disc disease); *Russo v. Corey Steel Co.*, 125 N.E.3d 1036, 1041 (Ill. App. 1st Dist., 3rd Div. 2018) (awarded $1 million in pain and suffering and $5 million for prior and future loss of normal life experience to plaintiff involved in accident causing labral tear to his hip, where constant hip pain required surgery and he could no longer lift weights, maintain a healthy relationship with his wife, or work in the same capacity as before); *Ukau*, 2014 WL 2894232, at *8–9 (awarded $5.49 million after bench trial to plaintiff-construction worker whose legs amputated after being crushed by steel panels, where immediate pain of injury was "tremendous" and plaintiff still suffers pain, cannot support his family, cannot play sports with his kids and friends, and his attitude has worsened).

Plaintiffs' request is also far less than the damages awarded to other forced labor victims who experienced very similar physical injuries. For instance, in *Licea*, the defendant drydock company trafficked Cuban citizens to Curacao and forced them to work 16 hours per day repairing ships and oil platforms. *Licea v. Curacao Drydock Co., Inc.*, 584 F. Supp. 2d 1355 (S.D. Fla. Oct. 31, 2008). Three injured workers sued the defendant: one was awarded $15 million in compensatory damages after falling on the ship, breaking his foot and ankle, and being returned to Cuba without medical attention; a second plaintiff was awarded $15 million after suffering an electric shock, leaving him bleeding and in shock; and a third was awarded $20 million when his glove caught fire, causing extensive burns to

his hand. *Id.* These scenarios are strikingly similar to Mr. Xu's bloody, inverted ankle, Mr. Meng's burnt hand and leg, and Tianming Wang's pants catching fire.

| Plaintiff | Injury | Lost Income (2017–2019)[14] | Future Lost Income[15] | Pain and Suffering |
|---|---|---|---|---|
| Wang, Tianming | burnt leg | $19,186.04 | $226,821 | $700,000 |
| Han, Dong | crushed finger | $12,839.07 | $63,114 | $400,000 |
| Sun, Liangcai | severed finger | $11,768.69 | n/a | $400,000 |
| Meng, Yongjun | burnt hand and leg | $6,675.46 | n/a | $400,000 |
| Xu, Qingchun | inverted ankle | $9,312.98 | $31,179 | $400,000 |
| Wang, Youli | fractured finger | $3,132.52 | $38,388 | $400,000 |
| Du, Xiyang | crushed finger | $8,767.28 | n/a | $400,000 |

### 3.  Punitive damages for IPI's reprehensible and egregious conduct.

The Supreme Court has identified three factors to guide the reasonableness of punitive damage awards: "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). However, of the three factors, "the most important indicium of the reasonableness … is the degree of reprehensibility of the defendant's conduct." *Id.*

Human trafficking is a "contemporary manifestation of slavery," thus TVPRA violations are inherently reprehensible and punitive damages are routinely awarded.[16] *Ditullio*, 662 F.3d at 1098 (awarding "punitive damages is consistent with Congress' purposes in enacting the TVPRA, which

---

[14]  Halegua Decl, Ex E.

[15]  Steinkamp Decl., Exs. B –E, Scenario 1.

[16]  *See Alabado*, 2016 WL 5929247, at *13-14 (awarding punitive damages "because of the egregious nature of defendants' conduct and the severe emotional harm plaintiffs suffered"); *Canal*, 2010 WL 3491136, at *4 (awarding punitive damages because defendant acted with "disregard of [plaintiff's] basic rights"); *Abafita*, 2019 WL 6735148, at *6 (awarding $800,000 in punitive damages due to "egregious nature" of defendant's conduct).

include increased protection for victims of trafficking and punishment of traffickers"). Indeed, the CNMI legislature explicitly included punitive damages as a remedy for forced labor victims who bring civil cases. 6 CMC § 1507. As to the quantum of damages, "[t]he factors to be considered are whether the harm was physical or economic, whether defendants acted with reckless disregard of the victim's health and safety, whether the conduct was repeated, and whether the conduct was a result of malice or deceit as opposed to mere accident." *Lagasan*, 92 F. Supp. 3d at 458.

Plaintiffs seek punitive damages twice the amount of the compensatory damages for each Plaintiff. This 2:1 ratio has been awarded in other TVPRA cases with facts similar to or less egregious than those present here. For instance, in *Arreguin*, 13 workers from Mexico were recruited by the defendant on false promises, threatened with deportation, and housed in deplorable conditions. *Arreguin v. Sanchez*, 398 F. Supp. 3d 1314, 1329 (S.D. Ga. 2019). In explaining that it had "no trouble" finding such a 2:1 ratio "warranted," the court made particular note of a worker who slipped and injured his arm in a dirty shower and was forced to tend to his own injury. *Id.*

Here, all seven Plaintiffs suffered more severe physical injuries than the worker in *Arreguin* and were similarly denied medical care. The IPI worksite was "the most dangerous…ever experienced" by Mr. Meng, who is 44 years old. (Meng Decl. ¶37). The injuries suffered by Plaintiffs are very severe, even amongst forced labor victims; and "[t]he total denial of medical care under such circumstances is quite extreme even for human traffickers." (Burke Decl. ¶24). Yet, even after being told about over 80 serious worker injuries occurring in 2016 alone, IPI still refused OSHA access to inspect the safety conditions. (FAC ¶¶135–43, 166–67, 184–85).[17] This was part of a pattern of behavior in which IPI not only recklessly disregarded workers' health, safety, and humanity, but

