Bruce Berline
BERLINE & ASSOCIATES, LLC
Second Floor, Macaranas Building
PO Box 5682 CHRB
Saipan, MP 96950
Tel: (670) 233-3663
Fax: (670) 233-5262
Email: bruce@saipanlaw.com

Aaron Halegua
AARON HALEGUA, PLLC
524 Broadway, 11th Floor
New York, New York 10011
Tel: (646) 854-9061
Email: ah@aaronhalegua.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| TIANMING WANG, *et. al*,<br><br>                         Plaintiffs,<br><br>v.<br><br>GOLD MANTIS CONSTRUCTION DECORATION (CNMI), LLC, *et. al*,<br><br>                         Defendants. | Case No. 18-cv-0030<br><br>**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFAULT JUDGMENT AGAINST IPI**<br><br>Hearing Date: n/a<br>Hearing Time: n/a<br>Judge: Hon. Ramona V. Manglona |

# TABLE OF CONTENTS

I.    INTRODUCTION ………………………..………………………….. 1

II.    ARGUMENT ………………………………………………………… 3

    A.   The *Eitel* factors strongly support entering a default judgment against IPI ……..…….. 3

    B.   A default judgment against IPI should be entered under Rule 54(b) because there is "no just reason for delay" in this case …………………………………………....... 5

      1.   Courts examine multiple factors in deciding whether to enter final judgment as to fewer than all defendants, not solely the possibility of inconsistent judgments ……………………………………………… 6

      2.   Collectability is an important reason to enter judgment under Rule 54(b) and any delay in this case risks rendering a judgment against IPI uncollectible ……….. 7

      3.   The Court may enter judgment under Rule 54(b) where divergent outcomes "would not necessarily be inconsistent" or illogical ……………………….. 10

      4.   Plaintiffs' TVPRA claims do not demand uniform judgments against all Defendants and divergent outcomes "would not necessarily be inconsistent" ………… 15

      5.   Uniform damages awards are not required by Plaintiffs' claims and a lesser damages award against MCC or Gold Mantis "would not necessarily be inconsistent" with a full damages award against IPI …………………………………………… 20

      6.   Entering a default judgment against IPI facilitates Plaintiffs' ability to collect payment and resolve the entire case …………………………………… 22

      7.   If the Court finds a substantial risk of possible inconsistent outcomes, it can be addressed through other measures less prejudicial to Plaintiffs …………....… 23

III.   CONCLUSION ………………………………………………………... 24

i

# TABLE OF AUTHORITIES

**Cases**

*Alabado v. French Concepts, Inc.*, No. 15-cv-2830,
2016 WL 5929247 (C.D. Cal. May 2, 2016) ............................................................ 3, 4, 5

*Albizu v. Strohl*, No. 02-cv-5875, 2005 WL 8176328, (E.D. Cal. Nov. 14, 2005) ............................ 13

*Allis-Chalmers Corp. v. Philadelphia Elec. Co.*, 521 F.2d 360 (3d Cir. 1975) ................................ 7

*Atl. Cas. Ins. Co. v. Paszko Masonry, Inc.*, No. 09-7452,
2014 WL 1847830 (N.D. Ill. May 8, 2014) ............................................................ 23

*Capital Distribution Servs., Ltd. v. Ducor Exp. Airlines, Inc.*,
462 F. Supp. 2d 354 (E.D.N.Y. 2006) ............................................................ 9

*Champion-Cain v. MacDonald*, No. 14-cv-02540,
2018 WL 3388095 (S.D. Cal. July 12, 2018) ............................................................ 5

*Corporate Com'n of Mille Lacs Band of Ojibwe Indians v. Money Centers of America*,
986 F. Supp. 2d 1062 (D. Minn. Dec. 2, 2013) ............................................. 8, 13, 14, 18

*Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1 (1980) ....................................... 6, 7, 8, 22

*David v. Signal*, No. 08-cv-01220 (E.D. La. Feb. 18, 2015) ............................................ 21

*Deloughery v. City of Chicago*, 422 F.3d 611 (7th Cir. 2005) .......................................... 23

*Dreith v. Nu Image, Inc.*, No. 05-cv-4146,
2007 WL 9658786 (C.D. Cal. Mar. 2, 2007) ............................................................ 3

*Echon v. Sackett*, No. 14-cv-03420 (D. Colo. May 4, 2018) ............................................ 21

*Eitel v. McCool*, 782 F.2d 1470 (9th Cir.1986) ............................................................ 3

*Fed. Deposit Ins. Corp. v. Elefant*, 790 F. 2d 661 (7th Cir. 1986) .................................... 22

*Federal Deposit Ins. Corp. v. Tripati*, 769 F.2d 507 (8th Cir. 1985) .................................. 10

*Fox Financial, LLC v. IPI*, No. 20-cv-00008 (D. N. Mar. I. June 1, 2020) ............................ 9

*Frow v. De La Vega*, 82 U.S. 552 (1872) ................................................................. 2, 6

*Gersh v. Anglin*, No. 17-cv-50, 2019 WL 3754454 (D. Mont. July 15, 2019) .................... 3

*Green v. Howser*, 942 F.3d 772 (7th Cir. 2019) ........................................................ 20

*Halliburton Energy Servs., Inc. v. NL Indus.*, No. 05-cv-4160,

　　2008 WL 2697345 (S.D. Tex. July 2, 2008) ............................................................ 9

*Hester v. Vision Airlines, Inc.*, 687 F.3d 1162 (9th Cir. 2012) ....................................... 3

*HICA Educ. Loan Corp. v. Warne*, No. 11–cv–04287,

　　2012 WL 1156402 (N.D. Cal. Apr. 6, 2012) ............................................................ 4

*Illinois Tool Works, Inc. v. Brunsing*, 378 F.2d 234 (9th Cir. 1967) ................................. 6

*In re First T.D. & Inv., Inc.*, 253 F.3d 520 (9th Cir. 2001) .............................. 2, 11, 12, 20

*In re Uranium Antitrust Litig.*, 617 F.2d 1248 (7th Cir. 1980) ...................................... 20

*J.M. Aquino v. IPI*, No. 20-cv-00009 (D. N. Mar. I. June 3, 2020) .................................. 9

*j2 Global Inc. v. Fax87*, No. 13-cv-05353, 2016 WL 7260588 (C.D. Cal. Dec. 15, 2016) .............. 19

*Kapadia v. Thompson*, No. 06-cv-1359, 2008 WL 5225813 (D. Ariz. Dec. 15, 2008) ........ 14, 15, 20

*Lehman Bros. Holdings Inc. v. Cafcalas*, No. 16-cv-0316,

　　2018 WL 6074597 (C.D. Cal. Feb. 27, 2018) ...................................................... 2, 5, 23

*Lucas v. Telemarketer Calling from (407) 476-5680*, No. 12-cv-00630,

　　2014 WL 5308573 (S.D. Ohio Oct. 16, 2014) ............................................................ 8

*M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio 2019) .......................... 16

*Navitag Technologies, Inc. v. Silva*, 738 F. Supp. 2d 207 (D. Mass. 2010) ............................ 9

*PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F.Supp.2d 1172 (C.D. Cal. 2002) ............................... 4

*Ping Shun Corporation v. IPI*, No. 20-cv-00012 (D. N. Mar. I. June 3, 2020) ......................... 9

*Protective Life Ins. Co. v. Mizioch*, No. 10-cv-1728,

　　2012 WL 2368483 (D. Ariz. June 21, 2012) ............................................................. 23

iii

*Red Coral Corporation v. IPI*, No. 20-cv-00016 (D. N. Mar. I. July 29, 2020) .................................. 9

*Sardini Group, Inc v. IPI*, No. 20-cv-00007 (D. N. Mar. I. May 27, 2020) ........................................ 9

*Schaeffer v. First Nat. Bank of Lincolnwood*, 465 F.2d 234 (7th Cir. 1972) ....................................... 7

*Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995 (N.D. Cal. 2001) .............. passim

*Steffenberg v. Gilman*, No. 04-cv-40113, 2005 WL 8176506 (D. Mass. Sept. 13, 2005) ........ 6, 10, 19

