F I L E D
Clerk
District Court

MAY 24 2021

for the Northern Mariana Islands
By_____
(Deputy Clerk)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| TIANMING WANG, *et al.*, | Case No.: 1:18-cv-00030 |
| Plaintiffs, | |
| vs. | **DECISION AND ORDER ENTERING DEFAULT JUDGMENT AGAINST DEFENDANT IPI** |
| GOLD MANTIS CONSTRUCTION DECORATION (CNMI), LLC; MCC INTERNATIONAL SAIPAN LTD., CO.; and IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC, | |
| Defendants. | |

## I.        INTRODUCTION

On June 12, 2020, the Court entered default against Defendant Imperial Pacific International (CNMI), LLC ("IPI") after an order to show cause hearing for IPI's repeated failure to comply with discovery orders and sanctions. (Min., ECF No. 157.)  Before the Court is Plaintiffs' petition for damages (ECF No. 172) in support of the entry of default judgment against IPI pursuant to Federal Rule of Civil Procedure 55(b)(2). Plaintiffs also filed a supplemental memorandum in support of a default judgment against IPI. (ECF No. 230.) The Court previously denied without prejudice Plaintiffs' petition for damages and motion for attorneys' fees (ECF No. 226) against IPI given that entry of default judgment at that time for less than all defendants would be inconsistent with *Frow v. De La Vega*, 82 U.S. 552 (1872) and its progeny and posed a risk of inconsistent judgments.  (ECF

1

No. 274.) Plaintiffs have since settled with and dismissed their actions against Defendants Gold Mantis Construction Decoration (CNMI), LLC ("Gold Mantis") and MCC International Saipan Ltd., Co. ("MCC") such that IPI is the only remaining defendant.  (ECF Nos. 288, 292.)  The Court thus granted Plaintiffs' motion for reconsideration to renew their request for entry of default judgment against IPI in the amount of $3,863,534 in compensatory damages and double that amount ($7,727,068) in punitive damages for a total of $11,590,602. (Mot. for Reconsideration at 3, ECF No. 295; Min., ECF No. 299.)   Having reviewed the briefs, supporting declarations, and applicable law, the Court GRANTS Plaintiffs' petition for damages but for the lower amount of $5,430,595.58 for the the following reasons.[1]

## II.    FACTUAL BACKGROUND

Plaintiffs are seven Chinese construction workers who bring claims against their former employers Gold Mantis and MCC and the project owner IPI under four causes of action: 1) forced labor under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C §§ 1589, 1590, 1592, 1595; (2) forced labor under the CNMI Anti-Trafficking Act, 6 CMC §§ 1502, 1503, 1507; (3) negligence; and (4) liability for employees of subcontractor (for injuries), 4 CMC § 9304(c). (First Amended Compl. "FAC" ¶¶ 308–340, ECF No. 6.)  They were recruited by Defendants and/or their agents from China under false promises of good conditions, high wages, and legal work status. (*Id*. ¶ 52.)  However, after paying high recruitment fees, Plaintiffs were instead subjected to over 12-

---

[1] A decision and order regarding Plaintiffs' fourth motion for attorneys' fees in connection to default judgment (ECF No. 226) will be entered separately.

hour work days without any rest and sometimes 24-hour work shifts, paid below legal minimum wage, crammed into dormitories, yelled at by their supervisors, forced to pay fines for arriving late or not working hard enough, and subjected to extreme, dangerous and inhumane work conditions on the Imperial Pacific Casino construction site in Garapan, Saipan.  (*Id.* ¶¶ 33–296.)   Furthermore, Defendants arranged for Plaintiffs to enter as "tourists" instead of under a lawful temporary work visa, took away their passports, instructed them to hide when government officials came to inspect the worksite or dormitories, threatened them from seeking medical care for their injuries, and failed to compensate them for their injuries suffered from working on the construction site—which varied from severe burns to damaged fingers or feet. (*Id.* ¶¶ 6, 45, 56, 160, 230, 244, 254, 267, 284, 287, 298, 318.)

MCC was the general contractor on the casino project.  (*Id.* ¶ 129.)  Three of the Plaintiffs were employed under MCC. (*Id.* ¶ 57.) During their employment with MCC, they had to pay an additional $2,000 recruitment fee upon arrival and work 12-hour or more work shifts with no rest.  (*Id.* ¶¶ 63–64.)  Plaintiffs under MCC were also never paid on time, paid less than minimum wage, forced to buy their own protective gear, threatened to be sent back to China given their unlawful status, and told that their complaints were useless given their immigration status. (*Id.* ¶¶ 65–75.) MCC's managers also held on to Plaintiffs' passports.  (*Id.* ¶ 76.)

Eventually, all of the Plaintiffs worked under Gold Mantis.  (*Id.* ¶¶ 218, 235, 242, 252, 265, 277, 286.)  A Gold Mantis manager charged Plaintiffs an additional $1,000 fee for their jobs. (*Id.* ¶ 80.) Under Gold Mantis, Plaintiffs similarly regularly worked 12-hour or longer days, including up to 24-hour shifts on occasion. (*Id.* ¶¶ 84, 85.) They were not paid in a timely manner and, if paid at all, were paid less than minimum wage and less overtime than they performed. (*Id.* ¶¶ 94–97.)  The Gold

Mantis manager fined employees when they did not work hard enough, rested on the job, or refused a shift. (*Id.* ¶¶ 105–108.) He also threatened to physically harm and kill employees. (*Id.* ¶¶ 109, 111.) Gold Mantis also threatened employees without immigration status that they would be deported or arrested if they went to government or medical authorities, instructed them that they could not go to public places or interact with others or else they would be deported, and actively hid them during inspections. (*Id.* ¶¶ 115–119.) All seven Plaintiffs sustained injuries during the course of their employment with Gold Mantis.  (*Id.* ¶¶ 219–220, 236-37, 243–44, 253–53, 265–66, 277-79, 286–87.)

As to IPI's role, IPI was the developer that was granted an exclusive license to build the casino project in Saipan and that hired multiple Chinese construction firms including MCC and Gold Mantis to build the casino. (*Id.* ¶¶ 2, 36, 37, 168.) IPI exercised significant control over the construction site, including its safety conditions; exercised control over which companies to hire or fire for the casino project; and directed the companies' tasks.  (*Id.* ¶¶ 37, 168–182.) Furthermore, IPI knew or should have known about the use of unauthorized workers, the lack of compensation insurance, the lack of adequate safety at its construction site, and their contractors' policies regarding hours and harsh punishments. (*Id.* ¶¶ 164–166, 197.)  IPI's general counsel served as the authorized representative for both MCC and Gold Mantis in their applications for an exemption from a CNMI law capping the number of foreign workers that an employer may hire. (*Id.* ¶171.) IPI also arranged or provided the unsanitary housing for many of the unauthorized workers, including Plaintiffs, and owned or arranged the buses that transported the workers to the casino project each day.  (*Id.* ¶¶ 193–195, 201.) Furthermore, IPI assisted in hiding unauthorized construction workers from government investigators and denied an OSHA inspector who went to investigate multiple claims of injuries access to the casino

site. (*Id*. ¶¶ 138, 202.) Accordingly, Plaintiffs sought general, special, and punitive damages, along with attorney fees and costs. (*Id*. ¶ 341.)

### III. PROCEDURAL BACKGROUND

After months of discovery and pre-trial motions, the Court on June 12, 2020 entered default against IPI pursuant to Federal Rule of Civil Procedure 37 for IPI's repeated violations of discovery orders. (Min., ECF No. 157; Amended Mem. Decision, ECF No. 193.)  Plaintiffs subsequently filed their petition for damages for entry of default judgment against IPI, specifically focusing on damages under the TVPRA because any damages for Plaintiffs' other three causes of action would be duplicative. ("Pet. for Damages" at 6, ECF No. 172.)  Plaintiffs seek approximately $3.86 million in compensatory damages for emotional distress suffered each day they were subjected to forced labor, lost income from their physical injuries incurred working for the casino project, future lost income, and pain and suffering related to those injuries.  (*Id*. at 9–27, 29.) Plaintiffs also seek twice that amount in punitive damages, for an approximate total of $11.6 million in damages. (*Id*. at 27–30.) Their petition was supported by a declaration from each Plaintiff,[2] photographs of their respective injuries, and documents that supported their claim for damages. (ECF Nos. 173–179.) Their petition also included declarations from Plaintiffs' counsel Aaron Halegua ("Halegua Decl.," ECF No. 180), Florence Burke, an expert in human trafficking trauma ("Burke Decl.," ECF No. 181), and Neil Steinkamp, a finance consultant ("Steinkamp Decl.," ECF No. 182).

---

[2] These include the declarations of Tianming Wang ("T. Wang Decl.," ECF No. 173), Dong Han ("Han Decl.," ECF No. 174), Liangcai Sun ("Sun Decl.," ECF No. 175), Yongjun Meng ("Meng Decl.," ECF No. 176), Qingchun Xu ("Xu Decl.," ECF No. 177), Youli Wang ("Y. Wang Decl.," ECF No. 178), and Xiyang Du ("Du Decl.," ECF No. 179).

