1

2

3

4

**F I L E D**
Clerk
District Court

JAN 10 2022

for the Northern Mariana Islands
By_____
(Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

5  TIANMING WANG, et al.,            ) Case No. 18-cv-00030

6          Plaintiffs,              )
                                    )
7          v.                       )
                                    ) **CERTIFIED**
8  GOLD MANTIS CONSTRUCTION,        )
   DECORATION (CNMI), LLC, et al., ) United States District Court
9          Defendants.              ) 1671 Gualo Rai Drive
                                    ) Saipan, MP  96950
10                                   )
                                    )
11                                   )
                                    ) December 29, 2021
12  _____) 8:40 a.m.

13

14

15             TRANSCRIPT OF PROCEEDINGS

16              SHOW CAUSE HEARING

17      BEFORE THE HONORABLE RAMONA V. MANGLONA,
                  CHIEF JUDGE

18

19

20

21

22

23

24  Heidi M. Doogan, RPR
    Federal Official Court Reporter
    1671 Gualo Rai Drive
25  Saipan, MP  96950

2

```
 1   APPEARANCE OF COUNSEL:

 2   FOR THE PLAINTIFFS:

 3   BY:   Bruce L. Berline, Esquire
           Berline & Associates, LLC
 4         P.O. Box 5682 CHRB
           Saipan, MP 96950
 5         670-233-3663
           bruce@saipanlaw.com
 6
                    and
 7
           Aaron Halegua, Esquire    (VIA VIDEOCONFERENCE)
 8         Aaron Halegua, PLLC
           154 Grand Street
 9         New York, New York 10013
           646-854-9061
10         aaron.halegua@gmail.com

11   FOR THE DEFENDANT:

12   BY:   Daniel H. Weiner, Esquire  (VIA VIDEOCONFERENCE)
           Hughes, Hubbard & Reed, LLP
13         1775 Street NW
           Washington, D.C. 20006-2401
14         202-721-4600

15   FOR THE THIRD-PARTY WITNESS:

16   BY:   Joey P. San Nicolas, Esquire
           San Nicolas Law office, LLC
17         P.O. Box 10001 PMB 602
           Saipan, MP 96950
18         670-234-7659
           jpsn@sannicolaslaw.net
19


20

21   ALSO PRESENT:

22   Cui LiJie, Third-Party Witness
     Yue Wang, Interpreter
23

24

25
```

1                          − − − − −

2        (In open court:)

3            THE CLERK:  All rise.  The United States District

4    Court for the Northern Mariana Islands is now open and ready

5    for transaction of business.

6            The Honorable Ramona V. Manglona, Chief Judge,

7    presiding.

8            THE COURT:  All right.  Good morning, everyone.

9    Please be seated.

10           MR. SAN NICOLAS:  Good morning, Your Honor.

11           THE CLERK:  If Your Honor please, this is civil

12   action 18-00030, Tianming Wang, et al. versus Gold Mantis

13   Construction Decoration (CNMI), LLC, et al., coming up for a

14   show cause hearing.

15           Will the parties please state their appearance.

16           THE COURT:  Plaintiff?

17           MR. HALEGUA:  Good morning, Your Honor.  This is

18   Aaron Halegua for Plaintiffs.

19           THE COURT:  All right.  Good morning, Mr. Halegua.

20           MR. HALEGUA:  Good morning.

21           MR. BERLINE:  Good morning, Your Honor.

22   Bruce Berline for Plaintiffs, as well.

23           THE COURT:  And, good morning, Mr. Berline.  And then

24   turning around the room.  Let me just recognize the folks in

25   the courtroom.

1          Well, I guess, Mr. Yumul, if you wish, you can have a

2    seat at Counsel's table.  It's a little bit more comfortable

3    over there.

4          MR. YUMUL:  Thank you, Your Honor.

5          THE COURT:  A matter of perspective, but...

6          MR. YUMUL:  Good morning.

7          THE COURT:  Good morning, Mr. Yumul.  And I see you

8    have your --

9          MR. YUMUL:  Tao and Mr. Chi.

10          THE COURT:  Mr. Tao -- Tao Xing, and How Yo Chi is

11    present as well in the courtroom.

12          But as to counsel for IPI, we have Mr.?

13          MR. WEINER:  It's Mr. Weiner, Judge.  How are you?

14          THE COURT:  Good morning, Mr. Weiner, from Saipan.

15          MR. WEINER:  Good morning, Your Honor.

16          THE COURT:  And then, as our third-party witness?

17          MR. SAN NICOLAS:  Good morning, Your Honor.  Joey San

18    Nicolas, appearing on behalf of Ms. Cui Lijie, and she's

19    accompanied by Ms. Wang Yue, Y-U-E.

20          THE INTERPRETER:  Good morning, Your Honor.

21          THE COURT:  Good morning, Mr. San Nicolas, Ms. Cui

22    Lijie, and Ms. Yue.

23          THE INTERPRETER:  Good morning, Your Honor.

24          THE COURT:  Good morning.

25          All right.  The matter's here for, basically, two

1   purposes:  One is the issue of the order to show cause

2   regarding the balance of the TransPerfect payment of $1,065;

3   that's the order to show cause.

4          MR. SAN NICOLAS:  Yes, Your Honor.

5          THE COURT:  I note that there was a motion that was

6   filed by Ms. Cui Lijie for a reconsideration about a finding of

7   contempt.  If you read the Plaintiffs' response, basically, I

8   concur with the Plaintiffs' reading of the procedural posture

9   on this particular motion.

10         MR. SAN NICOLAS:  Yes, Your Honor.

11         THE COURT:  Are you also on -- now, on the same page,

12   Mr. San Nicolas, regarding --

13         MR. SAN NICOLAS:  Yes, Your Honor.  If I may --

14         THE COURT:  -- the order to show cause?

15         MR. SAN NICOLAS:  If I may, Your Honor?

16         THE COURT:  Yes.

17         MR. SAN NICOLAS:  At this time, Ms. Cui has

18   instructed me to advise the Court that her position is that she

19   does concede to the amounts that were assessed by TPS.  Not

20   just the 1,065, but I believe there is an additional, if I'm

21   not mistaken, three -- 3,000.

22         THE COURT:  I think the only issue was the balance of

23   1,065.  There were recognized payments --

24         MR. SAN NICOLAS:  Yes.  Yes.

25         THE COURT:  -- partial payments along the way.

1          MR. SAN NICOLAS:  Yes, Your Honor.  So the 1,065
2    was -- was paid.  Now, with respect to the fees -- the
3    attorneys' fees, at this point the 4,336, and the overarching
4    request for payment for all of the TPS Services, Ms. Cui is
5    prepared to advise the Court that she does not dispute those
6    fees, neither the TPS fees, nor her -- nor the attorneys' fees.
7    And she's willing to make a payment today and make additional
8    payments through -- throughout the next month, Your Honor.
9          THE COURT:  All right.  Just to be clear, so I'm not
10   sure if it's my ears or because of the mask, but it's as to --
11         MR. SAN NICOLAS:  Your Honor, I can take off my mask.
12         THE COURT:  Yes.
13         TransPacific Legal Services, TLS.  That is the
14   invoice that was left unpaid.  There was a deadline under the
15   receipt or the invoice, and that was not paid pursuant to the
16   invoice.  And the protocol required Ms. Cui to pay the services
17   of TLS when it comes to providing information to the Court
18   regarding any of the ESI obtained --
19         MR. SAN NICOLAS:  Yes.
20         THE COURT:  -- in this proceeding.  So...
21         MR. SAN NICOLAS:  Your Honor, so -- so that 1,065 was
22   initially disputed.
23         THE COURT:  Right.  I understand.  I'm just
24   clarifying the identity because --
25         MR. SAN NICOLAS:  Yes.

1          THE COURT:  -- I might have heard something

2    different.

3          MR. SAN NICOLAS:  Now, since -- since October, there

4    has been at least one consultation with Mr. Langton at TPS and

5    that was to retrieve the iCloud information.  And that was

6    pursuant to a protocol, which we do not dispute.  So we

7    anticipate that that additional cost is included in what is --

8    what is the -- should be the balance.

9          THE COURT:  Okay.  So for purposes of the order to

10   show cause, I want to keep it narrow and --

11         MR. SAN NICOLAS:  Sure.

12         THE COURT:  -- simple.  Staying with the 1,065.  And

13   this is on an order to show cause for purposes of a civil --

14   potential civil contempt, not a criminal contempt.

15         MR. SAN NICOLAS:  Yes, Your Honor.

16         THE COURT:  And in this instance, there's the issue

17   of performance of a compliance.

18         MR. SAN NICOLAS:  Yes.

19         THE COURT:  And then there's the issue of the damages

20   for failure to comply.

21         MR. SAN NICOLAS:  And that -- that would be the

22   attorneys' fees, I believe, Your Honor.

23         THE COURT:  Correct.

24         MR. SAN NICOLAS:  And so, Ms. Cui also concedes to

25   that.  We do have a number; however, we don't believe we can

1   pay the entire TPS and the attorneys' fees today, but we can

2   make a substantial payment today, Your Honor.

3          THE COURT:  Okay.  Well, that's one of the most

4   easiest order to show cause that we've had in this matter, I

5   would say.

6          Mr. Berline or Mr. Halegua, my intention is to accept

7   Ms. Cui's acknowledgement of her failure to comply with this

8   lawful, clear Court order to pay the services of TLS.  By

9   finding her in contempt for her failure to pay, given that she

10  apparently has, since the deadline and since the motion for an

11  order to show cause was filed, paid that sum.  The only remedy

12  at this point is to assess the damages, which is Plaintiffs'

13  attorneys' fees.

14         And as to the amount for the attorneys' fee, it is

15  focused on the OSC, not for any other activity.

16         And that is, in fact --

17         MR. SAN NICOLAS:  Yes, Your Honor.

18         THE COURT:  -- Ms. Cui's position?

19         MR. SAN NICOLAS:  Yes, Your Honor.  And with -- if I

20  may continue, Your Honor, with respect to the payments.

21         THE COURT:  And the next question is when will

22  payment be made --

23         MR. SAN NICOLAS:  Yes, Your Honor.

24         THE COURT:  -- for the attorneys' fees?

25         MR. SAN NICOLAS:  Ms. Cui is prepared to make a

1    payment of $6,000 today.

2                THE COURT:  Well, has it come -- is it even up that

3    high at this point, Mr. Halegua?

4                MR. SAN NICOLAS:  What we're aware of is 4,336 --

5                THE COURT:  Okay.

6                MR. SAN NICOLAS:  -- in attorneys' fees, but we

7    anticipate that there --

8                MR. HALEGUA:  Your Honor?

9                THE COURT:  All right.

10               So, Mr. Halegua, for purposes of the attorneys' fees?

11               MR. HALEGUA:  Yeah.  I think things are getting a bit

12   muddled between Mr. San Nicolas and the numbers he's putting

13   out for different -- some of the fees are for TransPerfect,

14   some are our fees.  I agree with the Court, we should keep it

15   streamlined.

16               I think the first question is:  I did not hear any

17   dispute or -- to the fact that she be held in contempt, and I

18   believe it's important that the Court go through that motion of

19   finding her in contempt based on the noncompliance, and the

20   fact that we've been brought to this point.