---

[17]  *See In the Matter of Establishment Inspection of: MCC International Saipan Ltd., Co.*, No. 16-mc-00041, ECF No. 3 (D. N. Mar. I. December 15, 2016) ("Declaration of Rick Foster") ¶ 7 (IPI legal counsel Chuck McDonald instructing OSHA investigator to leave).

played a central role in undermining it. In addition to condoning the deplorable work conditions described above, IPI also provided a dorm unfit for humans (FAC ¶¶77–79, 195) where rats crawled over Plaintiffs' bodies (Sun Decl. ¶25); IPI took no action after learning workers were not paid (FAC ¶¶205–08); and IPI helped conceal the use of tourist workers after questions were raised by government authorities (*id.* ¶¶50, 164). The egregiousness of these repeated, intentional acts by IPI that caused such devastating physical and emotional harm to Plaintiffs warrants a punitive damage award at a ratio of 2:1 or higher.[18]

| Plaintiff | Emotional Distress | Physical Injuries | | | Total Compensatory Damages | Punitive Damages |
|---|---|---|---|---|---|---|
| | | Lost Income | Future Lost Income | Pain and Suffering | | |
| T. Wang | $79,050 | $19,186.04 | $226,821 | $700,000 | $1,025,057 | 2:1 |
| D. Han | $89,250 | $12,839.07 | $63,114 | $400,000 | $565,203 | 2:1 |
| L. Sun | $62,475 | $11,768.69 | n/a | $400,000 | $474,244 | 2:1 |
| Y. Meng | $9,775 | $6,675.46 | n/a | $400,000 | $416,450 | 2:1 |
| Q. Xu | $19,975 | $9,312.98 | $31,179 | $400,000 | $460,467 | 2:1 |
| Y. Wang | $51,425 | $3,132.52 | $38,388 | $400,000 | $492,946 | 2:1 |
| X. Du | $20,400 | $8,767.28 | n/a | $400,000 | $429,167 | 2:1 |

### 4. **Plaintiffs are entitled to an award of attorneys' fees and costs.**

Attorneys' fees and costs are available to the plaintiff under the TVPRA when a default judgment is entered. 18 U.S.C. § 1595; *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1178 (D. Kan. 2018); *Alabado*, 2016 WL 5929247, at *18. Therefore, Plaintiffs request that a briefing schedule be set at the August 7, 2020 hearing concerning an award of fees and costs.

---

[18] *See, e.g., Aguilar v. Imperial Nurseries*, No. 07-cv-0193, 2008 WL 2572250, at *1 (D. Conn. May 28, 2008) (awarding 2:1 ratio of punitive to compensatory damages to Guatemalan workers who suffered similar conditions but no physical injuries); *Magnifico*, No. 10-cv-80771, ECF Nos. 127, 133 (same); *Fernandes v. Hayes*, No. 11-cv-00137, ECF No. 22 (W.D. Tex. April 27, 2012) (same); *Francisco*, 2013 WL 4849109, at *3 (awarding punitive damages of $10,000 per day where plaintiffs worked 39 days or less); *Licea*, 584 F. Supp. 2d at 1362 ($10 million per plaintiff in forced labor case); *David v. Signal*, No. 08-cv-1220, ECF No. 2272-3 (E.D. La. February 8, 2015) (jury awarding punitive damages up to ten times the amount of compensatory damages).

## V.   CONCLUSION

Plaintiffs request for $3.86 million in compensatory damages and twice that amount in punitive damages is reasonable for the slave-like conditions and severe injuries endured by the seven Plaintiffs. It is also consistent with awards in other forced labor TVPRA cases, many of which do not involve physical injuries. *See Alabado*, 2016 WL 5929247, at *14 ($15.2 million to eleven plaintiffs despite no allegation of physical abuse or injury); *Signal*, No. 08-cv-1220, ECF No. 2406 ($12 million to five plaintiffs for TVPRA and other claims); *Magnifico*, 2012 WL 5395026, at *2 ($13 million to 18 plaintiffs, despite no allegations of physical harm).[19]

Respectfully submitted,

_____/s/_____

Aaron Halegua
Bruce Berline

Attorneys for Plaintiffs

---

[19]  *See also Does v. Rodriguez*, No. 06-cv-0805, ECF No. 64 (D. Colo. Apr. 15, 2009) ($7.8 million to five plaintiffs); *Aguilar*, 2008 WL 2572250, at *1–2 ($7.7 million to twelve plaintiffs); *Asanok v. Million Express Manpower, Inc.*, No. 07-cv-0048, ECF No. 68 (E.D.N.C. Oct. 26, 2009) ($1 million to a single plaintiff); *Lipenga*, 219 F. Supp. 3d 517 (same); *Carazani*, 972 F. Supp. 2d 1 (same).