*Sterling Nat'l Bank v. Meister*, No. 19-cv-01116, 2020 WL 882205 (C.D. Ill. Feb. 24, 2020) ........ 22

*Tang's Corporation v. IPI*, No. 20-cv-00006 (D. N. Mar. I. May 12, 2020) ...................................... 9

*Tattersalls Ltd. v. Wiener*, No. 17-cv-1125,

    2019 WL 2209400 (S.D. Cal. May 21, 2019) .................................................. 13, 18, 19

*United States v. Sandwich Isles Commc'ns, Inc.*, No. 18-cv-00145,

    2020 WL 544692 (D. Haw. Feb. 3, 2020) ......................................................... 8

*Weber v. Sanborn*, No. 06-cv-10125, 2006 WL 8458436 (D. Mass. Sept. 28, 2006) ....................... 19

*WRS, Inc. v. Plaza Entm't, Inc.*, No. 00-cv-2041, 2008 WL 2323991 (W.D. Pa. June 5, 2008) ........ 23

**Statutes**

18 U.S.C. §1589 ...........................................................................................4, 18, 20, 24

18 U.S.C. §1590 ...................................................................................................... 18, 20

18 U.S.C. §1592 ...................................................................................................... 18, 20

18 U.S.C. §1595 ............................................................................................................. 18

Fed. R. Civ. P. 62(h) .................................................................................................... 26

**Treatises**

Wright & Miller, 10 Fed. Prac. & Proc. Civ. § 2656 (4th ed.) ....................................... 10

iv

**Federal Rules**

Fed. R. Civ. P. 54(b)............................................................................................. passim

Fed. R. Civ. P. 60(b)............................................................................................. 5, 26

## I.  INTRODUCTION

Plaintiffs are seven Chinese construction workers who were subjected to forced labor and suffered serious physical injuries in 2017 while building IPI's massive casino and resort project—injuries for which they have not received a penny. During the 18 months of battling IPI's baseless motions, discovery abuses, and disregard of Court orders, Plaintiffs have watched a company that previously touted billions in revenue now begin to plead poverty. There is now a significant risk that Plaintiffs will collect nothing from their judgment against IPI.

As shown through the analysis of the *Eitel* factors below, the case for entering a default judgment against IPI is strong and compelling. IPI was given every opportunity to oppose the entry of default and Plaintiffs' proposed damages, but submitted no contrary evidence. However, Plaintiffs' prospects of collecting on this judgment grow more daunting with each passing day. Under such circumstances, "there is no just reason for delay" in entering the judgment. Fed. R. Civ. P. 54(b).

The "mere possibility" of future inconsistent outcomes does not preclude entry of judgment as a matter of law or "divest[] the Court of its discretion under Rule 54(b)." *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 1009 (N.D. Cal. 2001). The TVPRA does not explicitly provide for joint and several liability, Plaintiffs do not allege joint and several liability in their FAC, and Plaintiffs do not propose that a default judgment against IPI would create any such liability for the other Defendants. Rather, it "would not necessarily be inconsistent" for IPI to be liable under the TVPRA but for Gold Mantis and MCC to not be. *Id.* For instance, Gold Mantis and MCC have long argued that Plaintiffs worked for subcontractors, not them, and they did not control and were not aware of Plaintiffs' working conditions. A jury could accept this argument while still finding that IPI, who owned and operated the dormitories and buses as well as controlled the construction site, "should have known" about the forced labor conditions. 18 U.S.C. §1589. Hence, this is not a case where the defendants are charged with participating in a "joint fraud" such that it is logically impossible for some

1

to be liable but not others. *Frow v. De La Vega*, 82 U.S. 552, 554 (1872). Nor is it an instance where entering the default judgment will "directly contradict[]" an earlier legal determination in the same action. *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 532–33 (9th Cir. 2001). Quite the contrary, in the instant matter, there is no "extreme risk of inconsistent outcomes" that would require delaying the entry of a default judgment against IPI. *Shanghai Automation*, 194 F. Supp. 2d at 1010.

The risk of an inconsistent damages award is similarly low and should not preclude entering judgment. The largest category of damages, punitive damages, must be assessed against each Defendant and thus there is no risk of inconsistent awards. Plaintiffs also did not seek certain categories of damages against IPI, such as recruitment fees. Furthermore, like in *Shanghai Automation*, a "full damages award" against IPI and "possible lesser award" against Defendants "would not necessarily be inconsistent." *Id.* A jury determination that Gold Mantis and MCC are only liable for the time that Plaintiffs worked for that particular Defendant (but not when they worked for the other) would not be inconsistent with a finding that IPI, who knew about and benefitted from *all* contractor activity on its site, is liable for the whole period of Plaintiffs' employment. Indeed, several TVPRA juries have found multiple defendants liable but apportioned damages differently amongst defendants.

In this situation, the equitable result is to enter the default judgment and give Plaintiffs some chance of collecting against IPI on their well-founded claims. If Plaintiffs collect on their judgment, they are likely to dismiss their claims against the other Defendants thus mooting any concerns over inconsistent outcomes. *Lehman Bros. Holdings Inc. v. Cafcalas*, No. 16-cv-0316, 2018 WL 6074597, at *8 (C.D. Cal. Feb. 27, 2018). Furthermore, if any inconsistent outcome did arise at some future date, mechanisms exist to address this issue, such as Fed. R. Civ. P. 60(b). Therefore, mere speculation about the possibility of some future inconsistent outcome should not be a basis to cripple Plaintiffs' chance of collecting on their claims against IPI or forcing them to sacrifice their claims against MCC and Gold Mantis just to have some hope of doing so.

## II.  ARGUMENT

### A.  The *Eitel* factors strongly support entering a default judgment against IPI.

The Court already considered the five-factor test (often-labeled the "*Malone* factors") for imposing an entry of default as a Rule 37 sanction. (ECF No. 193). While some courts hold the view that this makes consideration of the seven-*Eitel* factors prior to entering default judgment unnecessary, other courts nonetheless engage in that analysis. *Compare Dreith v. Nu Image, Inc.*, No. 05-cv-4146, 2007 WL 9658786, at *6–7 (C.D. Cal. Mar. 2, 2007) *with Gersh v. Anglin*, No. 17-cv-50, 2019 WL 3754454, at *1–2 (D. Mont. July 15, 2019), *report and recommendation adopted*, No. 17-cv-50, 2019 WL 3755265 (D. Mont. Aug. 8, 2019). In an abundance of caution, Plaintiffs review the *Eitel* factors to show that they strongly support entering a default judgment against IPI. *See Alabado v. French Concepts, Inc.*, No. 15-cv-2830, 2016 WL 5929247, at *4 (C.D. Cal. May 2, 2016) (performing *Eitel* analysis in TVPRA default case).

The *Eitel* factors used to consider whether a default judgment should be entered include: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir.1986).[1]  Most of these were already explicitly considered by the Court in its decision entering default (ECF No. 193) and then again in denying IPI's motion to set aside that default (ECF No. 219).

---

[1]  By comparison, the five factors considered in the Court's decision to enter default were: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1169 (9th Cir. 2012).

The Court found that IPI's violations of its discovery obligations and the Court's orders have already prejudiced Plaintiffs through *inter alia*, the loss of phone data, WeChat data, and other ESI, as well as the numerous employees who have left IPI and the United States. The second and third factors, often considered together, "address the merits and sufficiency of [the plaintiff's] claims pled in the complaint." *HICA Educ. Loan Corp. v. Warne*, No. 11–cv–04287, 2012 WL 1156402, at *2 (N.D. Cal. Apr. 6, 2012). The Court previously denied IPI's motion to dismiss Plaintiffs' claims, and IPI has been unable to meet its burden of demonstrating a meritorious defense to those claims.

The fourth factor requires the court to "'consider the amount of money at stake in relation to the seriousness of Defendant's conduct.'" *Alabado*, 2016 WL 5929247, at *12 (*quoting PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F.Supp.2d 1172, 1176 (C.D. Cal. 2002)). After the entry of default against IPI, Plaintiffs have demonstrated the seriousness of IPI's conduct and the strong basis for their proposed damages. IPI had the opportunity to file two briefs in opposition to Plaintiffs' damages request and the Court held a hearing on the matter, at which IPI was free to present any witnesses or exhibits that it deemed proper. Therefore, the amount of damages requested for the default judgment against IPI, particularly considering the evidence provided, is reasonable. *See Alabado*, 2016 WL 5929247, at *17 (awarding $12,435,624 for TVPRA and other claims based on Plaintiffs' declarations).