In response to IPI's opposition ("Opp'n," ECF No. 196) to Plaintiffs' petition for damages supported by exhibits (ECF No. 196-1), Plaintiffs produced additional declarations from a former CNMI Secretary of the Department of Labor and a former IPI employee who worked for IPI's construction department and then operations department, both supported by photos taken during the time Plaintiffs worked on the project (*see* Plaintiffs' Reply, ECF No. 205; Edith Deleon Guerrero Declaration "Guerrero Decl." ECF No. 206; Roger Pich Declaration "Pich Decl.," ECF No. 207). Plaintiffs also provided a declaration from a medical doctor who previously worked at the Saipan public hospital and gave a medical opinion about Plaintiffs' injuries. (Neda Farzan, M.D. Declaration "Farzan Decl.," ECF No. 208.)   IPI also filed a supplemental position statement in opposition to Plaintiffs' petition for damages.[3] ("Second Opp'n," ECF No. 214.)

IPI in the interim also filed a motion to set aside the entry of default under shortened time. (ECF Nos. 183, 184.) The matters came on for a hearing on August 7, 2020, at which time the Court denied IPI's motion to set aside the entry of default, and further ordered that the parties file supplemental briefing on the issue of entry of default judgment against one of multiple jointly liable defendants. (Min., ECF No. 219.)   Particularly, the Court had concerns about the entry of default judgment against one defendant while the case was still pending against joint defendants who could refute Plaintiffs' claims, a risk recognized in *Frow v. De La Vega*, 82 US. 552 (1872).   Accordingly, Plaintiffs filed their supplemental brief in support of their petition for damages on August 20, 2020

---

[3] However, some of IPI's arguments relied on an exhibit that was never produced. (*See* Notice of Errata, ECF No. 215.) Arguments in reliance of that exhibit are rejected.

("Suppl. Pet.," ECF No. 230), and IPI filed its supplemental brief in opposition ("Suppl. Opp'n," ECF No. 240).

Plaintiffs also filed their fourth motion for attorneys' fees against IPI in support of the entry of default judgment against IPI. ("Mot. for Att'y Fees," ECF No. 226.) IPI filed a limited opposition ("Opp'n to Att'y Fees," ECF No. 231), and Plaintiffs filed their reply ("Att'y Fees Reply," ECF No. 241). This matter came before the Court on September 18, 2020, at which time the Court took the matter under advisement. (Min., ECF No. 252.) Then on November 25, 2020, the Court issued its decision and order denying *without prejudice* Plaintiffs' petition for damages and fourth motion for attorneys' fees in connection to an entry of default judgment, given that an entry of default judgment pursuant to Rule 55(b) at that juncture was premature in light of the similarly situated defendants (Gold Mantis and MCC) who remained active in the case and in light of the significant risk of inconsistent judgments as articulated in *Frow* and its progeny. (Decision and Order at 12, ECF No. 274; *see Frow*, 82 U.S. 552.)

On January 8, 2021, Plaintiffs and Gold Mantis filed a stipulation for Gold Mantis' dismissal with prejudice from the case given that the two parties settled (ECF No. 287), and this Court dismissed Gold Mantis with prejudice that same day (ECF No. 288). A month later on February 12, 2021, Plaintiffs and MCC filed a stipulation for MCC's dismissal with prejudice given that they too settled (ECF No. 292), and this Court dismissed MCC with prejudice that same day (ECF No. 293). Given that Gold Mantis and MCC have since been dismissed such that there would no longer be a risk of inconsistent judgments, Plaintiffs moved this Court to reconsider its petition for damages and motion for attorneys' fees in connection with entry of default judgment against the sole remaining defendant,

IPI.  (Mot. for Reconsideration, ECF No. 295.) The Court on February 23, 2021 granted the motion for reconsideration (Min., ECF No. 299.), and now renders its decision on the petition for damages.

## IV.    DEFAULT JUDGMENT

Under Federal Rules of Civil Procedure 55(b)(2), the Court has discretion to enter default judgment following an entry of default.  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). This Court has already considered the Ninth Circuit's five-factor test before it imposed the entry of default as a Rule 37 sanction.[4] (Amended Mem. Decision, ECF No. 193.) Thus, to be clear, the Court concludes that it need not address the Ninth Circuit's *Eitel* discretionary factors for default judgment, as "it would either be redundant or inconsistent to apply *Eitel*'s discretionary factors where default is imposed as a sanction." *Dreith v. Nu Image, Inc.*, No. CV 05–4146 SVW (MANx), 2007 WL 9658786, at *6 (C.D. Cal. Mar. 2, 2007); *see Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986) (citing 6 *Moore's Federal Practice* ¶ 55–05[2], at 55–24 to 55–26).  The Court accords with the reasoning in *Dreith*, in that "*Eitel* is ordinarily invoked when a defendant fails to file a timely pleading," and "[i]f the *Eitel* factors could somehow compel [the] Court to deny default judgment despite having already concluded that the entry of default was proper" after applying the *Malone/Hester* factors, "the result would defy common sense. The Court's discovery sanction for willful and deliberate misconduct would amount to a nullity, and would only have had the effect of delaying the case's resolution on the merits." *See Dreith*, 2007 WL 9658786, at *6; *Hester*, 687 F.3d at 1169; *Malone*, 833 F.2d at 130.

---

[4] These five factors are: "(1)  the public's interest  in  expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less  drastic  sanctions." *Hester v. Vision Airlines, Inc*., 687 F.3d 1162, 1169 (9th Cir. 2012) (quoting *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 130 (9th Cir. 1987)).

1   Thus, "[o]nce *Malone* has been met, and the Court is satisfied that the allegations of the complaint are

2   sufficient, the *Eitel* analysis is essentially rendered moot." *Dreith*, 2007 WL 9658786, at *7.

3       Nonetheless, the Court will address the *Eitel* factors here because both parties make opposing

4   arguments regarding whether default judgment is proper under *Eitel*. Those factors are:

5       1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive
        claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the
6       action; (5) the possibility of a dispute concerning material facts; (6) whether the
        default was due to excusable neglect, and (7) the strong policy underlying the
7       Federal Rules of Civil Procedure favoring decisions on the merits.

8   *Eitel,* 782 F.2d at 1471–72. The Court will analyze each of the factors in turn.

9       A.  Prejudice to the Plaintiffs

10      This first *Eitel* factor considers whether a plaintiff will suffer prejudice if default judgment is

11  not entered.  *Vogel v. Rite Aid Corp*., 992 F. Supp. 2d 998, 1007 (C.D. Cal. 2014). Plaintiffs argue that

12  they will be prejudiced absent entry of default judgment because ever since the Court entered default

13  against IPI, IPI has not remedied its discovery violations and has continued to conduct delay tactics

14  including payment of attorneys' fees.  (Mot. for Reconsideration at 2-3; Suppl. Pet. at 6–7.)  IPI

15  employees have since been furloughed and continue to be furloughed, and as IPI's financial situation

16  becomes more precarious, Plaintiffs' inability to collect on the judgment increases each day.  (Suppl.

17  Pet. at 6–7.) IPI on the other hand argues that Plaintiffs will not be prejudiced if the Court were to

18  deny entry of default judgment because denial would merely "rewind the clock" to submit responsive

19  pleadings and additional discovery.  (Suppl. Opp'n at 3–4.)

20      The Court agrees with Plaintiffs' arguments and finds IPI's arguments unpersuasive.  Plaintiffs

21  filed their initial complaint in 2018 and included Defendant IPI in the First Amended Complaint in

22

23

24

early 2019. Plaintiffs promptly propounded their first discovery requests in September 2019.  Over the course of discovery, IPI repeatedly failed to comply with their obligations to produce discovery and the Court's multiple discovery orders such that the Court entered default against IPI on June 12, 2020. (Min., ECF No. 157.)  Nearly a year later, IPI has still not fulfilled its discovery obligations such that the Court's $2,000 daily sanctions against IPI to compel compliance with the Court's discovery orders is still running. (*See* Min., ECF No. 98.) Given IPI's lack of cooperation with discovery, Plaintiffs cannot present all pertinent evidence on the merits and would be without any recourse. *See Vogel*, 992 F. Supp. 2d at 1007 (finding prejudice given the defendant's unwillingness to cooperate since plaintiff otherwise would have no recourse).  The Court also notes that nearly four years have lapsed since Plaintiffs have returned to China without compensation from IPI for their work-related injuries, and any further delays in this matter without compensation would be offensive to these Plaintiffs who suffered years after being subjected to forced labor and mistreatment. The Court therefore finds that this factor weighs heavily in favor of entering default judgment against Defendant IPI.