21               THE COURT:  Yeah.  Mr. Halegua, that is what Mr. San

22   Nicolas has been stating, that she's been authorized -- he's

23   been authorized to admit on behalf of the client, and I'm

24   prepared to accept her admission to having violated the Court's

25   order and find her in contempt.  This only issue is attorneys'

1   fees at this moment in time.

2          MR. HALEGUA:  Okay.  So I just wanted to make sure

3   that was -- that piece was clear as to what she was agreeing

4   to.

5          In terms of the attorneys' fees, I, at Mr. San

6   Nicolas's request, you know, yesterday, the day before the

7   hearing, to Mr. Berline, once it was relayed to me, calculated

8   our attorneys' fees as best as I could.  There was a slight

9   error in the number I sent to Mr. San Nicolas.  It should be a

10  hundred dollars less.  So the total fees are at least $6,008.

11         Oh, I'm sorry.  I'm looking at the wrong number.  The

12  total fee should be as $4,236 for the attorneys' fees up until

13  this point --

14         THE COURT:  Okay.

15         MR. HALEGUA:  -- for Mr. Berline and myself.

16         THE COURT:  Then --

17         MR. HALEGUA:  I just didn't want to -- one thing I --

18  before we get to the TransPerfect.  I would just say that every

19  penny that, you know, Ms. Cui claims that she is unable to pay

20  at this time and needs a payment plan for, is going to be money

21  that Mr. Berline is going to have to put on his credit card in

22  order to charge.  So I just think that should be kept in mind

23  as, you know, as Ms. Cui tells us that she needs more time and,

24  you know, we're the ones who will have to come forward and pay

25  Ms. -- pay TransPerfect's fees while -- while we wait for

1  Ms. Cui.

2          THE COURT:  All right.  So having heard from the

3  Plaintiffs.  Mr. San Nicolas, at this time, and I see Ms. Yue

4  talking to Ms. Cui, I want to make sure Ms. Cui understands.

5          Ms. Cui, you're here in court with an interpreter.

6  And at this time, I am going to accept your admission to the

7  violation of the Court's order regarding the payment of fees

8  for TransPerfect Legal Services, in particular, the previously

9  disputed $1,065.  It was disputed after the due date for that

10  service.  And then Plaintiff was forced to file the motion for

11  an order to show cause at the last hearing.

12          After the motion was filed, but before I granted the

13  motion to issue an order to show cause, you, through your

14  attorney, had indicated you were still going to continuously

15  object to it, and so that triggered more attorneys' fees.  And

16  now we're here to answer -- to have -- to have you fully

17  answer.  And based on your admission, I am going to find you in

18  contempt for failing to pay the fees to TLS timely.  You have

19  since paid that amount, and, so, therefore, no prospective

20  order regarding that payment will be entered.  And that's only

21  as to that particular invoice.

22          Mr. San Nicolas indicated there were some more

23  services rendered.  That, obviously, will be ongoing and

24  separate.  As to the attorneys' fees, that is the damages that

25  I'm going to award Plaintiffs for having to bring the motion

1    for an order to show cause, as well as pursue the motion with

2    the detailed facts to support the finding of contempt.

3          MR. SAN NICOLAS:  If Your Honor could give the

4    translator a minute --

5          THE COURT:  Yes, I'm going to give her a moment.

6          MR. SAN NICOLAS:  -- to translate.

7          THE COURT:  Was there any question from Ms. Cui?

8          MR. SAN NICOLAS:  Yes, Your Honor.  She was inquiring

9    whether this was criminal.

10          THE COURT:  No, it's a civil.

11          MR. SAN NICOLAS:  And I told her it was not.  If

12    Your Honor would like to speak to that, I -- but I just --

13          THE COURT:  Well, you clarified that it's a civil --

14          MR. SAN NICOLAS:  It's civil, yes.

15          THE COURT:  -- finding of contempt?

16          MR. SAN NICOLAS:  Your Honor, she just wanted to get

17    a clarification that there was a statement that the 1065 was

18    submitted and the Court is aware that the 1065 was paid?

19          THE COURT:  Yes, I've acknowledged that.

20          MR. SAN NICOLAS:  And she's inquired --

21          THE COURT:  Yes.

22          MR. SAN NICOLAS:  She's asking whether that is -- the

23    Court is aware.

24          THE COURT:  I am acknowledging it.  The reason why

25    I'm entering the finding of civil contempt is because the order

1    was clear as to when it was due, is when the service is

2    rendered, and it's invoiced by the service provider.  And when

3    you failed to pay it timely, and, despite your argument for

4    reasonable dispute, that, obviously, was not brought back to

5    the service provider.  It was -- from my review of the filings,

6    it appears to be a reading that the purpose for that affidavit

7    was really a part of the litigation that was brought to Court.

8    And it was quote, unquote, "more so in favor of the Plaintiff,"

9    whereas this service provider is like any expert, it's supposed

10    to come up with a finding.  It's not to make an opinion for or

11    against --

12                    MR. SAN NICOLAS:  Yes.

13                    THE COURT:  -- an individual party.  It's for the

14    benefit of the Court.  And so, if there is an error made by

15    this professional, Mr. Langton, on behalf of TLS, and you find

16    another expert to say so, then that will be reasonable.  But

17    obviously we have come this far to conclude that it wasn't an

18    issue of the accuracy of the finding.  It's more of, well,

19    you -- we had an evidentiary hearing, and that witness was, and

20    services was, procured by the Plaintiff, more so for the

21    Plaintiffs' benefit, as opposed to for the Court's benefit.

22                    MR. SAN NICOLAS:  Okay.

23                    THE COURT:  So hopefully that can be clarified.

24                    MR. SAN NICOLAS:  Yes.

25                    THE COURT:  You can clarify that with -- with Ms. Cui

1  through Ms. Yue.

2          MR. SAN NICOLAS:  Your Honor, she says she

3  understands that it is not criminal, yes.

4          THE COURT:  Okay.  So with that finding of civil

5  contempt and that -- that you, basically, purged the contempt

6  for purposes of the 1,065-dollar payment, the issue is damages

7  for violating the order, which is the attorneys' fees that was

8  incurred by Plaintiffs to bring the matter.  And having

9  reviewed everything, even after being noticed by Plaintiff that

10  if there's a failure to pay and Plaintiffs were forced to bring

11  the matter to Court, there will be consequences, well, here it

12  is.

13          MR. SAN NICOLAS:  Yes, Your Honor.

14          THE COURT:  So I am ordering that Ms. Cui, the third

15  party, make the payment.  The attorneys' fees right now is

16  $4,236.  You indicated she had the ability to pay up to 6,000.

17  So --

18          MR. SAN NICOLAS:  Yes, Your Honor.

19          THE COURT:  -- that should be paid today in full to

20  Plaintiffs through, I guess, Mr. Berline, as local counsel.

21  And he can put that in the trust account and get all these

22  other reimbursements done.  That will resolve the current order

23  to show cause before the Court.

24          MR. SAN NICOLAS:  Thank you, Your Honor.

25          THE COURT:  Now, as to final words in regarding that

1    point.  I understand Counsel for Plaintiffs' point about these

2    issues.  It really goes to what I've been saying all along to

3    each and every representative of IPI, whether it be, in this

4    case, Mr. Yumul, understands on behalf of the company, or for

5    Ms. Cui herself, which is, there has to be consequences when a

6    party doesn't comply with a lawful court order.

7         And if the party violates the order and forces the --

8    any other party to incur expenses, that is going to be put back

9    on the person who caused it.  And I just made the comment

10   regarding if there was a reasonable challenge to say the

11   finding of the expert through another expert, that will be

12   reasonable to say that was in error, disallow it.  And I would

13   even think that that professional would own up to it and say,

14   "Mea culpa, I misread something."  That's the way it should

15   work.  But not the -- from what I could determine, it was more,

16   "Well, he prepared it for their benefit," as in Plaintiffs, as

17   opposed to the truth-seeking process that the company was

18   required to do regarding the science of all this ESI.

19        MR. SAN NICOLAS:  Yes, Your Honor.

20        THE COURT:  So to the extent that there's going to be

21   added costs, these will be borne by the -- basically, the party

22   that caused it.  So that is a -- a sensitive -- time-sensitive

23   issue, because, as pointed out, when Ms. Cui did not make the

24   timely payments, Plaintiffs had to step in her shoes and incur

25   the expenses.  So that is not how this was intended.

1          All right.  Let me leave that issue and go to the

2     next issue set for today.  This is basically the big issue

3     we've been dealing with.

4          MR. SAN NICOLAS:  Yes, Your Honor.

5          THE COURT:  The ESI backup data.  And the Court did

6     previously find Ms. Cui in contempt of court for failing to

7     satisfy the Court's order regarding disclosing all the

8     information she had pertaining to at least two pieces of

9     evidence that indicate that there's ESI data somewhere else.

10         One is the finding by TLS that there was a backup

11    data made on the cell phone that she tendered back on

12    March 21st, 2021, I guess, Eastern Standard Time, March 22nd

13    Saipan time, because we were in the future for purposes of the

14    east coast.  And last week I -- before I make the finding of

15    contempt made the simple question of:  Is Ms. Cui aware of not

16    only her iCloud account, but an iTunes account?  And I want to

17    correct myself, because I believe and hope that -- Counsel can

18    correct me if I'm wrong -- it's not technically an iTunes

19    account, but it's, basically, using the iTunes application to

20    extract data (DAT-auh) or data (DATE-auh) from a device, which

21    is called making a backup, and then transferring all that data

22    to another device.  And so it is, nevertheless, a use of that

23    application with some indicia that there was backup done.  So

24    that means there's data that was placed somewhere.  And we've

25    been trying to find out where that somewhere was, and that's

1    what we're looking for as an explanation.

2            MR. SAN NICOLAS:  Yes, Your Honor.

3            THE COURT:  So that's based on physical evidence that

4    was found by TLS.  I have not seen or heard any reading or

5    discussion about this particular evidence until this, I guess,

6    amended declaration that was just filed -- things are kind of

7    moving kind of quickly again -- was it just yesterday, from

8    Mr. Estrellado, yesterday?

9            MR. SAN NICOLAS:  Yes, Your Honor.  If I may explain.

10           THE COURT:  So that will be the first issue and then

11   we'll talk about the QQ.com account.  So let's stay with the

12   first issue.

13           MR. SAN NICOLAS:  Yes.

14           THE COURT:  I saw late yesterday afternoon there was

15   some filings and I -- that indicate some individuals

16   accompanied Ms. Cui to the Computer Electronic Outlet here in

17   Saipan --

18           MR. SAN NICOLAS:  Yes, Your Honor.

19           THE COURT:  -- on March 22nd, 2021.  As well as

20   another -- and that's based on a declaration by, is it a

21   Mr. Hongdan Chen --

22           MR. SAN NICOLAS:  Yes, Your Honor.

23           THE COURT:  -- as well as Ms. Guan Manni?

24           MR. SAN NICOLAS:  Guan Manni.

25           THE COURT:  And she we know from the prior hearings.

1    That she accompanied, not only Ms. Cui, but two other

2    individuals, a Mr. Liu and Ms. Zhu.