The fifth factor concerns the possibility of a dispute concerning material facts. Plaintiffs have provided considerable evidence of the facts alleged in support of their claims. IPI had multiple opportunities to articulate any meritorious defense it might raise and to introduce evidence in support thereof; however, it was unable to offer any persuasive competing evidence. (*See generally* ECF Nos. 183-1, 213; Tr. 8/7/2029). For instance, IPI did not locate any witnesses who could testify that it did not engage in egregious conduct warranting an award of punitive damages, nor did it introduce a single exhibit towards this end. (ECF No. 212). Accordingly, there is no basis to believe that IPI will be able to dispute the material facts of Plaintiffs' claims. *Alabado*, 2016 WL 5929247, at *17 ("it appears that

there is no genuine dispute over material facts"); *Lehman Bros. Holdings Inc.*, 2018 WL 6074597, at *6 ("possibility of a dispute concerning the material facts has not been shown" where the "facts have been supported by sufficient evidence" and the defendant has not "offered any competing evidence").

There is no basis to find that IPI's routine violations of this Court's orders are attributable to excusable neglect. To the contrary, the Court has repeatedly found that IPI acted willfully in violating the unambiguous orders of this Court, even as to protocols to which IPI itself stipulated. Whereas IPI argued that its sanctionable, contempt-warranting behavior lacked "culpability" (ECF Nos. 183-1 at 4–5, 213 at 2–3), the Court found this argument unpersuasive in denying IPI's motion to set aside the entry of default (ECF No. 219).

The final factor naturally favors the defaulting defendant, but it "is not dispositive" and default judgment is sometimes warranted. *Alabado*, 2016 WL 5929247, at *7. The policy considerations favoring decisions on the merits may also be outweighed by considerations of "the timely administration of justice," *Champion-Cain v. MacDonald*, No. 14-cv-02540, 2018 WL 3388095, at *7 (S.D. Cal. July 12, 2018), or where the defaulting party's conduct has made "a decision on the merits impractical, if not impossible," *Alabado*, 2016 WL 5929247, at *18.

In sum, virtually every *Eitel* factor supports entering a default judgment against IPI for the amount sought in Plaintiffs' petition for damages and multiple petitions for fees. (*See* ECF Nos. 172, 226). Therefore, the equities strongly favor the Court taking such action against IPI.

**B.  A default judgment against IPI should be entered under Rule 54(b) because there is "no just reason for delay" in this case.**

The primary issue to address is whether the Court should enter final judgment against IPI while Plaintiffs' claims against Gold Mantis and MCC have not yet been adjudicated. Fed. R. Civ. P. 54(b) explicitly provides that "[w]hen an action presents more than one claim for relief … or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." As

the Court noted at the August 7, 2020 hearing, one factor often-considered in this decision is the impact of entering final judgment on the possibility of inconsistent judgments amongst the multiple defendants. In the instant matter, however, where divergent verdicts or damages awards "would not necessarily be inconsistent," this risk is low and does not provide a just reason to delay the entry of judgment against IPI. *Shanghai Automation*, 194 F. Supp. 2d at 1009.

### 1. Courts examine multiple factors in deciding whether to enter final judgment as to fewer than all defendants, not solely the possibility of inconsistent judgments.

District courts have broad discretion in making decisions under Rule 54(b). *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 12 (1980) ("the task of weighing and balancing the contending factors is peculiarly one for the trial judge, who can explore all the facets of a case"); *Illinois Tool Works, Inc. v. Brunsing*, 378 F.2d 234, 236 (9th Cir. 1967) (determinations under Rule 54(b) "are matters exclusively within the discretion of the district court"). Consistent with *Frow*, the risk of an inconsistent judgment or outcome is to be considered by the district court as it conducts this balancing. *Shanghai Automation*, 194 F. Supp. 2d at 1009 ("The purpose of Rule 54(b) which post-dates *Frow* by nearly a century, is to strike a balance between premature decision-making and the pragmatic needs of the litigants in complex multiple-party actions.") However, as elaborated further below, the most compelling reading of Rule 54(b)'s history and *Frow*'s progeny is that speculation as to the "mere possibility" of a future inconsistent result does not strip the district court of all discretion in entering a final partial judgment. *Id.* ("Preserving the Court's discretion in balancing those competing interests comports with other provisions of the Federal Rules which weigh the policy against inconsistent judgments against the pragmatic consideration of the hardship to existing parties in the litigation.")

Numerous courts have explicitly recognized that decisions under Rule 54(b) involve considerations beyond merely the concern over inconsistent judgments. *See*, *e.g.*, *Steffenberg v. Gilman*, No. 04-cv-40113, 2005 WL 8176506, at *5 (D. Mass. Sept. 13, 2005) ("In deciding whether to enter final judgment pursuant to Rule 54(b), the district court may consider, among other things,

6

the need for partial final judgments in complex modern civil actions; the possibility that defaulters might conceal or transfer assets subject to execution; and the seriousness of the charges in the complaint, together with the willful and deliberate avoidance of those charges by the defaulting defendants"); Wright & Miller, 10 Fed. Prac. & Proc. Civ. § 2656 (4th ed.) ("The court is given power to enter a final judgment as to less than all the claims or parties to an action, if it decides that the ends of justice so require"). The Seventh Circuit has endorsed the Third Circuit's "catalogue of relevant considerations along with the caveat that it is not all-inclusive," of which "[t]he relationship between the adjudicated and unadjudicated claims" is just one of five factors. *Schaeffer v. First Nat. Bank of Lincolnwood*, 465 F.2d 234, 235 (7th Cir. 1972) (*quoting Allis-Chalmers Corp. v. Philadelphia Elec. Co.*, 521 F.2d 360, 364 (3d Cir. 1975)).[2] Where the *Eitel* factors strongly favor entering a default judgment against a party, that also indicates that "there is no just reason for delay" in entering that judgment. *Shanghai Automation*, 194 F. Supp. 2d at 1005.

### 2. Collectability is an important reason to enter judgment under Rule 54(b) and any delay in this case risks rendering a judgment against IPI uncollectible.

Courts have found the possibility that delaying entry of judgment may render that judgment uncollectible, or even just a delay in collection, to be compelling reasons to enter that judgment. For instance, in *Curtiss-Wright*, the Supreme Court found that the district court did not abuse its discretion under Rule 54(b) by entering final judgment as to one of the plaintiff's claims (after summary judgment was granted) simply because the damages owed were large and it would be "many months, if not years" until the rest of the litigation concluded. *Curtiss-Wright*, 446 U.S. at 11. The district court

---

[2] The five factors are: "(1) The relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like." *Schaeffer*, 465 F.2d at 235.

found this reason compelling even where there was no real risk that the defendant General Electric would be insolvent if the court waited to enter judgment. *Id.* at 12.