   B.   Merits of Plaintiffs' claim and sufficiency of the complaint

   The second and third *Eitel* factors involving the merits of Plaintiffs' claims and the sufficiency of the complaint "require that plaintiff[s'] allegations state a claim on which [it] may recover." *Discovery Commc'n Inc. v. Animal Planet, Inc.*, 172 F. Supp. 2d 1282, 1288 (C.D. Cal. 2001).  "Upon entry of a default judgment, facts alleged to establish liability are binding upon the defaulting party," but "facts which are not established by the pleadings of the prevailing party, or claims which are not well-pleaded, are not binding and cannot support the judgment." *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978)).

IPI argues that these factors weigh against default judgment because Plaintiffs fail to state any claim upon which relief may be granted. (Opp'n at 2–4.)  Specifically, IPI argues that Plaintiffs fail to allege that: (1) IPI "knowingly" violated the TVPRA, (2) IPI "knowingly, recklessly, or intentionally" violated the CNMI Anti-Trafficking Act, (3) IPI owed a duty of care for negligence given the lack of an employer-employee relationship, and (4) IPI is an employer pursuant to 4 CMC § 9304, as required to find liability under the statutes.  (Opp'n at 5–21.) However, as Plaintiffs properly note, IPI has already previously filed a motion to dismiss regarding the same pleadings and joined MCC's motion to dismiss, and the Court previously denied Defendants' motions to dismiss. (*See* IPI Mot. to Dismiss, ECF Nos. 11, 12; IPI Joinder to MCC's Mot., ECF No. 17; Order Denying Motions, ECF No. 30; Reply at 2).

To be clear, Plaintiffs here seek damages pursuant to the TVPRA, and their complaint sufficiency pleads facts upon which they may recovery from IPI under the TVPRA. Plaintiffs allege that Defendants, including IPI, subjected them to forced labor in violation of the TVPRA under 18 U.S.C §§ 1589, 1590, 1592, 1595.  Section 1589(a) provides criminal penalties for anyone who "knowingly" obtains labor or services in four ways:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;
> (3) by means of the abuse or threatened abuse of law or legal process; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C. § 1589(a)(1)–(4). Section 1590(a) also provides penalties against anyone who "knowingly

recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter."

Plaintiffs in their amended complaint allege that MCC and Gold Mantis subjected them to over 12-hour workdays; threatened them with fines and/or sending them back to China; and reminded them of their unlawful "heigong" status and their large debts back home.[5]  (*See* FAC ¶¶ 64, 70–72, 82–85, 101–108.)  Plaintiffs also allege that Gold Mantis' supervisor threatened to physically harm or kill them; that MCC held on to their passports;[6] and that IPI provided buses that took unauthorized construction workers to and from the construction site and owned the dormitories in which unauthorized construction workers were housed. (*See* FAC ¶¶ 76, 109–114, 193, 201.) Accepting these facts as true for purposes of default against IPI only, the Court finds by a preponderance of the evidence that Defendants MCC and Gold Mantis have committed direct egregious acts in violation of Section 1589, and that IPI has also committed overt acts in violation of Section 1590 by harboring and transporting Plaintiffs for labor and services in violation of Section 1589.

Important to this analysis, further, is that under the TVPRA, Section 1595(a) provides victims civil remedies, including damages and attorneys' fees "against the perpetrator (or *whoever knowingly benefits*, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)." (Emphasis added);

---

[5] "Heigong" literally means "black worker" in Chinese and implies that the person lacks legal status. (*See* FAC ¶ 55.)
[6] Under Section 1592(a), "[w]hoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person" in the course of violating and with intent to violate Sections 1589 and 1590, for example, or to prevent or restrict the person's liberty to move or travel, is also subject to a fine or imprisonment.

*see also* 18 U.S.C. § 1589(b) (providing criminal penalties for same). The TVPRA therefore expressly provides that, even absent an overt act, anyone who knowingly benefits from a forced labor scheme that they knew or should have known about may be subject to a civil action. *See* 18 U.S.C. §§ 1589, 1590, 1592, 1595; *B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-cv-00656-BLF, 2020 WL 4368214, at *3, 6 (N.D. Cal. July 30, 2020) (holding that a plaintiff need not allege an overt act in furtherance of or actual knowledge of a venture in order to sufficiently plead a civil liability § 1595 claim and recognizing agency liability in the context of the TVPRA).

Thus, even if IPI did not commit an overt egregious act by obtaining Plaintiffs' labor through threats, abuse of process, or serious harm, IPI benefited from being able to quickly obtain foreign construction workers that could be compelled to work long hours for low wages with little to no rest. (FAC ¶ 214.) MCC and Gold Mantis' conduct were for the benefit of quickly completing the casino project for IPI. (*Id.* ¶ 39.) IPI was deeply involved with selecting and supervising the contractors, knew of its contractors' policies on work hours and harsh punishments, carried out the health and safety inspections, provided workers transportation to and from the construction site as well as housed the workers, knew about its contractors exploitative and illegal practices, and denied entry to an Occupational Safety and Health Administration investigator who came to inspect safety conditions. (*Id.* ¶¶ 168, 185, 193, 197, 201.) IPI even expressly made a statement through its 2016 annual report that "over 2,000 construction workers" were on the project "working around the clock to ensure timely completion" of the casino. (*Id.* ¶ 47.) In January 2017, employees of Gold Mantis staged protests because their employer had not paid their wages. (*Id.* ¶ 206.) Furthermore, IPI knew or should have known that unauthorized workers were being used to construct the Casino because the CNMI

13

Lieutenant Governor told IPI that federal authorities were investigating the presence of unauthorized workers on the Casino Project in February 2017 (*id.* ¶ 50), around the same time period that all seven Plaintiffs were working on the project (*id.* ¶¶ 217, 235, 242, 252, 266, 277, 286).  IPI's general counsel was also the authorized representative for both MCC and Gold Mantis in their applications for the exemption from the cap on the number of foreign workers that an employer may hire. (*Id.* ¶ 171.) These allegations, as well as the other facts in the First Amended Complaint, collectively support the finding that IPI "knowingly benefited, financially and in other ways, from participating in a venture that engaged in providing or obtaining Plaintiffs' labor through the means described [in the first amended complaint], either knowingly or in reckless disregard of the fact that the venture was engaged in the providing or obtaining of labor or services through such means." (*Id.* ¶ 317.) Taking the facts as alleged in the complaint as true, damages are therefore appropriate against IPI. Accordingly, these two factors weigh in favor of default judgment.

    C.  <u>Sum of money at stake</u>

       This fourth factor balances "the amount of money at stake in relation to the seriousness of the Defendant's conduct." *PepsiCo, Inc. v. California Security Cans*, 238 F. Supp. 2d 1172, 1176 (C.D. Cal. 2002). "Default judgment is disfavored where the sum of money at stake is too large or unreasonable in relation to defendant's conduct." *Vogel*, 992 F. Supp. 2d at 1012.

       Plaintiffs seek approximately $11.6 million in damages, plus attorneys' fees.  (*See* Pet. for Damages at 29.) IPI argues that this amount is too large and unreasonable, whereas Plaintiffs argue that this amount is reasonable in light of IPI's conduct.  (*See* Suppl. Pet. at 4; Suppl. Opp'n at 6.) While the Court agrees that $11.6 million is a large amount of money at stake, other courts have awarded

larger amounts in TVPRA cases by default judgment.  *See, e.g.*, *Magnifico v. Villanueva*, No. 10-cv-80771, 2012 WL 5395026, at *1-2 (S.D. Flo. Nov. 2, 2021) (awarding $13.5 million to 18 plaintiffs from the Philippines and the United States subjected to forced labor); *Alabado v. French Concepts, Inc.* Case No. CV 15–2830 FMO (AJWx), 2016 WL 5929247, at *17 (C. D. Cal. May 2, 2016) (awarding $12.4 million in damages to 11 plaintiffs subjected to human trafficking). The amount of money at stake is thus not unreasonable considering the egregious nature of trafficking cases.

D.  Possibility of dispute concerning material facts

This fifth *Eitel* factor considers the possibility of dispute concerning any material facts. *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177.  "Upon entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages." *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987) (per curiam)..

Here, because default has already been entered against IPI in this matter, Plaintiffs' factual allegations are thus presumed true. Therefore, no factual disputes exist that would preclude entry of default judgment.

E.  Whether default was due to excusable neglect

The next factor looks to whether the defendant's default may have resulted from excusable neglect. *Eitel*, 782 F.2d at 1471–72. It "takes into account factors such as 'prejudice, the length of the delay and impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.'" *Alabado*, 2016 WL 5929247, at *18. Here, however, as Plaintiffs argue, the Court already repeatedly found that IPI acted willfully in violating the Court's orders. (Suppl. Pet. at 5.) In entering default against IPI, the Court

found that "IPI's repeated failure to tender complete discovery was clearly within its own control" and that "[o]verall, IPI has willfully ignored Court deadlines, repeatedly letting them pass without filing a single motion for an extension. It has walked back from the stipulations it agreed to in January 2020." (Amended Mem. Decision, ECF No. 193.)  In denying IPI's motion to set aside the entry of default, the Court again found that IPI "willfully" violated the Court's discovery orders and found IPI's arguments on non-culpability unpersuasive.  (Mem. Denying IPI's Motion to Set Aside Default, ECF No. 233.) This factor therefore weighs in favor of entry of default.