3            MR. SAN NICOLAS:  Zhu.

4            THE COURT:  And that pertains to the cell phone that

5    was subsequently sent to New York, so there are two, shall we

6    say, locations or particular areas.  So based on all that

7    training, apparently, you had at least an hour-and-a-half of

8    training; do you have any updates --

9            MR. SAN NICOLAS:  Yes, Your Honor.

10           THE COURT:  -- to explain this information that we've

11   been looking for?

12           MR. SAN NICOLAS:  Yes, Your Honor.

13           She did -- she was trained last Thursday by

14   Mr. Estrellado, who was assisted by Mr. How Yo Chi.  Since

15   then, we have been advised by Mr. Estrellado, I think provided

16   it in his own declaration, that -- and this was also something

17   that we were considering even prior to his advice, which was

18   getting to the actual time and date of the backup.  We do not

19   dispute -- we have nothing to dispute a backup occurred on

20   March 22nd.  In fact, Mr. Estrellado acknowledged that there

21   was a backup on March 22nd.

22           THE COURT:  Just by looking at that Plist file?

23           MR. SAN NICOLAS:  Yes, Your Honor.  So by -- by

24   figuring out what time that it occurred, we -- we will know

25   that it will either have been done by one of the -- some

1    individual who had contact with it.  We -- we want to find out

2    whether it was done by the Computer Electronic Outlet store.

3         Again, we maintain that there was never any

4    instruction to do a backup or to delete anything from her

5    phone, other than to just fix it.  But we -- we would like to

6    know exactly what time.  And I -- Counsel has already reached

7    out to Mr. Langton, sent him an e-mail, I haven't received a

8    response, but we -- what we understand is the Purplebuddy List,

9    the Cellebrite report that Mr. Langton refers to in his initial

10   report, shows the exact time and date.  That's not reflected in

11   the report, it's just a -- like a snippet of that Cellebrite or

12   Pbuddy List.  So the entire page would actually show, and this

13   is according to Mr. Estrellado.

14        And we have also consulted with another expert out of

15   Miami, and he -- he confirmed that that's -- that's the way to

16   kind of pinpoint exactly when that happened.  And so if -- if,

17   in fact, it happened --

18        THE COURT:  When you say "pinpoint," we're talking

19   about date and hour versus --

20        MR. SAN NICOLAS:  Yeah.

21        THE COURT:  -- pinpoint location?

22        MR. SAN NICOLAS:  If we know the date and hour, then

23   we know it's at the computer outlet store.  If -- if it shows

24   the date and the hour on -- as to when it occurred, then --

25   then that will reveal where it was done, in our opinion.

1  Because those are the only -- that was the only computer store

2  that she went to on that day, and Guan Manni.  And Guan Manni

3  has already stated that she did not do a backup.

4         So what we are requesting from Mr. Langton is the

5  entire P- -- Pbuddy List, so that it could show --

6         THE COURT:  Have you made that -- submitted that

7  request from him?

8         MR. SAN NICOLAS:  We -- we sent him an e-mail,

9  Your Honor.

10         THE COURT:  Okay.

11         MR. SAN NICOLAS:  We haven't received -- I could

12  provide a copy, we sent it several days ago to Mr. Langton.  We

13  didn't receive it.  But we don't think it should be that

14  difficult, because he already has the entire report.  What he

15  provided for in his July initial report was that, according to

16  the PBuddy List, there was a backup on that date.

17         What we'd like to know, and if he shows us the entire

18  page, it will show us the exact time, it's called a time-stamp,

19  and that's -- that's important, according to Mr. Estrellado and

20  Mr. -- his name is Jesus Pena from E Forensics in Miami.  That

21  that could tell you exactly when it happened.  And if it

22  happened at the same time that she was at the Computer

23  Electronic store, then we know where it happened, and we would

24  have to pursue a -- Computer Electronics Outlet.  According to

25  Mr. Hongdan, who's provided a statement, he claimed that he did

not fix it.  And that he gave the phone back.  However -- yes, that he had diagnosed it, but was not able to fix the phone. If we had information that it was, in fact, the backup was created at the time that -- that Ms. Cui was there, then we would know where to go to to get that data.

If we -- if it requires a subpoena, Your Honor, we would issue the subpoena.

THE COURT:  I mean, Mr. Chen's declaration talked about diagnosed the phone, but we don't know what activity, what actions he took.  Did he -- you know, we don't know the details of that diagnosis.  And I'm not sure what the fix was for.

MR. SAN NICOLAS:  Well, if Your Honor would recall, according to Ms. Cui, she had always had issues with her phone, this WeChat or -- would -- would just disappear or there would be the Circle of Death that would occur, and she would occasionally bring it to Guan Manni and she would bring it -- and she did -- and she brought it to Computer Electronic Outlet on that date.  So we have no reason to believe that it did not occur.  In fact, Mr. Estrellado concurs with Mr. Langton that some backup happened.

What Ms. Cui is saying, she had nothing to do with a backup on that date.  But if there was, then it would -- we would want to know exactly what time it was so we could use that as a basis to pursue Mr. Hongdan Chen for more

1   information.

2          THE COURT:  Okay.  So, basically, the current

3   explanation for this Plist file that indicates that there was a

4   backup, the current explanation is, it must been based on some

5   visit to someone that Ms. Cui turned to, to get assistance to

6   fix her phone, whether it be Computer Electronics Outlet,

7   through the owner, Mr. Hongdan Chen, or even Ms. Guan Manni,

8   who at least had a limited access to the phone.  Although her

9   statement is she used her own WeChat phone number, but no

10  reference at all to any use, either by herself, or by Ms. Cui

11  or anyone else for an iTunes account.

12         MR. SAN NICOLAS:  Yes.  With -- with respect to

13  Mr. Guan Manni [sic], yes.

14         THE COURT:  It's silent, is what I'm saying.

15         MR. SAN NICOLAS:  Yes.

16         THE COURT:  There's no reference at all as to a use

17  or lack of a use of an iTunes application to backup the cell

18  phone; why is that?

19         MR. SAN NICOLAS:  From Ms. Guan Manni?

20         THE COURT:  Yes.

21         MR. SAN NICOLAS:  Well, she has -- as an officer of

22  the Court, it was inquired of her, and she said she had nothing

23  to do with the -- any backup to iTunes.  We could have -- make

24  it so that it can be amended and provided to the Court, but...

25         THE COURT:  Yes, that's the issue.

1          MR. SAN NICOLAS:  Yes.  Yes.  Yes.

2          THE COURT:  Not -- not only explaining why and how it

3    could happen, but to the individuals who had access to the

4    phone around that date, whether any of them used the iTune

5    application.

6          And you're saying Ms. Guan Manni did not use the

7    iTunes application on this device.

8          MR. SAN NICOLAS:  Yes, Your Honor.  And that we will

9    seek an amendment of that.

10          THE COURT:  You can amend her declaration to reflect

11    that.

12          MR. SAN NICOLAS:  Yes.  Yes.

13          THE COURT:  Now, as to Mr. -- is it Mr. Liu?

14          MR. SAN NICOLAS:  Hanqin Liu, Your Honor.

15          THE COURT:  Hanqin Liu, yes.  I mean, there was

16    passwords given to the technician.  So are we talking about

17    passwords to iTunes, Apple ID password?

18          MR. SAN NICOLAS:  Yes, Your Honor, it's exactly that.

19    It's an Apple ID.  And what we understand is that it is iTunes

20    as well.

21          THE COURT:  So the likelihood right now then is, the

22    iTunes backup occurred at Mr. Chen's shop or store, the

23    Computer Electronics Outlet?

24          MR. SAN NICOLAS:  That is what we wish to confirm,

25    Your Honor.  We suspect it, but we would need the time-stamp

1    that's reflected on the Purplebuddy List report.

2               THE COURT:  If the time-stamp was obtained, would

3    that even identify the device that was used?

4               MR. SAN NICOLAS:  Well, it would identify the exact

5    time.

6               THE COURT:  Understood, that's already clear.

7               MR. SAN NICOLAS:  And we would hope that there could

8    be some identification of -- of a computer.

9               THE COURT:  Mr. Estrellado did not make that clear

10   for you?

11              MR. SAN NICOLAS:  Um...

12              THE COURT:  You're relying on Mr. Estrellado's

13   expertise at this point, right, to tell you?

14              MR. SAN NICOLAS:  Yes, Your Honor.  Mr. Estrellado

15   and Mr. Pena, who was -- who's been communicating with Mr. How

16   Yo Chi, Your Honor.

17              THE COURT:  Okay.  I'm already clear about the fact

18   that Mr. Estrellado concedes that based on this plist  file

19   that there was a backup on an iTunes application.  And the date

20   seems to be well-taken based on the declaration from

21   Mr. Langton from TLS.  The date and time would, basically,

22   convince Ms. Cui, as well as, I guess, Mr. Chen, that -- that

23   backup occurred at a time, let's say, if it was in the middle

24   of the night, Mr. Chen would say, "See, you weren't here."

25              If it was during the working hours, likely.

1              MR. SAN NICOLAS:  There is a time frame that we know

2      that she was there.  And if it's within that time frame, then

3      we -- we believe that the information should be with -- with

4      Computer Electronic Outlet.  If it's outside of that, then,

5      Your Honor, then we -- we can confirm whether it was at

6      Computer Electronic Outlet, based on the time-stamp that is on

7      the P- -- Pbuddy List, Your Honor.

8              So we've already made the request to Mr. Langton, and

9      we would hope that he can give us the -- he already did the

10     report.  It's just that he only gave a small snippet of -- of

11     the Purplebuddy List report, and that's actually attached as

12     Exhibit 3, I believe, to his July -- his first declaration,

13     Your Honor.

14             THE COURT:  Well, we have the reports that were made.

15     And you say the reports does not contain this particular

16     information you're looking for?

17             MR. SAN NICOLAS:  No, Your Honor.

18             THE COURT:  All right.  Let me then turn to the

19     Plaintiffs for any comments or concerns.

20             Mr. Halegua?

21             MR. HALEGUA:  Thank you, Your Honor.  This all seems

22     very reminiscent of, you know, a time where there was a lost

23     SIM card and we tried to place that on a third party and say it

24     was all the fault of Fely Forbes.  It's also very reminiscent

25     of when we were told, you know, that Mr. Estrellado put

something in his sworn declaration, but then counsel stood

before us and said, "Oh, we" -- "you know, we have this plan,

we need to subpoena everything from Apple.  We need to spend

three weeks doing this and analyzing this, that, and the

other."  And it turned out that that was completely

unnecessary.  And as far as I know, I don't think we've even

heard the result of this Apple subpoena.

        I think it's just a continued pattern of sending us

on wild goose chases for information that either, A, was

available six months ago or they could have started pursuing

six months ago, or is completely not relevant, without getting

to the heart of the matter.  I think there's an extreme

problem, that, one, again, we, basically, have Counsel

testifying to matters that he is not expert in -- with no

offense to Mr. San Nicolas, but I think self-admittedly so.  If

Mr. Estrellado was -- you know, has something to say, he put it

in a declaration.  He knows how to do that.  Right.