The case for entering judgment is even more compelling where there is a real risk of insolvency by the defendant and further delay jeopardizes the collectability of the judgment. Several district courts in the Ninth Circuit have found this to be a persuasive reason to not delay entry of judgment in a multi-defendant case. In *Shanghai Automation*, the district court attributed considerable weight to the fact that "[n]early all the factors enumerated in *Eitel* … militate in Plaintiff's favor, particularly the danger that any damages awarded is likely to become increasingly uncollectible with the passage of time." *Shanghai Automation*, 194 F. Supp. 2d at 1011. The court focused on the fact that the corporate defaulting defendants had all suspended operations and there was a "substantial likelihood" that the individual defaulting defendant's "assets may be disbursed or transferred out of this country." *Id.*

The district court in *Sandwich Isles* also recognized that "courts sometimes indeed consider a plaintiff's need to execute on a judgment promptly in deciding whether to enter a Rule 54(b) judgment." *United States v. Sandwich Isles Commc'ns, Inc.*, No. 18-cv-00145, 2020 WL 544692, at *7 (D. Haw. Feb. 3, 2020) (collecting cases). In *Sandwich Isles*, the court entered final judgment on one count for which it granted summary judgment in favor of the plaintiff. *Id.* In deciding that the "equities weigh in favor of…entry of a Rule 54(b) judgment," the court considered the need to "preserve the [plaintiff's] ability to collect" on that claim. *Id.* at *8. The plaintiff presented evidence that the defendant had taken steps that "could jeopardize collection efforts" and that other creditors had already asserted claims, creating a risk that defendant would seek to dissipate assets prior to resolution of the entire lawsuit.[3] *Id.*

---

[3] Courts outside the Ninth Circuit have also followed this practice. *See*, *e.g.*, *Lucas v. Telemarketer Calling from (407) 476-5680*, No. 12-cv-00630, 2014 WL 5308573, at *2 (S.D. Ohio Oct. 16, 2014) ("Insolvency, therefore, is a genuine risk, and the interests of justice would seem to dictate allowing Plaintiff to begin enforcement proceedings sooner than later"); *Corporate Com'n of Mille Lacs Band of Ojibwe Indians v. Money Centers of America*, 986 F. Supp. 2d 1062 (D. Minn. Dec. 2, 2013)

In the instant matter, Plaintiffs already face a considerable risk that their judgment against IPI is uncollectible—and the risk grows with each passing day. First, IPI has been stating for months that it has no revenue and is unable to even pay the modest sanctions imposed by this Court or expenses required to proceed with discovery, let alone a judgment against it. Second, IPI has also declared its inability to pay more significant obligations, such as a $15.5 million license fee that was due on August 12, 2020. (*See* IPI Letter to Ralph DL Torres, et al., dated August 11, 2020 (Exhibit A)). Third, IPI's financial condition is not expected to improve in the coming months—IPI predicts a total absence of revenue for the next eight months (*see* Exhibit A) and their license is now at risk of being revoked.[4] Fourth, other creditors are increasingly coming forward to collect debts owed by IPI: since the FAC was filed in March 2019, at least eleven other lawsuits have been filed against IPI in this Court alone, including at least six cases in the last three months.[5] Moreover, Pacific Rim has already been

---

(entering judgment where defendant's "precarious financial state creates a considerable danger that the Commission will not be able to collect its judgment—a danger which has only grown throughout this litigation" and defendant's pending "insolvency makes the immediate entry of judgment essential to mitigating the Commission's already diminished odds"); *Navitag Technologies, Inc. v. Silva*, 738 F. Supp. 2d 207 (D. Mass. 2010) ("company's business would suffer harm without a final judgment, and defendant had shown a lack of compliance with prior court orders causing the case to move at a slow pace through no fault of plaintiffs"); *Halliburton Energy Servs., Inc. v. NL Indus.*, No. 05-cv-4160, 2008 WL 2697345, at *8 (S.D. Tex. July 2, 2008), *aff'd sub nom. Halliburton Energy Servs., Inc. v. NL Indus. Inc.*, 306 F. App'x 843 (5th Cir. 2009) (noting "Rule 54(b) certification may be used to permit prompt execution of a judgment"); *Capital Distribution Servs., Ltd. v. Ducor Exp. Airlines, Inc.*, 462 F. Supp. 2d 354, 358 (E.D.N.Y. 2006) (entering judgment where "CDS will likely suffer severe hardship from such delay … [b]ecause CDS faces the real possibility that its judgment will be rendered uncollectible during the pendency of this action").

[4] *See* Letter from Governor Ralph DLG. Torres to Donald R. Browne, CEO, Imperial Pacific International (CNMI) LLC, dated August 19, 2020 (attached as Exhibit B).

[5] *See Tang's Corporation v. IPI*, No. 20-cv-00006 (filed 05/12/20); *Sardini Group, Inc v. IPI*, No. 20-cv-00007 (filed 05/27/20); *Fox Financial, LLC v. IPI*, No. 20-cv-00008 (filed 06/01/20); *J.M. Aquino v. IPI*, No. 20-cv-00009 (filed 06/03/20); *Ping Shun Corporation v. IPI*, No. 20-cv-00012 (filed 06/12/20); *Red Coral Corporation v. IPI*, No. 20-cv-00016 (filed 07/29/2020). Many of these are breach of contract cases that can likely be adjudicated far quicker than Plaintiffs' fact-specific forced labor claims against Gold Mantis and MCC.

executing on its multi-million-dollar judgment against IPI, seizing whatever cash is available and any other easily-accessible assets. At this point, IPI's real property interests—mostly long-term leaseholds rather than fee simple ownership—may be all that remains within Plaintiffs' reach. Yet, this too will soon disappear as the number of creditors grows. *See Federal Deposit Ins. Corp. v. Tripati*, 769 F.2d 507 (8th Cir. 1985) ("Because Tripati's and the Companies' assets were rapidly being dissipated by other criminal and civil litigation, the equities weighed in favor of certification so that the FDIC could begin collecting on the judgment as soon as possible.").

IPI's behavior further suggests that it is unlikely to voluntarily pay any monies it owes, but instead conceal or dissipate whatever assets it has. In this litigation, IPI has repeatedly refused to offer any meaningful information as to its assets or financial condition, preferring to avoid scrutiny by either Plaintiffs or this Court. Such conduct is consistent with an effort to make it difficult to trace any asset transfers. Moreover, IPI has a "history of running their financial operations through a maze of business entities scattered throughout the country and in off-shore locations," which enhances their ability to conceal funds. *Steffenberg*, 2005 WL 8176506, at *6. Despite being subject to a daily contempt sanction of $2,000 for several months, IPI has still not paid for Plaintiffs to obtain a copy of its ESI for safe-keeping. Thus, Court orders will not be sufficient to make IPI pay its debts. Plaintiffs' only hope of collection is the ability to proactively enforce a judgment.

Simply put, any further delay in entering a final judgment runs the extremely high risk that Plaintiffs will be unable to collect a penny from IPI.

### 3. The Court may enter judgment under Rule 54(b) where divergent outcomes "would not necessarily be inconsistent" or illogical.

The court in *Shanghai Automation* provides the most persuasive analysis of the impact of *Frow* and its progeny after the issuance of Fed. R. Civ. P. 54(b), and the current state of the law in the Ninth Circuit. In short, the Ninth Circuit rejects an overly formalistic interpretation of the inconsistent judgment rule. On the one hand, a mechanical application based on legalistic concepts is rejected: the

10

*Frow* principle does not only apply where there is strict "joint liability" between defendants, or even only in situations of "joint and several liability," but is to be considered in all scenarios where the defendants are "otherwise similarly situated." *Shanghai Automation*, 194 F. Supp. 2d at 1006. However, entry of a default judgment is only precluded in those instances where "uniformity of liability is … logically required by the facts and theories of the case" and thus an "extreme risk" of inconsistent outcomes exists. *Id.* at 1009–1010. In cases where such uniformity is not required, or the "mere possibility of inconsistent judgment" exists, the district court "retains the discretion to balance various factors in deciding whether to enter judgment against less than all defendants permitted under Rule 54(b)." *Id.* at 1009 ("To hold [otherwise] would imply that whenever there are multiple defendants who raise similar defenses, the court could never enter a default judgment until conclusion of the entire case regardless of the substantial prejudice likely to be suffered by the plaintiff as a result of the delay. Such a rule would contravene the purpose of the 1961 amendment to Rule 54(b).").

The *Shanghai Automation* standard takes *Frow* as the starting point for its analysis. *Id.* at 1005. The 1872 *Frow* decision concerned the entry of default against one of fourteen defendants who were all charged with a conspiracy to defraud, and thus all alleged to be jointly liable for the conspiracy. *Frow*, 82 U.S. at 552. The Supreme Court noted that if a final decree was entered against the defaulting party, but the remaining parties established no fault, then there would be an inconsistent outcome that is not permissible. *Id.* at 554. However, while the Supreme Court clearly disapproved of entering a default judgment in certain multi-defendant, joint liability scenerios, there was no further explanation as to the specific contours of that rule.