### F. Strong policy favoring decisions on the merits

Finally, as to the last factor, "[c]ases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472.  This preference for having decisions on the merits, however, "standing alone, is not dispositive." *Kloepping v. Fireman's Fund*, No. C 94-2684 TEH, 1996 WL 75314, at *3 (N.D. Cal. Feb. 13, 1996).  Here, IPI's failure to comply with discovery and its persistent delay makes a decision on the merits "impractical, if not impossible." *See Alabado*, 2016 WL 5929247, at *18.

Thus, even after considering the *Eitel* factors, the Court concludes that entry of default judgment against Defendant IPI here is appropriate.

## V.     DAMAGES

The Court must next determine Plaintiffs' entitlement to their requested damages. Plaintiffs seek only damages under the TVPRA, as any other damages under their other three claims would be

duplicative of their damages under the TVPRA.[7] (Pet. for Damages at 6.) The Court will therefore only analyze Plaintiffs' damages under the TVPRA.

A. Legal standard

"The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Televideo Sys., Inc.*, 826 F.2d at 917–18. "[B]efore the court can enter a default judgment on a sum uncertain, the plaintiff must *prove* its damages." *Rubicon Global Ventures, Inc. v. Chongqing Zongshen Group Import/Export Corp*., 226 F. Supp. 3d 1141, 1148 (D. Ore. 2016) (emphasis added). Furthermore, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

Rule 55(b) also does not require that testimony be presented as a prerequisite to the entry of a default judgment. *See* Fed. R. Civ. P. 55(b)(2) (noting that the court "may" conduct hearings). However, it is "well settled that a default judgment for money may not be entered without a hearing unless the amount claimed is a liquidated sum or capable of mathematical calculation." *Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981) (citation omitted). The moving party has the burden to prove all damages, *Lyons v. Clancy*, No. CV-20-00866-PHX-MTL, 2021 WL 75828, at *2 (D. Ariz. Jan. 8, 2021), but "need not submit voluminous evidence to support a claim for damages; a declaration or affidavit from the plaintiff describing the factual allegations that support a damages award will

---

[7] This is consistent with the notion that parties may not recover twice for one injury. *See Gen. Tel. Co. of the Nw., Inc. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 333 (1980).

suffice." *Barbee v. DNSPWR2 LLC*, No. CV-20-08100-PCT-MTM, 2020 WL 6585666, at *4 (D. Ariz. Nov. 4, 2020) (citing *Vogel*, 992 F. Supp. 2d 998).

B.  Discussion

Before addressing the damages amount, the Court notes that it previously addressed IPI's arguments for an evidentiary hearing. IPI argued that the Court should grant an evidentiary hearing so that IPI may cross-examine Plaintiffs instead of merely relying on Plaintiffs' affidavits, and that the Plaintiffs may appear by videoconferencing if they are in China. (Opp'n at 24-25.) Plaintiffs countered that a live testimony would create additional burdens, health risks, and delay for Plaintiffs. (Reply at 1.)  At the default judgment hearing held on August 7, 2020, the Court concluded that an evidentiary hearing was not necessary in light of the sufficiency of Plaintiffs' declarations from various people including themselves, the unfeasibility of doing video testimony from China given the legal issues, and the difficulties of arranging travel due to COVID-19. (*See* ECF No. 219.)  Accordingly, damages would be determined based on the briefs and supporting evidence.

The TVPRA provides for mandatory restitution to the victim for the "full amount of the victim's losses." 18 U.S.C § 1593(b)(1). "Full amount of the victim's losses" includes "any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim," including: medical services related to physical, psychiatric, or psychological care; physical and occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; reasonable attorneys' fees and costs; any other relevant losses incurred; as well as "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under

the minimum wage and overtime guarantees of the Fair Labor Standards Act." *Id.* §§ 1593(b)(3), 2259(c)(2).  Section 1595 of the TVPRA also provides for a victim's recovery of "damages and reasonable attorney fees" in a civil action against the perpetrator or benefactor of the violations. *Id.* § 1595(a).  Accordingly, the TVPRA provides for a range of damages.

Plaintiffs seek $3,863,534 in compensatory damages and $7,727,068 in punitive damages, for a total of $11,590,602, along with attorneys' fees and costs.[8] (Pet. for Damages at 29; Reply at 3.) Specifically, Plaintiffs seek compensatory damages for (1) the emotional distress from being subjugated to forced labor, (2) past lost income resulting from their physical injuries, (3) future lost income resulting from their physical injuries, and (4) pain and suffering (emotional distress) arising from their physical injuries, and twice the compensatory damages amount in punitive damages.[9] (Pet. for Damages at 6, 29.) The Court will address whether Plaintiffs are entitled to each of these damages under the TVPRA.

(1) Compensatory damages: emotional distress

Plaintiffs may recover emotional distress awards that are the proximate result of a TVPRA offense.  *See Alabado,* 2016 WL 5929247, at *13 (citing 18 U.S.C. § 2259(b)(3)); *see also Doe v. Howard*, No. 1:11-CV-1105, 2012 WL 3834867, at *2 (E.D. Va. Sept. 4, 2012). In determining those damages, courts look to "all relevant circumstances . . . , including sex, age, condition in life and any

---

[8] These are in conformance to the form of damages sought in their first amended complaint, which seeks general, special, and punitive damages, as well as attorneys' fees and costs.  (*See* FAC ¶ 341.)

[9] Plaintiffs do not seek unpaid wages for the period they were subjected to forced labor or recruitment fees, as this compensation was part of the settlement agreements between the U.S. Department of Labor and MCC and Gold Mantis. (*See* Pet. for Damages at 9; Ex. A and B to Halegua Decl. ¶¶ 3–4; FAC ¶ 125.) Plaintiffs are also not seeking reimbursement for their travel costs to Saipan and medical expenses at this time.  (*See* Pet. for Damages at 9.)

other fact indicating susceptibility of the injured person to [the] type of harm." *Mazengo v. Mzengi*, No. 07-756, 2007 WL 8026882, at *7 (D.D.C. Dec. 20, 2007).  Moreover, courts "look to other awards in similar cases to ensure that the award is within reasonable range." *Shukla v. Sharma*, No. 07–CV–2972 (CBA)(CLP), 2012 WL 481796, at *14 (E.D.N.Y. Feb. 14, 2012).

In similar cases dealing with victims of human trafficking, courts have awarded plaintiffs between $400 to $800 per day for their emotional distress. *See, e.g.*, *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 25 (D.C. Cir. 2013) (awarding $400 per day as compensatory damage for emotional distress in forced labor TVPRA claim); *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1174 (D. Kan. 2018) (awarding $800 per day for 10 years of forced labor); *Lipenga v. Kambalame*, 219 F. Supp. 3d 517, 531–32 (D. Md. 2016) (awarding $400 per day for 971 days of forced labor); *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 458 (E.D. Va. 2015) ($400 per day for 18 months of forced labor); *Doe*, 2012 WL 3834867, at *3–4 (awarding $500 per day for three months of forced labor); *Shukla*, 2012 WL 481796, at *15 (awarding $780 per day for three and a half years of forced labor).

Here, Plaintiffs request an emotional distress award of $425 for each day they were subjected to forced labor. (Pet. for Damages at 12.)  Plaintiffs were recruited under false promises of lawful status to work and paid recruitment fees for doing so, only to be subjected to over 12-hour workdays with no rest and sometimes forced to work 24-hour shifts. (FAC ¶¶ 3–4, 64, 84–85.)  They were paid far below minimum wage and sometimes not paid at all.  (*Id*. ¶¶ 4, 66–67, 94.)  They were also constantly screamed at by their supervisor, who threatened to harm or kill them sometimes (*id*. ¶¶ 103, 109–114), and were slapped on with excessive fines for taking a rest or being late (*id*. ¶¶ 104–107). Plaintiffs were also told not to associate with others or contact authorities, and their managers

20

constantly threatened them with deportation if they complained given their unlawful status. (*Id.* ¶¶ 71, 73, 115–17). They were also crammed into filthy, overcrowded dormitories (Guerrero Decl. ¶ 5), sometimes with no showers and air conditioning (*id.* ¶¶ 77–78), sometimes with up to 12 bunk beds (Meng Decl. ¶ 17), and sometimes where rats crawled over them (Meng Decl. ¶ 17; Pich Dec. ¶ 5, Sun Decl. ¶ 25). When Plaintiffs then suffered their physical injuries given the hazardous work conditions, they were told not to go to the hospital and were left to tend to their own medical injuries. (FAC ¶¶ 226, 238, 246, 256–57, 267, 282, 289–90.) During this entire period, Plaintiffs experienced stress, anxiety, depression, humiliation, and fear from being deported, of being harmed or killed, and of being unable to pay back loan sharks from whom they borrowed money from. (T. Wang Decl. ¶¶ 41–42; Han Decl. ¶ 41–42; Sun Decl. ¶ 45; Meng Decl. ¶ 36; Xu Decl. ¶¶ 11, 30; Y. Wang Decl. ¶ 38; Du Decl. ¶¶ 29.) The dehumanization they faced left emotional scars that persisted even after their return to China. (Xu Decl. ¶ 31.)