        If they spoke to someone in Florida, that person

also -- Mr. San Nicolas knows how to prepare a declaration and

put it before this Court.  You know, we are asking that Ms. Cui

be put in jail for the fact that the last six months they knew

about this iTunes file and backup and have done, essentially,

nothing to explain that to Plaintiff and the courts.  But now,

they cannot be bothered to have these people appear themselves

at this hearing.  They can't even put forward a declaration

1    under the penalty of perjury to say what Mr. San Nicolas is now

2    telling us.  My understanding, and I don't claim to be an

3    expert, is -- because this was never really raised -- is that

4    you can't tell the precise time from the Plist file, and it's

5    not going to give you the information that you want to give.

6    And this is all just another wild goose chase.  And then we're

7    going to get into a fight back and forth about whether or not

8    this file has a time-stamp or should have the time-stamp or

9    whatnot.

10           But I think Mr. San Nicolas, under the Court's

11   questioning, answered what we want to know anyway:  It doesn't

12   really matter what the time-stamp shows, according to them,

13   despite having for six months not admitted that there ever was

14   an iTunes application used and there was never a backup made,

15   and there was no initialization that occurred, right, now they

16   seem to be conceding that six months later.

17           And according to them, the only possible place that

18   it could have occurred, regardless of what the time-stamp

19   shows, is allegedly this computer store.  So how come six

20   months ago, you know, we don't have a subpoena to Mr. Hongdan

21   Chen?  I just want to point out that Ms. Cui -- all the

22   declarations that were submitted to the Court this morning or

23   yesterday, literally add no new information that we did not

24   already know.

25           Ms. Cui in her initial ESI declaration, which was

1  June 10th, 2021, talks about going to the Computer Electronic

2  Store.  We knew that in June.  It is not in dispute.  It was

3  always known and accepted that she went to the computer store,

4  right.  Ms. Cui knew that.  How Yo Chi knew that.  All these

5  people who went with her knew that.  Her Counsel knew that.

6  Right, this is not new information:  Oh, my gosh, all of a

7  sudden there was this time she went to the computer store, and

8  they must have done something, right.

9          They knew that she went there in June.  Mr. Langton

10  found this file in June, July, August.  And then in the

11  subsequent months they've done nothing.  They never requested

12  this Plist file to say we need to determine the time, right.

13  They never subpoenaed Mr. Chen.  They never came forward and

14  said, "We think that he, you know, without my permission,

15  apparently, you know, did a backup of my phone onto his

16  computer, deleted everything off of my phone, and installed

17  this backup back onto it."  If that's the allegation of what

18  happened, first of all, we have this statement from Hongdan

19  Chen that's not even under oath, so it's worth, essentially,

20  nothing.  So why is -- why in the past four months has Mr. San

21  Nicolas, who knows very well how to issue a subpoena and told

22  us all about how he did one before, why has he not subpoenaed

23  this person?  Why has he not subpoenaed this computer?  Why

24  haven't we taken all of these actions in the last four months?

25          Instead, here's four declarations that tell us

1    exactly what we already know, right.  Here's a training for
2    Ms. Cui, as if the training were the end in itself.  The point
3    of the training was so that Ms. Cui could then tell us:  Okay,
4    did you have an iTunes application?  Was something created?
5    Instead, we have the training that happens.  We get four
6    declarations that tell us things we already know.  And we get
7    nothing from Ms. Cui, right.

8          So what's the result of this 1.5-hour training?
9    Nothing.  Right.  No declaration.  So Ms. Cui does not feel
10    compelled to clarify the fact that she made this bold statement
11    under oath in her declaration about no iTunes being used, never
12    being used, she never directed it being used.  It sounds like
13    today she's conceding and admitting that an iTunes backup was
14    made and installed onto her phone.

15          I just think that we've been given the runaround for
16    so long and so many times, and the one obvious path, if Ms. Cui
17    was interested in actually getting the truth as opposed to
18    hiding it, would have been to pursue whatever happened at this
19    computer store.  Instead it was obfuscation, no backup
20    occurred.  Even sitting here today under the threat -- Your
21    Honor's threat of  imprisonment at the December 22nd hearing,
22    apparently, that doesn't inspire even the thought to have a
23    sworn declaration or the idea to issue a subpoena.  Instead,
24    let's go on this wild goose chase of looking for the
25    time-stamp.  Even though there's only one possible source of

1    where this may have occurred.

2            I think it's time for the games to stop, frankly,

3    Your Honor.  I think we're all very fed up by this and being

4    taking down roads with no logical reason and no logical

5    expected beneficial outcome.  And I think we know what needs to

6    be done.  I think Ms. Cui should be under a penalty.  The ball

7    is in her court to get the evidence, to come forward, and

8    explain exactly what happened.

9            And until you do, it's not our job, or the Court's

10   job, to spoon-feed you the next step every time.  To tell you

11   to issue a subpoena.  To tell you to compel, you know, the

12   person to come for deposition.  To subpoena evidence.  Right.

13   You gather the evidence.  You make your case.  And then the

14   sanction will be lifted.  Until you do, I think, you know,

15   that's great, the sanction should continue to accrue.

16           I personally do not believe, based on what we've seen

17   and the four declarations that were submitted yesterday, that

18   the $200 sanction is sufficient for the billionaire Ms. Cui to

19   feel compelled to do very much of anything.  I think we now

20   have firm evidence of that.

21           And I think she should be under a meaningful

22   sanction.  And when she feels that she has purged that

23   contempt, she can notify the Court of that fact.  Otherwise, I

24   think we come back here every week, and, basically, have to

25   write the script for her of the next thing we would like her to

1    do.  But, really, the burden should be on her.  She's known

2    about this fact for more than four months.

3              Thank you, Your Honor.

4              THE COURT:  Thank you, Mr. Halegua.

5              All right.  Mr. San Nicolas, this is on your client

6    for her ongoing order to show cause regarding --

7              MR. SAN NICOLAS:  Yes, Your Honor.

8              THE COURT:  -- the ESI data, having found her in

9    contempt last week and trying to get all of this explanation.

10   What is your final response?

11             MR. SAN NICOLAS:  Yes, Your Honor.  In response to

12   what Mr. Halegua stated, Ms. Cui has never conceded that she

13   had anything to do with any backup.  She's never conceded that.

14   What she concedes is that there appears to be a backup that was

15   made.  And what she wants to find out is who did it.  She's

16   saying that she had nothing to do with it, that it could have

17   been done at the Computer Electronics store.  And we have every

18   intention of pursuing that.  We did -- Mr. Halegua can attest

19   to it, did reach out to request for stipulation to continue

20   this so that we could get all of our experts ready and get

21   something from Mr. Hongdan Chen in order to present, but time

22   was not on our side.

23             What we did is we got a statement.  We've already

24   reached out to another expert.  And we've gotten already a

25   request by Mr. Estrellado to get the Purplebuddy List, and

1    we've reached out to Mr. Langton for that information.

2         We are on the same side when it comes to finding out

3    when it was made and how it was made.  We've disputed that she

4    had anything to do with it.  We have no reason to dispute

5    Mr. Langton's contention that it was created, but we are saying

6    she, Ms. Cui, did not put up a Guan Manni or a Hongdan Chen or

7    anybody in this world to backup her data on March 22nd, 2021.

8         So what we're asking --

9         THE COURT:  What -- but she did reach out to people

10   to fix her cellphone.

11        MR. SAN NICOLAS:  That is correct.  She's reached out

12   to people to fix it.

13        THE COURT:  So her words is to fix it, and the

14   recipient who knows how to handle cellphones will say, "Well,

15   you do things like backup."

16        MR. SAN NICOLAS:  Yes, Your Honor.

17        THE COURT:  And you're saying they're not one in the

18   same?

19        MR. SAN NICOLAS:  Well, to fix it means to restore

20   the WeChat or the phone.

21        THE COURT:  How do you restore data?

22        MR. SAN NICOLAS:  Exactly, Your Honor.  And so what

23   we want to know is if -- if Mr. Hongdan Chen did do it on that

24   day, then we -- we need to pursue him for that.  We have --

25   he'd been approached before, he said that he did not --

1          THE COURT:  Wouldn't that be not to pursue him, but

2     it's -- it's Ms. Cui?  And I just focused you on these -- we're

3     not playing semantics here.  Her words are to fix the phone.

4     She didn't want to go to IT&E and buy a brand new one, saying

5     the device is not working.  She's saying, "I've been using this

6     phone.  I want this one fixed."  Why?  Because you just said,

7     she wants that information in there, it's the data, that's the

8     difference.  Yes?

9          MR. SAN NICOLAS:  Your Honor, the main reason for

10    Ms. Cui wanting to -- to phone -- to use her phone is to take

11    pictures and to use WeChat, that's primarily what she used the

12    phone for.  But it wasn't for there to be an iTunes backup, to

13    take -- take information and restore it.  I mean, that's not,

14    in her mind, what was requested.

15         Now, if it was done and we know that it's -- it's in

16    Mr. Hongdan Chen's possession or in his computer, then we will

17    pursue that.

18         THE COURT:  Even if it's solely for WeChat and photos

19    only and not for music, videos, or any other mediums, the point

20    is, she wanted the photos she took to be restored or have

21    access to it when it somehow -- when the device somehow failed

22    to give her access as opposed to basically getting a new

23    cellphone to take photos with.

24         MR. SAN NICOLAS:  Yes, Your Honor.

25         THE CLERK:  Getting a new cellphone with a new phone

1    number to communicate via WeChat.  It's like picking up another

2    phone.

3              MR. SAN NICOLAS:  Yes, Your Honor.

4              THE COURT:  And that's the point is the "fix the

5    phone," may be her choice of words, but it's, in the ESI world,

6    it's, well, that means I need to find and gain access to your

7    account so I can get the data.  Otherwise, open up a new cell

8    phone SIM card number and take new photos; move forward.

9              MR. SAN NICOLAS:  Well, Your Honor, fixing the phone

10   for Ms. Cui is merely to be able to access WeChat.  Her request

11   was never to back anything up.  Now, if there is a backup, then

12   we'd like to get it too so that we can present it to the Court.

13   That has always been the order of the Court.  So we don't --

14   we're not trying to hide -- hide the ball here.  We want to

15   find it just as much as Mr. Halegua wants to find it.  And we

16   think this is the way that we can do it, Your Honor, is by

17   getting that.

18             And we will -- we will prepare the subpoena.  And we

19   will try to obtain that ESI data from Mr. Hongdan Chen, but we

20   would also like to get the information from Mr. Langton that

21   really pinpoints the time and date.

22             And according to Mr. Estrellado, that is contained

23   within the Pbuddy List report.

24             THE COURT:  Now, assuming that the report for that

25   Plist file will indicate that the timing of the backup occurred

1    during the visit at Mr. Chen's shop.  You go back over there,

2    what do you expect to do and find?

3              MR. SAN NICOLAS:  Oh, we're going to subpoena.

4              THE COURT:  But what's going to happen?  What are you

5    going to subpoena?

6              MR. SAN NICOLAS:  Mr. Hongdan Chen, and we will ask

7    him, or we'll depose him, or we'll get the computer that was

8    supposedly used for the -- for the backup, if it's, in fact --

9    he -- if he is, in fact, the one who did it.

10             THE COURT:  Are you not able to go over there and

11   just ask him that right now without a subpoena?

12             MR. SAN NICOLAS:  We've attempted in the past, Your

13   Honor, and we were not successful.  All we got was the

14   statement that he diagnosed it, and that was it.  And he did

15   not fix it.