The leading Ninth Circuit case on this issue, *In re First T.D. & Inv., Inc.*, 253 F.3d 520 (9th Cir. 2001), is consistent with the standard announced by the *Shanghai Automation* court. *First* presented a very different procedural posture. The bankruptcy trustee had filed an adversary action against 132 investors alleging that their security interests were unperfected under California law. A

group of these investors prevailed on summary judgment with the bankruptcy court holding that their interests were in fact perfected. Nonetheless, the trustee moved to enter a default judgment against the non-answering investors, which the bankruptcy judge granted over an objection that the central legal issue in the case had already been decided in the defendants' favor. The Ninth Circuit deemed it an abuse of discretion to "allow the Trustee to prevail against Defaulting Defendants on a legal theory rejected by the bankruptcy court with regard to the Answering Defendants in the same action." *Id.* at 532. In other words, the default judgments did not merely present a risk of inconsistent outcomes, they "directly contradicted [the court's] earlier ruling in the same action." *Id.* at 532–33. There was a clear and direct inconsistent outcome the moment the default judgments were entered. *See Shanghai Automation*, 194 F. Supp. 2d at 1007 (explaining that *First* found an abuse of discretion because it was "unfair to allow recovery against defaulting defendants on a legal theory that had *already been rejected* by the court as to answering defendants in the same action") (emphasis added).

The factual circumstances in *Frow* and *First* are therefore at the extreme end of the spectrum in which the defendants' positions are virtually identical and differing results are necessarily inconsistent. *See Shanghai Automation*, 194 F. Supp. 2d at 1010 (distinguishing cases that present an "extreme risk of inconsistent outcomes") (internal quotations omitted). However, where this is not the case, even if there remains *some* overlap between the pending claims and adjudicated claims, a mere possibility of future inconsistency is a factor to be balanced against the other equitable considerations. *Shanghai Automation*, 194 F. Supp. 2d at 1009. In *Shanghai Automation*, for example, the plaintiff brought claims against several corporate defendants and two individual defendants, Kuei and Tsai. When only Tsai answered, the plaintiff moved for a default judgment against the other defendants on the nine counts in its complaint. The court noted that this was not a *Frow*-like "case of 'joint' liability where the theory of the case demands uniformity of judgments among all defendants." *Id.* at 1009. The plaintiffs had alleged only "joint and several liability," and therefore the judgment against the

12

defaulting defendants "would not necessarily be inconsistent with a judgment in favor of defendant Tsai should he choose to defend." *Id.*

The court explained that the conversion and breach of contract claims against the defaulting defendants can stand "without necessarily finding defendant Tsai individually liable as well." *Id.* For instance, the corporate defendants could be liable for conversion, but while Kuei could be found to be their alter ego (and thus also liable), Tsai could establish that his particular "conduct, control, and culpability" made him not liable. *Id.* Similarly, while the claim for non-repayment of loans can stand against the corporate defendants, Tsai may be able to establish that he "had no direct involvement in and did not unlawfully benefit from that transaction." *Id.* This meant that "differing judgments would not necessarily be illogical." *Id.* Accordingly, the court found that it "retains discretion" under Rule 54(b) to enter judgment against less than all defendants, and given the other equitable considerations, found that "[t]his is an appropriate case to exercise such discretion." *Id.* at 1010.

The approach articulated in *Shanghai Automation* has since been adopted by numerous district courts in the Ninth Circuit. *See Tattersalls Ltd. v. Wiener*, No. 17-cv-1125, 2019 WL 2209400, at *5 (S.D. Cal. May 21, 2019) (exercising discretion where "the risk of inconsistent judgments is not sufficiently extreme" to enter a default judgment against one defendant while claims against other alleged co-conspirators still pending); *Albizu v. Strohl*, No. 02-cv-5875, 2005 WL 8176328, at *14 (E.D. Cal. Nov. 14, 2005), *report and recommendation adopted as modified*, No. 02-cv-5875, 2005 WL 8176335 (E.D. Cal. Dec. 27, 2005) (entering judgment to give plaintiff "best chance of recovery for [his] loss" despite the "bare logical possibility that [a co-defendant] will have his default set aside and will interpose defenses at some time" potentially creating an inconsistent outcome).

Another instructive example of this approach, albeit from outside the Ninth Circuit, is the *Ojibwe Indians* decision from Minnesota. *Ojibwe Indians*, 986 F. Supp. 2d 1062. The district court granted summary judgment on the plaintiff's breach of contract claim against MCA, but the breach of

contract claims against MCA's principals, the Wolfingtons, remained. *Ojibwe Indians*, 986 F. Supp. 2d at 1066. The court found these claims were "inextricably related" in the sense that the plaintiff needed to prove the breach of contract by MCA to pierce the corporate veil and hold the Wolfingtons liable. *Id.* at 1066. However, the claim against the Wolfingtons also involved the "consideration of substantial factual and legal issues that its claim against MCA does not" – the breach by MCA is "just *one* element" of its claim against the Wolfingtons. *Id.* The plaintiff must also prove that MCA was the Wolfingtons' alter ego and that they used the entity to commit fraud or injustice. *Id*. In the court's view, this created a "modest" overlap between the claims. *Id.* at 1067. Nonetheless, the court found that the plaintiff's "strong interest in collecting its judgment," which was increasingly endangered by the "precarious financial state" of MCA, "justifies the entry of judgment nonetheless." *Id.*

The *Kapadia* decision referenced by the Court at the August 7, 2020 hearing is consistent with the standard set forth in *Shanghai Automation* but distinguishable on the facts. *Kapadia v. Thompson*, No. 06-cv-1359, 2008 WL 5225813, at *3 (D. Ariz. Dec. 15, 2008). The case presented a *Frow*-like scenario where the defendants alleged they were "joint beneficiaries" of a life insurance policy—thus, there was no logical basis to explain a potentially inconsistent outcome between the defaulting and non-defaulting parties. *Id.* at *3. At the same time, it was not clear that a default judgment was warranted at all, let alone that a compelling reason existed to enter one. The court found that the complaint, originally an interpleader complaint filed by the insurance company, did not "set forth any facts that would support a judgment in Plaintiff's favor." *Id.* Moreover, the movant seeking default did not even *allege* any prejudice if the default was not entered. *Id.* at *3. Hence, there was a *near-certain* risk of an inconsistent outcome and *no* compelling reason to enter the default judgment—the opposite of the situation presented in *Shanghai Automation* and the present case. In *Kapadia*, there was *nothing* in the record to compel immediate entry of the judgment but there were significant reasons to delay. Interestingly, however, even in this circumstance, the district court did not simply end its

14

analysis after finding a likelihood of inconsistent outcomes, but rather proceeded on to consider the strength of the case for entering the default judgment and the potential prejudice to the plaintiff of denying that request. *Id.*

**4. Plaintiffs' TVPRA claims do not demand uniform judgments against all Defendants and divergent outcomes "would not necessarily be inconsistent."**

Plaintiffs' TVPRA cause of action in the FAC references these sections of the statute: 18 U.S.C. §§ 1589, 1590, 1592 and 1595. It is important to restate that the TVPRA is primarily a criminal statute. The first section, §1589 ("Forced labor"), establishes liability for whoever (a) "knowingly provides or obtains the labor or services of a person by any one of" certain specified means, or (ii) "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in" the activities set forth in subsection (a). The next section, §1590 ("Trafficking with respect to … forced labor") establishes liability for whoever "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of" §1589. Similarly, §1592 creates liability for whoever engages in certain behavior concerning passports or immigration documents in the course of violating §1589 or §1590. Finally, §1595 ("Civil remedy") permits a victim of a violation of any of the preceding sections to "… bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)."