Having reviewed Plaintiffs' declarations, which detail the egregious conditions Plaintiffs were forced to work under and the dates of their employment (*see* ECF Nos. 173–179), corroborated by the photos provided by the former CNMI Secretary of Labor and IPI employee (ECF Nos. 206, 207) the Court finds that $425 for each day Plaintiffs were subjected to forced labor as reasonable and well within the range of awards for similar cases. The Court therefore awards compensatory damages for Plaintiffs' emotional distress for a total amount of $332,350 as follows[10]:

---

[10] Each Plaintiff's period of employment with MCC and Gold Mantis is derived from their declarations and worksheets that are part of the settlement agreements between the U.S. Department of Labor and MCC and Gold Mantis, respectively. (Ex. A, B to Halegua Decl., ECF No. 180.)

| | MCC Start | MCC End | GM Start | GM End | Days Worked | Daily Rate | Total |
|---|---|---|---|---|---|---|---|
| Tianming Wang | 9/10/2016 | 2/18/2017 | 2/20/2017 | 3/17/2017 | 186 | $ 425 | $ 79,050 |
| Dong Han | 9/1/2016 | 2/7/2017 | 2/10/2017 | 4/2/2017 | 210 | $ 425 | $ 89,250 |
| Liangcai Sun | 11/2/2016 | 1/12/2017 | 1/16/2017 | 4/2/2017 | 147 | $ 425 | $ 62,475 |
| Yongjun Meng | | | 2/14/2017 | 3/9/2017 | 23 | $ 425 | $ 9,775 |
| Qingchun Xu | | | 2/14/2017 | 4/2/2017 | 47 | $ 425 | $ 19,975 |
| Youli Wang | | | 11/20/2016 | 3/21/2017 | 121 | $ 425 | $ 51,425 |
| Xiyang Du | | | 12/3/2016 | 1/20/2017 | 48 | $ 425 | $ 20,400 |
| **Total** | | | | | | | **$ 332,350** |

### (2) Compensatory damages: losses for physical injuries

Plaintiffs also seek compensatory damages related to their physical injuries in the form of lost wages, future wages, and pain and suffering. (Pet. for Damages at 14.) While there is a dearth of TVPRA cases awarding damages related to physical injuries, the clear definition of TVPRA's mandatory restitution to victims also includes "any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim," including lost income or any other loss. 18 U.S.C. §§ 1593(b)(3), 2259(c)(2). Furthermore, the TVPRA "civil remedy provision creates a cause of action that sounds in tort." *Ditullio v. Beohm*, 662 F.3d 1091, 1096 (9th Cir. 2011). Tort remedies typically include compensatory damages for the injured party's loss of earnings, loss of future earning capacity, pain and suffering, and reasonable medical expenses. *See United States v. Burke*, 504 U.S. 229, 236 (1992). The Court therefore concludes that the types of damages that Plaintiffs seek here related to their physical injuries are recoverable under the TVPRA.

Moreover, through Plaintiffs' declarations, exhibits including medical records and photographs, and declarations from experts,[11] Plaintiffs have sufficiently demonstrated how their physical injuries and subsequent economic and non-economic losses were a proximate result of their forced labor on the IPI casino site or for the benefit of the Casino Project, where Plaintiffs worked under hazardous conditions, were not given proper protective equipment, and were not allowed access to proper medical care. Specifically:

1) **Tianming Wang**: Wang was cutting a metal barrel with a tool on March 17, 2017 at the IPI construction site at the direction of his Gold Mantis supervisor when a spark ignited, creating a flame that then engulfed his lower left leg. (FAC ¶¶ 209–10.) Gold Mantis' supervisor refused him medical care, told him that he would be arrested if he went to the hospital, and instead only gave him two rolls of gauze. (*Id*. ¶¶ 223–26). Wang has been unable to work after the injury. (*Id*. ¶ 207.) Because of this "superficial-to-deep partial thickness burn to the left calf," Wang has experienced "chronic pain, numbness, and atrophy of his leg muscles" and the pain will continually significantly impair his daily activities.  (Farzan Decl. ¶¶ 15, 20.) Wang struggles to walk for more than 15 minutes and has been unable to work since returning to China despite having done construction work prior to coming to Saipan.  (T. Wang Decl. ¶¶ 4, 33, 35.)

---

[11] Plaintiffs provided a declaration from Neda Farzan, M.D., an emergency medicine physician, testifying to her opinions as to Plaintiffs' injuries. (ECF No. 208.)  This undercuts IPI's argument that no medical expert was provided. (*See* Second Opp'n, ECF No. 214.)

2) **Dong Han**: Han was stacking metal pipes at the site in March 2017 when the pipes shifted and crushed Han's right pinky finger, causing bleeding, severe pain, swelling, and bruising. (FAC ¶ 236.) Gold Mantis refused to take him to the hospital or otherwise render any adequate medical care, which would have expedited his healing.  (*Id*. ¶ 237; Farzan Decl. ¶ 25.) Instead, he was forced to go back to work after the injury, lengthening the time for healing.  (Farzan Decl. ¶ 27; Han Decl. ¶ 28.) As a result of this injury to his dominant hand, he has been unable to lift heavy objects and has only been able to do cleaning work in China despite having done construction work prior to coming to Saipan. (Han Decl. ¶¶ 5, 33, 35–37.)

3) **Liangcai Sun**: Sun was lifting and transporting large, heavy boxes in the lobby area of the casino site around January 26, 2017 when a box fell onto Sun's left hand, smashing his finger. (FAC ¶ 253.) Such injury resulted in an "amputation of the tip of the left index finger that has been complicated by chronic pain and bone infection." (Farzan Decl. ¶ 30.) Gold Mantis' supervisor told him not to go to the hospital given his unlawful status after the injury, but Sun nonetheless sought medical consultation on his own. (FAC ¶¶ 256, 258.) Sun continues to experience pain and tenderness on the finger. (Sun Decl. ¶ 42.) A year after returning to China, Sun did not work due to the injury despite doing farming work and long-distance truck driving previously, but then found a job as a truck driving starting May 2018. (*Id*. ¶¶ 39–41.)

4) **Yongjun Meng**: Meng and two other workers were loading a large, heavy vat of hot soup onto a vehicle for transport to the construction site in March 2017 when the soup spilled

onto Meng, causing severe pain and burns to his left hand and leg and rendering him unable to work. (FAC ¶ 244.) As a result, Meng suffered "deep partial thickness burns to the dorsum (back) of the left hand and a superficial partial thickness burn to an area of the left thigh." (Farzan Decl. ¶ 38.) When this incident occurred, Meng was not provided with gloves or any other protective gear for dealing with hot items. (*Id*. ¶ 25.) Gold Mantis' supervisor told him not to go to the hospital and instead sent him to the dormitories without any medicine. (*Id*. ¶¶ 245–46.) Due to his injury, he faces "chronic pain [that] may continue for the remainder of his life." (Farzan Decl. ¶ 42.) He was unable to work for seven months since returning to China due to his injury despite having done construction work prior to coming to Saipan, but starting in 2018 was able to do light work in China and then Maldives, but in 2020 he was able to perform heavy work again. (Meng Decl. ¶ 3, 34–35.)

5) **Qingchun Xu**: During his work at the site, a stone fell onto Xu's left lower leg as he and another worker were using ropes to lift stones up a stair, inverting his left ankle. (FAC ¶ 279.) Gold Mantis refused to take him to the hospital. (*Id*. ¶ 282.) As a result of the injury and lack of medical care, Xu still experiences aching on his ankle. (Xu Decl. ¶ 26.) He started working again in 2018 only doing light construction work, despite having done construction work prior to coming to Saipan. (*Id*. ¶¶ 4, 27.)

6) **Youli Wang:** Wang was injured around January 20, 2017 when the plywood carrying a load of steel beams snapped and sent the workers, including Wang, who were sitting on the beams, falling to the ground—from which the beams smashed Wang's left hand and fractured his left ring finger (tuft fracture). (FAC ¶ 266; Farzan Decl. ¶ 47; Wang Decl. ¶

18, ECF No. 178.)  Wang was immediately in pain and his fingernail was nearly separated from his finger.  (*Id*. ¶ 267.) Instead of sending him to the hospital, Gold Mantis' agent took him to a dormitory and poured drinking alcohol over the wound.  (*Id*. ¶ 269.) He was then forced to return to work despite the injury. (*Id*. ¶ 270.)  As a result, Wang has felt pain and numbness and has been unable to do heavy construction work or lift heavy objects. (Y. Wang Decl. ¶ 29.)  Despite having previously done construction and factory work, he has since done light renovation work, and after being hospitalized for a period due to a heart attack,[12] Wang opened up a snack shop.  (*Id*. ¶¶ 5, 30–33.)