16             So, yeah, yes, Your Honor, we -- we are going to use

17   that opportunity, use this opportunity, to get it from him

18   through a subpoena.

19             THE COURT:  According to Mr. Lui's declaration,

20   paragraph three:  When we entered the store, I handed Ms. Cui's

21   phone to the technician to fix her phone.  I saw Ms. Zhu give

22   the account passwords to the technician.  After waiting --

23   paragraph four:  After waiting for roughly 20 minutes or more,

24   the technician came out and gave me back the phone.

25             So you're saying that 20 minutes, there -- there was

1  no access to an iTunes application to backup the cellphone?

2            MR. SAN NICOLAS:  At that point, no.  There was no

3  access to WeChat or iTunes.  She brought it to -- she

4  subsequently brought it to Ms. Guan Manni, who mana- -- who by

5  the time the phone was brought to Ms. Guan Manni, she was able

6  to access the -- the phone.  It was -- it was -- somehow it was

7  restored.

8            THE COURT:  And that's the backup?

9            MR. SAN NICOLAS:  Yes.

10           THE COURT:  All right.

11           MR. SAN NICOLAS:  So what we think is whatever

12  happened in those 20 minutes, what could have occurred was the

13  backup, was the backup that Mr. Langton is referring to.

14           THE COURT:  So now that is the explanation?

15           MR. SAN NICOLAS:  Yes.

16           MR. HALEGUA:  Sorry, could you repeat that?  I really

17  did not understand.  What -- what is now the explanation?

18           THE COURT:  Mr. Halegua, I just pointed out that

19  according to Mr. Lui's declaration, Ms. Cui's phone, basically,

20  was tendered to a technician to -- to a technician over at

21  Computer Electronics Outlet in Garapan, with a password.

22           MR. HALEGUA:  Right.

23           THE COURT:  And in that 20 minutes, they come -- came

24  out, gave back the cellphone.  And from the outlet, they went

25  over to Ms. Guan Manni, and that's when she was able to access

1    the WeChat app.  But in order to access the WeChat app, it had

2    to be restored at the -- at the outlet without that 20-minute

3    fixing.  It was not the ultimate one, but it's a step.  It was

4    to restore, and then go to Ms. Guan Manni to get the actual

5    WeChat to work.  So the data was actually restored by the

6    technician.  So it's all in that 20 minutes.  And that's what

7    Mr. San Nicolas believes would be shown, that if it's down to

8    that period of time.

9                MR. HALEGUA:  I --

10               THE COURT:  And I think the question is:  Was the --

11   a technician -- is the technician the same person as the owner,

12   Mr. Hongdan Chen?

13               MR. SAN NICOLAS:  Yes, Your Honor.

14               THE COURT:  Okay.

15               MR. SAN NICOLAS:  It's a husband and wife,

16   Your Honor, owners.

17               THE COURT:  It's a husband-and-wife shop?

18               MR. SAN NICOLAS:  Yes.

19               THE COURT:  Okay.

20               MR. HALEGUA:  Your Honor, may I ask one clarifying

21   question?

22               THE COURT:  Yes.

23               MR. HALEGUA:  So, Mr. San Nicolas, what is -- you say

24   you have the time window.  What is the period of time that they

25   were at the shop?

1          MR. SAN NICOLAS:  On the 22nd between --

2          MR. HALEGUA:  Yes.

3          MR. SAN NICOLAS:  One moment, Your Honor.

4       (Pause in the proceedings.)

5          MR. SAN NICOLAS:  A time period of between 12 and

6   maybe one -- 1:30.

7          THE COURT:  Twelve noon to 1:30 in the afternoon?

8          MR. SAN NICOLAS:  About -- about that time frame.

9   She knows that she was at Ms. Guan Manni's by 2 o'clock.

10          THE COURT:  I'm sorry, she knows?

11          MR. SAN NICOLAS:  Ms. Cui says that she recalls being

12   at Ms. Guan Manni by about 2 p.m.  So about an hour before she

13   went to Ms. Guan Manni, she went to the Computer Electric

14   Outlet in Garapan.

15          THE COURT:  Okay.

16          MR. HALEGUA:  Your Honor, I'm not going to rehash the

17   objections I've made so far.  I mean, I do think we've been

18   down this road.  I think what is happening is entirely

19   inappropriate, which is we have Mr. San Nicolas, basically,

20   testifying, once again, about what fix means to Ms. Cui, right.

21   Pulling words from a declaration, an unsigned declaration of

22   Hongdan Chen, that we don't even know if it was translated.  We

23   don't know if his first language is English, it's not

24   notarized.  It's not under perjury.  Using the word fix to

25   suggest what that means to Ms. Cui and what instructions were

1    given.  Once again, Ms. Cui did not even feel the need to

2    submit a declaration after Your Honor told her the gravity of

3    what we're talking about, you know, told her that the next step

4    is imprisonment.  We don't have any explanation from her as to

5    what her expectations were at that store, what she learned from

6    her training, why she gave the passwords to him.

7            I think there's a very -- I mean, there's also a very

8    critical point, we're not just talking about making a backup.

9    We are talking about, according to Mr. San Nicolas, what would

10   have had to happen is that Hongdan Chen, or whoever did this,

11   would not just create a backup of her phone, or have a backup

12   from somewhere, right, they need to wipe clean all of the data

13   that was existing on the phone.  I would be shocked if a

14   technician came forward and said, "I decided to wipe clean this

15   person's entire phone without their permission."  It will come

16   out, I suppose.

17           But I think even this story that we're being spun, as

18   if this sort of rogue technician in 20 minutes, you know, just

19   decided to delete everything off her phone and had a backup

20   from somewhere that he installed back on it, is extremely,

21   extremely suspect for so many reasons.  But be that as it may,

22   we do not have a declaration -- declaration from Ms. Cui, all

23   we have is sort of this test- -- you know, quote, unquote,

24   "testimony" from Mr. San Nicolas.  And we have the  fact that

25   they just slept on all of these things for four months, right,

1   waiting until Plaintiffs and the Court closed down all of their

2   other explanations and then we're going to come back to:  Okay.

3   Great.   Now, we can finally pin it on Hongdan Chen, or whoever

4   the technician is.

5         Again, it's about a burden.  She's been found in

6   contempt.  We have the physical evidence.  She's had four

7   months.  Don't think it's Plaintiffs' job or the Court's job to

8   try to take these snidbits of declarations and facts and

9   potential, possible theories being spun by Mr. San Nicolas and

10  try to make a coherent case for it, right.  The burden is now

11  clearly on her to come forward and say:  You put together your

12  package, right.  Give us the sworn declarations.  Give us the

13  physical evidence.  Give us the expert declarations.  When you

14  think you have an explanation that is plausible, we will look

15  at it.  We will respond.  And we will consider purging the

16  contempt.

17        Right now, what's being asked is, basically, for

18  Your Honor and myself to try to make sense of what I would say

19  purposely makes no sense, right.  Because they are -- it's

20  quite clear to me that they've been hiding the ball for a very,

21  very, very long time.  And it's not that they've had a, you

22  know, come to Jesus moment all of a sudden, and it's all going

23  to be clear.  It's been games and hiding for four months.  It's

24  still games and hiding about we're going to send this guy,

25  right -- I mean, why don't we have a declaration from

1    Mr. San Nicolas about all of the steps he's taken in the last

2    four months to get Hongdan Chen to turn over his computer,

3    right?  To tell him what steps he took.  Asking him about

4    whether he wiped clean the phone.  That he went there on this

5    day.  He went there on that day.  Right.  There's none of that.

6    There's literally no evidence in the record to show that

7    they've done anything to pursue this prior to yesterday.

8              So I think they're taking us on another wild goose

9    chase.  I can easily say they haven't met their burden of

10   providing an explanation.  And I strongly caution against it

11   becoming the Court's problem and our problem to come up with an

12   explanation.  I believe that burden rests with Ms. Cui.  And

13   until she can meet it, I think she should be under very severe

14   sanctions because nothing's motivated her in the past four

15   months for Ms. Cui to come clean and tell us what happened.

16             THE COURT:  All right.  I think I've heard enough

17   arguments on this issue of the iTunes backup, as shown by the

18   physical evidence through the June 2021 report regarding a

19   March 22nd, 2021, Chamorro Standard Time, I guess March 21st

20   Eastern Standard Time backup.

21             Before I act and address that point, let me turn to

22   the other issue that was raised as some evidence.  This time

23   it's not physical, but the testimonial evidence regarding the

24   QQ account that was witnessed by Ms. Fely Forbes regarding the

25   cellphone that showed her Apple ID.  So, that's the last of the

1    evidence --

2              MR. SAN NICOLAS:  Yes.

3              THE COURT:  -- regarding ESI that says there's

4    evidence to show there's another source of ESI that has not

5    been produced.  Mr. San Nicolas, what is your response?

6              MR. SAN NICOLAS:  Yes, Your Honor.  As we understand

7    it, the QQ account was with respect to the iCloud.  That is

8    when Ms. Forbes was asked to do a backup for her new phone so

9    that she could back up into the iCloud and then bring that --

10   that information, that ESI, back into the new phone that was

11   purchased at IT&E.  And it was during that moment when Ms. --

12   according to Ms. Forbes, she said that she noticed a QQ

13   account, Your Honor.

14             Ms. Cui maintains that she did not create an iCloud

15   backup account using QQ.  She maintains that the only backup to

16   iCloud that she made, that she requested was on May 9 --

17   May 10th CNMI time.  And that the -- the extent of her use of

18   QQ was to communicate with friends of hers.  She maintains that

19   she has never asked anybody on her behalf to open up an iCloud

20   account with the QQ.com.

21             We did point out, Your Honor, to the Court that --

22             THE COURT:  Can I ask this question:  Based on what

23   we have so far with the cellphone that is in New York, was

24   there any physical evidence about a QQ account being used in

25   any way?  Actually even --

1          MR. SAN NICOLAS:  In New York?

2          THE COURT:  Well, the cellphone that was transmitted

3    to TLS.

4          MR. SAN NICOLAS:  Your Honor, we did highlight that

5    there was no information about a QQ account from Mr. Langton's

6    analysis.  Mr. Langton's pointed out only the Gmail account,

7    Your Honor.

8          THE COURT:  There's one by -- in fact, its Mr. Tao

9    Xing's Gmail account, was it not, that was found in the

10   reports?

11         MR. SAN NICOLAS:  No, Your Honor.  It was Ms.-- oh,

12   the -- the reference to another account was with respect to the

13   computer --

14         THE COURT:  Ah --

15         MR. SAN NICOLAS:  -- that was sent to --

16         THE COURT:  Sure.

17         MR. SAN NICOLAS:  -- to TransPerfect.

18         THE COURT:  That's right.  So it's a Tao Xing Gmail

19   account --

20         MR. SAN NICOLAS:  Yes.  Yes.

21         THE COURT:  -- for the computer?

22         MR. SAN NICOLAS:  Yes, computer.

23         THE COURT:  But not for the cellphone?

24         MR. SAN NICOLAS:  Not for the cellphone.

25         THE COURT:  Okay.

1          MR. SAN NICOLAS:  So what we pointed out in the

2     December 8th declaration was that the report from New York

3     really didn't -- didn't mention the QQ.com account.  Now, in --

4     I know Mr. Halegua's going to accuse me of testifying, but I'm

5     just going to repeat what -- what was stated to me.