The TVPRA does not mention the terms "joint liability" or "joint and several liability" and Plaintiffs have found no authority to suggest that such principles are applicable.[6]  Instead, as evident

---

[6]  While there are examples of default judgments awarding damages "jointly and severally" against defendants for TVPRA and other violations, Plaintiffs are unaware of any actual substantive legal analysis (or particular legal basis) justifying such an award.

from the statutory text above, liability is established by the defendant either engaging in certain illegal conduct, or "knowingly benefitting" from participation in a venture engaging in that illegal conduct. Accordingly, Plaintiffs' FAC does not plead "joint liability" or "joint and several liability" for its TVPRA claims. Plaintiffs are required to prove each Defendant's liability to each Plaintiff for a specific violation of the TVPRA and any harm proximately caused by that violation. *See M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 974 (S.D. Ohio 2019) (noting that where plaintiff "conceded that joint and several liability is not appropriate" as to multiple defendants in TVPRA claim, this made "each Defendant potentially liable only for its own actions"). Therefore, Plaintiffs' theory of liability does not "demand[] uniformity of judgments among all defendants." *Shanghai Automation*, 194 F. Supp. 2d at 1009. To the contrary, a judgment of liability against IPI "would not necessarily be inconsistent with a judgment in favor" of Gold Mantis and/or MCC. *Id.*

Different findings of liability against the various Defendants would not necessarily be inconsistent because each of the Defendants played different roles in the IPI project and had a different relationship with Plaintiffs. Critically, the two non-defaulting defendants, Gold Mantis and MCC, have repeatedly insisted that Plaintiffs were not their employees, but rather worked for subcontractors that they hired. Therefore, Gold Mantis and MCC argue that they were not responsible for Plaintiffs' working, housing, or other conditions, nor did they know about them. Indeed, a review of the arguments in Gold Mantis' and MCC's motions to dismiss and subsequent Answers to the FAC indicate an intention to argue precisely that defense.[7]

---

[7] In its motion to dismiss Plaintiffs' TVPRA claims, Gold Mantis argued that: Plaintiffs have not stated with specificity their relationship with Gold Mantis (ECF No. 16 at 2); Plaintiffs' supervisor, Mr. Kong, was not an agent of Gold Mantis (*id.* at 3); and Plaintiffs have not specified how Gold Mantis benefited from Plaintiffs' labor for Kong (*id.* at 2). This defense strategy was then also reflected in the company's Answer, in which Gold Mantis denies setting Plaintiffs work schedules (ECF No. 31 ¶83), setting their rate of pay (*id.* ¶87), arranging their transportation (*id.* ¶88), having the power to hire and fire them (*id.* ¶90), knowing about unsafe work conditions (*id.* ¶131), that Plaintiffs were its "employees" (*id.* ¶218), or that Kong was its "employee" (*id.* ¶113). MCC took a similar tact. In its

Therefore, even if Plaintiffs were found to be subject to forced labor by these various subcontractors, Gold Mantis and MCC could potentially prove that they bear no liability for this conduct. For example, they may prove that there is no §1589 violation because they did not "knowingly…obtain[] the labor or services" of Plaintiffs, or did not "knowingly benefit" from any forced labor to which Plaintiffs were subjected by these subcontractors. Similarly, the jury may find no §1590 violation because the Defendants are not the entities that recruited, harbored, or transported Plaintiffs, and no §1592 violation because they are not the entities that took Plaintiffs' passports.

These no-liability verdicts against Gold Mantis and MCC "would not necessarily be inconsistent" with a finding of liability against IPI under the TVPRA. IPI is known to have owned worker dormitories, owned and operated the buses transporting workers, and of course is the property owner of the construction site. Therefore, even if a jury finds that Gold Mantis or MCC did not violate any provision of the TVPRA, IPI could still have violated §1590 because it provided the buses that transported the workers to and from the construction site, or because it owned the dormitories in which the workers were housed. Similarly, while a jury could accept Gold Mantis' or MCC's argument that there is no reason they "should have known" how their subcontractors were treating Plaintiffs, it "would not necessarily be inconsistent" to find that IPI should have known about the conditions because of its role in housing or transporting workers or its ultimate responsibility over the site.

There may also be distinctions as to the specific harms for which each Defendant is liable. For instance, even if a jury finds that MCC and Gold Mantis subjected Plaintiffs to forced labor, it may find that such wrongdoing was only the *proximate cause* of Plaintiffs' payment of recruitment fees, but not their physical injuries. (MCC, for example, stresses that Plaintiffs were not working for MCC at the time they sustained their injuries.) Such a result would "not necessarily be inconsistent" with a

---

motion to dismiss Plaintiffs' TVPRA claims, MCC argues that only three Plaintiffs allege having worked for MCC (ECF No. 15 at 2), MCC was not responsible for Plaintiffs' injuries (*id.* at 3), and there is no allegation as to how MCC benefitted from Plaintiffs' labor (*id.* at 4).

finding that IPI is liable for those physical injuries because it had ultimate control over the worksite but denied access to OSHA's inspectors, failed to provide workers with adequate training or proper PPE, and failed to correct unsafe working conditions.

Accordingly, the instant matter is virtually identical to other cases entering a default judgment where there may be some overlap with the pending claims, or one element of those claims is similar, but differing outcomes would not necessarily be inconsistent. For example, in *Shanghai Automation*, the court entered judgment on the plaintiff's claim for non-repayment of loans, but Tsai could still establish that he did not "unlawfully benefit" from those transactions. 194 F. Supp. 2d at 1009. This is akin to how Plaintiffs may have been subjected to forced labor and IPI may have transported or harbored Plaintiffs in furtherance thereof, but Gold Mantis and MCC could establish that they did not "knowingly benefit" from any of that conduct. Similarly, in *Tattersalls*, where the complaint alleged that the various defendants were "participants and co-conspirators" in an effort to defraud the plaintiff, the court entered a partial default judgment under Rule 54(b) because the remaining defendants "could successfully defend" themselves by showing they were not part of the conspiracy—which would not be "logically inconsistent" with a liability finding against the defaulting defendant. *Tattersalls Ltd.*, 2019 WL 2209400, at *6.

The instant matter is also similar to breach of contract cases in which entering judgment against one defendant (implying that the agreement was breached) still does not logically require a finding that all other defendants are liable for that breach. As explained above, in *Ojibwe Indians*, the court noted that breach of contract was necessarily found as part of the judgment that was entered, but this was just "one element" of the claim against the individual defendants. 986 F. Supp. 2d at 1066. Liability for the individuals still required establishing that they were alter egos of the corporate defendant and used the entity to commit fraud or injustice. Likewise, the court in *j2 Global* entered judgment against certain defaulting corporate defendants for breaching their obligations under a

18

licensing agreement, but noted this "does not require a finding of liability against Fani personally" and the plaintiff would still need to prove the non-defaulting Fani's participation in the wrongful conduct. *j2 Global Inc. v. Fax87*, No. 13-cv-05353, 2016 WL 7260588, at *3, *5 (C.D. Cal. Dec. 15, 2016). Similarly, even if a default judgment against IPI implies that Plaintiffs were subjected to forced labor, that is only "one element" of the claim against Gold Mantis and MCC. Plaintiffs must still prove that these Defendants either knowingly obtained their services, knowingly transported or harbored them, or knowing benefited from a venture to do so—all points that these Defendants intend to contest.

The district court in *Steffenberg* reached a similar decision in a tort case where the plaintiff alleged that she and her husband were defrauded by various defendants. *Steffenberg*, 2005 WL 8176506. The plaintiff did not "expressly allege" that the defaulting defendants and the individual defendant, Scoll, were "jointly liable." *Id.* at *6. Therefore, "it would be logical for a jury to conclude that the [defaulting] defendants participated in a scheme to steal from the plaintiff and her husband, but that Scoll knew nothing of their fraudulent activity" or had no duty to inform the plaintiff of it. *Id.* Accordingly, the court held that potentially differing judgments could be "easily reconciled" and thus *Frow* did not control. *Id.* (entering default judgment); *see also Weber v. Sanborn*, No. 06-cv-10125, 2006 WL 8458436 (D. Mass. Sept. 28, 2006) (entering default judgment on plaintiff's claims for conversion, negligent misrepresentation, and fraud because, even if those torts were committed, the jury could still find co-defendant to not be liable for those acts).

The reasoning adopted in *Shanghai Automation*, *Tattersalls Ltd.*, *j2 Global*, *Steffenberg*, and *Weber* applies in the instant matter: a jury could find there was a forced labor scheme involving Plaintiffs in which IPI participated, but conclude that Gold Mantis and MCC did not participate in it or did not knowingly benefit from it. These outcomes could be "easily reconciled" given the differing roles of the various Defendants and the defenses that they intend to raise. Accordingly, this is not a

case akin to *Frow*, *First*, or *Kapadia* in which logically inconsistent judgments are a near-certainty or there is an "extreme risk of inconsistent outcomes." *Shanghai Automation*, 194 F. Supp. 2d at 1010.