7) **Xiyang Du**: Du was moving heavy pieces of plaster around December 2016 when a large piece of it fell over and crushed his right hand middle finger, causing it to swell and bleed. (FAC ¶ 287.)  Gold Mantis' supervisor forbade him from leaving work to go home or seek treatment, thereby delaying his recovery (*Id*. ¶ 288; Farzan Decl. ¶ 54.)  While he worked as a courier prior to coming to Saipan, after returning to China he was only able to do work installing security monitoring systems and repairing computers for a while until a bad car accident in November 2018 rendered him unable to work.[13] (Du Decl. ¶¶ 4, 25–26.) His finger still hurts whenever it touches something.  (*Id*. ¶ 28.)

---

[12] Plaintiffs do not seek any lost income during the period that Youli Wang was in the hospital due to the heart attack. (*See* Halegua Decl. ¶ 13.) Therefore, IPI's arguments on the need of medical testimony regarding the heart attack is irrelevant. (*See* Second Opp'n at 5.)

[13] Plaintiffs do not seek any lost income or future earnings for Du after his car accident (*see* Halegua Decl. ¶ 15), and therefore IPI's argument that Plaintiffs are seeking to supplement damages with this injury is erroneous (*see* Second Opp'n at 5.)

Having reviewed the evidence, the Court concludes that Plaintiffs may recover compensatory damages in the value of their lost income, future lost income, and pain and suffering due to their physical injuries incurred as a result of being subjected to forced labor.

a. <u>Lost income (2017 – 2019)</u>

Plaintiffs generally seek "but for" lost income from May 2017 to December 2019[14] for all seven Plaintiffs, with the exceptions to income sought for Youli Wang and Xiyang Du starting in August 2017 to reflect their return to China.[15] (Ex. E to Halegua Decl. ¶ 8; Halegua Decl. ¶ 9.)  Having thoroughly reviewed Plaintiffs' declarations and calculations, the Court finds Plaintiffs' use of the National Bureau of Statistics of China's "Average Wage of Employed Persons in Urban Private Units" for the Construction sector as the "but for" earnings for Tianming Wang, Dong Han, Yongjun Meng, Qingchun Xu, and Youli Wang reasonable, given that the averages are based on a national average and are less than what those Plaintiffs purported to make prior to coming to Saipan.  (*See* T. Wang Decl. ¶ 4; Han Decl. ¶ 5; Meng Decl. ¶ 3; Xu Decl. ¶ 4; Wang Decl. ¶ 5.)  Plaintiffs' use of 84,000 Chinese Yuan Renminbi ("RMB") for Xiyang Du as the "but for" income is also reasonable, as this was his average earning as a courier in China prior to coming to Saipan. (*See* Du Decl. ¶ 4.)

However, the Court finds the use of 84,000 RMB as the average "but for" earnings for Liangcai Sun is unreasonable. While Sun made about 7,000 RMB per month, or 84,000 RMB a year, as a long-distance truck driver one year after his departure from Saipan, prior to coming to Saipan, Sun's primary

---

[14] Plaintiffs do not seek lost or future income for 2020.

[15] Lost income is also not sought for: Liangcai Sun for 2019 to reflect no lost income with his higher earnings, Youli Wang during the months he was hospitalized due to a heart attack, and Xiyang Du starting in November 2018 to reflect his inability to work from a car accident. (Ex. E to Halegua Decl. ¶ 8; Halegua Decl. ¶¶ 13–15.)

work was farming with long-distance driving as his supplemental work.  (Sun Decl. ¶ 5, 41.) According to Sun's declaration, he could make from 30,000 to 40,000 RMB from farming during a good year prior to coming to Saipan.  (*Id.* ¶ 5.) Accordingly, the Court will use the average of his 1) earnings as a farmer prior to working in Saipan, and 2) first earnings as a long-distance truck driver upon return to China.[16]

The Court therefore awards Plaintiffs in lost income[17] for 2017 to 2019 as follows:

| Plaintiff | Lost Income |
| --- | --- |
| 1.  Tianming Wang | $19,186.04 |
| 2.  Dong Han | $12,839.07 |
| 3.  Liangcai Sun | $6,032.44 |
| 4.  Yongjun Meng | $6,675.46 |
| 5.  Qingchun Xu | $9,312.98 |
| 6.  Youli Wang | $3,132.52 |
| 7.  Xiyang Du | $8,767.28 |
| **Total** | **$65,945.79** |

//

/

---

[16] Because Sun made about 30,000 to 40,000 RMB, the Court will use the average of 35,000 RMB as his earnings as a farmer. In averaging that amount with 84,000 RMB, the Court finds the use of 59,500 RMB as Sun's "but for" annual earnings reasonable.

[17] These amounts adopt Plaintiffs' use of a 7.09 RMB to 1 USD conversion rate. (*See* Halegua Decl. ¶ 7, ECF No. 180.) While Plaintiffs explain that they derived this rate from Google's reported exchange rate on June 19, 2020 (*see* Pet. for Damages at 1), the Court takes judicial notice that 6.547 RMB to 1 USD is the most recent exchange rate published by the United States Treasury. *See* Fed. R. Civ. P. 201(b)-(c) (permitting the court to take judicial notice on its own of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."; Bureau of Fiscal Service, *Historical Rates*, U.S. Department of the Treasury, https://www.fiscal.treasury.gov/reports-statements/treasury-reporting-rates-exchange/historical.html (last visited May 24, 2021).  The Court therefore finds no issue in Plaintiffs' rate, which is rather conservative in comparison to the Treasury's March 31, 2021 reported rate.

b.   Future lost income

Only four of the Plaintiffs seek damages for future lost income: Tianming Wang, Dong Han, Qingchun Xu, and Youli Wang. (Pet. for Damages at 21.)  No future lost income is sought for the other three plaintiffs because Yongjun Meng and Liangcai Sun are making more than their national average salaries, and Xiyang Du was rendered unable to work after his car accident.[18]

Plaintiffs argue that the Court should apply the "total offset" rule in awarding future lost income.  (Pet. for Damages at 21–23.) The total offset method "presume[s] that the ideal discount rate—the after-tax market interest rate on a safe investment—is (to a legally tolerable degree of precision) completely offset by certain elements in the ideal computation of the estimated lost stream of future income." *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 544 (1983). The method assumes "that the effects of future price inflation on wages are part of what offsets the market interest rate." *Id*. In other words, the failure to account for inflation and other wage increase factors such as productivity or promotional gains offsets the failure to discount for the present value of money. *Id*. at 545. Accordingly, calculations are based on multiplying a uniform income amount by a number of years.

While such a method was considered unacceptable as a *uniform* method to calculate future lost damages in *Jones*, it nonetheless "could be stipulated to by the parties, or applied by the trial court in an appropriate case." *Trevino v. United States*, 804 F.2d 1512, 1519 (9th Cir. 1986) (citing *id*. at 550–

---

[18] That Neil Steinkamp does not provide future earnings calculations for those three Plaintiffs does not render his calculations unsupported for *all* of the Plaintiffs, as IPI attempts to argue. (See Second Opp'n at 7-8.) It would be illogical and a waste of resources to provide calculations for future earnings for the three Plaintiffs whom future lost wages are not sought for.

51). Where a court adopts a discount rate above 3 percent or below 1 percent, the discount rate must be supported by credible expert testimony. *Id*.; *see also Colleen v. United States*, 843 F.3d 329, 332 (9th Cir. 1987) (noting that a court "cannot assume, without evidence, that inflation and interest rates will balance each other out."). Given that the total offset method employs a zero-discount rate, *see Trevino*, 804 F.2d at 1519, the rate must be supported by credible expert testimony.  As such, the market rate and inflationary rate "must be independently established by competent evidence." *Colleen*, 843 F.3d at 331. In determining these rates, there cannot be reliance on unrepresentative timespans. *Trevino*, 804 F.2d at 1519 (holding that it is "impermissible to select a time period over which to compare inflation and interest rates that provides a decidedly aberrational result.").