6          THE COURT:  By whom?

7          MR. SAN NICOLAS:  By Ms. -- Ms. Cui.

8          THE COURT:  Okay.

9          MR. SAN NICOLAS:  That if you look at her phone,

10    one -- one app that you will see is a QQ.com application.  And

11    according to Ms. Cui, that -- that's the only way that if

12    you're to look at her phone, you would think that she used the

13    QQ.com because the application was on her phone.  Now, she's

14    never used it.  She doesn't use it.  It's on her phone.  And

15    she hasn't used it to backup any iCloud account.  And so what

16    would -- in the December 8th declaration that Ms. Cui

17    submitted, she highlighted the fact that even in Mr. Langton's

18    report, and it's attached again to his July -- July 25th or

19    July of this year, his initial report, that the Gmail.com, the

20    Gmail account, was linked to the iCloud account, not a QQ.com

21    account.  And so going back to Ms. Forbes, what may have

22    happened is that she saw the QQ.com application on her phone,

23    but we have no physical evidence to show that it was -- it was

24    linked to her iCloud.  The only evidence of the iCloud that we

25    are aware of, is the report by Mr. Langton, and it's not --

1   it's not referenced.  It's not linked to it.  The only

2   statement is from Ms. Fely Forbes, who did the backup on

3   May 10th.  But Ms. --

4           THE COURT:  But do we have a statement from Ms. Cui

5   that she does not have a QQ iCloud account?  Instead of a Gmail

6   iCloud account, is there a QQ iCloud account?  Gmail to access

7   iCloud versus QQ.com to access the iCloud?

8           MR. SAN NICOLAS:  So Ms. -- Ms. Cui had a QQ account,

9   and she used it only for communicating with her friend.  The

10  app on her phone was not used for any other purpose, but it was

11  just there.

12          THE COURT:  Okay.  You're repeating what you just

13  said and I heard it and understood it.  But my question is:

14  QQ.com allows for, like Gmail, it's a means of an account for

15  communication, like you just said.  My question is:  Was that

16  QQ.com account ever used to access and create an iCloud

17  account?

18          MR. SAN NICOLAS:  And her statement is no, she did

19  not use a QQ.com account to access iCloud.

20          The passwords that she gave to Mr. Langton, and to, I

21  believe, Ms. -- Ms. Forbes were Gmail accounts.  And a long

22  password.  I believe Mr. Langton stated that it wasn't

23  accessible using that password.  Eventually, we were able to

24  overcome the -- I guess, the -- a block in November.  But even

25  in July, he still had information on the iCloud account.  And

1    it's contained in his report.

2              THE COURT:  I'm sorry.

3              MR. SAN NICOLAS:  And it doesn't show QQ.com.

4              THE COURT:  Can you repeat that part?  I didn't

5    appreciate all that.

6              MR. SAN NICOLAS:  Yes, Your Honor.  If I may,

7    Your Honor.

8              THE COURT:  This is as to the QQ account again, okay.

9    And you're referring to which?

10             MR. SAN NICOLAS:  I'm going to -- I'm opening

11   Mr. Langton's report, Your Honor.

12             THE COURT:  He made several.  Which one?

13             MR. SAN NICOLAS:  So it would be Document 380,

14   Exhibit 3.

15             THE COURT:  Yes.  I have that.  And Exhibit 3 is a

16   Cellebrite extraction report?

17             MR. SAN NICOLAS:  Yes, Your Honor.

18             THE COURT:  And what about it?

19             MR. SAN NICOLAS:  I'm sorry, Your Honor, it's -- it's

20   the last -- Your Honor, if I -- if Your Honor could just give

21   me just a minute.  It's the last report, Your Honor.

22             THE COURT:  The last report made, the declaration,

23   you mean, made by Mr. Langton?

24             MR. SAN NICOLAS:  Yes, the last declaration,

25   Your Honor.

```
1              THE COURT:  Okay.  Yes, the -- ECF 380 was filed back
2     on August 2nd.
3              MR. SAN NICOLAS:  Yes, Your Honor.  If Your Honor
4     would recall, Mr. Langton did get access to the file -- or to
5     the iCloud in November.
6              THE COURT:  Yes.  After Mr. Lemons was sending us
7     down the subpoena route.
8              MR. SAN NICOLAS:  Yes, Your Honor.
9              THE COURT:  So you're looking for Mr. Langton's last
10    declaration?
11             MR. SAN NICOLAS:  Yes, Your Honor.
12             MR. HALEGUA:  I believe it's 459-1, Your Honor.
13             THE COURT:  Four, five, nine.  Thank you, Mr.
14    Halegua.
15             So that's a third-party witness Cui Lijie's status
16    report regarding her iCloud account.  So it's 459-3.
17             MR. SAN NICOLAS:  Yes, Your Honor.  If Your Honor
18    could --
19             MR. HALEGUA:  I believe -- I believe dash 1.
20             THE COURT:  Oh, okay.
21             MR. SAN NICOLAS:  459-1, paragraph four.  It refers
22    to the Gmail account, Your Honor.
23             THE COURT:  Okay.
24             MR. SAN NICOLAS:  G133211@gmail.com.
25             MR. HALEGUA:  This is November, right?  Are you
```

1   talking about the November 24th, 2021, declaration?

2           MR. SAN NICOLAS:  Yes, Your Honor.  Yes, Aaron.

3   Mr. Halegua.

4           THE COURT:  Okay.  So ECF 459 is Ms. Cui's status

5   report.  And at ECF 459-1 is the fifth declaration of

6   Mr. Jonathan Langton.

7           MR. SAN NICOLAS:  Yes, Your Honor.

8           THE COURT:  And the paragraph number you're referring

9   to, is it paragraph 7?

10          MR. SAN NICOLAS:  No, Your Honor, paragraph 4.

11          THE COURT:  Four.

12          MR. SAN NICOLAS:  That is the Gmail account --

13          THE COURT:  Correct.

14          MR. SAN NICOLAS:  -- that Mr. Langton used to access

15  it, Your Honor.

16          THE COURT:  Yes.  That's what -- we're not talking

17  about a Gmail address to access an iCloud account; the question

18  is a QQ account.

19          MR. SAN NICOLAS:  Yes, Your Honor.  If Your Honor

20  could refer to Document 380 again.

21          THE COURT:  Yes.

22          MR. SAN NICOLAS:  This is Exhibit Number 3.  About

23  two-thirds down in the Cellebrite report.

24          THE COURT:  Yes.

25          MR. SAN NICOLAS:  It's a cell -- it says:  Extraction

1    report, Apple iPhone.  Under device information name, if you go

2    about halfway down, it says, "Apple ID" --

3              THE COURT:  So --

4              MR. SAN NICOLAS:  -- and the value shows the Gmail

5    account.

6              THE COURT:  Right.

7              MR. SAN NICOLAS:  And this was from the -- the July

8    report, Your Honor.  And it says: iCloud account present; it

9    said true.  And so what -- what we're saying, Your Honor, is

10   that even as far back as July when this report was created, and

11   more recently, in the fifth declaration from December -- I'm

12   sorry, from November -- it shows that the iCloud is linked or

13   the Apple ID is linked -- the Apple Cloud -- iCloud and Apple

14   ID are linked to the g133211@gmail.com, not a QQ.com account.

15             THE COURT:  This is the phone settings.  I mean,

16   basically, can someone else log on with their own account to

17   that device, such as a QQ account?  I mean, it's a phone's

18   setting for automatic, but you can always log off to one and

19   punch in another.  Yes?

20             MR. SAN NICOLAS:  I'm sorry, Your Honor, could you

21   please repeat it.

22             THE COURT:  So this device information regarding the

23   settings shows the Apple ID is set to Ms. Cui's Gmail account.

24             MR. SAN NICOLAS:  Yes, Your Honor.

25             THE COURT:  My point is:  Doesn't access to the

1    iCloud allow for the entry of another Apple ID account, such as

2    a QQ account, to, yet, access the iCloud from the same device,

3    but it's not part of the, shall we say, default settings?

4         Unless you're saying any and all Apple ID accounts

5    that's ever been used on this device is listed here as the

6    value.  I guess these are questions that more so Mr. Langton

7    and Mr. Estrellado would know.

8              MR. SAN NICOLAS:  Yes, Your Honor.

9              THE COURT:  I don't know.

10              MR. SAN NICOLAS:  I can only speak to -- 'cause all

11    the attorneys were present when we provided the Gmail

12    account --

13              THE COURT:  Right.

14              MR. SAN NICOLAS:  -- and password and were prompted

15    with the new, I guess, password or code, which had occurred, I

16    think, on November 17th.  And so from -- from my personal

17    knowledge, just having been present when we coordinated with

18    Mr. Estrellado and Mr. Langton was the only information that

19    was provided, was the Gmail account and the, I guess, Apple

20    gives a new verification code and -- and that was it.  There's

21    no QQ.com reference or information that was provided,

22    Your Honor.

23         And so what we're saying, Your Honor, is that Ms. --

24    Ms. Cui maintains that she never created an account using

25    QQ.com.  And just based on what I know, the only way that you

1    could access that iCloud account was if you had that Gmail

2    account and you had the -- the new phone.  Because even if you

3    gave the Gmail account, it would send a verification code to

4    the new phone.  So we were ready to receive it, and we gave it

5    to Mr. Langton.

6             THE COURT:  But did that answer my question which is:

7    Can another e-mail account, such as a QQ account, be used as an

8    Apple ID on this same device and not be picked up in this

9    analysis?

10            MR. SAN NICOLAS:  Again, I'm not an expert.  And I

11   think the experts are best to answer that, but question.

12            THE COURT:  And those are the --

13            MR. SAN NICOLAS:  I just know with respect to what I

14   observed on November 17, was only that Gmail account.

15            THE COURT:  I understand, Mr. San Nicolas.  Let's not

16   repeat the one that we understand.

17            MR. SAN NICOLAS:  Yes.

18            THE COURT:  Let's focus on what is not explained --

19            MR. SAN NICOLAS:  Yes.

20            THE COURT:  -- and how we can get that done.  I guess

21   one is to ask the experts.

22            MR. SAN NICOLAS:  Yes.

23            THE COURT:  And I -- there's a lot missing, and,

24   obviously, that is a frustration that I and Mr. Halegua are

25   saying.  All of this was supposed to be acted upon since the

1  filing back in July -- or it was June, when the -- the reports

2  were made.  And then we have, again, in August.  And you're

3  still trying to educate yourself, let alone an expert.

4          I think the bottom line is, you need to have your

5  expert be the one to speak --

6          MR. SAN NICOLAS:  Yes, Your Honor.

7          THE COURT:  -- and eliminate the possibilities.

8  Because unless they're eliminated, it's -- it's a fair reading

9  that she did have access to an iCloud account based on

10  testimony by an individual, Who, "I personally witnessed her

11  using a QQ account."

12          And it was at the initialization of her cellphone.

13  And this is all again on the cellphone.  We've distinguished

14  the computer and any other devices.