**5.   Uniform damages awards are not required by Plaintiffs' claims and a lesser damages award against MCC or Gold Mantis "would not necessarily be inconsistent" with a full damages award against IPI.**

Some courts consider certain inconsistent damages awards to present concerns similar to those posed by inconsistent findings of liability. *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1262 (7th Cir. 1980) ("the joint nature of plaintiffs' claim prohibits different findings as to damages against all defendants"). However, as with liability, this is only one factor to be considered under Rule 54(b) and does not preclude entering judgment if uniformity is not required and thus divergent awards "would not necessarily be inconsistent." *Shanghai Automation*, 194 F. Supp. 2d at 1009.

In this case, there is no "extreme risk" of inconsistent damages awards. *Id.* The largest category of damages sought against IPI, punitive damages, is to be determined against each Defendant individually and thus presents no risk of inconsistency. *See Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019) (even where defendants are jointly and severally liable for compensatory damages in §1983 action, "punitive damages are assessed separately against each defendant"). In addition, Plaintiffs have not requested damages against IPI for the recruitment fees and medical costs that they paid, so any determination as to Gold Mantis' and MCC's liability for those items and the appropriate quantum of damages presents no risk of inconsistency.

Plaintiffs' theory of the case also does not require identical awards against IPI and the other two Defendants for any other category of damages, and thus any differing awards would not necessarily be inconsistent. In *Shanghai Automation*, the court found that "a full damages award against the defaulting defendants would not necessarily be inconsistent with a possible lesser award against defendant Tsai. Defendant Tsai might be found liable for certain proven conduct and not others, and thus could be held liable on less than all Plaintiff's claims." *Shanghai Automation*, 194 F.

Supp. 2d at 1010. The same is true in the instant matter: a full damages award against IPI would not necessarily be inconsistent with a lesser award against MCC or Gold Mantis. For instance, a jury could find that MCC is only liable for the forced labor suffered by the three Plaintiffs who worked for MCC, but not the other Plaintiffs who only worked for Gold Mantis; similarly, the jury could find that Gold Mantis is only liable for forced labor during the time when Plaintiffs worked for Gold Mantis, but not the earlier period when they worked for MCC. This outcome would be consistent with a finding that IPI is responsible for the full period of time because, as the developer, it knowingly benefited from the forced labor scheme regardless of which particular contractor Plaintiffs worked for at the time.

Differing damages awards would also not be illogical since Gold Mantis, MCC, and Imperial Pacific each engaged in different conduct for different periods of time with different impacts on Plaintiffs. In fact, several juries have found multiple defendants responsible for TVPRA violations but then assigned different damages to each one. In *Echon*, the three plaintiffs brought a forced labor claim against the married couple who brought the plaintiffs to the United States to work on their farm. *Echon v. Sackett*, No. 14-cv-03420, ECF No. 1 (D. Colo. May 4, 2018). The jury found the wife to be liable to Plaintiffs under both §1589(a) (providing or obtaining labor services) and §1589(b) (knowingly benefitting from a venture that provides or obtains labor services), but found that the husband was only liable under the latter. *Id.* at ECF No. 205. The jury then apportioned the economic and non-economic damages amongst the married defendants in differing amounts—33% of the total was attributed to the husband and 67% to the wife. *Id.* at ECF Nos. 205, 215. There was a similar result in the *Signal* case. After the jury found that all defendants were liable to Plaintiffs under the TVPRA, the jury awarded monetary damages against Signal, a different quantum of damages against the two corporate defendants, but then zero damages against the two individual defendants. *David v. Signal*, No. 08-cv-01220, ECF No. 2268-2, 2272-3 (E.D. La. Feb. 18, 2015).

In considering how to weigh the risk of a potentially improper damages award, it is instructive that the Supreme Court explicitly rejected the argument that district courts may not enter partial judgment against a defendant under Rule 54(b) simply because that same defendant has an unresolved counterclaim—even one that already survived a motion to dismiss—that could result in a set-off against any damages owed. *Curtiss-Wright*, 446 U.S. at 6, 12 ("the task of weighing and balancing the contending factors is peculiarly one for the trial judge, who can explore all the facets of a case"). In other words, the possibility that a defendant may later be shown to owe less money than initially determined is but a single, non-dispositive factor. In fact, the Seventh Circuit has affirmed the entry of a default judgment against two defendants while acknowledging as "[t]rue" that the remaining defendants' pending counterclaims "may affect the net sums [the defaulting defendants] must pay…". *Fed. Deposit Ins. Corp. v. Elefant*, 790 F. 2d 661, 664 (7th Cir. 1986). Similarly, in a 2020 decision, an Illinois district court entered judgment against one defendant where the "[p]laintiff's damages would *likely* be less than that stated in the proposed [judgment]" once the remaining defendants had an opportunity to litigate the plaintiff's duty to mitigate its loss. *Sterling Nat'l Bank v. Meister*, No. 19-cv-01116, 2020 WL 882205, at *3 (C.D. Ill. Feb. 24, 2020) (finding plaintiff's "strong interest in obtaining a judgment so it can commence collection [to be] a significant consideration") (emphasis added). If a "likely" inconsistent damages award does not preclude entry of a default judgment, then mere speculation as to some future award that may *potentially* be inconsistent certainly should not.

### 6. Entering a default judgment against IPI facilitates Plaintiffs' ability to collect payment and resolve the entire case.

If the Court enters final judgment against IPI, any risk of inconsistent outcomes would likely not arise for at least a year, or perhaps several years. During this time, any potential problem about inconsistent judgments may resolve itself. If Plaintiffs are able to collect their judgment against IPI, or a significant portion thereof, there would be no compelling reason for continued litigation against Gold Mantis or MCC and those claims would be dismissed. *See Lehman Bros. Holdings Inc.*, 2018

22

WL 6074597, at *8 (entering judgment would "increase the likelihood" that plaintiff collects payment and thus moot the claims against remaining defendants, which "further supports the determination that no just reason for delay exists under Rule 54(b)").

> **7.** **If the Court finds a substantial risk of possible inconsistent outcomes, it can be addressed through other measures less prejudicial to Plaintiffs.**

a. _IPI may move to stay enforcement by posting a bond or other security_. Prior to Plaintiffs enforcing the judgment, IPI can make a motion pursuant to Rule 62(h) to stay enforcement subject to it posting a bond or other adequate security. Fed. R. Civ. P. 62(h); _Protective Life Ins. Co. v. Mizioch_, No. 10-cv-1728, 2012 WL 2368483 (D. Ariz. June 21, 2012).

b. _Plaintiffs can be required to put any monies collected into escrow_. If IPI is unable or unwilling to post a bond, the Court may order that Plaintiffs place any monies collected in escrow until their claims against all parties are resolved.

c. _If necessary, the Court can modify the judgment against IPI to resolve any inconsistencies_. In the event that a potentially inconsistent outcome actually does arise at some future date, the Court may address it at that time. If the case goes to trial, the Court must first seek to reconcile the verdict with the default judgment. _See Deloughery v. City of Chicago_, 422 F.3d 611, 617 (7th Cir. 2005) ("If possible, this court must reconcile apparently inconsistent verdicts, rather than overturn them"). If it is impossible to reconcile the outcomes, pursuant to Rule 60(b)(6), the Court may modify the judgment against IPI to make the outcomes consistent. _See Atl. Cas. Ins. Co. v. Paszko Masonry, Inc._, No. 09-7452, 2014 WL 1847830, at *4 (N.D. Ill. May 8, 2014) (vacating default judgment under Rule 60(b)(6) after co-defendants prevailed on appeal so as to avoid inconsistent judgments). Similarly, if a finding as to damages cannot be reconciled with the judgment against IPI, the Court may modify that as well. _See WRS, Inc. v. Plaza Entm't, Inc._, No. 00-cv-2041, 2008 WL 2323991 (W.D. Pa. June 5, 2008) (modifying damages in earlier judgment under Rule 60(b)(6) when presented with new evidence).