The Court finds that the total offset method here is supported by Plaintiffs' expert's declaration. Plaintiffs provide a declaration from Neil Steinkamp, Managing Director at Stout Risius Ross, LLC with over 20 years of financial consulting experience.  (Steinkamp Decl. ¶¶ 2–3.) In it, Steinkamp provides three scenarios in calculating Plaintiffs' lost income—one which uses the total offset method, a second scenario which assumes no inflation or wage growth but discounts for present value[19], and a third scenario which considers the effect of inflation and discounts for present value of money. (*Id*. ¶¶ 14–16). The scenarios use a 1.25 percent discount rate based on an interest rate of a 20-year Treasury Note as of July 2020, which the Court finds to be a proper rate. Steinkamp Decl. ¶ 29; *see Pfeifer*, 462 U.S. at 537 (noting that the discount rate should be based on "the best and safest investments."). It

---

[19] In *Trevino*, however, the Ninth Circuit Court held that it was "impermissible . . .  to *exclude* the effects of inflation in determining the size of the lost income stream and employ a discount rate equal to the market rate of interest" because it "denie[d] the injured party any adjustment for inflation while making available such adjustment to the party deemed responsible for the injury." 804 F.2d at 1519 (emphasis in original).

also employs a 20-year average Chinese inflation rate of 2.2 percent based on 2000 to 2019 data from

the World Bank. (Steinkamp Decl. ¶ 29.) The Court finds support for applying scenario three, which

would obtain Plaintiffs the most future lost income under the three scenarios because there would be

a net negative discount value. Nonetheless, Plaintiffs seek using the total offset method even though

it would undercompensate them.  Steinkamp also declares in his opinion that the total offset method

"is the most reasonable methodology" here because "[g]iven the duration of expected damages in this

matter (10 or more years for each Plaintiff) it is reasonable to expect that wage growth for the Plaintiffs

and inflation will, on average over the period, be roughly equivalent, offsetting the impact of either."

(*Id*. ¶ 30.)  The Court therefore finds that total offset method appropriate for Plaintiffs.  Having

reviewed Steinkamp's methodology[20] (*see* Steinkamp Decl. ¶¶ 18–26, Halegua Decl. ¶ 16), the Court

awards Plaintiffs for future lost income as follows:

| Plaintiff | Future Lost Income |
|---|---|
| 1.  Tianming Wang | $226,821 |
| 2.  Dong Han | $63,114 |
| 3.  Liangcai Sun | n/a |
| 4.  Yongjun Meng | n/a |
| 5.  Qingchun Xu | $31,179 |
| 6.  Youli Wang | $38,388 |
| 7.  Xiyang Du | n/a |
| **Total** | **$359,502.00** |

[20] The methodology uses the National Bureau of Statistics' average construction sector wage for 2019 (54,167 RMB) as the expected wage, and uses actual incomes of 0 RMB for Tianming Wang, 24,000 RMB for Dong Han, 35,000 for Qingchun Xu, and 24,000 for Youli Wang based on their declarations of their most recent income. Lost future income is provided for up until Plaintiffs reach 60, the statutory retirement age of China.

c.   Pain and suffering

As for pain and suffering, Plaintiffs seek $700,000 for Tianming Wang and $400,000 for each of the other Plaintiffs. (Pet. for Damages at 25.) While the Court recognizes the pain that Plaintiffs still experience due to their injuries, the Court finds that $300,000 is reasonable and adequate to compensate each of the Plaintiffs for their pain and suffering for the following reasons.

For one, the Court agrees with Plaintiffs that an award for pain and suffering from their physical injuries is not duplicative of an award for their emotional distress for being subjected to forced labor, as both stem from different harms. *See Doe*, 2012 WL 3834867, at *2–3 (awarding distinct emotional distress damages for forced labor and rape). Furthermore, the Court also agrees with Plaintiffs that "the law does not provide a precise formula by which pain and suffering . . . may be properly measured and reduced to monetary value." *Shukla*, 2012 WL 481796, at *13 (internal quotation and citation omitted).  However, any award must be "just and reasonable in light of the evidence." *Spitzke v. United States*, 914 F.2d 263 (9th Cir. 1990) (unpublished).

In providing a basis for calculating pain and suffering, Plaintiffs offer a 2013 CNMI Superior Court case, *Price v. Kan Pacific, Ltd.*, No. 08-0046E, at *4, *17 (N.M.I. Super. Ct. Apr. 23, 2013) (Ex. D to Halegua Decl., ECF No. 180), whereby the trial judge in that matter found a $300,000 award for non-economic damages reasonable for a plaintiff who suffered severe pain and would continue to suffer pain from a fractured rotator cuff from a slip and fall.  (Pet. for Damages at 25.) Plaintiffs argue that because the injuries they suffered are more severe than that experienced by the Plaintiff in *Price*,

higher damages are warranted.  (Pet. for Damages at 25.) Furthermore, the amount they request is much less than damages awarded in other tort cases elsewhere.  (*Id*. at 26.)

However modest Plaintiffs' request may be compared to other awards in different jurisdictions, the Court notes that in the CNMI, non-economic damages that are permitted to compensate for "pain, suffering, inconvenience, physical injury, mental and/or emotional distress, loss of consortium and other non-pecuniary damage" for personal injury cannot exceed $300,000.  *See* 7 CMC § 2922; *see also Indalecio v. Mobil Oil Marianas, Inc*., 2020 WL 118605, 2020 MP 1 ¶ 11 (N.M.I. 2020) (noting that while the jury awarded $600,000 in non-economic damages, the trial court reduced the damages to $300,000 pursuant to 7 CMC § 2922.)  While Plaintiffs pursue damages here under the TVPRA, a federal law, the compensation for pain and suffering they seek here are related to physical injuries incurred during performance of their jobs on the IPI casino site in the CNMI.  Under their state law negligence claim for the same type of injuries, Plaintiffs are limited to $300,000 each for pain and suffering.

Accordingly, the Court finds $300,000 for pain and suffering just and reasonable for each of the Plaintiffs, whom still experience pain from their injuries as further described above. As to Tianming Wang, particularly, the Court finds $400,000 much more appropriate, as he endured severe burns to his leg that still leave him unable to work—let alone to walk or stand for longer than 15 minutes. In awarding Wang a higher amount, the Court notes that it is not bound by the CNMI's statutory cap given that this claim arises under federal law.  The Court therefore awards Plaintiffs a total of $2.2 million for pain and suffering.

/

(3) Punitive damages

As to punitive damages, the Ninth Circuit has held that punitive damages are available under the TVPRA. *See Ditullio*, 662 F.3d at 1094 ("We hold that the TVPA permits recovery of punitive damages because it creates a cause of action that sounds in tort and punitive damages are available in tort actions under the common law.") Here, Plaintiffs seek a 2:1 ratio in punitive damages for each Plaintiff against IPI. (Pet. for Damages at 29.)

The Supreme Court has identified three factors to guide the reasonableness of punitive damage awards: "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). However, of the three factors, the first factor regarding the degree of reprehensibility of the defendant's conduct is "the most important indicium of the reasonableness." *Id.*

In recognizing punitive damages under the TVPA—the predecessor to the TVPRA— the Ninth Circuit noted that "[p]unitive damages are generally appropriate under the TVPA civil remedy provision because it creates a cause of action for tortious conduct that is ordinarily intentional and outrageous." *Ditullio*, 662 F.3d at 1098. Human trafficking, "which Congress described as 'a contemporary manifestation of slavery' . . . obviously meets the common law standards for award of punitive damages because it is both intentional and outrageous." *Id.* (citing Pub. L. No. 106–386, § 102, 114 Stat. 1488 (2000)); *see also Lagasan*, 92 F. Supp. 3d at 458 ("Courts routinely hold that trafficking in violation of the TVPRA is a particularly depraved act that warrants punitive damages.").

Despite the egregious nature of TVPRA violations, courts have frequently awarded punitive damages in TVPRA cases at the same amount of compensatory damages and have found a 1:1 ratio sufficient to deter future conduct. *See, e.g., Lagasan*, 92 F. Supp. 3d at 450, 458 (awarding punitive damages equal to compensatory damages of $369,606 for worker's action against employers who confiscated her passport, forced her to work 18-hour work days for over a year and half for as little as $200 a month, denied her medical care, prohibited her from speaking to anyone, and subjected her to inhumane living conditions.); *Carazani*, 972 F. Supp. 2d at 26 (finding a 1:1 ratio sufficient to deter offenders where defendant forced plaintiff to work as an live-in domestic servant for seven days a week for three years and only paid a total of $8.50, threatened plaintiff with deportation, and recklessly disregarded her health.); *Lipenga*, 219 F.Supp.3d at 532 (awarding punitive damages in same amount as compensatory damage where plaintiff was forced to work excessive hours for three years and was psychologically abused); *Ross*, 325 F. Supp. 3d at 1176 (awarding punitive damages in equal amount as compensatory damages of $3,373,517.20); *cf. Shukla*, 2012 WL 481796, at *15–16 (finding that a 2.5:1 ratio for punitive damages was excessive for a $1 million compensatory damage award and finding that a 1:1 ratio would be more appropriate, even accounting for the "greater reprehensibility of defendants' conduct.").