15          MR. SAN NICOLAS:  Yes, Your Honor.

16          THE COURT:  Okay.

17          MR. SAN NICOLAS:  If Your Honor requires an

18  evidentiary hearing of some sort, we will certainly contact

19  these experts to provide testimony in answer to Your Honor's

20  questions, Your Honor.

21          THE COURT:  Well, it looks like you need to go back

22  to your experts and get them to file the declarations, because

23  in this instance, it's sounding like there's a better

24  understanding of the way that ESI or technology works.  And

25  with this better understanding, there's now an acknowledgement,

1   at least, physical evidence, that has been identified is

2   credible to say that there was a backup done.  And the question

3   is:  Is this still available?

4          And this is on Ms. Cui's burden.  And given what she

5   has stated, her age and her lack of expertise in this area, it

6   is incumbent that the people around her that have, in fact,

7   tried to assist her, submit sworn declarations in order for the

8   Court to properly consider them as admissible evidence.  So

9   when -- when we have this report that says it was only showing

10  a Gmail account as the -- appears to be the default account, I

11  don't think it closes the opportunity for another account to be

12  used.  And if that other account can be used, why not use it in

13  front of your presence between yourself and your client,

14  Mr. San Nicolas, with your expert as an investigator to assist

15  you to confront it?  Because if you don't, then I can

16  reasonably conclude that an i -- third-independent eyewitness

17  saw a QQ account attached an Iaccount [sic] and this is her

18  area of expertise.

19          MR. SAN NICOLAS:  Yes, Your Honor.

20          THE COURT:  Apparently, all of this complicated,

21  technical part is sending us on a wild goose chase here to

22  identify, one, the fact that there is another ESI device which

23  is wherever that cellphone was backed up.

24          MR. SAN NICOLAS:  Uh-huh.

25          THE COURT:  And how, if it was backed up, basically,

1  who decided to delete most of it and why.  That needs to be

2  explained.  That is what we're looking for under penalty of

3  perjury.

4          MR. SAN NICOLAS:  Yes, Your Honor.

5          THE COURT:  And inasmuch as Mr. Halegua would

6  encourage me to make a decision today and find that -- Ms. Cui

7  in contempt because she has not adequately explained what

8  happened to all of this ESI, that at this point in time is

9  undisputed, existed at one point, meaning it was from the

10 cellphone to some other device, likely a computer, to back it

11 up and then do something with the same cellphone, should I say.

12 From the cell phone that is in New York, it was somehow

13 tendered to someone with an iTunes application to backup and

14 possibly restore the applications that were on the cellphone,

15 let alone the data.  Because now you're saying, "Well, it was

16 just to get the WeChat."  That's an application.  But the

17 information on it or the photos, I don't know if those are the

18 things that she also wanted or those were deleted.  But it's

19 undisputed at this point that there was a backup.  And if

20 that's the case, there has to be an explanation of where it is,

21 is it still accessible, and that needs to be tendered to the

22 third-party TLS to store.  Do you understand, Mr. San Nicolas?

23         MR. SAN NICOLAS:  Yes, Your Honor.

24         THE COURT:  And you agree?

25         MR. SAN NICOLAS:  Yes, Your Honor.

1          THE COURT:  That's the goal from the beginning.

2          MR. SAN NICOLAS:  That's the goal from the beginning,

3    Your Honor.  We're -- we're asking for an opportunity to find

4    where that -- where that is.  We have our suspicions, and we

5    will act on those suspicions, Your Honor.

6          THE COURT:  All right.

7          I know Mr. Halegua is not too eager to let this

8    linger any further for -- especially into the new year.  But,

9    Mr. Halegua, before I put anyone in jail, I give people an

10   opportunity to present the whole truth.  And if there's some

11   basis here to explain these things, I will give Ms. Cui one

12   last chance to properly answer it, not through counsel and

13   hearsay, but through admissible evidence.  Mr. San Nicolas,

14   you're going to need to get yourself primed up --

15         MR. SAN NICOLAS:  Yes, Your Honor.

16         THE COURT:  -- so you can be the conduit both for

17   your client, as well as your expert.  And then have your expert

18   reduce it to writing, so we, as in myself and opposing parties,

19   can have an opportunity to review the findings and then make a

20   decision.

21         MR. HALEGUA:  Your Honor, may I clarify something?

22         THE COURT:  Yes.

23         MR. HALEGUA:  I mean, I -- I just would like to say,

24   you know, of course, our first instinct is never that anyone

25   should be incarcerated for something.  I think we have been

quite patiently looking at a course of behavior that now spans literally 11 months, starting from Ms. Cui's deposition.  And, you know, I think we identified this QQ account months and months and months ago.  And, frankly, with all due respect to the Court, I don't see any meaningful difference between the conversation and colloquy with counsel that happened today and that which happened a week ago, and really one that happened months ago, where we very explicitly -- I really don't think we could be anymore clear that we are not looking for the content of her use of the QQ application.  That we are concerned about an Apple ID, you know, with the QQ.com address.  We literally are still hearing from Ms. Cui's side that she hasn't used the application and I have zero confidence after, you know, the second or third time going through this, that, you know, without -- I hate to be so Pavlovian about this, but without anything changing on the ground, I just don't see us getting a different response the third time.

        The other thing I wanted to point out is -- you know, so I think, first, again, I think it comes down to the burden.  And, again, it's not that we want to put Ms. Cui in jail.  I think a more significant fine would also be extremely appropriate.  I think the wisdom of the way that the contempt is ordered and established is, back in August Your Honor found Ms. Cui in contempt, right, and ordered her to, you know, disclose all ESI backups that exist.  She was held in contempt

back in August.  I think that what we're talking about is

sanctions continuing to accrue until she comes forward and

purges them, right, that's what creates the urgency.  That's

what creates the incentive, right, to move quickly.

I fear that the more, you know, chances we give her,

right, that is just time for delay.  I think the sanction

should happen now if she is -- if she is, as Mr. San Nicolas

represents, wholly dedicated to finding out the truth and

taking every action and acting on every suspicion, she can be

free of contempt by tomorrow, right?  All those declarations,

the effort, statements, the files that they need, right, they

can gather all things together, put together a very

comprehensive and persuasive explanation of all these things as

quickly as they want.  Nobody is standing in their way.

I'm sure Your Honor, if somebody didn't respond to a

subpoena, would sign that motion to compel.  We wouldn't oppose

it.  You would sign it the next day.  All of the balls are in

her court.  All of the tools are available to her.  It's just

the -- any sense of urgency or real feeling that she needs to

comply that is missing.

I also just need to point out:  In terms of

Fely Forbes, this sort of half suggestion by Counsel, right,

with any -- without any further sworn statements from Ms. Cui

or Mr. How Yo Chi who was there, you know, as if Ms. Fely

Forbes is, you know, making this up or confused, I just take

1    strong objection to.

2            I remind the Court of the pattern where we went on

3    this whole wild goose chase of Ms. Fely Forbes losing Ms. Cui's

4    SIM card, right.  How Yo Chi basically said under oath in a

5    declaration that that's what happened.  He gave her two cards.

6    Ms. Cui said she gave How Yo Chi two cards.  And that when they

7    came back from Fely Forbes, it wasn't there anymore, right.

8    And all of that turned out to be a lie, right.

9            Ms. Fely Forbes testified before this Court at a

10    hearing that Mr. San Nicolas was at, Clyde Lemons was at, two

11    experienced attorneys, talked about the QQ account.  If there

12    was any suspicion that she has made up this entire thing, they

13    had a chance to cross examine her and they didn't even contest

14    it or bring it up.  For the last four months, they've had a

15    chance to depose her.  Why haven't they deposed her and say:

16    Hey, you made up -- weren't you confused?  Didn't you make up

17    this whole thing about a QQ.com address?  Didn't -- aren't you

18    unaware of the difference between a QQ.com application and an

19    Apple ID?

20            They've had the ability if they really wanted to seek

21    the truth to do all of these things.  And for four months that

22    she's been in contempt already, she's done nothing.  And so I

23    just think that giving her more time without changing the

24    penalty or flipping the sanction that this penalty is going to

25    accrue until you take those steps that everyone knows you

1    should take.  I fear that we've already are going to be going

2    into 2022, but we're going to be going months and months into

3    '22, if, frankly, the pain is not felt or some urgency is not

4    felt by Ms. Cui.  I just think we've -- this week was too much

5    of a repeat of last week.

6          And despite what was very clear to me from the Court,

7    an expression of frustration and that something needs to

8    change.  But we literally got nothing new in terms of iTunes or

9    in terms of QQ.  I don't think we could say with a straight

10   face that based on their submissions we know anything more than

11   we did a week ago.  And so I fear that that is going to be the

12   pattern that just continues, as it has continued since August.

13         Thank you, Your Honor.

14         THE COURT:  Thank you, Mr. Halegua.

15         I share in your frustration.  I don't normally let

16   issues continue for so long in regards to making a decision.

17   When it's an issue of law, it's easy for me to make that

18   decision quickly and promptly.  Try to be as accurate,

19   obviously, but here we've got some complicated issue that I too

20   have been getting myself up to speed to clearly understand why

21   and how this all means and their impact is still some basis to

22   conclude that there is an outstanding ESI that has not been

23   appropriately identified and accessed, even though your concern

24   is, obviously, not the contents, because you can't even use the

25   contents, even if we accessed it.  The whole protocol is to

1    access and pour it into the third party.  But identify, access,

2    and pour it into the third party is the objective; not to open

3    it up and start looking into the contents before all of this is

4    either lost or too far back to be found.

5            But I hear your point that a lot of this could have

6    and should have been done sooner.  And whereas, the daily per

7    diem was very modest in my opinion, of the $200 per diem

8    because of my understanding of Ms. Cui's financial background.

9    And so I am at this point going to increase the daily per diem

10   to again push Ms. Cui to get all of this, basically, done in

11   the legal expectations of admissible evidence.

12           Mr. San Nicolas, that falls on you with declaration.

13   And have them, just as Plaintiffs had Mr. Langton review,

14   prepare the affidavit, and ready to testify.  You need to have

15   your expert, who you are relying on, be prepared to give me

16   this detail, to explain it for Ms. Cui, to make her explanation

17   reasonable, because it doesn't count -- come through counsel.

18   As you just admitted, you're not the expert.  I'm not the

19   expert.  So I need that information.

20           MR. SAN NICOLAS:  Yes, Your Honor.

21           THE COURT:  And I am going to, at this time, increase

22   the daily per diem.  Because I'm going to set this matter for a

23   final hearing next month, any and all efforts to meet, get

24   declarations, affidavits, depositions, you need to finish it

25   up, Mr. San Nicolas.

```
1          MR. SAN NICOLAS:  Yes, Your Honor.

2          THE COURT:  I'm giving you the benefit that since

3   last week, being given the holidays and other issues that one

4   week was not enough time for you to get all of this completely

5   set.  But as pointed out, at this point, Ms. Cui has already

6   been being sanctioned.  So as to this issue, it is a finding of

7   contempt that includes a possible jail term.  This is the last

8   order to show cause issue in this matter.

9          MR. SAN NICOLAS:  Yes, Your Honor.

10          THE COURT:  We resolved all the others.  The rose

11  gold cellphone.  All the -- the unpaid TLS invoice.  Now, we're

12  talking about two ESI data issue regarding the iTunes account

13  as well as a QQ account to an iCloud -- linked to an iCloud,

14  that's the last ESI backup data issue.

15          If this can't be resolved between now, and I'm

16  looking at January 27 -- let's see.  I got some motion hearings

17  at 9 o'clock already.  I'll move that one up to -- or to the

18  afternoon.

19          MR. SAN NICOLAS:  I'm sorry, Your Honor, did you?

20          THE COURT:  I'm looking -- I have another matter set

21  in the morning already.  I was going to set it for

22  January 27th, a Thursday.

23          MR. SAN NICOLAS:  Would it be in the afternoon,

24  Your Honor?

25          THE COURT:  And I'm going to set it for -- oh, I have
```

1    another matter at 9 a.m.  So I'll move that maybe for about an

2    hour.