1

2

### III.   <u>CONCLUSION</u>

3

Since Plaintiffs' are not alleging joint and several liability, and there is no significant risk of

4

inconsistent outcomes as to liability or damages, Plaintiffs request that the Court enter judgment

5

against IPI so that Plaintiffs may have some opportunity to collect on their claims. That judgment will

6

not have any impact as to the determination of liability or damages against Gold Mantis or MCC.

7

8

Respectfully submitted,

9

_____/s/_____

10

Aaron Halegua

11

Attorney for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

24

**Exhibit A**



# IMPERIAL PACIFIC
INTERNATIONAL(CNMI)LLC

August 11, 2020

Ralph DLG. Torres
CNMI Governor
Pagan Loop, Capitol Hill
Caller Box 10007
Saipan, MP 96950

Victor B. Hocog
Senate President
PO Box 500129
Saipan, MP 96950

Blas Jonathan T. Attao
CNMI House of Representative
House Speaker
P.O. Box 500586
Saipan, MP 96950



Edward E. Manibusan
Attorney General
Pagan Loop, Capitol Hill
Caller Box 10007
Saipan, MP 96950

Mark O. Rabauliman
Chairman
CNMI Lottery Commission
Department of Commerce
PO Box 5795 CHRB
Saipan, MP 96950

Andrew Yeom
Acting Executive Director
Commonwealth Casino Commission
PO Box 500237
Saipan, MP 96950



***Re: Request for an Abatement of the Casino License Fee due August 2020
for the period August 2020 to August 2021***

Dear Esteemed Sirs,

The purpose of this letter is to let you know that Imperial Pacific International (CNMI) LLC ("IPI") will not be able to pay the annual license fee due tomorrow.  This letter will explain why.

Pursuant to 4 CMC §2306(b)(3) and (4), IPI is obligated to the CNMI about $15,500,000 on August 12, 2020. As you are aware, the world is in the grip of a pandemic. The pandemic started in China in November 2019 and as a result tourism from China to the CNMI dropped significantly in November, December and January. In February 2020, flights from China to the CNMI were stopped. In March 2020, IPI had to close its casino to protect its employees and the public from the virus. We are now in August and IPI has had no income for the last five months. It does not appear that international flights will resume until January 2021. It does not seem likely that tourism to the CNMI will begin again until May 2021. In all likelihood IPI will remain closed, and have no income, for the next eight months.



IPI has had to furlough hundreds of employees. This has required IPI to pay repatriation costs and for CW workers IPI has had to pay ¾ of their annual wages they should have earned even though they will not be working because that is what USCIS requires. When IPI reopens it will have significant reopening costs as it will have to bring back hundred of workers. Yet, to fund all of this IPI will have no income until after it does reopen.

Even though IPI has closed the casino IPI still has significant operating costs each month that it must pay. IPI must periodically turn on the air-conditioning so that the furnishings do not get moldy and so that the electrical gaming machines do not rust. IPI also must maintain security even though there is no income to pay these costs.

IPI is presently current on all wages owed to its remaining employees.  IPI is providing its employees that remain on Saipan with health insurance.  IPI is keeping the power on for its employees who remain in company provided housing.  IPI is in the process of repatriating hundreds of employees who will not remain with IPI to their home countries.

Unfortunately, IPI will not be able to pay the annual licensing fee on August 12, 2020. What has happened is a classic "force majeure," and event that effects more than just IPI and that was beyond the control of IPI.

Relief when there is a force majeure was provided for in the Casino License Agreement:

> "25. Force Majeure
>
> Licensee shall not be in default for any failure or delay in the performance due under this License Agreement if such failure or delay is due to causes beyond reasonable control including, but not limited to: Act(s) of God, war(s), strike(s) or labor dispute(s), embargo(es), act(s) of terrorism, fire(s), flood(s), or accident(s) without the fault or negligence of the Licensee ("Force Majeure Event"). Invocation of force majeure by the Licensee shall not excuse any payment obligations to the Commonwealth where the grounds and or purpose for such payments have already accrued."

Pursuant to Section 25 of the Casino License Agreement, and because of the worldwide pandemic, IPI respectfully requests an abatement of the casino license fee for the year of 2020.



Likewise, IPI will owe about $3,000,000 in October to support the operations of the Commonwealth Casino Commission. There will be no casino operations to monitor until IPI does reopen. Therefore, IPI proposes that payment of the $3,000,000 be delayed until thirty days before the scheduled reopening.

What IPI is requesting is not unheard of. Airlines in the United States were almost completely shut down by the pandemic. Not only has the Federal Government provides the airlines relief from certain taxes and fees but has also given the airlines tens of millions of dollars in direct aid so that they would not permanently close. IPI is only asking for the relief from certain fees.

IPI understands that the Legislator may be required to approve the relief IPI seeks. IPI requests your support in providing to it relief from those fees.

We really appreciate your consideration and understanding. With this relief IPI will be able to stay in business and reopen stronger. In the long term providing this relief to IPI now will benefit both IPI and the CNMI.


Donald R. Browne
CEO
Imperial Pacific International

**Exhibit B**



RALPH DLG. TORRES
Governor

ARNOLD I. PALACIOS
Lieutenant Governor

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
## OFFICE OF THE GOVERNOR

August 19, 2020

GOV20-276

Mr. Donald R. Browne
CEO
Imperial Pacific International (CNMI) LLC.
PMB 918 Box 10000
Saipan, MP 96950

Dear Mr. Browne:

I received you letter dated August 11, 2020, wherein you state that IPI will not timely make the Annual License Fee payment, and you seek "an abatement of the casino license fee for the year of 2020." Further, IPI seeks delay of the Commonwealth Casino Commission Regulatory Fee "until thirty days before the scheduled reopening."

I write in response as the party with "authority for enforcement of the terms and conditions of [the] License Agreement" pursuant to CLA Section 2. To be clear, the Annual License Fee for the year 2020 is due and payable on the anniversary date of the signing of the CLA, or August 12, 2020.

I further address the two issues raised in IPI's letter.

The Annual License fee is required pursuant to Commonwealth Law, the Casino License Agreement, and applicable Commonwealth regulation. IPI seeks "an abatement of the casino license fee for the year 2020" citing a portion of the Force Majeure clause found in CLA Section 25.

I assume by "abatement" "for the year of 2020" IPI seeks to be absolved from paying the required fee entirely. This request cannot be dealt with administratively as the fee has been set by law. The law that provided IPI's obligation specifically as to the Casino License fee was unconditional.

Further, the Casino Regulatory Fee is created by Commonwealth Law. The amount to be paid, and the date on which it shall be paid, is determined by 4 CMC §2309. The Force Majeure clause of the License Agreement cannot supersede an explicit statutory command of the Legislature. This is also true with regards to the payment of the Casino License fee. Further, IPI's stated reason for wanting to delay payment, "There will be no casino operations to monitor until IPI does reopen" has already been foreclosed by the Legislature. See 4 CMC §2309(a) ("The Casino Regulatory Fee is due regardless of actual costs incurred by the Commission").

Secondarily, IPI is in material breach of the Casino License Agreement for its Community Benefit Fund deficiencies pursuant to CLA Section 31 "License Suspension or Revocation." Section 31 defines a "Material Breach" as, among other failures, the failure "to pay any amount due and payable hereunder upon the date when such payment is due" and the failure "to observe or perform

any material obligation or covenant under this Agreement." This letter serves as the notice of intent to suspend or revoke the license required by Section 31. Pursuant to Section 31, IPI now is entitled to an "adequate and reasonable time to cure" the breach.

Finally, please be reminded of CLA section 17: Requirement for Compliance with Applicable Laws, which states, in pertinent part: "The continuing validity of the License is conditional upon the Licensee's compliance with applicable laws, rules and regulations of the Commonwealth and the United States.

I look forward to your response.

Sincerely,

**RALPH DLG. TORRES**
GOVERNOR

cc:     Honorable Victor B. Hocog, Senate President
        Honorable Blas Jonathan T. Attao, House Speaker
        Honorable Edward E. Manibusan, Attorney General
        Mr. Mark O. Rabauliman, Chairman, CNMI Lottery Commission
        Mr. Andrew Yeom, Acting Executive Director, Commonwealth Casino Commission