However, some courts have awarded punitive damages at a 2:1 ratio, or even higher, for TVPRA violations. *See*, *e.g.*, *Arreguin v. Sanchez*, 398 F. Supp. 3d 1314, 1319, 1329 (S.D. Ga. 2019) (awarding punitive damages of $176,532.48, in a 2:1 ratio with compensatory damages, to 13 workers from Mexico who were recruited under false promises, worked for little to no pay, and were subjected to deplorable living conditions for ranges of 6 to 32 days, in manners very similar to the Plaintiffs in

this case); *Doe*, 2012 WL 3834867, at *5 (awarding $2 million in punitive damages despite $1,306,468 in compensatory because case involved forceful rape and sexual assault); *Francisco v. Susano*, No. 10–cv–00332–CMA–MEH, 2013 WL 4849109, at *3-4 (D. Colo. Sept. 10, 2013) (awarding punitive damages of $10,000 per day in amounts over at least ten times the compensatory damages for plaintiffs forced to work between 19 to 39 days); *Magnifico*, 2012 WL 5395026, at *1–2 (awarding punitive damages of approximately $9 million, at 2:1 ratio, to 18 plaintiffs from the Philippines and the United States subjected to forced labor); *Aguilar v. Imperial Nurseries*, No. 07-cv-0193, 2008 WL 2572250, at *1 (D. Conn. May 28, 2008) (awarding 2:1 ratio of punitive to compensatory damages to 12 Guatemalan workers who suffered similar forced labor conditions).

Although the Court recognizes that some district courts have awarded a 2:1 ratio in TVPRA cases, the Court finds that awarding punitive damages in a 1:1 ratio with compensatory damages is more appropriate in this matter.  To be clear, the Court does not condone human trafficking and agrees with the Eastern District of Virginia court in *Lagasan* that trafficking is such a "depraved act." *See Lagasan*, 92 F. Supp. 3d at 458.  Furthermore, Defendants' conduct in this matter as a whole is appalling and IPI played no small part while benefitting from the endeavor.[21]  In fact, IPI was the driving force in why workers were working excessively and around the clock in IPI's rush to complete the casino project in time for opening (*see* FAC ¶¶ 47–49), and it utterly disregarded workers' safety despite being on clear notice of worker unsafety (*see* FAC ¶¶ 50, 131–54, 180, 183–86, 191–92). IPI's

---

[21] Contrary to IPI's assertion, Plaintiffs do not only allege misconduct committed by MCC or Gold Mantis.  (*See* Second Opp'n at 2-4.)  Therefore, punitive damages are appropriate against IPI.

own evidence in support of its opposition to the petition for damages establish how dangerous the work site was almost a year prior to Plaintiffs' accidents.  (*See* Ex. 9 to Ojeda Decl., ECF No. 196-1.) IPI's construction manager's April 2016 reports documented the various safety violations around the Casino Project, including unsafe material stacking, missing guardrail at the edge of steel structure, a worker wearing a safety harness improperly, and another worker not using any fall arrest equipment while working at height. (*Id*. at 43–44, 47, 55.) Despite this clear notice to IPI, the problems persisted. In December 2016, eight months after the report, an OSHA compliance safety and health officer observed workers exposed to fall hazards because they were climbing between levels of scaffolding without continuous protections. (FAC ¶ 136.) Furthermore, IPI harbored and transported Plaintiffs and utterly disregarded the health and sanitation of workers when housing them in repugnant dorms. (*Id*. ¶¶ 193, 201–202; Deleon Guerrero Decl. ¶ 5; Pich Decl. ¶¶ 5–8.)

However, the stake here is a multi-million-dollar judgment, and the Court finds that Plaintiffs were subjected to forced labor during a much shorter period—ranging from 23 days to 7 months— than the plaintiffs in other cases where a 2:1 ratio, or even a 1:1 ratio, was awarded in a multi-million dollar judgment. *See, e.g. Magnifico v. Villanueva*, No. 10-cv-80771, ECF No. 127 at 15 (S.D. Flo., 2012) (ranging from 144 to 559 days); *Alabado*, 2016 WL 5929247, at *14–17 (ranging from 481 to 1,200 days); *Ross*, 325 F. Supp. 3d at 1174 (3,650 days, or 10 years).  Given the large amount of money at stake, the Court also finds that a 1:1 ratio is sufficient to deter defendant IPI from committing or benefiting from any TVPRA violations in the future. An award of punitive damages in the same amount as compensatory damages is therefore more appropriate here.

In sum, Plaintiffs are entitled to a total damages award of $5,916,445.58 as follows:

|  | Emotional Distress | Lost Income | Future Lost Income | Pain and Suffering | Total Compensatory Damages | Punitive Damages (1:1) | Total |
|---|---|---|---|---|---|---|---|
| Tianming Wang | $79,050 | $19,186.04 | $ 226,821 | $400,000 | $725,057.04 | $725,057.04 | $1,450,114.08 |
| Dong Han | $89,250 | $12,839.07 | $ 63,114 | $300,000 | $465,203.07 | $465,203.07 | $ 930,406.14 |
| Liangcai Sun | $62,475 | $6,032.44 | n/a | $300,000 | $368,507.44 | $368,507.44 | $737,014.88 |
| Yongjun Meng | $9,775 | $6,675.46 | n/a | $300,000 | $316,450.46 | $316,450.46 | $632,900.92 |
| Qingchun Xu | $19,975 | $9,312.98 | $ 31,179 | $300,000 | $360,466.98 | $360,466.98 | $720,933.96 |
| Youli Wang | $51,425 | $3,132.52 | $38,388 | $300,000 | $392,945.52 | $392,945.52 | $785,891.04 |
| Xiyang Du | $20,400 | $8,767.28 | n/a | $300,000 | $329,167.28 | $329,167.28 | $658,334.56 |
| **Total** | **$332,350** | **$65,945.79** | **$359,502** | **$2,200,000** | **$2,957,797.79** | **$2,957,797.79** | **$5,915,595.58** |

(4) Offset

Finally, the Court must consider whether Plaintiffs' damages must be offset by the amount paid to Plaintiffs as part of their settlement agreements with Gold Mantis and MCC. Plaintiffs argue that there should be no offset because IPI has no right to contribution under the TVPRA. (Mot. for Reconsideration at 3–4). However, the Court finds those arguments irrelevant because IPI has not filed any claim for contribution. Instead, the question is whether Plaintiffs' recovery is subject to the one satisfaction rule, and the Court concludes that it is.

"The one satisfaction rule reflects the equitable principle that a plaintiff who has received full satisfaction of its claims from one tortfeasor generally cannot sue to recover additional damages corresponding to the same injury from the remaining tortfeasors." *Uthe Tech. Corp. v. Aetrium, Inc.*, 808 F.3d 755, 760 (2015); *see also Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 348 (1971) (noting that "the law . . . does not permit a plaintiff to recover double payment."). "A corollary principle of the one satisfaction rule is that 'payment made by a joint tortfeasor diminishes the claim against the remaining tortfeasors." *Uthe Tech. Corp.,* 808 F.3d at 760 (quoting *Seymour v. Summa*

38

*Vista Cinema, Inc.*, 809 F.2d 1385, 1389 (9th Cir. 1987), *as amended on denial of reh'g and reh'g en banc*, 817 F. 2d 609 (9th Cir. 1987)).  To apply the one satisfaction rule, "there must be such an identity between the injuries alleged and the remedies available that any additional recovery would unjustly enrich the plaintiff." *Id.* at 760–61. Here, the Court finds that Plaintiffs' claims against IPI, MCC, and Gold Mantis all arise from the same injuries and the same scheme of forced labor such that they represent common damages.  Plaintiffs would be unjustly enriched, for example, if Gold Mantis and/or MCC already compensated Plaintiffs fully for their physical injuries that occurred at the IPI worksite and Plaintiffs obtain that same full amount of recovery again from IPI.

Any settlement amount, however, is to be credited towards the total damages.  *See Uthe Tech. Corp.,* 808 F.3d at 762 (noting that in RICO claims, "the 'full satisfaction' to which treble damages claimants are entitled is 'three times the proven actual damages'" rather than three times the reduced proven damages, as "any award less than [the full] constitutes an incomplete recovery." (citing *In re Nat'l Mortg. Equity Corp. Mortg. Pool*, 636 F. Supp. 1138, 1152 (C.D. Cal. 1986)).  Plaintiffs' total damages is therefore reduced by the total settlement amount.[22]

## VI.    CONCLUSION

For the reasons set forth above, Plaintiffs' petition for damages in connection to an entry of default judgment (ECF No. 172) is GRANTED. Default judgment against Defendant IPI shall be entered in the amount of $5,430,595.58.

---

[22] The Court sought an *in camera* review of this total amount through Plaintiffs, with notification to all Defendants of the Court's communication.  All relevant parties have consented to disclosure of the total amount.

The Clerk is directed to enter a civil judgment in Plaintiffs' favor in the amount of $5,430,595.58, plus post-judgment interest at the applicable federal rate, plus attorneys' fees. [23]

IT IS SO ORDERED this 24th day of May, 2021.

_____
RAMONA V. MANGLONA
Chief Judge

---

[23] This judgment amount will be amended to include Plaintiffs' attorneys' fees and costs regarding Plaintiffs' fourth motion for attorneys' fees in connection to default judgment (ECF No. 226).