3            So we'll -- we'll stay with the 8:30, but I'll move

4    the other matter that's currently set for 9 for a later time in

5    the morning.

6            MR. SAN NICOLAS:  Your Honor, can I just ask, is it

7    January 27 at 8:30?

8            THE COURT:  Yes.

9            MR. SAN NICOLAS:  Thank you.

10            THE COURT:  January 27, 2022, at 8:30 a.m.  This

11    will be, basically, an evidentiary hearing, possibly, on the

12    pending issue of Ms. Cui's contempt -- the Court's finding of

13    contempt of Ms. Cui in regards to the ESI backup data that's

14    still lingering pertaining to the iTunes backup, as well as an

15    access to -- potential access to a QQ iCloud account.

16            MR. SAN NICOLAS:  Thank you, Your Honor.

17            THE COURT:  And I think it's very telling,

18    Mr. San Nicolas, that you need to get all the details clarified

19    with yourself and your client and your expert.

20            When Ms. Cui says, "Well, I just wanted them to fix

21    it," I don't need to know the details.

22            Well, then you need to get someone else to break it

23    down because now her definition and ours here in Court of:

24    Well, you may have said "fix it," but what we're looking for is

25    ESI data --

1          MR. SAN NICOLAS:  Yes --

2          THE COURT:  -- and there's evidence that somebody

3    made a backup.

4          MR. SAN NICOLAS:  Yes, Your Honor.

5          THE COURT:  So all of these needs to be resolved.  I

6    don't intend and I don't anticipate this matter to go beyond

7    January 2022 on this limited issue.  I will make that a clear

8    point, Mr. Halegua.

9          And as to the daily sanctions, to ensure that we get

10   this finalized, I am going to increase the daily per diem if

11   you can get all of this resolved.  I'm going to increase it to

12   $1,000 a day.

13         This needs to be acted on promptly.  It's been

14   months.  And seeing it from, shall we say, our perspective,

15   meaning the individuals who have been with the case since its

16   inception, it is frustrating.

17         Mr. San Nicolas, you came on board, was it in,

18   August, September?

19         MR. SAN NICOLAS:  Your Honor, I was local counsel

20   beginning, I believe, July.

21         THE COURT:  July.

22         MR. SAN NICOLAS:  But I came on board as the lead in

23   November 8th.

24         THE COURT:  There's a lot.  And as you can see from

25   the March incident, March 2022, the June report, and then you

1    came on board in July, and this has been ongoing.  So it's been

2    taxing on both Plaintiffs and the Court.  If it's going to tax

3    us, then there has to be a basis to convince Ms. Cui to get

4    this all resolved.  And the daily per diem that will be

5    increased will begin tomorrow.

6           Because the prior sanction was at two hundred.

7           MR. SAN NICOLAS:  Two hundred.

8           THE COURT:  Now, starting tomorrow.

9           If you can get all of this done in the next week or

10   two, get it done, get it filed.

11          MR. SAN NICOLAS:  Yes, Your Honor.

12          THE COURT:  There's a lot of incentive here, because

13   I really would rather avoid any -- imposing any jail term

14   because I believe there is a way to get this resolved short of

15   that.  But it's not by delaying, delaying, delaying.  And on

16   our perspective, that's what's -- that's what we see, and it's

17   going to come to an end in January.

18          All right.  That is the order.  We'll see you all

19   next year.

20          MR. HALEGUA:  Your Honor, may I just make a --

21          MR. SAN NICOLAS:  Thank you, Your Honor.

22          MR. HALEGUA:  -- clarifying point, Your Honor?

23          THE COURT:  Yes.  Mr. Halegua?

24          MR. HALEGUA:  Thank you.  Two small things:  One is,

25   I think, we keep using the term "iTunes backup," and I think

1  just for the sake of clarity, we don't want to -- just want to

2  know if at some point one backup was created somewhere, also an

3  explanation of the fact that there was this initialization,

4  right, which means the phone was wiped clean and that data

5  was -- not just: I didn't have anyone back up the phone,

6  that's great. But, also, who put stuff onto the phone, right,

7  and where did that come from? And I -- just to avoid any

8  cuteness, I think that just needs to be clear, is the first

9  point.

10              THE COURT: Okay. I understand your point,

11 Mr. Halegua. Thank goodness I can actually follow that --

12              MR. SAN NICOLAS: Your Honor --

13              THE COURT: -- Mr. San Nicolas, I'm pretty sure you

14 can follow that.

15              MR. SAN NICOLAS: -- if Mr. Halegua could repeat. I

16 mean, I'm sorry. I was --

17              THE COURT: This whole thing.

18              MR. SAN NICOLAS: -- listening to my client and

19 didn't catch --

20              THE COURT: All right. So, Mr. San Nicolas --

21              MR. SAN NICOLAS: -- the last maybe 30 seconds.

22              THE COURT: Okay. His concern -- Mr. Halegua's point

23 is not to be narrow, but to be explicit and be clear that it's

24 actual broadly. When I say, "iTunes backup," it's not just the

25 cellphone was tendered and then backed up, and that's the

1    evidence that we need to clarify -- or Ms. Cui needs to

2    clarify.  It's:  The cellphone was tendered to someone who used

3    an iTunes application and somehow data was backed up, but

4    somehow also that same cellphone was wiped clean, and then

5    there's some installation of certain applications.  So in other

6    words, the full usage --

7            MR. SAN NICOLAS:  Yes.  Understood, Your Honor.

8            THE COURT:  -- of iTunes, not just the retrieving and

9    backing up of data, but everything about the, I guess, it could

10   have been that 20 minutes, could be.  What happened?  I mean --

11           MR. HALEGUA:  Yes, Your Honor.

12           THE COURT:  -- there's so many scenarios that I

13   already think of saying, "Well, I just want it to work.  If it

14   means delete everything, get it started again so I can just get

15   using it," I don't know.  And that's what Mr. Halegua

16   previously mentioned.

17           But, yes, the scope of this iTunes backup with

18   explanation, it's not just literally the backup of the data

19   from the cellphone, but also what happened after the data was

20   backed up; was it somehow transferred somewhere else and then

21   the old cellphone was restored and that's the one that went to

22   New York.  I want to know the details.

23           And, basically, whoever -- whoever the individual is,

24   this technician, apparently, could be Mr. Chen, if he's the one

25   who did so, then he needs to prepare both a declaration,

1    possibly make himself available here.

2              MR. SAN NICOLAS:  Yes.

3              THE COURT:  Because I sense that we're going to be

4    asking more questions.

5              Do you understand, Mr. San Nicolas?

6              MR. SAN NICOLAS:  Understood, Your Honor.

7              THE COURT:  And was I clear enough, Mr. Halegua,

8    about the point that you wanted to make?

9              MR. HALEGUA:  Yes.  Absolutely, Your Honor.

10             THE COURT:  All right.

11             MR. HALEGUA:  And second, was just procedurally, you

12   know, again, so we're not sort of -- us and the Court are not

13   blindsided with the presentation of evidence on that day and

14   forced to kind of scurry to respond without the advantage of

15   any preparation.  I look to the Court's guidance as well, but

16   I'm thinking something like prior, you know --

17             THE COURT:  Deadline.

18             MR. HALEGUA:  -- fourteen- or ten-days prior --

19             THE COURT:  Okay.

20             MR. HALEGUA:  -- to the hearing, all declarations be

21   submitted, all witnesses be identified, you know, if there's

22   deposition --

23             THE COURT:  All right.

24             MR. HALEGUA:  -- transcript, they should be

25   submitted.

 1          THE COURT:  I hear your point.  I hear your point.

 2   So the request is prior to the hearing, set a deadline for some

 3   of the filings so that both the Court and the opposing party

 4   has an opportunity to review and prepare.  Said --

 5          MR. SAN NICOLAS:  Understood, Your Honor.

 6          THE COURT:  So --

 7          MR. SAN NICOLAS:  Similar to our earlier -- our

 8   October evidentiary hearing, we'll -- we'll be providing -- I

 9   mean, we would expect --

10          THE COURT:  I'm setting a deadline of two weeks prior

11   to the hearing, so that would be January 14th, apparently, if

12   the hearing date is on the twenty -- I said 27th, so that would

13   be January 13; so that's a deadline for Ms. Cui to file her

14   report, her affidavits, her declaration, her list of witnesses,

15   her exhibits.  Share it with opposing counsel and the Court,

16   that way, if there's something objectionable by the Plaintiff,

17   that Plaintiff -- Plaintiffs' counsel can point out, then they

18   will get that opportunity about a week, I guess or so.

19          And if you need more time, you should at least

20   consult with opposing counsel and look at what you can tender

21   within that two weeks.  With a thousand dollars a day, I can

22   make things move.  The sooner it's purged, the sooner that all

23   of this will stop.

24          Are we clear, Mr. San Nicolas?

25          MR. SAN NICOLAS:  Yes.  Yes, Your Honor.

1          THE COURT:  So that is the additional deadline:

2     Filings to be made two weeks prior to the hearing, which, in

3     this instance, would be January 13, 2022.

4          And then to the extent the Plaintiffs will provide

5     the Court any reply, I'm going to set one week, that way I get

6     to see your point of view, as well as, Mr. Halegua and

7     Mr. Berline.  And then if there's any other issues to be

8     resolved, we'll have it at the hearing.  But, hopefully, all

9     the filings can make it a little bit more crystal clear.  We'll

10    learn some more about ESI.

11          All right.  At this point, we're going to recess.

12          Happy New Year to you all, and please be safe.

13          All right.  Thank you.

14          MR. YUMUL:  Thank you, Your Honor.

15          THE CLERK:  Court is in recess.

16          MR. WEINER:  Thank you, Judge.

17          THE INTERPRETER:  Thank you, Your Honor.

18          THE CLERK:  Thank you to Counsel.

19       (The proceedings concluded at 10:21 a.m.)

20

21

22

23

24

25

1                                    CERTIFICATE

2

3          I, HEIDI M. DOOGAN, Official Court Reporter, in the United

4    States District Court for the Northern Mariana Islands, hereby

5    certify that pursuant to Section 753, Title 28, United States

6    Code, the foregoing is a true and correct transcript of the

7    stenographically-reported proceedings held in the

8    above-entitled matter and that the transcript page format is in

9    conformance with the regulations of the Judicial Conference of

10   the United States.

11

12   Date:   January 8, 2022

13

14

15                                    /s/ Heidi M. Doogan

16                                    Heidi M. Doogan, RPR
                                      U.S. Court Reporter
17

18

19

20

21

22

23

24

25